1  Stephen C. Hinze (State Bar No. 131787)
   STEPHEN C. HINZE, ATTORNEY AT LAW
2  217 Civic Center Drive, Suite 10
   Vista, CA 92084
3  Tel:  760-689-0705
4  Fax: 760-454-2427

5  Bankruptcy Counsel
   for Debtor in Possession
6

7

8                    UNITED STATES BANKRUPTCY COURT

9                     SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  IN RE: | Case No.: 17-06078-MM11 |
| 12 | Chapter 11 |
| 13  CORE SUPPLEMENT TECHNOLOGY, INC. a California Corporation | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ENTRY OF (1) ORDER APPROVING STALKING HORSE, MARKETING AND OVERBID PROCEDURES, AND SETTING FINAL SALE HEARING; (2) ORDER APPROVING (A) SALE FREE AND CLEAR, (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
| 15  Debtor and Debtor in Possession | |
| | Judge:        Hon. Margaret M. Mann |
| | Dept :        1, Room 218 |
| | Hearing Date: February 22, 2018 |
| 21 | Time:         11:00 a.m. |

22

23     CORE SUPPLEMENT TECHNOLOGY, INC. a California Corporation, the debtor and

24  debtor-in-possession in the above-captioned Chapter 11 case ("Debtor"), hereby files this

25  memorandum of points and authorities in support of its Motion for an Order Approving Stalking

26  Horse, Marketing and Overbid Procedures, and Setting Final Sale Hearing; (2) Order Approving

27

Page **1** of **12**

(A) Sale Free and Clear, (B) Assumption and Assignment Of Executory Contracts and Unexpired Leases; and (C) Related Relief.

## I.

## INTRODUCTION

With this motion, the Debtor respectfully requests that the Court enter two orders:

(1) The first order ("Bid Procedures Order") to be entered immediately following the February 22, 2018 hearing on this Motion, approving an interim operating agreement, approving Simpson Labs as a stalking horse bidder, approving the marketing and sale procedures described herein, authorizing the Debtor to implement them; and setting a date for hearing on the sale with overbidding.

(2) The second order ("Sale Order") to be entered following a subsequent hearing, at which hearing the Court will conduct an auction of the assets and approve the winning bidder (and possibly a backup bidder).

Good cause exists to authorize the Debtor to utilize a Stalking Horse, seek approval of marketing and overbid procedures and to obtain a final sale hearing for a sale free and clear of liens and encumbrances and to authorize the assignment and assumption of executory contracts and unexpired leases, and such further relief as the Court may grant.

This Debtor manufactures and sells nutritional supplements in an extremely competitive market with razor thin profit margins.  The Debtor has been unable to achieve the manufacturing efficiencies necessary to generate a profit in this industry.  Although the Debtor has, since the inception of this bankruptcy case, been able to increase collections of existing accounts receivable and increase cash on hand it has been unable to generate a profit from operations, and since the petition date, has seen a general decrease in monthly sales.  Paradoxically, the last month has been one of the Debtor's best months for new orders, receiving approximately $1.35 million in new customer orders.  However the Debtor is unable to pay for the raw material or hire the staff necessary to fulfill the new orders. The analysis and income projections prepared

1  by the newly appointed Chief Restructuring Officer, show that unless the business is sold
2  quickly the cash reserves generated by the recent successful collection efforts will be wasted
3  through the maintenance of ongoing operational expenses.  Analysis indicates that if sold
4  promptly, the Debtors current assets and going concern value potentially allow for the full
5  payment of secured claims and administrative expenses, and provide a distribution to unsecured
6  creditors.
7  Because the manufacturing operations are so detrimental to the Debtor's financial
8  existence and because Simpson Labs, the proposed Stalking Horse Buyer, has the necessary
9  expertise and capacity to manufacture the products produced by the Debtor, the Debtor proposes
10 to enter into an Interim Operations Agreement (IA) as part of the sale procedures and Asset
11 Purchase Agreement with Simpson.  The IA preserves the Debtor's going concern value,
12 conserves current cash reserves, and maximizes the value of the current significant increase in
13 customer orders without requiring the Debtor to double its staff or purchase $1 million in raw
14 material.  Under the IA Debtor will complete all current work in process and reduce its staff to a
15 skeleton crew. To accomplish this Debtor will outsource manufacturing the new orders to
16 Simpson Labs.  Outsourcing means that Simpson will accept the cost of Debtor's manufacturing
17 team, provide manufacturing services, pay the rent for Debtors manufacturing building, pay the
18 utilities associated with the manufacture; Simpson will provide all raw material, manufacturing
19 capabilities ship the finished product to customers, bill customers and collect money due for the
20 new product.  Simpson will keep the collected accounts receivable in return for the manufacture.
21 If there is a profit it belongs to Simpson, if there is a loss that too belongs to Simpson and
22 Simpson will have no righto assert an administrative or other claim if the process results in a
23 loss. Debtor will have no right to recover the profit is one results from the process. This will
24 allow the Debtor to reduce its operating expenses, preserve existing cash, fulfill current orders
25 keeping customers happy, preserving going concern value and allowing the collection of
26 additional accounts receivable. It would also enable the Debtor to preserve existing assets and
27

1  gong concern value while the marketing and selling the business.

2      The Debtor believes that this procedure is the best possible method available to both
3  ensure fair sale proceedings, conducted on a level playing field for all prospective bidders and
4  preserve substantial value of the existing bankruptcy estate for creditors.

5  **II.**

6  **STATEMENT OF FACTS**

7  **A.**     **Background**

8      The Debtor was formed as a California corporation on May 25, 2012.  Since then, the
9  Debtor has been a corporation duly organized and existing under the laws of the State of
10 California. O'Dea Declaration, ¶ 3.

11     The Debtor maintains headquarters in Oceanside, California.  O'Dea Declaration, ¶ 4.It
12 formulates and manufactures nutritional supplements for its own account and for the special
13 order of its customers.  O'Dea Declaration, ¶ 5.The Debtor raised $300,000 from investors and
14 approximately $2.1 million in secured debt for the purchase of equipment and machinery and an
15 operating line of credit.  This secured debt was incurred to develop sufficient manufacturing
16 capacity to efficiently compete in the nutritional supplement market.  O'Dea Declaration, ¶ 6.

17 **B.**     **Lack of Profitability and the Bankruptcy Filing**

18     The Debtor has been unable to achieve profitability.  The Debtor's cash flow problems
19 required cut backs its business operations, including terminating many of its employees, further
20 impacting its ability to manufacture efficiently and exacerbating cash flow problems.  To meet
21 customer orders and collect outstanding accounts receivable, the Debtor has been selling raw
22 material and outsourcing manufacturing to Simpson Labs.  Through these efforts, the Debtor has
23 converted raw material into customer product, satisfied customer orders, and collected
24 substantial outstanding accounts receivable.  As of the filing of this motion, the Debtor has
25 approximately $700,000 on deposit in its DIP operating account.  However, the inefficiencies in
26 its manufacturing process remain.  The Debtor continues to lose money and is not a viable

27

manufacturing business. A sale of its assets will yield the greatest possible recovery for creditors. Feferman Declaration, ¶ 7.

On October 3, 2017 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is operating and managing its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. O'Dea Declaration, ¶ 8.

### C. Infighting Among the Board and Shareholders

As the Court is aware, the Debtor's Chapter 11 case was hampered by substantial disagreement among the members of the Board of Directors and the shareholders as to the direction the case should take and who should lead the Debtor through the case. O'Dea Declaration, ¶ 9.

On December 26, 2017 the Debtor's board of directors met and unanimously voted to engage Richard Feferman as its Chief Restructuring Officer to assist in the administration of the bankruptcy estate and expeditious sale of the business. O'Dea Declaration, ¶ 10.

On February 8, 2018, the Court approved the Debtor's retention of Mr. Feferman as CRO. This important step resolved the infighting among the board and shareholders, and hopefully paved the way for a successful sale of the Debtor's assets. O'Dea Declaration, ¶ 11.

### D. The Stalking Horse Offer from Simpson Labs

Simpson Labs has submitted a stalking horse offer ("Stalking Horse Agreement") to purchase the vast majority of the Debtor's assets in exchange for payment of $1,600,000, subject to overbid and Court approval. A true and correct copy of the agreement is attached to the Declaration of Mr. Feferman as Exhibit 2. The assets being sold include substantially all of the Debtor's equipment, supplies, inventory, vehicles, a 100 percent interest in a subsidiary, intellectual property, work-in-process, open orders, and accounts receivable. The sale includes certain equipment financed by Bank of America and the assumption of a building lease. The only assets of the Debtor not being sold are certain other leases, and avoidance actions under

Chapter 5 of the Bankruptcy Code. The agreement includes a process for the Debtor to fulfill current open customer orders thereby preserving going concern value and assisting in the collection of old and new accounts receivable. For full details on the sale, see the Stalking Horse Agreement attached as <u>Exhibit 2</u> to the Feferman Declaration.

### E. **Break Up Fee**

The Stalking Horse Agreement provides that Simpson Labs is entitled to a "Break Up Fee" of $80,000 (representing five (5%) percent of the purchase price) in the event that a sale of the subject assets closes to another over bidder). Such a scenario would require any successful over bidder to pay $100,000 more than the purchase price under the Stalking Horse Agreement – meaning that even after paying a $80,000 Break Up Fee to Simpson Labs, the bankruptcy estate would still enjoy an additional $20,000 in sale proceeds above that contemplated by the Stalking Horse Agreement.

### F. **Marketing of the Assets**

To date, in addition to the negotiations which led to Simpson Labs' stalking horse offer, the Debtor - through its Chief Restructuring Officer, Richard Feferman - has engaged in discussions with two other potential buyers. The two other buyers have made informal offers, neither of which was equal or superior to the stalking horse offer. Nonetheless, Mr. Feferman remains in contact with the two other buyers, in the hope that one or both of them decide to overbid. Feferman Declaration, ¶ 11.

In addition to the marketing described above, the Debtor proposes to market the assets directly to 50 other buyers and advertise the assets through the online listing services of businessforsa.e.com andbizbin.com. Feferman Declaration, ¶ 14.

Given the Debtor's rapidly deteriorating financial condition, the Debtor does not believe that it has the time, money or manpower to conduct a broader and more traditional marketing campaign, and that were it required to spend the time, money or manpower on such a campaign, it could threaten the success of the current process – a process which may result in payment in

full of Bank of America and administrative claims, and the possibility of a distribution to unsecured creditors, a result that seemed out of reach only two months ago. Accordingly, under the present circumstances, the Debtor believes that the marketing proposed herein is adequate and in the best interests of the Debtor. Feferman Declaration, ¶ 16.

### G. The Proposed Auction Procedures

The proposed procedures governing the auction are attached as Exhibit 3 to the Feferman Declaration. The procedures set forth the requirements for qualifying to bid at the auction; the amount of the deposit required ($100,000); the bid deadline (three days prior to the Sale Hearing; due diligence matters; the initial overbid increment ($100,000); the minimum amount of subsequent overbid amounts ($20,000); back-up bidder provisions; closing date (three business days following entry of the Sale Order); and related matters. For greater detail, see the proposed procedures attached as Exhibit 3 to the Feferman Declaration.

### H. Relief Requested

With this motion, the Debtor requests that the Court enter two orders:

(1) The Procedures Order, to be entered immediately following the February 22, 2018 hearing on this motion, approving Simpson Labs as a stalking horse bidder, approving the marketing and sale procedures described herein, and authorizing the Debtor to implement them, setting a date for the hearing on the sale and opportunity to overbid and waiving the 14 day stay imposed by FRBP 6004(h); and

(2) The Sale Order, to be entered following a subsequent hearing, at which hearing the Court will conduct an auction of the assets and approve the winning bidder (and possibly a backup bidder) and waiving the 14 day stay imposed by FRBP 6004(h).

### I. Service

The Debtor is serving a copy of this motion and all supporting papers on all of the following:

(1) All creditors listed on the master mailing matrix;

Memorandum Of Points And Authorities In Support Of Motion to Approve Sale Procedures 17-006078-11 MM11

(2) All equity holders;

(3) The United States Trustee;

(4) The Internal Revenue Service;

(5) The Securities Exchange Commission;

(6) Parties requesting special notice; and

(7) Stalking Horse Bidder and counsel.

## III.

## AUTHORITY

**A.  The Standard for Asset Sales - Section 363(b)**

Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1).  The standard for approval of a sale of property of the estate under Section 363 is whether there exists some articulated business justification for the proposed transaction, and whether the sale is in the best interests of the debtor, creditors and equity holders.  *See In re Walter*, 83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) (*quoting In re Continental Airlines, Inc*., 780 F.2d 1223, 1226 (5th Cir. 1986).  In making such a determination, courts may look to the following factors:

    a. Whether the assets are increasing or decreasing in value;

    b. Whether the proposed sale will effectuate a *de facto* reorganization;

    c. Whether the assets have been given adequate marketing; and

    d. Whether adequate and reasonable notice of the sale was given.

*See In re Work Recovery*, 202 B.R. 301, 303-04 (Bankr. D. Ariz. 1996); and *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991).

**B.  Procedural Requirements for Asset Sales - Rules 6004(f) and 2002(c)(1)**

Rule 6004(f) of the Bankruptcy Rules provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f).  A debtor is

Page **8** of **12**

Memorandum Of Points And Authorities In Support Of Motion to Approve Sale Procedures 17-006078-11 MM11

1  entitled to broad discretion in determining the manner of a sale, including whether to sell
2  property by public or private sale. *In re Frezzo*, 217 B.R. 985, 989 (Bankr. M.D. Pa. 1988)
3  (*citing In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985)).

4  Rule 2002(c)(1) of the Bankruptcy Rules provides that:

> [N]otice of a proposed use, sale, or lease of property… shall include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections.

Fed. R. Bankr. P. 2002(c)(1).

**C.    Sales "Free and Clear" - Section 363(f)**

Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interests in such property of an entity other than the estate, only if–
>
>   (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
>   (2)  such entity consents;
>
>   (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
>   (4)  such interest is in bona fide dispute; or
>
>   (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money judgment of such interest.

11 U.S.C. § 363(f).  Section 363(f) is written in the disjunctive.  Therefore, satisfaction of any one of the five conditions is sufficient to sell property free and clear of any interests in such property.

**D.    Assumption and Assignment – Section 365**

Section 365 of the Bankruptcy Code; Provides:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

The Asset Purchase Agreement contemplates the assignment and assumption of responsibility for a building lease and specifically identified equipment leases.

**E.     Orders Necessary and Appropriate - Section 105**

Section 105(a) of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

## IV.

## ARGUMENT

This Debtor was formed May 25, 2012. Since that time the Debtor has been unable to realize profitability. Since the inception of this bankruptcy case, the Debtor has increased collections of existing accounts receivable resulting in an increase of cash on hand, but it has generally realized a monthly decrease in sales. Paradoxically, the Debtor attained an increase in customer orders lase month selling approximately $1.3 million. However the Debtor has neither the cash or credit necessary to acquire the raw material, nor the staff necessary to fulfill these new customer orders.

On February 8th 2018 the Court confirmed the appointment of Richard Feferman as Chief Restructuring Officer. Mr. Feferman has been working with the Debtor since December 26, 2017. Mr. Feferman is a financial analyst with extensive experience in distressed businesses. His analysis of the Debtor indicates on October 31, 2017 the Debtor had a book value of $3,559,106.15. To date the Book Value has fallen to $2,683,747.34. Debtor's management estimates the liquidation value of the assets is substantially lower, an estimated gross liquidation value of $1,034,000.00. For the 11 months ending November 30, 2017 average sales were approximately $1,127,000 per month, but since filing the Bankruptcy, due to loss of key

Memorandum Of Points And Authorities In Support Of Motion to Approve Sale Procedures 17-006078-11 MM11

personnel and additional workloads on management sales have average less than $700,000 per month.

The analysis and income projections prepared by the Chief Restructuring Officer show daily operational expense is eating the Debtors remaining value on a daily basis, and although the debtor currently has close to $700,000 in cash deposits, unless something is done immediately to reduce operational expenses, the debtor will run out of cash in less than a month. Current analysis shows the business has valuable assets and going concern value, which if preserved and sold promptly will potentially allow for the full payment of secured claims, administrative expenses and a distribution to unsecured creditors.

The proposed Stalking Horse Buyer, has the necessary expertise and capacity to manufacture the products the Debtor sells. The Debtor proposes to enter into an Interim Operations Agreement (IA) as part of the sale procedures and Asset Purchase Agreement with Simpson. The IA preserves the Debtor's going concern value, conserves current cash reserves, and maximizes the value of the current significant increase in customer orders without requiring the Debtor to double its staff or purchase $1 million in raw material. It will also enable the Debtor to preserve existing assets and gong concern value while the marketing and selling the business. The Debtor believes that this procedure is the best possible method available to both ensure fair sale proceedings, conducted on a level playing field for all prospective bidders and preserve substantial value of the existing bankruptcy estate for creditors.

## V.

### CAUSE EXISTS TO WAIVE THE STAY
### IMPOSED UNDER RULE 6004(h) OF THE
### FEDERAL RULES OF BANKRUPTCY PROCEDURE

Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtor submits

that, once the Court enters both the Order Approving Sale Procedures and Marketing and the Sale Order, good cause exists to waive the 14-day stay imposed by Rule 6004(h).  Given the Debtor's cash flow difficulties, the Debtor needs to effectuate expeditiously close the sale.  The longer the Debtor operates, the more its cash will be drained.  Closing the sale as soon as possible will preserve as much cash to pay creditors as possible.  The Debtor knows of no party that would be prejudiced by the waiver of the stay.

## VI.
## CONCLUSION

Based on the foregoing, the Debtor requests that the Court:

(1) Enter the Procedures Order immediately following the February 22, 2018 hearing on this motion, approving Simpson Labs as a stalking horse bidder, approving the marketing and sale procedures described herein, authorizing the Debtor to implement them, and setting a date for the sale confirmation and overbidding hearing;

(2) Enter the Sale Order following a subsequent hearing, at which hearing the Court will conduct an auction of the assets and approve the winning bidder (and possibly a backup bidder);

(3) Waiving the 14 day stay imposed by FRBP 6004(h); and

(4) Granting such other relief as the Court may find just and proper.

Date:  February 19, 2018                              /s/ Stephen C. Hinze
                                                     Stephen C. Hinze, Attorney for
                                                     Debtor and Debtor in Possession