1  Stephen C. Hinze (State Bar No. 131787)
   STEPHEN C. HINZE, ATTORNEY AT LAW
2  217 Civic Center Drive, Suite 10
   Vista, CA 92084
3  Tel:  760-689-0705
   Fax: 760-454-2427
4

5  Bankruptcy Counsel
   for Debtor in Possession
6

7

8              UNITED STATES BANKRUPTCY COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11 IN RE:                          )  Case No.: 17-06078-MM11
                                   )
12                                 )  Chapter 11
                                   )
13 CORE SUPPLEMENT TECHNOLOGY,     )  DECLARATION OF RICHARD
   INC. a California Corporation   )  FEFERMAN IN SUPPORT OF MOTION
14                                 )  FOR ENTRY OF (1) ORDER APPROVING
                                   )  STALKING HORSE, MARKETING AND
15                                 )  OVERBID PROCEDURES, AND SETTING
        Debtor and Debtor in Possession )  FINAL SALE HEARING; (2) ORDER
16                                 )  APPROVING (A) SALE FREE AND
                                   )  CLEAR, (B) ASSUMPTION AND
17                                 )  ASSIGNMENT OF EXECUTORY
                                   )  CONTRACTS AND UNEXPIRED LEASES;
                                   )  AND (C) RELATED RELIEF;
18                                 )  MEMORANDUM OF POINTS AND
                                   )  AUTHORITIES IN SUPPORT THEREOF
19                                 )
                                   )  Judge:      Hon. Margaret M. Mann
20                                 )  Dept :      1, Room 218
                                   )  Hearing Date: February 22, 2018
21 _____     )  Time:       11:00 a.m.

22

23     I, Richard Feferman, declare and state as follows:

24     1.    I am the Chief Restructuring Officer of Core Technology, Inc., the debtor and

25 debtor-in-possession in the above-captioned Chapter 11 case ("Debtor").  The matters set forth

26 herein are within my own personal knowledge, except as to those matters stated upon

27

Page **1** of **6**

1    information and belief, and as to those matters I believe them to be true.  If called upon as a

2    witness, I could and would testify competently thereto.

3         2.        I began working with the Debtor on December 26, 2017, reviewing business

4    operations, financial reports, meeting with employees and analyzing business operations. The

5    Debtor has been unable to achieve profitability. The Debtor's deepening losses have required cut

6    backs its business operations and many of its employees have left.  This has impacted its ability

7    to manufacture efficiently and exacerbated cash flow problems.  To meet customer orders and

8    collect outstanding accounts receivable the Debtor has been selling raw material and outsourcing

9    a portion of its manufacturing to Simpson Labs.  Through these efforts Debtor as converted raw

10   material into customer product, met customer orders and collected substantial outstanding

11   accounts receivable.  At the time of this declaration the Debtor maintains slightly more than

12   $700,000 on deposit in its DIP operating account.  However, the inefficiencies in its

13   manufacturing process remain and the debtor is not a viable manufacturing business.

14        3.        I have analyzed the Debtor's financial records and interviewed management. My

15   investigation reveals that the Debtor has been accumulating cash collecting accounts receivable

16   and minimizing the replacement of raw material inventory. Comparing the book values for total

17   inventory and accounts receivable set forth in the Debtor's year-end financial statements for

18   2016 and 2017 will illustrate the Debtor's strategy for accumulating cash.  All data in the chart

19   below is from the Debtor's financial statements unless noted.

| Item | 12/31/16 | 12/31/17 | Most Recent Data |
|---|---|---|---|
| Accounts Rec | 1,992,483.92 | 1,326,353.32 | 853,207.24 |
| Inventory | 2,666,583.68 | 1,544,920.28 | 1,207,035.90 |
| Cash | 370,101.81 | 563,473.57 | 742,654.77 |
| | | | |
| Sources of Information | | | |

Feferman Declaration In Support of Motion to Approve Sale Procedures          17-006078-11 MM11

| Inventory (2/9/18) Joseph O'Dea | | | |
|---|---|---|---|
| Cash (2/8/18) Per Debtor's Accounting Staff | | | |

4.      Disturbingly, Debtor's management estimates the Liquidation Value of its assets to be substantially lower, an estimated gross Liquidation Value of $1,034,000.00. See chart below:

| Approximate Cash on hand | $742,000.00 |
|---|---|
| Inventory (Management est. $100 to $200k | $200,000.00 |
| Accounts Receivable (Management est. of collectable amount if manufacturing suspended) | $200,000.00 |
| Estimated Gross Liquidation Value | $1,142,000.00 |

5.      Debtors sales have deteriorated since filing the Bankruptcy.  For the 11 months ending November 30, 2017 average sales were approximately $1,127,000 per month, but since filing the Bankruptcy, sales have average less than $700,000 per month. Paradoxically, customer orders over the last month have increased to approximately 1.35 million dollars.  This creates yet another problem for the debtor.  The debtor does not have the cash or credit to purchase the raw material nor the staff or manufacturing capability necessary to fulfill the new orders.

6.      Daily operational expenses are consuming the Debtors remaining value on a daily basis, and although the debtor currently has approximately $700,000 in cash deposits, unless something is done immediately to reduce operational expenses, the debtor will run out of cash.

Feferman Declaration In Support of Motion to Approve Sale Procedures          17-006078-11 MM11

1  The Debtor cannot sustain operations. Staff reports that inventory is insufficient and although on

2  the books for $1,207,035.90 by last count, the remaining items are odds and ends of little use,

3  "remnants" worth perhaps $100,000.00 to $200,000.00. Additionally, the remaining staff is

4  sufficient only to complete a few remaining orders that the Debtor is completing in-house.

5  Ramping up production to the level required to fill the open orders on the Debtor's books will

6  require more cash than the Debtor has. The Debtor's production manager and I have examined

7  this problem and we estimate that manufacturing these orders will result in negative cash

8  outflows of more than $800,000.000 during the next 30 days. See attached Exhibit 1 "Pro Forma

9  Profit and Loss Ramp-up Month 1".

10      7.      My analysis indicates that an immediate sale of Debtors assets will yield the

11  greatest possible recovery for creditors.

12      8.      I have participated in the negotiation of an Asset Purchase Agreement between

13  the Debtor and Simpson Labs.  A true and correct copy of the agreement is attached to this

14  Declaration as Exhibit 2.  The agreement contains an Interim Operating Agreement (IA) that

15  allows the Debtor to continue operating and collecting current accounts receivable, while shifting

16  manufacturing costs and risk away from the Debtor. The IA allows the Debtor to outsource

17  manufacturing of new orders to Simpson.  Outsourcing means that Simpson will take on the all

18  costs of manufacturing and distributing the outsourced work, the cost of material, the cost of its

19  manufacturing staff, the rent and utilities for the Debtor's manufacturing facility, and the cost of

20  distribution for the finished product, billing and collection the accounts receivable generated

21  from that manufacturing work.  If there is a loss Simpson bears the loss without right to assert

22  any claim against the estate, administrative or otherwise.  If there is a profit, Simpson keeps it

23  without the obligation to return it to the debtor, this is the cost and benefit of outsourcing

24  manufacturing, all risk shifts to Simpson.  This preserves the Debtors current cash position and

25  greatly reduces the cash burn related to operations. It also preserves the Debtor's going concern

26  value, and makes it possible to continue collecting accounts receivable.

27

Feferman Declaration In Support of Motion to Approve Sale Procedures          17-006078-11 MM11

1      9.     Attached as <u>Exhibit 3</u> to this declaration are the proposed Sales Procedures to be

2  used during marketing and qualification of acceptable bidders.

3      10.    In opting to include the IA in the Asset Purchase Agreement I had to consider

4  whether shutting down the business and selling only assets, continuing operations and incurring

5  the continued cash melt down associated with those operations or the possible chilling effect of

6  outsourcing all manufacturing to Simpson would be more beneficial to the creditors in the case.

7  It seemed that continuing operations and eliminating the cash burn associated with operations

8  would be the most beneficial.  Even if Simpson was given operational status, it should not

9  materially affect bidding by truly viable purchasers.  It seemed any bidder with the appropriate

10  cash and manufacturing capacity should be able to step into Simpson's shoes and take over

11  ongoing operations.

12      11.    I have also been in contact with two other parties who have indicated interest in

13  purchasing the Debtor's assets.  I have disclosed and presented to them the same offer and

14  options that Simpson has agreed to accept.  Both parties have withdrawn their interest, however I

15  continue contact with them and will give them the opportunity to bid, should they qualify and

16  reassert interest in acquiring the Debtor.

17      12.    The proposed Asset Purchase Agreement between Simpson and the Debtor

18  provides that Simpson Labs, upon approval by the Bankruptcy Court, will be responsible for

19  manufacturing and distributing new orders pending the final sale.  Simpson will acquire all the

20  necessary raw material, manufacture the product, take on the expense obligations of manufacture

21  including Debtor's building rent, staffing for manufacture, manufacturing utility expense,

22  distribution expense and all other expenses associated with the manufacture and distribution of

23  new orders. This action will generally solve the Debtor's problem of operational expenses

24  consuming existing current assets, especially cash and provide for the preservation of going

25  concern value.

26

27

Feferman Declaration In Support of Motion to Approve Sale Procedures       17-006078-11 MM11

1   13.   The details of the IA are set forth in the Asset Purchase Agreement. This

2   agreement allows the Debtor to maintain control of its business, continue billing and collecting

3   revenue, maintain customer relations and preserve going concern value while reducing

4   operational expense and risk of further loss. While it is not possible to guarantee a positive

5   result, the probability of a more favorable result for creditors lies in the continued operation of

6   the business with its associated preservation of cash and going concern value.

7   14.   In addition to discussing an asset sale with Simpson Labs and two other parties

8   mentioned above I will market directly to at least 50 other buyers and advertise the Debtor's

9   assets through the online listing services businessesforsale.com and bizbin.com.

10   15.   All due diligence information will be supplied to interested bidders promptly

11   upon their execution of an appropriate Nondisclosure Agreement. A true and accurate copy of

12   the Nondisclosure Agreement is attached to this Declaration as Exhibit 4.

13   16.   Given the Debtor's rapidly deteriorating financial condition, the Debtor does not

14   believe that it has the time, money or manpower to conduct a broader and more traditional

15   marketing campaign, and that were it required to spend the time, money or manpower on such a

16   campaign, it could threaten the success of the current process – a process which may result in

17   payment in full of Bank of America, and the possibility of some distribution to administrative

18   claimants and unsecured creditors; a result that seemed out of reach only two months ago.

19   Accordingly, under the present (difficult) circumstances, the Debtor believes that the marketing

20   proposed herein is adequate and in the best interests of the Debtor.

21   I declare under penalty of perjury under the laws of the United States of America that the

22   foregoing is true and correct.

23   Executed this 19th day of February 2018 at San Diego, California.

24   

25   Richard J. Feferman

26   

Page 6 of 6

Feferman Declaration In Support of Motion to Approve Sale Procedures         17-006078-11 MM11

# Exhibit 1
# Pro Forma Calculations

Estimate Subject to Change

Pro Forma Profit and Loss
Ramp-up Month 1

| Column1 | Column2 Column3 |
|---|---|
| | 3/1/18 |
| REVENUE: | |
| Contract Mfg Revenues | 1,000,000 |
| Revenues - Encapsulation | 350,000 |
| Revenues - Raw Material Sales | 0 |
| Research and Development Revenues | 0 |
| Shipping & Handling Revenue | 0 |
| Warehousing and Fufillment Revenue | 0 |
| Other Revenues | 0 |
| Sales Discounts | 0 |
| Total Revenue | 1,350,000 |
| | |
| COS: | |
| COS-Contract Mfg | 900,000 |
| COS-Encapsulation | 315,000 |
| COS-Research and Development | 400 |
| Rounding Difference from Mfg | 0 |
| Packaging (fees) | 0 |
| Shipping and Freight | 60,000 |
| Lab/QC Supplies | 5,000 |
| MFG Supplies | 30,000 |
| Shipping and Packaging Supplies | 20,000 |
| COS-Pallet Storage | 1,643 |
| QC and Testing Sublet | 60,000 |
| Sublet Other | 949 |
| Direct Labor | 30,000 |
| Direct Temp Labor Cost | 200,000 |
| Direct Labor Cost | 0 |
| COS - Commission | 0 |
| Inventory Variation | (6,639) |
| Purchase Price Variance | 0 |
| COGS Other | (3,154) |
| COS - Lost/Obsolete | 994 |
| COS - Vendor Discounts | 0 |
| Contra COS OH Allocation | 112,537 |
| Total COS | 1,726,730 |
| COGS % | 128% |
| Gross Profit | (376,730) |
| Gross Margin | (27.91%) |
| | |
| OPERATING EXPENSES: | |
| Wages | 210,000 |
| Commission | 0 |
| Bonuses | 20,000 |
| Contract/Temp Labor | 45,091 |
| Consulting | 0 |
| Accounting | 1,345 |

Estimate Subject to Change

**Pro Forma Profit and Loss**
**Ramp-up Month 1**

| | |
|---|---:|
| Auto and Mileage | 0 |
| Bad Debt Expences | 0 |
| Bank Charges | 145 |
| Computer Supplies | 0 |
| Courier | 0 |
| Depreciation | 27,571 |
| Employee Relations | 87 |
| Entertainment and Promotion | 165 |
| Garden/Landscape | 550 |
| Gasoline | 378 |
| Information Technology | 2,923 |
| Insurance-Auto | 121 |
| Insurance-Fire and Liability | 657 |
| Insurance-Life | 842 |
| Insurance-Medical | 1,834 |
| Insurance-Product Liability | 3,346 |
| Insurance-Workman's Comp | 6,736 |
| Insurance-D&O & EPLI | 1,222 |
| Janitorial Services | 0 |
| Janitorial Supplies | 1,297 |
| Licenses and Permits | 8,300 |
| Mail and Postage | 216 |
| Maintenance and Repair | 18,436 |
| Management Fee | 30 |
| Meals and Refreshments | 617 |
| Membership Dues | 197 |
| Merchant Fees | 201 |
| Miscellaneous | 719 |
| Office Supplies/Stationary | 3,242 |
| Outside Services | 0 |
| Payroll Taxes | 16,186 |
| Pest Control | 942 |
| Professional and Legal Fees | 12,348 |
| Recruitment and Hiring | 15,000 |
| Rent | 54,000 |
| Rentals | 238 |
| Research and Development | 86 |
| Security System | 246 |
| Shop Supply | 4,231 |
| Small Tools | 159 |
| Subscriptions | 147 |
| Training and Seminars | 1,800 |
| Trash | 4,048 |
| Travel and Lodging | 16 |
| Uniforms | 1,092 |
| Telephone | 190 |
| Utilities Electric | 6,277 |
| Utilities Gas | 103 |

Estimate Subject to Change

Pro Forma Profit and Loss
Ramp-up Month 1

| | |
|---|---:|
| Utilities Water | 603 |
| State & Local Tax | 3,926 |
| Finance Charge/Late Fees | (449) |
| Other | (7) |
| Adjust for Life Brand | 0 |
| Adjust for Life Brand | 0 |
| Contra COS OH Allocation | |
| Total Operating Expenses | 477,449 |
| Operating Expense % | 35% |
| Operating Income | (854,179) |
| | |
| OTHER INCOME/(EXPENSES): | |
| Other Income | |
| Other Expences | |
| Interest Expence | (10,826) |
| Income Tax Expense | |
| Total Other Income/(Expenses): | (10,826) |
| | |
| NET INCOME/(LOSS): | (865,005) |
| Net Income % | (64.07%) |

# Exhibit 2
# Asset Purchase Agreement

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made and entered into as of February _____, 2018, by and between SIMPSON LABS LLC, a California limited liability company (or nominee) as buyer ("Simpson"), and CORE SUPPLEMENT TECHNOLOGY INC., a California corporation, as seller and debtor-in-possession in the Bankruptcy Case (as defined below) ("Core"). Each of Simpson and Core are referred to herein individually as a "Party," and both Simpson and Core are referred to collectively as the "Parties."

## RECITALS

A.     Core is in the business of formulating and manufacturing nutritional supplements. Core is a debtor and debtor-in-possession in a Chapter 11 case pending in the United States Bankruptcy Court, Southern District of California ("Bankruptcy Court"), Case Number 17-06078-MM11 (the "Bankruptcy Case"). The transaction described in this Agreement is subject to approval by the Bankruptcy Court.

B.     Core is the owner of the following assets, which are referred to collectively as "the Included Assets":

      1.     All equipment, tools, machinery, and office furniture that is owned by Core, whether or not subject to a security interest (the "Owned Equipment"), including without limitation the specific items detailed in Exhibit "A" hereto;

      2.     Possessory and other rights as the lessee under that certain lease of real property (the "Premises Lease"), pursuant to an assumption and assignment of such lease, as detailed in Exhibit "B" hereto;

      3.     All supplies and raw materials used in the formulation and manufacture of nutritional supplements (the "Supplies"), as detailed in Exhibit "C" hereto, subject to changes in the Supplies during the period between execution of this Agreement and the closing;

      4.     All finished goods (the "Inventory") as detailed in Exhibit "D" hereto, subject to changes in the Inventory during the period between execution of this Agreement and the closing;

      5.     Two (2) trucks and trailers (the "Vehicles"), as detailed in Exhibit "E" hereto;

      6.     One hundred percent (100%) of the membership interests in Life Brand, LLC, a California limited liability company (the "Subsidiary") that owns intellectual property including trade names, trademarks, and service marks related to the nutritional supplement business and other property (the "Subsidiary Property"), as detailed in Exhibit "F" hereto;

7.      Core's tradename, website, domain names, formulas, trade secrets, customer and supplier lists, and goodwill (the "Intellectual Property"), as detailed in Exhibit "G" hereto;

8.      Core's open customer orders, work-in-process ("WIP"), deposits by customers for such orders or WIP, and accounts receivable associated with such orders or WIP (the "Orders"), as detailed in Exhibit "H" hereto, subject to changes in the Orders during the period between execution of this Agreement and the closing; and

9.      All accounts receivable of Core (the "Receivables"), including without limitation the accounts receivable detailed in Exhibit "I" hereto, subject to changes in the Receivables during the period between execution of this Agreement and the closing.

C.      This Agreement does not address assets of Core that are not listed in §B(1-9) above, including but not limited to cash and bank deposits. The assets that are not the subject of and being purchased pursuant to this Agreement are referred to as the "Excluded Assets."

D.      Core wishes to sell to Simpson the Included Assets at the price and on the other terms and conditions specified in detail below and Simpson wishes to so purchase and acquire the Included Assets.

E.      Following execution of this Agreement, Core will file a motion with the Bankruptcy Court to obtain Bankruptcy Court Approval of the sale described herein (as defined in §4.1 below). The sale will be subject to overbid, and the sale will close promptly to the highest and best bidder following such Bankruptcy Court Approval.

## AGREEMENT

In consideration of the foregoing Recitals and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration as set forth herein, the Parties agree as follows:

1.      Transfer of Included Assets.

1.1  Purchase and Sale of Included Assets.  On the Closing Date, as hereinafter defined, in consideration of the covenants, representations and obligations of Simpson hereunder, and subject to the conditions hereinafter set forth, Core shall sell, assign, transfer, convey and deliver to Simpson, and Simpson shall purchase all of Core's right, title and interest as of the Closing Date in and to the Included Assets, consisting of all of Core's right title and interest in and to those assets listed in the attached Exhibits "A" through "I", inclusive, pursuant to 11 U.S.C. §363, free and clear of all liens, claims and encumbrances, as provided by Bankruptcy Court order.

       1.2    <u>Instruments of Transfer</u>. The sale, assignment, transfer, conveyance and delivery of the Included Assets to Simpson shall be made by bill of sale and assignment duly executed buy Core, and such other instruments as may reasonably be requested by Simpson.

       1.3    <u>No Assumed Liabilities</u>. Simpson is not assuming any liability of Core or agreeing to assume and perform any contractual obligation of Core, and Simpson shall not be liable for any other liabilities or obligations of Core by virtue of this transaction, except for liabilities for payments due after the Closing Date on leases that are assumed by Simpson as specifically identified in Exhibit "B" hereto.

2.    <u>Consideration</u>.

       2.1    <u>Purchase Price</u>. The consideration to be paid by Simpson to Core for the Included Assets is One Million One Hundred Thousand Dollars ($1,100,000.00) (the "Purchase Price"), which shall be paid as follows:

       (a)    Five Hundred Fifty Thousand Dollars ($550,000.00) (the "Deposit") as described in §2.2 hereof; and

       (b)    Five Hundred Fifty Thousand Dollars ($550,000.00) (the "Completion Payment") payable at the Closing as defined and described in §3 hereof.

       2.2    <u>Deposit</u>. Concurrently with the mutual execution and delivery of this Agreement (the date of such mutual execution and delivery is sometimes referred to herein as the "Execution Date"), Simpson shall deposit with the Trust Account of Core's Chapter 11 counsel the sum of Five Hundred Fifty Thousand Dollars ($550,000.00) in Good Funds (the "Deposit"). For purposes of this Agreement, "Good Funds" shall mean immediately available funds delivered via wire transfer or cashier's check drawn on a California bank. Core's Chapter 11 counsel shall return to Simpson the Deposit only as provided in §4.6 hereof.

       2.3    <u>Interim Agreement</u>. In addition to the Deposit and the Completion Payment, Simpson shall provide to Core the services and shall assume the financial risks set forth in the Interim Agreement attached as Exhibit "L" hereto.

3.    <u>Closing Transaction</u>.

       3.1    <u>Closing</u>. The Closing of the transactions provided for herein (the "Closing") shall take place on the Closing Date at the offices of Sullivan Hill Lewin Rez & Engel, 550 West C Street, Suite 1500, San Diego, CA 92101 or other such place as mutually agreed upon by Core and Simpson.

       3.2    <u>Closing Date</u>. Following execution of this Agreement, Core will file a motion with the Bankruptcy Court to obtain Bankruptcy Court Approval and the sale will close within three (3) business days following the entry of an order of the Bankruptcy Court authorizing such sale, as provided in §4.1 hereof, so long as the

effectiveness of such order has not been stayed by a court of competent jurisdiction ("Closing Date").   Alternatively, the parties may mutually agree to an extended Closing Date.   Until this Agreement is either terminated or the parties have agreed upon an extended Closing Date, the parties shall diligently continue to work to satisfy all conditions to Closing.

      3.3   <u>Core's Deliveries to Simpson at Closing</u>.   At the Closing, Core shall cause to be delivered to Simpson the following:

      (a)  An Assignment and Bill of Sale in the form attached hereto as Exhibit "J" hereto, duly executed by Core, pursuant to which Core sells and assigns the Assets to Simpson (the "Assignment"); and

      (b)  Such other instruments of transfer, including without limitation such assignments and consents to assignments as are reasonably requested by Simpson and necessary to transfer to Simpson good, marketable and legal title to all of the Included Assets, all in forms which are consistent with the terms of this Agreement and are usual and customary for transferring the type of assets involved under the laws of the jurisdictions applicable to such transfers.

      3.4   <u>Simpson's Deliveries to Core at Closing</u>. At the Closing, Simpson shall cause to be delivered to Core the Completion Payment.   The Completion Payment shall be paid at the Closing by cash, certified check or wire transfer.

      3.5   <u>Allocation</u>.   The Parties have agreed to the allocation of the consideration referred to in §2.1 hereof among the Included Assets, as set forth in Exhibit "K" hereto.   The allocation set forth in Exhibit K shall be conclusive and binding upon the Parties for all purposes, and no Party (or any affiliate of) shall file any tax return or other document with, or make any statement or declaration to, any taxing agency that is inconsistent with such allocation.

      3.6   <u>Sales, Use and Other Taxes</u>.   Core shall bear and pay any sales or use taxes imposed by the State of California on the sale of the Included Assets based upon and to the extent of the consideration allocated to the property as set forth in Exhibit "K" hereto.

4.   <u>Conditions Precedent to Closing</u>.

      4.1   <u>Bankruptcy Court Approval; Hearing; Overbid Procedure</u>.   Core's obligation to sell and Simpson's right to buy are each conditioned on (collectively "Bankruptcy Court Approval"):

      (a)   Entry of an Order of the Bankruptcy Court approving the bid and related procedures for the sale as described in the "Sale Procedures Memorandum" approved by Simpson on February _____, 2018, except as to such

revisions thereto that are specifically agreed to by Simpson and Core in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court;

(b)    The subsequent conduct of the in-court auction sale described therein in conformance with such procedures, except as to variances and changes to such procedures that are specifically agreed to by Simpson and Core in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court; and

(c)    Entry of an Order of the Bankruptcy Court authorizing the sale to Simpson on the terms described herein, except as to such revisions thereto that are specifically agreed to by Simpson and Core in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court.

4.2    Conditions to Core's Obligations. Core's obligation to make the deliveries required of Core at the Closing Date shall be subject to the satisfaction or waiver by Core of each of the following conditions:

(a)    Core has received the Deposit;

(b)    All of the representations and warranties of Simpson contained herein shall continue to be true and correct at the Closing in all material respects.

(c)    Simpson shall have executed and delivered to Core all of those documents, instruments and agreements required to be executed by Simpson to Core under §3.4 hereof.

(d)    No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

(e)    Core shall have obtained Bankruptcy Court Approval, as provided in §4.1 hereof above.

4.3    Conditions to Simpson's Obligations. Simpson's obligation to make the deliveries required of Simpson at the Closing shall be subject to the satisfaction or waiver by Simpson of each of the following conditions:

(a)    All representations and warranties of Core contained herein shall continue to be true and correct at the Closing in all material respects.

(b)   Core shall have executed and delivered to Simpson all of those documents, instruments and agreements required to be executed by Core to Simpson under §3.3 hereof.

(c)   Core shall have obtained Bankruptcy Court Approval, as provided in §4.1 hereof above.

4.4   <u>Notice</u>. Notice of Core's motion for approval of the sale of the Included Assets shall be given by Core to all creditors of Core listed on the master mailing matrix maintained by the Bankruptcy Court as updated through the date such notice is served.

4.5   <u>Termination</u>. This Agreement shall be terminated only as provided below:

(a)   By written mutual consent of Core and Simpson executed at any time prior to the Closing;

(b)   Upon the closing of a transaction with a third-party overbidder, as provided in §4.1(b) hereof above; or

(c)   Pursuant to order of the Bankruptcy Court obtained upon notice to Core and Simpson.

4.6   <u>Consequences of Termination</u>

(a)   In the event this Agreement is terminated pursuant to §4.5(a) hereof, all rights and obligations of the Parties hereunder shall terminate, and Core shall immediately deliver the Deposit to Simpson to the extent that Core and Simpson agree.

(b)   In the event this Agreement is terminated pursuant to §4.5(b) hereof, all rights and obligations of the Parties hereunder shall terminate, Core shall immediately deliver the Deposit to Simpson, and Core shall immediately pay Simpson a break-up fee of Eighty Thousand Dollars ($80,000.00) in addition thereto (if such break-up fee has been approved by the Bankruptcy Court as part of the approval of sale procedures described in §4.1(a) hereof).

(c)   In the event this Agreement is terminated pursuant to §4.5(c) hereof, all rights and obligations of the Parties hereunder shall terminate, and the Bankruptcy Court shall determine whether the break-up fee described in §4.6(b) above or the liquidated damages described in §4.7 below are payable.

4.7   <u>Liquidated   Damages</u>.   **SIMPSON   AND   CORE ACKNOWLEDGE THE IMPRACTICALITY AND EXTREME DIFFICULTY OF FIXING THE ACTUAL DAMAGES CORE WOULD SUSTAIN AS A RESULT OF THE BREACH OF SIMPSON'S OBLIGATION TO COMPLETE THE PURCHASE OF THE INCLUDED ASSETS FOLLOWING OBTAINING**

**BANKRUPTCY COURT APPROVAL, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR HEREIN REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES THAT CORE WILL INCUR AS A RESULT OF SIMPSON'S FAILURE TO COMPLETE THE PURCHASE. IF SIMPSON BREACHES THE OBLIGATION TO COMPLETE THE PURCHASE OF ASSETS, THEN CORE, BY NOTICE TO SIMPSON, MAY TERMINATE SIMPSON'S RIGHTS TO PURCHASE THE ASSETS AND, AS CORE'S SOLE REMEDY FOR THE DEFAULT BY SIMPSON, CORE SHALL RECEIVE AND RETAIN ONE HUNDRED THOUSAND DOLLARS ($100,000.00) OF THE DEPOSIT UNDER THIS AGREEMENT AS LIQUIDATED AND AGREED UPON DAMAGES. BY INITIALING THE SPACES WHICH FOLLOW, SIMPSON AND CORE SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS PARAGRAPH CONCERNING LIQUIDATED DAMAGES.**

_____                    _____
CORE's INITIALS                          SIMPSON'S INITIALS

5.      Core's Representations and Warranties. Core hereby makes the following representations and warranties to Simpson:

        5.1     Validity of Agreement. Upon obtaining Bankruptcy Court approval, this Agreement shall constitute the valid and binding obligation of Core, enforceable in accordance with its terms.

        5.2     Title. At the Closing, Simpson will acquire all of Core's right, title and interest in and to all the Included Assets, free and clear of any liens, claims or encumbrances, as provided in the Bankruptcy Court Order approving the sale.

        5.3     Insurance. Core will take all reqasonbable steps to designate Simpson as a beneficiary or additional insured on all insurance of Core that is presently in force, including without limitation insurance against defalcation or other improper acts by directors, officers, or employees of Core.

        5.4     Equipment in Good Working Order. All of the Owned Equipment will be maintained by Core in substantially the same condition as it was when Simpson inspected the Equipment, pending the Closing. In the event that any item of Owned Equipment is damaged, destroyed, breaks, wears out, or is lost or stolen, after the execution of this Agreement and prior to the Closing, and Core is aware of such fact, Core shall notify Simpson immediately upon learning such fact, and Simpson may reduce the Purchase Price by an amount reasonably equivalent to the lesser of the value of the equipment or the cost to repair such equipment.

6.    Simpson's Representations and Warranties.  Simpson hereby makes the following representations and warranties to Core:

        6.1    Validity of Agreement.  This Agreement, when executed and delivered by Simpson, shall constitute the valid and binding obligation of Simpson enforceable in accordance with its terms.

        6.2    No Conflicts or Violations.  The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Simpson do not and will not: (i) conflict with or result in a breach of the articles of organization of Simpson; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Simpson is a party or by which Simpson or its assets or properties may be bound.

        6.3    "AS IS" Transaction.  Core specifically disclaims (and Simpson expressly agrees that Core is not making or giving) any covenant, undertaking, representation or warranty, express or implied, in connection with the nature, quantity, quality and description of the Included Assets, or the condition, quality, suitability, value, or merchantability of Core's interest in or rights to the Included Assets, except as specifically provided in §5 hereof.  SIMPSON ACKNOWLEDGES AND AGREES THAT EXCEPT AS SPECIFICALLY PROVIDED IN §5 HEREOF: (A) THE SALE OF THE INCLUDED ASSETS TO SIMPSON IS ON AN "AS IS, WHERE IS" BASIS; WITHOUT ANY REPRESENTATION OR WARRANTY AS TO THE NATURE, QUANTITY, QUALITY OR DESCRIPTION OF THE INCLUDED ASSETS; (B) CORE MAKES NO REPRESENTATIONS AS TO THE VALUE OF THE INCLUDED ASSETS; (C) THE SOLE REPRESENTATIONS AND WARRANTIES OF CORE REGARDING THE INCLUDED ASSETS ARE THOSE SPECIFICALLY PROVIDED IN WRITING IN THIS AGREEMENT AND NO OTHER REPRESENTATIONS OR WARRANTIES ARE TO BE IMPLIED OR INFERRED.  SIMPSON FURTHER ACKNOWLEDGES THAT PRIOR TO THE CLOSING DATE, SIMPSON HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF ALL RELEVANT MATTERS RELATING TO OR AFFECTING THE INCLUDED ASSETS AS SIMPSON DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE INCLUDED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN §5 HEREOF, SIMPSON IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INVESTIGATIONS.

_____                        _____
CORE's INITIALS                        SIMPSON's INITIALS

7.    Post-Closing Covenants.

      7.1    <u>Post-Closing Maintenance of and Access to Information</u>.   The Parties acknowledge that after closing, Core or its successors will need access to Core's information technology system and all information residing thereon (including installed software and data in memory) for the purposes of preparing or filing tax returns, responding to audits, prosecuting or defending third party claims, completing the administration of the bankruptcy case, satisfying other legal requirements, and otherwise fulfilling its duties as a debtor under the Bankruptcy Code.  Accordingly,

      (a)    Immediately upon closing, the Parties will instruct a third party vendor to be agreed upon to prepare a separate identical duplicate copy of Core's information technology system and all information residing thereon (including installed software and data in memory), so that each Party will have its own copy (with different usernames and passwords for each to use in accessing the system), with the Parties to split the costs charged by such vendor, to a maximum of $15,000.00 per Party, based on the actual needs of each Party  .  Until such time as the duplicate copy is complete, Core shall maintain custody of the information technology system and all information residing thereon, and shall allow Simpson access to such information technology system as reasonably necessary to fulfill the purposes and intents of this Agreement (including the Interim Agreement attached as Exhibit L hereto .

      (b)    Immediately upon closing, the Parties will instruct a third party vendor to be agreed upon to prepare a separate identical duplicate copy of Core's non-electronic books and records (including into OCR searchable PDF files, at Core's discretion), so that each Party will have its own copy, with the Parties to split the costs charged by such vendor to a maximum of $2,500.00 per Party.  Until such time as the duplicate copy is complete, Core shall maintain custody of the non-electronic books and records, and shall allow Simpson access to such records as reasonably necessary to fulfill the purposes and intents of this Agreement (including the Interim Agreement attached as Exhibit L hereto ..

      (c)    Simpson agrees to use the information described in this Section 7 in compliance with all laws and regulations applicable thereto (including applicable to Core).

      (d)    Core agrees to use the information described in this section 7 solely for the purpose

described in this Section 7, and not to operate a business or otherwise compete with Simpson. Core's right to access the system shall terminate upon the closing of Core's bankruptcy case.

7.2    Indemnification.   Simpson agrees to defend at its own cost and to indemnify and hold harmless Core, and its employees, affiliates and agents, from and against any and all loss, costs, expenses (including attorney fees), damages, and liabilities, however caused, resulting directly or indirectly from or pertaining to the ownership or operation of the Included Assets after Closing.

7.3    Broker's Commission.   Simpson and Core each represent to the other that it knows of no claim for broker's or finder's fees or other commissions in connection with this transaction other than as provided herein.

8.    Miscellaneous.

8.1    Attorneys' Fees.   In the event that either Party brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

8.2    Notices.   Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either Party to the other ("Notice") shall be in writing and shall be deemed given:  (1) when personally delivered, or (2) upon receipt or refused delivery if deposited in the United States mail, certified or registered mail, postage prepaid, return receipt required, or (3) the next business day after being deposited with a recognized overnight mail or courier delivery service, or (4) the next business day after being transmitted by email or facsimile, with receipt acknowledgment upon transmission, and with a copy sent on the same day by one of the other permitted methods of delivery addressed as follows:

To Core:              Core Supplement Technology, Inc.
                      Attn:  Richard Feferman, CRO
                      3830 Valley Centre Drive; Suite 705-152
                      San Diego, CA 92130
                      Fax: (858) 430-2454
                      E-Mail: richard@crarecovery.com

With a copy to:       Core Supplement Technology, Inc.
                      Attn: Joseph O'Dea, President
                      4645 North Avenue
                      Oceanside, California 92056
                      Fax:  760-639-6041

Email: joe@coresupplementtech.com

With a copy to:      Stephen C. Hinze, Attorney at Law
217 Civic Center Drive, Suite 10
Vista, California 92084
Fax: (760) 454-2427
Email: sch@schinzelaw.com

With a copy to:      Sullivan Hill Lewin Rez & Engel
550 West C Street, 15th Floor
San Diego, California 92101
Attn: Christopher V. Hawkins
Fax: (619) 231-4372
Email: hawkins@sullivanhill.com

To Simpson:      Simpson Labs LLC
27540 Avenue Mentry
Valencia, California 913554
Attn: Donald Grace
Fax: (661) 347-4331
Email: dgrace@simpsonlabs.net

With a copy to:      Donahoe & Young LLP
25152 Springfield Court, Suite 345
Valencia, California 91355
Attn: Mark T. Young
Fax: (661) 554-7088
Email: myoung@donahoeyoung.com

      8.3   Entire Agreement. This instrument and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Included Assets. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

      8.4   Modification. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all Parties.

      8.5   Closing Date. All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously at 12:01 AM on the Closing Date, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

8.6     Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

8.7     Captions. All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

8.8     Further Assurances. Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto.

8.9     Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

8.10    Payment of Fees and Expenses. Each Party shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

8.11    Survival.    Except for the covenants and agreements to be performed after the Closing Date, none of the respective representations, warranties, covenants and agreements of Core and Simpson herein, or in any certificates or other documents delivered prior to or at the Closing, shall survive the Closing.

8.12    Assignments. Except as specifically provided otherwise in this Agreement, neither this Agreement nor any interest herein shall be assignable (voluntarily, involuntarily, by judicial process, operation of law or otherwise), in whole or in part, by Simpson without first obtaining the prior written consent of Core. Any attempt at such an assignment without such consent shall be void and, at the option of Core, shall be an incurable breach of this Agreement resulting in the termination of this Agreement.

8.13    Binding Effect. This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties.

8.14    Applicable Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of California, the United States Bankruptcy Code, the Federal Bankruptcy Rules and the Federal Rules of Evidence.

8.15    Good Faith. The Parties agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

8.16    Construction.    In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party.

8.17    Counterparts.    This Agreement may be signed in counterparts, and may be executed by the exchange of facsimile signature pages.

8.18    Time is of the Essence.    Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

8.19    Tax Effect.    None of the Parties (nor such Parties' counsel or accountants) has made or is making in this Agreement any representation to any other Party (or such Party's counsel or accountants) concerning any of the tax effects or consequences on the other Party of the transactions provided for in this Agreement. Each Party represents that it has obtained, or may obtain, independent tax advice with respect thereto and upon which it, if so obtained, has solely relied.

8.20    Bankruptcy Court Jurisdiction.    **THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (I) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (II) THE INCLUDED ASSETS. THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.**

9.    Mutual Release.    Except as specified in §9.2, effective as of the Closing, the Parties fully and forever release, acquit and discharge each other Party – including the other Party's past and present employees, agents (whether ostensible or actual), shareholders, directors, officers, members, managers, insurance carriers, attorneys, successors, predecessors and assigns – from any and all claims, damages, costs, attorney's fees, demands, rights, causes of action, or liabilities which any of them ever had, or now have, against each other.

9.1    Waiver of California Civil Code §1542.    Except as specified in §9.2, the Parties waive any and all rights which each may have under the provisions of California Civil Code §1542, which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

It is understood by the Parties that facts with respect to which the releases are hereby given may turn out to be other than, or different from, the facts now believed by

the Parties to be true. Each Party expressly assumes the risk of the facts turning out to be different than that Party believes them to be, and agrees that this Agreement shall in all respects be effective and not subject to termination or rescission because of any such mistaken belief.

### 9.2 EXCEPTION TO THE MUTUAL RELEASE OF CLAIMS

The release provided for herein shall not apply to any breach of any provision of this Agreement, including without limitation the warranties stated in §§5-6 hereto and the post-closing covenants stated in §7 hereto.

IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the day and year first above written.

**SIMPSON:**
SIMPSON LABS LLC
a California limited liability company,
as Buyer

By: _____
     Donald Grace, its Executive Vice President

**CORE:**
CORE SUPPLEMENT TECHNOLGY INC.
a California corporation,
as Seller

By: _____
     Joseph O'Dea, its President

and
By: _____
     Richard Feferman, Chief Restructuring Officer

## EXHIBIT "A"

### OWNED EQUIPMENT

Group 1 (Bank of America security interest):
1. 165 cu. ft. Paul Abbe Double Cone Blender  304/S/S 48460
2. NRS51-HES Chuck Capper Machine w/3 sets of tooling NRS51-HES
3. Cremer Counter Tablet Press Machine 1308
4. AF3 screw Conveyor & In-feed Turn table (39" diameter)

Group 2 (Bank of America security interest):
5. Bosch Capsylon 705 complete with all standard, parts, attachments and accessories 8-111-999-201
6. GRFLOWRATEX: Flodex
7. 2008 Hyster E50Z - 5,000 LB, Electric Forklift, complete with all standard parts, attachments and accessories. G108N09950
8. 2009 Skyjack Scissorlift SJIII 3219, complete with all standard parts, attachments and accessories 22019403
9. 2003 Yale Reach Truck, NR035AENM24TE095/EASIR40TT, complete with all standard parts, attachments and accessories. C815N03043A/DZ-A-98-11405
10. Global Auto Floor Scrubber 20", complete with all standard parts, attachments and accessories. 261165GN

Group 3 (Core List 8/9/17):

Portable AC unit - 10000 BTU
Dehumidifier IDEAL Air CG2
16 Station Tablet Press & set of
Acer G236HL Bbd 23 In LED
48" ROTARY TABLE STAINLESS STEEL
A/C Unit 1400 Portable 14000BTU
A/C Unit 1400 Portable 14000BTU
AC DAIKIN 5 TON 3 PHASE 208/230
Air Conditioning for MFG
AC Unit Diakin 5 ton Heat Pump
AFS SCREW CONVEYOR/W
150 PSI Oilless Air Compressor 8
Air Dryer – Refrigerated
Euro-Dry Energy DE106 Air Chille
AAV-90D DESICCANT AIR DRYER
AIR IMPACT WRENCH
All Fill Autp Powder Filler
Fiber Optic Amp for Feeder

Sartorius LE225D Analytical Bala
Auto Auger Series Filler
Auger BSL-S3 130001
A&D FX-700CT Balance
Sartorius ENTRIS64-1S Analytical
Precision Balance
ENTRIS323-1S
Marburg Delibander Model 1250
Battery Reconditioned Deka 18-12
Bi directional label process 18-
Bin Blender Motor  5HP 1725 6 0H
Blender 10 Cu. Ft.
Bin Blender
Bin Blender
Big Blender
480 Volt 60 Amp Breaker Steam Cl
Fiberoptic BRKT Guide
2 Door Flammable Cabinet
Cabinet Stainless Steel on Wheel
Black Metal Storage Cabinets
Cabinets in WH
King  Capsule Counter
ZANASI 40F
Capsule Filler Semi-Automatic
Spring torque tester - 0-100in.L
Spring torque tester - 0-100in.L
Cremer CF1230 Channel Counter
Sure Kap (Capper Machine)
CAP SHOE
Bosch 705 Encapsulation Machine
Carts Stainless Steel
Carts
Carts and Tools
3M T&B Model 200A SN 15054
Casters for Bin Blender
Desk Chairs
Mid-Back Swivel Chair
Hercules Swivel Task chair with
5 Tier Chrome Wire Shelving
Small Clean Room
Cleanroom
Clean Room Strip Doors
6 2 x4 Logi-Clean Room Light



Front Lobby Clock
Compressor
Computers
Computer
Computer Dell 745 Optiplex
Computer Sales (label printer ro
Windows 7 Dell 745 Desktop, Ramo
HP Compaq 8200 Elite Win 7 DVD
HP Compaq 8200 Elite Win 7 DVD
HP Compaq 8200 Elite Win 7 DVD
Computer Dell 745 Optiplex B. As
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC – Intte
Dell Computer 840 EVO MZ-7TE250B
HP Elite 8300 Desktop PC
Dell Optiplex 745 3.4GHZ 8GB
Lenovo Think Centre M71e SFF Des
Hp Elite 8300 Desktop PC
Dell 745 Optiplex Desktop Comput
Dell Optiplex 780 SFF E800 Dual
CONTROL PANEL FOR SCREW CONVEYOR
Conveyor Belt
Conveyor SS 6x4
12.5 FT. CONVEYOR 304 SS SHELLS
GlobalTek 6' X 4" SS Conveyor W/
Conveyor Bottomless
Conveyor Table Top 8x4.5
Conveyor Label Aire 6x3.5
Conveyor 6" Wide
Conveyor 4.5"
Bottomless Conveyor
CONVEYOR 59" LENGTH
8' Stainless Steel Conveyor
Globaltek 10' X 4" SS Conveyor
CONVEYOR 12' x 4" SS W/ SPEED CO
10ft Conveyor (7.5"W) W/Indexing
Transfer Conveyor 60 in x 30 in
Bottomless Conveyor G100TR
Cottner (Lasko)
Clean Room Soft Walls
Cubical with desk and drawers
Cubical with desk and drawers
Cubical with desk and drawers



Double Cone Blender
15.6 E6520 laptop PC - Intel cor
Dell Optiplex 790 SFF Desktop In
Dell Latitude E5520 15" Notebook
Dell Optiplex 780 SFF E8400 3ghz
Desk - Extra in AK Office
Double Pedestal Desk Maple
Desk L. Rocha Mfg
Desk for R. Arreola
5'6"x6'6" Right Return Desk
24"x 48" Mahogany Single pedesta
C/M Amber 30X60 single pedestal
Desk L Shape Right Return Mahoga
DESK L SHAPED 6' X 6' CHERRY
6'x6' L SHAPE DESK W/LEFT RETURN
dosing discs for Capsylon Encaps
57850-1/16-1/2 X Chicago-Latrobe
Dust Collection
Data View Temperature Data Logge
Nissan CUM01L15S 36V Electric Fo
Electric Sub Panel
Lakso 73 Electric Lift
Encapsulating Digital Balance
Encapsulation Machine
Encapsulator Orientator 70F
F40 Encapsulator Tooling
Vibrator for Encapsulation Machi
Encapsulation Room Electricity
Beach Pebble Front Entry
INDUCTION SEALER
24' FG Extension Ladder
Patterson Fan 2052533
4 Hands Free Faucets
File Cabinet 4 Drawer Vertical
4 Drawer Vertical File w/Lock
4 Drawer Vertical File w/Lock
4 Drawer Vertical File w/lock Le
1 4 drawer 1 2 drawer Black w/lo
Lateral File Cabinets
Fork Lift Aerial Platfor, 48x40
FLOWABILITY INDEX MEASUREMENT
Weigh Tronix DWS3030-01 Floor Sc
Weigh Tronix DWS3030-01 Floor Sc



Tennant Floor Scrubber
Global Auto Floor Scrubber 20"
Floor Scrubber for W/H
Flooring Temple Heights
CHARGER 24VDC 11 A 50/60HZ
Blender
food scale 6 X0.001 lbs NTEP
Fork Lift
Fork Lift CAT Reach lb
Freight Forklift
Freight Euro Dry Air chiller
Freight for Conveyor
Freight Encapsulator
Freight Flowability Tester
Freight for heritage global purc
FRT Pallet Rack
freight for ss conveyor for feed
Freight Turn Tables, SS tables
ATR STD SET Polystyrene ATR Stan
2007 GMC TRUCK MODEL C7500
Hand Capsule Counter
Wireless Headset W/handset lifte
Heat Guns
Heat Lamps
Heat Tunnel
Heat Tunnel - Oven-3Levell/6" Tal
Digimatic Height Gage w/ switcha
Bulk Hopper/Elevator Assembly
Hot Stamp Coder for Labeler
HP ELITE 8300 DESKTOP PC
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC
Humidity Data Loggers with displ
hydraulic driver for stud driven
Electric 3 stage side shift 2008
Sotax FT-300 Flowability Testerm
Nilfisk CFM - 3151 Industrial Va
PN# STC05-57 / 5" dia x 7.5 Inde
Induction Sealer
Inductiion Tunnel Pkg Line
Lepel CSplus200 Induction Sealer
MARKEM-IMAJE SERIAL#FR16210026



Markem - imaje serial number FR1
Inspection Table Kangola Machine
server, monitor wiring whs 3 for
Cisco 7940 G IP Phones
IT Equipment
IT Equipment
Kirby Lester TT Count Verificati
Lab/QC Equipment
Easy Labeler Label Machine
Label Machine
Zebra Label Machine
Label Printer
Zebra ZM400 Thermal Label Printe
Zebra ZT410 Direct Thermal Trans
Label Sensor Model #1120
Labelette Labeler
ST1100 Wrap around Labeler 8'X10
Label Machine with Encoder
CLEAR LABEL SENSOR
High Shelf Ladders
Low Step Ladder
Dell Latitude E6510 15.6 in Lt C
Laser Jet Printer  Pro 400
Laser Printer AK
LASER SENSOR 1 250 MM RANGE 4 PI
Lateral File Cabinet
4 DR LATERAL FILE GREY
Lot of locks and tags
LOCKOUT TAGS
Sink and Faucet for Lunch Room
Ungesa Clean-Trace NG Luminomete
MAGNET 4N-201505301 GR1
MAKITA XT218 18V LXT LITHIUM-ION
Manual for Auto Label Appicator
Material Guide 66MM (butterfly)
Material Guide 77MM (Butterfly)
Material Guide 90 MM (butterfly)
80 pc pan set
Loma Auto Metal Detector for Bot
TOUCH SCREEN  & 60" CONVEYOR/PLO
Mezzanine for Big Blender
Mezzanine for Big Blender
Mezzanine

Extension of Manufacturing Rooms
Extension of Manufacturing Rooms
Milling Machine
Mobile Box/File Pedestal Black
Moisture Analysis pans & Glass f
Arizona Instruments Moisture Ana
Ohaus MB200 Moisture Analyzers
Moisture Meter HE53/03
Monitor 21.5"
Acer G236HL Bbd 23 inch LED Moni
Acer G236HL Bbd 23 inch LED Moni
Monitor LED 23" A. Kumjian
Monitor ASUS VH238H 23 " B. Asli
Monitor R. Arreola
Monitor LED 24 inch, R. Rocha
Acer 23" Monitor for Sales
VA2446M-LED 24" N. McEvers
Acer G236HL Bbd 23 Inch Led-lit
ACER G236HL BbD 23-INCH MONITOR
Monitor ACER 23"
Monitor C. Robison Sales
ViewSonic VA2446M-LED 24 inch LE
Monitor Joe  VA2246M 22 inch led
Viewsonic 27 inch lit lcd 1080
ViewSonic VA2446M-LED 24 inch LE
24in LCD Monitor
Acer G236HL 23 inch
ViewSonic VA2446M-LED 24 inch LE
Acer G237HK bi 23 inch LED Back
MONITOR ASUS VS207T-P 20 IN
Acer G246HL 24 inch  LED Monitor
Toledo ID 1 Multirange Scale
Neck Bander for Packaging
NECK BANDER
HP Probook 6560B Notebook PC
Office Equipment
Office Furniture/Fixture
Office Furniture/Fixture
Office Furniture/Fixture
Office Furniture
Mounting Brackets qty 2
Skidding
Pallet Jack



Pallet Jack
Mitsu Pallet Jack
2.5 Ton Pallet Jack
2.5 Ton Pallet Jack
2.5 Ton Pallet Jack
Heavy Duty Pallet Rack
Heavy Dute Pallet Rack
Heavy Duty Pallet Rack
Pallet Racks in W/H
Pallet Racking for Warehouse
TEAR DROP STYLE PALLET RACKS
Heavy Duty Pallet Racks
Heavy Duty Pallet Racks
Packaging Pallet Wrapper
Panic Bar for Door
Picnic table and banches 6 ft
Picnic Table Round 44" Top Almon
Picnic Tables
Packaging Line
Packaging Line
Packaging Line
Packaging Line
Lab Work Station Portable 2 Shel
PDC Shrink Heat Tunnel
Sartorius Digital Balance Scale
Ishida Check Weigher Model:RE-W-
LD19SB Custom 1-6 HR 1 Phase 60h
Ramsond CUT 50DY
Ohaus EP 12001 Explorer Pro Plat
LITTLE GIANT NCB-2448-8PYBK
Polishing Macine CVC
Capsule Polisher
Logistical S-7 Weigh & Fill 1503
Power Washer
Precision Balance Sartorius
Mi-T-M JP-1502-3ME1 - 1500 PSI
Print Plates for Labeling
Brother DCPL2540DW WCL Printer
Office Jet Printer All in one
Brother HL-L2340DW Compact
Brother all in one CL  MFCL2700D
Brother Wireless Compact Laser P
Brother DCPL2540DW Wireless CL p



Monochrome Desktop Thermal Trans
InFocus IN116A DLP Projector
LEYBOLD SV-100 PUMP
BUSCH RC-0100 PUMP
PUNCH AND DIE SET FOR STAINLESS
QC Luminameter
Racks
Storage Racks
Yale Reach Truck
High Back Exec Chair Black
U-Shape, Left return 6'X8'6" Esp
Hot Point Refrigerator/Freezer
Full Face Respirator
Roller for PKG Labeler
12 step rolling ladder
SS ROTARY TABLE W/ SPEED CONTROL
48" Global Tech Rotary Table W/S
Rotary Table 58 in. Stainless St
Rotary Table 48" SS-48
Rotary Table 48"
Sanitation Equipment
SCALE WEIGHING EJ6100 COMPACT
SCALE – PRODUCTION
Scales
Scales
Scale
Sartorius ENTRIS323-1S Milligram
Digital Scale Ohaus Model Valor
Scale Platform FG-30KAM
Scale Sartorius AY-5101 Small
SARTORIUS SCALE
Screening Machine Model #MTS 600
AF3 Screw Conveyor
INDUCTION FOIL SEALER
SECURITY CAMERA WHS 3
Security System
Security Equipment
Security Equipment
Security Camera System TH
8 ch DVr w/4 IR Camera Kit, IR c
Sensor kit, Triton, Gen IR Detec
Sensor kit, Triton, Gen IR Detec
Server Net Gear



Shipping for Equipment from SJ A
Shrink Tunnel
Document Shredder
Stainless Steal Sink
SKIDDING FOR ASSET SHIPMENT
Scissorlift 19 ft platform 25 ft
SS Slot Sampler (4) Slots 1000 m
SLOT SAMPLER STAINLESS STEEL
Custom cleanroom soft walls
Software
Spindle Capper w/ 6 spindles
SS Shelves Wall Mt 2 12 x 48, 1
Toledo SS table w/casters
SS Tables w/casters
SS WORK TABLE 30 X 24 X 33
Stack Pack Machine Former 80MM
40KW X Treme Steam Generator 480
Former 65 mm Cooling Part for St
Steel Wheel Risers
Metal Storage Cabinet
Strip Doors Clean Room
STRIP DOORS FOR CLEAN ROOMS
STRIP DOORS CLEAN ROOMS
Strip Doors 4
Custom Clean room Strip Doors
Table for Filler
Bi Directional Accumultion Table
SS Table 24" X 24"
Rolling Stainless Steel Table 30
Stainless Steel Table w/Bcksplsh
Tap Density tester SERIAL # 504.
DUAL TABLET/CAPSULE COUNTER
Testing Equipment
Testing Equipment
Testing Equipment
Testing Equipment
Lenovo Thinkserver TS140
16' Isuzu Box Truck
Turntable 48"
Turntable
2854-3 CAPPLUS TWIN SHELL BLENDE
T&B T3 UNIV FER CRIMP TOOL
Alto Vacuum

Air Power Vibrator
VINYL WALL PANELS FOR ENCAPSULAT
Motorola Talkabout MD200, Ramon
Motorola Talkabout MD200, Alex.
Motorola Talkabout MD200, Luis.
Motorola Talkabout MD200, Beau
Motorola Talkabout MD200, Fabian
Motorola Talkabout MD200, Japhet
20 gallon/2000W  electric Water
Brother DCPL2540DW Wireless Comp
Ubiquiti UAP-LR-3 Unifi AP Enter
WIRE SHELVING WH
Stainless Steel Work Table
CVC 300C Wrap Labeler
CVC 310 WRAP LABELER

## EXHIBIT "B"

## REAL PROPERTY LEASE

Real property lease for Building 1, 4645 North Ave, Oceanside, CA 92056, month to month tenancy.  Landlord Wade W. Prescott, et al.  Monthly rent $16,367 per month. Lease payments (and all other obligations of Core) are current through February 28, 2018.



**EXHIBIT "C"**

**SUPPLIES**



## EXHIBIT "D"

### INVENTORY



## EXHIBIT "E"

## VEHICLES

2007 GMC C7500 Truck

2007 Isuzu Box Truck (16')



## EXHIBIT "F"

## SUBSIDIARY PROPERTY

1. **Rights to trade name and logo for "Strongman" products, including:**

| |
|---|
| Strongman Pre-Workout Airplane Punch Bulk Powder |
| Strongman Pre-Workout Lemonade Lift Bulk Powder |
| Strongman Pre-Workout Lift Juice Watermelon Bulk Powder |
| Strongman Pre-Workout Airplane Punch |
| Strongman Pre-Workout Lemonade Lift |
| Strongman Post-Workout Airplane Punch |
| Strongman Post-Workout Lemonade Lift |
| Strongman Pre-Workout Lift Juice Watermelon |
| Strongman Glutamine |
| Strongman Creatine |
| Strongman Whey Protein Isolate Chocolate 30 serving |
| Strongman Whey Protein Isolate Chocolate 15 serving |
| Strongman Pre-Workout Lift Juice Strawberry Lemonade |
| Strongman Whey Protein Isolate Chocolate 5 serving |

2. **All inventory of such products on hand;**
3. **All materials for manufacture of such products on hand; and**
   4. **All receivables for products of Subsidiary.**

## EXHIBIT "G"

### INTELLECTUAL PROPERTY

**Website:**      www.coresupplementtech.com
**Tradename:   Core Supplement Technology**
**Formulas and Trade Secrets:      Not identified in a public document**
**Customer List:      Not identified in a public document**
**Supplier List:      Not identified in a public document**

## EXHIBIT "H"

## ORDERS (INCLUDING WIP)



**EXHIBIT "I"**

**RECEIVABLES**



EXHIBIT "J"

# ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE is being delivered as of the date indicated below by CORE SUPPLEMENT TECHNOLOGY INC. ("Seller"), pursuant to the terms of that certain Asset Purchase Agreement dated February _____, 2018 (the "APA"), by and between Seller and SIMPSON LABS LLC ("Purchaser"). Capitalized terms used herein without definition shall have the same respective meanings as the capitalized terms that are defined in the APA.

1. **Transfer of Assets**: In consideration of payment of One Million Six Hundred Thousand Dollars ($1,600,000.00), the receipt of which is hereby acknowledged, Seller hereby sells, grants, assigns, transfers, conveys and delivers to Purchaser the Included Assets described in §B of the APA, including the specific assets listed in §§1.1 -1.9 below, and all right, title and interest therein and thereto (collectively the "Transferred Assets"):

   1.1   All equipment, tools, machinery, office furniture, computers, servers and Core's information technology system and all information residing thereon (including installed software and data in memory) that is owned by Core, whether or not subject to a security interest (the "Owned Equipment"), including without limitation the specific items detailed in Exhibit "A" hereto;

   1.2   Possessory and other rights as the lessee under that certain lease of real property (the "Premises Lease"), pursuant to an assumption and assignment of such lease, as detailed in Exhibit "B" hereto;

   1.3   All supplies and raw materials used in the formulation and manufacture of nutritional supplements (the "Supplies"), as detailed in Exhibit "C" hereto;

   1.4   All finished goods (the "Inventory") as detailed in Exhibit "D" hereto;

   1.5   Two (2) trucks and trailers (the "Vehicles"), as detailed in Exhibit "E" hereto;

   1.6   One hundred percent (100%) of the membership interests in Life Brand, LLC, a California limited liability company (the "Subsidiary") that owns intellectual property including trade names, trademarks, and service marks related to the nutritional supplement business and other property (the "Subsidiary Property"), as detailed in Exhibit "F" hereto;

   1.7   Core's tradename, website, domain names, formulas, trade secrets, customer    and supplier lists, and goodwill (the "Intellectual Property"), as detailed in Exhibit "G" hereto;

      1.8 Core's open customer orders, work-in-process ("WIP"), deposits by customers for such orders or WIP, and accounts receivable associated with such orders or WIP (the "Orders"), as detailed in Exhibit "H" hereto

      1.9 All accounts receivable of Core (the "Receivables"), including without limitation the accounts receivable detailed in Exhibit "I" hereto,

      2.    **Further Acts and Documents:** Seller hereby covenants that it will, at any time and from time to time, upon the request of Purchaser, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further acts, deeds and documents as Purchaser may reasonably request in order to vest in Purchaser the Included Assets and all right, title and interest therein and thereto.

      3.    **Subject to APA:** This Assignment and Bill of Sale is subject to all of the terms and conditions of the APA.

      4.    **Binding Effect:** This Assignment and Bill of Sale shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns.

      5.    **California Law Applies:** This Assignment and Bill of Sale shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws principles.

      6.    **No Amendment Without Consent:** This Assignment and Bill of Sale may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of Seller and Purchaser.

      IN WITNESS WHEREOF, Seller has caused this Assignment and Bill of Sale to be executed and delivered on the date stated below.

Dated: _____, 2018      CORE SUPPLEMENT TECHNOLGY INC.
                               a California corporation, as Seller

                               By: _____
                                   Joseph O'Dea, its President

            and

                               By: _____
                                   Richard Feferman, Chief Restructuring Officer

## EXHIBIT "K"

## ALLOCATION

| | |
|---|---|
| Owned Equipment: | $50,000.00 |
| Premises Lease: | -0- |
| Supplies: | 1,000.00 |
| Inventory: | 100,000.00 |
| Vehicles: | 10,000.00 |
| Subsidiary/Subsidiary Property: | 34,000.00 |
| Intellectual Property (incl. goodwill): | 100,000.00 |
| Orders/WIP: | 530,000.00 |
| Receivables: | 275,000.00 |
| Total: | $1,100,000.00 |

EXHIBIT "L"

## INTERIM AGREEMENT

Whereas Core's Chief Restructuring Officer ("CRO") believes that continued operations of Core's business would result in further losses and deplete the bankruptcy estate, and that accordingly, Core should cease operations; and

Whereas Simpson desires to purchase the majority of the Core's assets, but to do so, Simpson requires that Core's business continue to operate through the closing of the sale of assets contemplated by the Asset Purchase Agreement to which this Interim Agreement is an exhibit (the "Closing"), so that going concern value is maintained;

THEREFORE, the parties agree that as of 9:00 a.m. on the business day following the Court's entry of an order approving the procedures for the sale of the assets of Core to Simpson or an overbidder, but in no event prior to 9:00 a.m. on February 23, 2018 (the latter of which is referred to as the "Effective Date"), Core's business will be operated as provided herein.

10.    Work in Process.    Core is to complete all work in process (i.e., orders as to which manufacturing has begun) as soon as possible. Core will notify Simpson by telephone and email as soon as such work in process is completed.

11.    Reduction in Staff.    Upon completion of the work in process described in §1 above, Core will reduce its staff to a "skeleton crew" consisting of two teams:

11.1 An Administrative Team consisting of Kathy Haycock, Richard Bass, Nicky McEvers, and Linda Saurez, the purpose of which is to assist the CRO in winding down Core and completing administration of Core's Chapter 7 case. The employee salaries and all other costs associated with the Administrative Team shall be borne by Core without reimbursement or other contribution from Simpson; and

11.2 An Operating Team consisting of Joseph O'Dea, Chad Robison, and Demetri Karetny, the purpose of which is to preserve the going concern value of Core's business and assist Simpson in the manufacture and distribution product and collection proceeds from product sales. The employee salaries and all other costs associated with the Operating Team shall be initially paid by Core (and the Operating Team shall at all times be employees of Core and not of Simpson), subject to reimbursement for such costs to Core from Simpson within 5 days after submission to Simpson of cost reports, provided that Core notifies Simpson of such costs as they are incurred (i.e., on the same day as such costs are incurred).

12.    Open Orders.    Orders to Core that exist as of the Effective Date, but as to which no manufacturing has begun, are referred to as "Open Orders." Core will "outsource" all Open Orders to Simpson as follows:

12.1  Core will transmit all data concerning Open Orders to Simpson by 10:00 a.m. on the Effective Date.

12.2  Simpson will exercise all commercially reasonable efforts to fulfill the Open Orders, including acquiring raw materials, manufacturing finished products, and shipping the products, all on Simpson's own account. Such efforts may require that Core provide certain intellectual property (such as formulas) to Simpson; Core agrees to cooperate with Simpson's requests for information needed to fulfill Open Orders. If Simpson desires to purchase any raw materials or other supplies from Core that Core has on hand to fulfill an Open Order, Core will sell such materials or supplies to Simpson at Core's cost, without mark-up.

12.3  Simpson will bill the customer, collect the account, and provide Core with data on such billings and collections on a weekly basis.

12.4  Whether the sale to Simpson closes or not, Simpson will keep all proceeds of the Open Orders, but will not have claims against Core in connection with any unpaid receivables on Open Orders.

13.   New Orders. Orders to Core that are first generated after execution of this Interim Agreement are referred to as "New Orders." Core will "outsource" all New Orders to Simpson on the terms described in §3 above as to Open Orders, except that if the sale to Simpson does not close, Simpson will pay to Core a commission of six percent (6%) on all funds collected on New Orders.

14.   Existing Accounts Receivable.      As of the Effective Date, Core is required to use commercially reasonable efforts to collect existing accounts receivable, and to deposit all funds collected on such accounts into a segregated account. If the sale to Simpson closes, all such funds are to be turned over to Simpson at the Closing. If the sale to Simpson does not close, such funds are to remain with Core or be paid to the successful overbidder, at the Court's direction.

15.   Return of Assets.      If the sale to Simpson does not close, Simpson will promptly return to Core all assets of Core that are in Simpson's custody, including intellectual property. Simpson agrees that Simpson will not keep property (including intellectual property) of Core if the sale to Simpson does not close, and that Simpson will not do business with any customer of Core that was not already also a customer of Simpson for a period of one (1) year after the Effective Date.

16.   Settlement of Accounts.      All accounts existing between Core and Simpson as of the Effective Date will be settled within five (5) business days of the Effective Date. The Bankruptcy Court shall have jurisdiction to resolve any disputes arising from such settlement.

# Exhibit 3
# Sales Protocols

## SALE PROCEDURES

     **A.**     **Marketed Assets.** Core Supplement Technology, Inc. ("Seller")[1] proposes to sell substantially all of the assets and properties of Seller, including without limitation, Seller's furniture, fixtures, equipment, inventory, accounts, intangibles, intellectual property rights and goodwill associated with the operation of the Business (collectively, the "Marketed Assets").

     **B.**     **Seller's Retention of Financial Advisor.** Seller has retained Richard Feferman of Corporate Recovery Associates, LLC ("CRA") as its Chief Restructuring Officer. Mr. Feferman will be primarily responsible for marketing the Marketed Assets; interfacing with prospective bidders regarding qualification of bidders and performance of diligence investigations; conducting a Court-supervised auction ("Auction"); evaluating any bids made; and selecting the "Successful Bidder" (as defined below).

     **C.**     **Stalking Horse Bidder.** Simpson Labs ("Stalking Horse Bidder") has provided to Seller an offer to acquire the Marketed Assets, and Seller has accepted that offer, subject to overbid and the approval of the Court. Seller and the Stalking Horse Bidder have entered into that Asset Purchase Agreement which is attached as Exhibit "1" hereto ("Stalking Horse Bidder's Purchase Agreement"). The proposed purchase and sale transaction ("Transaction") between Seller and the Stalking Horse Bidder is subject to overbid at the Auction in accordance with the Sale Procedures set forth herein. As set forth in the Stalking Horse Bidder's Purchase Agreement, the Stalking Horse Bidder does not propose to acquire the "Excluded Assets" described therein.

     **D.**     **Sale Hearing/Auction.** On _____, 2018, the Court will conduct a hearing ("Sale Hearing")[2] at which it will conduct the Auction of the Marketed Assets, with open bidding by prospective buyers, after which the Court will approve the winning bidder.

     **E.**     **Bidder Pre-Qualification for Auction.** Any person or entity that desires to participate in the Auction must be a qualified bidder ("Qualified Bidder"). In order to become a Qualified Bidder, a bidder must satisfy the following requirements:

     **1.**     **Required Documentation/Evidence of Bidder's Ability to Consummate the Proposed Transaction.** In order for a potential bidder to be deemed a Qualified Bidder to participate in the Auction, the bidder must deliver to CRA (with a copy to Seller's Counsel (defined below)), among other things, the following documents: (a) an executed confidentiality agreement in the form attached hereto as Exhibit "2" (Seller reserves the right to require that such form of the confidentiality agreement be executed without any revisions thereto); (b) current financial statements of the bidder, current bank account statements of the bidder or such other form of disclosure regarding the bidder's financial condition acceptable to Seller, providing to Seller evidence of the bidder's having sufficient funds, a commitment for financing or ability otherwise to consummate its proposed Transaction, (c) a signed letter setting forth the identity of the

---

[1] All references to Seller mean Core Supplement Technology, Inc. acting by and through its Court-approved Chief Restructuring Officer Richard Feferman, subject to final approval by the Court.
[2] Unless otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the motion to approve these sale procedures.

bidder, the contact information for the bidder, and full disclosure of any pre-petition or post-petition affiliations that the bidder has or may have with (i) Seller, (ii) any of Seller's affiliates, (iii) any creditor of Seller, (iv) any holder of an equity interest in Seller, or (v) any of Seller's current or former officers, directors or other insiders, and/or their relatives or family members; (d)  signed letter acknowledging receipt of a copy of this Sale Procedures Memorandum and agreeing to accept and be bound by the provisions contained herein; (e) a signed letter by the bidder that any bid made by the bidder is irrevocable and binding until the closing ("Closing") of the sale of Marketed Assets; and (f) any other documents reasonably requested by Seller.

In addition, a potential bidder will qualify to participate in the Auction only if the potential bidder demonstrates its ability to consummate the Transaction contemplated by the terms of the potential bidder's bid and demonstrates its ability to provide, under Section 365 of the Bankruptcy Code, adequate assurance of its future performance under all leases and contracts that the bidder desires to assume from Seller ("Assumed Contracts"). Each bidder must cooperate with Seller with respect to the assumption and assignment of Assumed Contracts to the bidder by providing to Seller information regarding the bidder, including financial information regarding the bidder, that will be sufficient to demonstrate adequate assurance of the bidder's future performance pursuant to the Assumed Contracts. Seller may deliver such information to the non-debtor party to an Assumed Contract, and may file such information with the Court. Seller may decline to recognize a potential bidder as a Qualified Bidder if Seller determines that the potential bidder lacks the ability to consummate timely the proposed Transaction.

Seller may take into account several subjective factors in determining whether a bidder will be deemed to be a Qualified Bidder, as described in paragraph H below. Seller may approve as many or as few Qualified Bidders as it deems appropriate for an active and productive sale process. Seller may consult with, and may take into account any input provided by, any creditor and any other party-in-interest. By way of example, and not limitation, Seller will require that, in order for a bidder to be deemed a Qualified Bidder, the bidder demonstrate to Seller that the bidder can obtain timely for consummating the proposed Transaction any acquisition and/or working capital financing that the bidder proposes to obtain to fund the proposed Transaction, and the bidder demonstrate to Seller that the bidder will be able to close timely the Transaction.

**2.** **Bid Requirements.** Seller will require that all bids be in the form of an Asset Purchase Agreement, comparable to the form of the Stalking Horse Bidder's Purchase Agreement, marked to show all proposed revisions to the Stalking Horse Bidder's Purchase Agreement, including the purchase price and other financial terms proposed by the Qualified Bidder ("Over bidder's Purchase Agreement").

All bids must include all assets to be purchased under the Stalking Horse Bidder's Purchase Agreement, but may also include additional assets designated by the Stalking Horse as Excluded Assets, provided that such assets may be lawfully sold or assigned to the bidder. If a bidder submits a bid to acquire an assignment of an executory contract or unexpired lease of Seller, the bidder must either obtain the consent of a counterparty to any such executory contract or unexpired lease ("Counterparty") to such assignment, or obtain a determination by the Court at the Sale Hearing that such executory contract or

unexpired lease is assignable to the bidder without the consent of the Counterparty. Seller will authorize a Qualified Bidder, after the execution of an appropriate confidentiality agreement, to engage in discussions with any Counterparty to an executory contract or unexpired lease with Seller, for the purpose of obtaining consent to the assignment of such executory contract or unexpired lease to such bidder.

Seller will require that a Qualified Bidder's bid for Marketed Assets be signed by the Qualified Bidder and be irrevocable and binding until the Closing of the sale of Marketed Assets.

Unless otherwise determined by Seller in the exercise of its sole and absolute discretion, Seller will consider a Qualified Bidder's bid <u>only</u> if the bid (a) provides, in the case of any bidder other than the Stalking Horse Bidder, for a purchase price ("Purchase Price") with a value not less than the sum of: (i) $1,700,000 in cash; (ii) the amount of sales taxes that will be assessed in connection with the Transaction; (iii) the amount of any costs required to be paid to cure arrearages under the Assumed Contracts in connection with the assumption and assignment to the Qualified Bidder of any Assumed Contracts; (iv) the value to Seller's Chapter 11 estate of the assumption by the Stalking Horse Bidder of the "Assumed Liabilities," as that term is defined in B(2) of the Stalking Horse Bidder's Purchase Agreement; and (v) an initial overbid increment of $100,000; (b) is not conditioned on the Qualified Bidder's obtaining financing; (c) is not conditioned on the outcome of diligence to be performed by the Qualified Bidder after the Bid Deadline (as defined below); (d) states the legal and identifying tax identification number of the Qualified Bidder; (e) does not include any closing conditions or other terms more burdensome to Seller than those set forth in the Stalking Horse Bidder's Purchase Agreement; and (f) does not request a payment of a break-up fee or expense reimbursement ("Qualified Bid").

In evaluating competing bids, Seller generally will favor cash consideration over non-cash consideration, such as any proposed assumption of liabilities. At this early stage of Seller's case, the projected recovery by general unsecured creditors is highly uncertain. It is very difficult, if not impossible, therefore, for Seller now to evaluate with any degree of accuracy the benefit to Seller's bankruptcy estate of an assumption of any assumed liabilities by a Qualified Bidder. Accordingly, to be conservative, Seller intends to discount substantially the benefit to Seller's estate of any Qualified Bidder's assumed liabilities versus the benefit of a competing cash bid. In this regard, given Seller's current evaluation of Seller's assets and liabilities, it is Seller's current intention to place only a nominal value on any assumed liabilities (e.g., a 10% value versus a competing cash bid). Seller reserves the right to change the value that it attributes to any assumed liabilities, if and when changes in circumstances so dictate. Seller will give to any Qualified Bidders prompt notice of such change in valuation.

**3.**    **Deposit.** In order for a bidder to qualify as a Qualified Bidder, the bidder must provide to Seller a deposit in the amount of $100,000 ("Deposit"):

a.    Payment of Deposits.  The Deposit must be wired to STEPHEN C. HINZE, ATTORNEY AT LAW, A PC ("Seller's Counsel").  Wire instructions are attached as Exhibit "3" hereto.

      b.    <u>Refund of Deposits</u>.  A Qualified Bidder will be entitled to obtain a refund of its Deposit only if the Qualified Bidder's Qualified Bid is not selected as the Successful Bid in accordance with the provisions of paragraph N hereof.

    **4.**    **<u>Notification of Qualifying</u>.** Seller will notify promptly each potential bidder whether Seller will deem the bidder to be a Qualified Bidder or whether Seller has declined to recognize the bidder as a Qualified Bidder. The Stalking Horse Bidder is deemed to be a Qualified Bidder. Seller may provide to any bidder an opportunity to remedy any deficiencies in a bid. Seller's recognizing a bidder as a Qualified Bidder reflects only that the bidder may participate in the Auction, and does not reflect any determination by Seller, or by the Court, that the bidder is capable of consummating the proposed Transaction, or is capable of demonstrating adequate assurance of the bidder's future performance under any Assumed Contracts in accordance with Section 365 of the Bankruptcy Code.  Seller reserves the right to reject any Qualified Bid as unsatisfactory, or to discount a Qualified Bid relative to other bids, based upon any matter pertaining to the business experience or financial condition of the bidder, or based upon any other matter pertaining to the bidder, that Seller believes will impair Seller's ability to obtain from the Court approval of the proposed Transaction with the bidder or otherwise will impair Seller's ability to close timely the proposed Transaction with the bidder.

    **F.**    **<u>Due Diligence</u>.** Parties interested in purchasing the Marketed Assets who have satisfied the requirements of paragraph E(1) above may obtain diligence materials, and arrange for inspection of the Marketed Assets, by contacting Richard Feferman of CRA, as follows:

> 3830 Valley Centre Drive, Suite 705-152,
> San Diego, CA 92130
> E-Mail:  richard@crarecovery.com
> Telephone:  858.792.7473

A bidder's due diligence must be completed no later than the Bid Deadline (defined below).

    **G.**    **<u>Bid Deadline</u>.** The deadline for all Qualified Bidders to submit a Qualified Bid is 5:00 p.m. (Pacific) on _____ **2018** ("Bid Deadline"), three days prior to the Sale Hearing, subject to Seller's ability to extend the Bid Deadline as it deems appropriate.

    A bidder that desires to make a Qualified Bid must deliver, by mail, e-mail or by personal delivery, (1) an executed copy of the Qualified Bid (in the form of the Over bidder's Purchase Agreement), with original signatures, (2) a corresponding redlined version of the Qualified Bid (in the form of the Over bidder's Purchase Agreement), marked to show changes made to the Stalking Horse Bidder's Purchase Agreement, and (3) the materials required to become a Qualified Bidder as set forth in paragraph E(1) above, as follows:

To CRA:                Richard Feferman
                          3830 Valley Centre Drive, Suite 705-152,
                          San Diego, CA 92130
                          E-Mail:  richard@crarecovery.com
                          Telephone:  858.792.7473

With a Copy to
Seller's Counsel:                    Stephen C. Hinze, Esq.
                                     STEPHEN C. HINZE, ATTORNEY AT LAW, A PC
                                     217 Civic Center Drive, Suite 10
                                     Vista, California 92084
                                     Telephone: (760) 689-0705
                                     E-Mail: sch@schinzelaw.com

**H.**    **Seller's Consideration of Bids.** After all Qualified Bids have been received by
Seller, Seller will determine the best Qualified Bid to recommend that the Court approve,
including the bid by the Stalking Horse Bidder. Seller will make this determination based in part
upon the financial and other terms proposed by the Qualified Bidder pursuant to its Qualified
Bid, and Seller's determination regarding the likelihood of Seller's ability to consummate timely
a Transaction with the Qualified Bidder in accordance with the terms and conditions of the
Qualified Bidder's Qualified Bid, taking into account, among other things, the evidence provided
by the Qualified Bidder of its financial ability to close timely the Transaction.

Seller will favor bids that provide, in part, for the following terms: (1) a Purchase Price
payable all in cash, rather than one that requires that Seller finance a portion of the Purchase
Price; (2) the assignment to the Qualified Bidder of Seller's executory contracts and unexpired
leases associated with the operation of Seller's business; (3) Seller's retention of the "Excluded
Assets" associated with Seller's business as provided in paragraph C of the Stalking Horse
Bidder's Purchase Agreement; (4) Seller's making covenants, or making representations or
warranties, not more burdensome to Seller than those set forth in the Stalking Horse Bidder's
Purchase Agreement; (5) conditions to the closing of the Transaction not more burdensome to
Seller than those set forth in the Stalking Horse Bidder's Purchase Agreement; (6) an expeditious
Closing of the Transaction; and (7) a Transaction that is reasonably certain to be consummated.

Subject to the approval of the Court at the Sale Hearing, Seller may, in the exercise of its
business judgment, reject a bid that is not an all-cash bid, or discount any bid that is not an all-
cash bid relative to a cash bid, based upon criteria adopted reasonably by Seller (e.g., based upon
whether collateral is provided to secure the payment of the non-cash component of the bid; the
terms of the non-cash bid; the bidder's ability to demonstrate that the bidder will be able to pay
the non-cash portion of its bid; and Seller's need for cash in the administration of its case).

**I.**    **Auction.** The Auction will be conducted in Court on _____, 2018, at:

                                     Jacob Weinberger United States Courthouse
                                     325 West F Street
                                     San Diego, CA 92101 – 6998
                                     Department 1
                                     Room 218

The Auction will be held in person; provided, however, that Seller reserves the right, in the
exercise of its sole and absolute discretion, to allow telephonic participation by certain bidders.
Qualified Bidders, and representatives of Qualified Bidders, will be entitled to attend and/or

participate at the Auction. Seller may elect, in the exercise of its sole and absolute discretion, not to hold an Auction if no overbids, or only overbids deemed unsatisfactory by Seller, are received by Seller. Seller will provide to all Qualified Bidders notice of any cancellation of the Auction. Seller may seek to sell the Marketed Assets through a single Transaction, or through separate Transactions under separate Purchase Agreements with different purchasers in the event that the combination of such sales is determined by Seller in the exercise of its sole and absolute discretion to obtain the highest or otherwise best bid for the Marketed Assets.

     **J.**    **Overbidding at Auction.** Seller will announce at the commencement of the Auction the Qualified Bid that Seller determines to be the most favorable bid for the Marketed Assets. At the Auction, Qualified Bidders, including the Stalking Horse Bidder, will have the opportunity, but not the obligation, to make in an open forum overbids in excess of their initial bids.

     The Purchase Price offered by any over bidder must include an initial overbid in an amount not less than $100,000. Subsequent overbids by any bidder (including the Stalking Horse Bidder) must be in minimum increments of not less than $20,000. Seller reserves the right to amend the bidding terms at any time.

     **K.**    **Successful Bid/Court Approval/Sale Order/Good Faith Finding.** After the conclusion of bidding, Seller will select the successful bid for the Marketed Assets ("Successful Bid") and will request that the Court approve it by entry of an order ("Sale Order") pursuant to which the Court will authorize Seller to consummate the Transaction with the Successful Bidder, in accordance with the terms and conditions of the Successful Bid. The Sale Order will be in a form acceptable to the Successful Bidder, which acceptance cannot be unreasonably withheld. Within one (1) business day after the completion of the Auction, the bidder making the Successful Bid ("Successful Bidder") must complete, execute and deliver to Seller all agreements, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

If the Successful Bidder desires a "good faith" finding under Bankruptcy Code section 363(m), then it will be required to file with the Court a declaration confirming that it has not engaged in any collusion with respect to the bidding or the sale process.

     **L.**    **Non-Refundable Deposit of Successful Bidder.** In the event that the Successful Bidder fails, through no fault of Seller, to consummate timely the Transaction approved by the Sale Order, the Successful Bidder will irrevocably forfeit its Deposit without further order of the Court.

     **M.**    **Back-Up Bids.** Seller will request that, in connection with the Sale Order, the Court determine the priority, with reference to the favorableness to Seller's Chapter 11 estate, of any Qualified Bid made by one or more Qualified Bidders other than the Successful Bidder ("Back-Up Bidders") and establish the date by which each Back-Up Bidder must consummate a Transaction with Seller (as such Back-Up Bidder's bid may be improved by the terms of any overbid made by such Back-Up Bidder pursuant to the Auction), in the event that the Successful Bidder fails to consummate its Transaction with Seller by the date established by the Court therefor. If a Successful Bidder fails to close timely a Transaction after approval of the Transaction by the Court, the next highest or otherwise best back-up bid ("Back-Up Bid"), as

determined by the Sale Order, instead will be deemed to be the Successful Bid with respect to such Transaction, without any need for further order of the Court. Seller reserves the right to seek all additional damages from, and to exercise all remedies against, a defaulting Successful Bidder or Back-Up Bidder.

N.    **Retention and Return of Deposits.** Except as provided expressly to the contrary herein, all Deposits provided to Seller by Qualified Bidders will be retained by Seller, and all Qualified Bids will remain open, notwithstanding the Court's approval of a Transaction with the Successful Bidder, until two (2) business days after the Closing of the Transaction with the Successful Bidder, but in no event later than thirty (30) days after the Sale Hearing without the consent of the Qualified Bidder; provided, however, that Seller will return, within seven (7) days after the Auction, all Deposits provided by a Qualified Bidder if Seller determines, in the exercise of its sole and absolute discretion, that the Qualified Bid of such Qualified Bidder is not viable as a Back-Up Bid.

O.    **Closing of the Transaction.** The Closing of a Transaction with the Successful Bidder or with any Back-Up Bidder will occur no later than three (3) business days following the entry of the Sale Order, so long as the effectiveness of such order has not been stayed by a court of competent jurisdiction.

P.    **Seller's Discretion with Respect to Sale Procedures.** Seller may amend the Sale Procedures set forth herein, or may adopt additional procedures or rules for the bidding process, that in the discretion of Seller will better promote the goals of the sale process and which will maximize the proceeds generated for the benefit of Seller's estate which are not inconsistent with the provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Local Bankruptcy Rules. Without limiting the generality of the foregoing, Seller may, in the exercise of its sole and absolute discretion, do any of the following: (1) extend the Bid Deadline; (2) deem a bidder a Qualified Bidder, notwithstanding the bidder's failure to comply with the terms of the Sale Procedures, or notwithstanding any initial determination by Seller that the bidder is not a Qualified Bidder; (3) adopt criteria that Seller deems appropriate for determining the Successful Bid; (4) amend the terms and conditions of the Stalking Horse Bidder's Purchase Agreement or an Over bidder's Purchase Agreement, including, without limitation, the Purchase Price, conditions to the Closing of the Transaction contemplated thereby, and the timing of the Closing of the Transaction, as Seller and the bidder may mutually agree; (5) sell any Excluded Asset (other than bankruptcy avoidance claims and causes of action); (6) reject any bid that is inadequate or insufficient, or that is not in conformity with the requirements of the Sale Procedures; and (7) allow additional bidding after the Auction, up to the conclusion of the Sale Hearing, as Seller may deem appropriate. Seller's ability to consummate any Transaction, however, will be subject to the approval of the Court.

Q.    **Acceptance of Successful Bid.** Seller's obligation to consummate a sale of the Marketed Assets to the Successful Bidder will arise only when the Court approves the proposed Transaction at the Sale Hearing, and the Successful Bidder tenders in full the Purchase Price for the Marketed Assets and otherwise complies with its obligations under its Purchase Agreement. Seller reserves the right, in the exercise of its sole and absolute discretion, to decline to sell the Marketed Assets in the event that (1) the Successful Bidder does not consummate timely its proposed Transaction, and (2) Seller determines that the terms of any overbid are unsatisfactory or are not in the best interest of Seller's creditors.

All funds that a bidder will pay to Seller in connection with the sale process described herein, including, without limitation, all Deposits and the Purchase Price, will be paid to the attorney trust account of Seller's Counsel. Seller's Counsel will hold all such funds and will not release such funds to Seller or to a bidder, unless either (1) Seller and the bidder provide to Seller's Counsel their mutual written instructions authorizing the release of such funds, or (2) the Court enters an order authorizing the release of such funds after notice and a hearing. All bidders hereby absolve and waive and release fully and completely Seller's Counsel from any liability of any nature whatsoever for any acts taken by Seller's Counsel in accordance with the provisions of this paragraph.

**R.    Jurisdiction.** Any and all disputes relating to, resulting or arising from the Sale Procedures set forth herein, the Auction, the Sale Hearing, the selection of the Successful Bidder, the disposition of Deposits or the conduct of Seller, will be adjudicated solely by the Court. A bidder's submission of a bid will constitute an express consent by the bidder to the exclusive jurisdiction of the Court to hear and to rule on any action or proceeding with respect to all such matters. Notwithstanding the foregoing, in the event that the Court declines jurisdiction or is otherwise wholly unavailable, then any action or proceeding with respect to such matters may be brought only in the state or federal courts sitting in San Diego County, California.

**FOR FURTHER INFORMATION REGARDING THE MARKETED ASSETS, DUE DILIGENCE OR THE SALE PROCESS, PLEASE CONTACT:**

> Richard Feferman
> 3830 Valley Centre Drive, Suite 705-152,
> San Diego, CA 92130
> E-Mail:  richard@crarecovery.com
> Telephone:  858.792.7473

2018-02-14-Core - Sale_Procedures_Memo-wire instructions

# EXHIBIT "1"

## ASSET PURCHASE AGREEMENT

[TO BE ADDED]

See Exhibit 2 to Feferman Declaration

## EXHIBIT "2"

## NON-DISCLOSURE AGREEMENT

[TO BE ADDED]

See Exhibit 4 to Feferman Declaration

## EXHIBIT "3"

## <u>WIRE INSTRUCTIONS</u>

Account Name:                                    Stephen C. Hinze, Attorney At Law, APC

Account Address:                                 217 Civic Center Drive, Suite 10

Vista CA 92084

Bank Name:                                       California Bank and Trust

Account No.:                                     5790048287

Routing No:                                      122232109

SWIFT No. (International Transfers):             ZFNBUS55

**All domestic wire transfers must include an additional $14.00 to cover incoming wire service fee charged by the Bank.  International wires include an additional $15.00.**

2018-02-14-Core - Sale_Procedures_Memo-wire instructions

# Exhibit 4
# Non-Disclosure Agreement

## NON-DISCLOSURE AGREEMENT

THIS NON-DISCLOSURE AGREEMENT ("**Agreement**") is made this ___ day of _____, 2016, by the undersigned on behalf of itself and its subsidiaries, affiliates, officers, directors, partners, members, managers, employees, agents, successors and assigns, (collectively, the "**Recipient**") with respect to documents and information related to CORE SUPPLEMENTS, INC. a California Corporation (**"Core"**).

### BACKGROUND

Core manufactures nutritional supplements in Oceanside California.  Core filed a voluntary petition under Chapter 11 of the Bankruptcy Code on 10/03/2017 in the United States Bankruptcy Court for the Southern District of California, such action being captioned Core Supplement Technology, Inc. case number 17-6078 MM11. In connection with the chapter 11 proceedings, Core has retained Richard Feferman of Corporate Recovery Associates, LLC 3830 Valley Center Drive, Suite 75-152, San Diego CA 92130 ("CRA") as Chief Restructuring Officer in connection with a sale or sales of its assets (the "**Assets**").  Recipient has requested, or may request in the future, certain non-public information from Core (the **"Provider"**) regarding Core or the Assets for the sole purpose of determining whether Recipient desires to submit a bid to purchase some or all of the Assets (the "**Transaction**").

### AGREEMENT

In consideration of the foregoing and as a condition to the disclosure of the Confidential Information (as defined below), Recipient hereby agrees as follows:

**1.**     **Definition of Confidential Information**.   When used in this Agreement, "**Confidential Information**" means all documents relating to Core, the Assets and any other information related to Core or the Assets which are provided or otherwise made available for observation or inspection (including electronic access), directly or indirectly to Recipient or any of Recipient's directors, managers, officers, shareholders, members, partners, employees, agents, affiliates, consultants, attorneys, accountants and other advisors or representatives (each a "**Recipient Representative**" and collectively, the "**Recipient Representatives**") including, but not limited to, any and all financial statements, forecasts, projections, business plans, due diligence materials and research results, permits, agreements, service and personnel costs, reports, marketing plans, research and development activities, information pertaining to independent contractors, employees, customers, clients, suppliers and vendors, know-how or other business and technical information, and any and all related notes, analyses, compilations, lists, studies and other works prepared by Recipient or any Recipient Representative that contains or is generated from the foregoing information.  All Confidential Information, in whatever form, is and shall remain the property of the Provider.

**2.**     **Safeguarding of Confidential Information**.   Upon receipt, observation or inspection of the Confidential Information, Recipient shall (a) only disclose such Confidential Information to its Recipient Representatives with a need to have access to and knowledge of the Confidential Information solely for the purpose of the Transaction and not disclose to any other person or entity except with the prior written consent of Provider to do so; provided that at all

times Recipient shall maintain a list of the names and addresses of such Recipient Representative who has received, observed or inspected the Confidential Information and provide such list to Provider promptly upon request; (b) advise each Recipient Representative who receives, observes or inspects the Confidential Information of the existence and terms of this Agreement and of the obligations of confidentiality and nondisclosure herein and cause each Recipient Representative to comply with this Agreement as if it was a party hereto and be responsible for any breach of this Agreement by all Recipient Representatives; (c) use and require each Recipient Representative to use at least the same degree of care to protect the Confidential Information as is used with its own proprietary information, with the degree of care, in no event, to be less than holding the Confidential Information in strict confidence; and (d) use, and require each Recipient Representative to use, the Confidential Information solely for the purpose of the Transaction.

**3.    Confidentiality of this Agreement.**  Recipient shall not, and shall cause each Recipient Representative to not, disclose the existence or the terms of this Agreement or the Transaction to any other third party except upon prior written consent of Provider.

**4.    Prohibited Actions**.  In addition to the matters set forth in sections 2 and 3 above, Recipient further agrees that it shall not, and any Recipient Representative shall not:  (a) use the Confidential Information to engage in any business which competes, directly or indirectly, with Core (provided, however, that Provider acknowledges that Recipient and any Recipient Representative may own or hold up to 10% of the outstanding equity interests in a publicly traded entity which is a competitor of Core without violating this provision); (b) solicit, directly or indirectly, any employee of Core to engage in any activity which competes with Core (provided, however, that a general solicitation to the public to which an employee responds is not a violation of this Agreement); (c) contact or otherwise attempt to communicate with any of Core's employees, landlords, vendors, lenders or creditors concerning Core.

**5.    No Representation**.  ALL CONFIDENTIAL INFORMATION IS PROVIDED "**AS IS**" WITH ALL FAULTS.  IN NO EVENT SHALL PROVIDER, CRA, RICHARD FEFERMAN, OR ANY PERSON BE LIABLE TO RECIPIENT OR ANY RECIPIENT REPRESENTATIVE FOR THE ACCURACY OR COMPLETENESS OF ANY CONFIDENTIAL INFORMATION.

**6.    Term**.  Recipient agrees that all of its obligations undertaken herein with respect to Confidential Information under the terms of this Agreement shall survive and continue after any expiration or termination of this Agreement for a period of two (2) years after the date of execution of this Agreement by the Recipient.

**7.    Exceptions**.  Notwithstanding anything to the contrary herein, Recipient shall have no obligation to preserve the confidentiality of any Confidential Information, which (a) is or becomes publicly available by other than unauthorized disclosure by Recipient, any Recipient Representative or any third party; or (b) is developed by Recipient or any Recipient Representative wholly independent of any Confidential Information.  Further, the Recipient may disclose the Confidential Information pursuant to a valid order issued by a court or governmental agency; provided that the Recipient provides Provider (i) prior written notice of such obligation, and (ii) the opportunity to oppose such disclosure or obtain a protective order.  Notwithstanding

any disclosure under the previous sentence, the disclosed Confidential Information shall remain Confidential Information and otherwise be subject to all of the protections under this Agreement.

**8.**     **No Obligation**.     Neither this Agreement nor the disclosure or receipt of Confidential Information shall constitute or imply any promise, intention or commitment by either party to enter into a business transaction with the other party, including without limitation, the Transaction.  In addition, Provider has no obligation whatsoever to furnish Recipient or any Recipient Representative with any Confidential Information.

**9.**     **Return of Confidential Information**.     Confidential Information furnished in written, pictorial, magnetic and/or other tangible form shall not be duplicated by Recipient or any Recipient Representative except as necessary for the purpose of the Transaction.  At any time upon demand by Provider, Recipient shall, and shall cause each Recipient Representative to, immediately return to Provider, all written documents of any nature disclosed or delivered to Recipient or any Recipient Representative under this Agreement, and all copies, extracts and reproductions of such information.  Recipient further agrees to destroy, and shall cause each Recipient Representative to destroy, all notes, analyses, compilations, studies and all other works prepared by Recipient and all Recipient Representatives that were generated from or are based on the Confidential Information, immediately after receipt of request of the same from Provider.  Recipient agrees to promptly provide, and to cause each Recipient Representative to promptly provide, Provider with written certification of its satisfaction of the terms of this Section 9.  Notwithstanding the foregoing, if Recipient is a private equity fund or other organization which is required to retain copies of Confidential Information in accordance with established records retention policies, such Recipient may retain the Confidential Information, but it shall remain Confidential Information and otherwise be subject to all of the protections under this Agreement.

**10.**     **No Removal of Markings**.     Recipient agrees that it shall not, and shall cause each Recipient Representative not to, remove, overprint or deface any notice of confidentiality, copyright, trademark, logo, legend or other notices of ownership or confidentiality from the Confidential Information, or authorize any third party to do any of the foregoing.

**11.**     **Remedies**.     Recipient acknowledges that any failure to carry out any obligation under this Agreement, or a breach by Recipient or any Recipient Representatives of any provision herein, will constitute immediate and irreparable damage to Provider, which cannot be fully and adequately compensated in money damages and which will warrant preliminary and other injunctive relief, an order for specific performance, and/or other equitable relief.  Recipient agrees that no bond or other security shall be required in obtaining such equitable relief, and hereby consents to the issuance of such injunction, the ordering of specific performance and/or any other equitable relief requested by Provider.  Recipient further agrees that any action to enforce this Agreement may be brought in the United States Bankruptcy Court for the Southern District of California, and Recipient expressly consents to the jurisdiction and venue of that court.  Such remedies listed in this Section shall not be deemed to be Provider's exclusive remedies, but shall be in addition to all other remedies available at law or equity to Provider.  Recipient further acknowledges that the limitations contained herein are reasonable and necessary for the protection of Provider's interests.  In the event that an action is brought by Provider to enforce this Agreement, Recipient agrees to fully reimburse Provider for all

reasonable attorneys' fees, costs and expenses incurred by Provider in bringing or defending the action.

      **12.**    **Miscellaneous**.  No amendment shall be made to this Agreement unless agreed upon in writing and executed by Provider.  If any term of this Agreement shall be held to be illegal or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect.  This Agreement is not assignable or transferable (whether by merger, operation of law or otherwise) by Recipient.  This Agreement shall be construed in accordance with the laws of the State of California, without regard to conflict of law principles.  This Agreement sets forth the entire understanding of the parties to this Agreement regarding the subject matter hereof and supersedes all prior agreements, arrangements, communications, representations and warranties, whether oral or written, between the parties regarding the subject matter hereof.  This Agreement may be executed in electronic, telecopy or other similar form and such will be treated as an original for all purposes.

      The undersigned has executed this Non-Disclosure Agreement as of the date first written above.

If Recipient is an individual:

If Recipient is an entity:

_____
Signature

_____
Printed Name

_____
Address

_____
City/State/ZIP

_____
Phone

_____
Email

_____
Signature

_____
Printed Name

_____
Company

_____
Title

_____
Address

_____
City/State/ZIP

_____
Phone

_____
Email