TENTATIVE RULING

ISSUED BY JUDGE MARGARET M. MANN

Debtor:     CORE SUPPLEMENT TECHNOLOGY, INC.
Number:    17-06078-MM11

Hearing:    11:00 AM   Thursday, February 22, 2018

Motion:     MOTION FOR (1) ORDER APPROVING STALKING HORSE, MARKETING AND OVERBID PROCEDURES, AND SETTING FINAL SALE HEARING; (2) ORDER APPROVING (A) SALE FREE AND CLEAR, (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) RELATED RELIEF FILED BY DEBTOR

The court has several concerns regarding the Motion:

1. The purchase price is inconsistently stated. The papers filed in support of the Motion identify the purchase price as $1,600,000. Doc. 139, p 5. The Asset Purchase Agreement ("APA") identifies the Purchase Price at $1,100,000. Doc. 141, p. 14. The Bill of Sale attached to the APA provides a purchase price of $1,600,000 again. Doc. 141, p. 46. What is the purchase price? Further, the purchase price used to be $2.2 million. Why did it decline?

2. Since January, Simpson has been doing all of Debtor's manufacturing per O'Dea's January 30, 2018 declaration. This conflicts with the CRO's current declaration that that only a portion of Debtor's business was outsourced. According to O'Dea, Simpson had been purchasing raw materials on behalf of Debtor, performing the work needed to turn them into finished product, and shipping the product to Debtor's customers, allowing the Debtor to get paid without Debtor providing cash up front. Simpson did not require payment from Debtor until after product completion, which allowed Debtor to collect from its own customers before having to pay Simpson. Debtor's orders have a turnaround period of eight weeks. Why these generous financing terms could not be continued until the sale is not explained. Did Simpson stop the arrangement in conjunction with the negotiations for the sale?  O'Dea's declaration seemed to indicate this previous arrangement was positive for Debtor. If not, why did Debtor continue operating if it was losing money with this arrangement?

3. The court has significant concerns with the Interim Operating Agreement ("IOA"). It provides that Debtor's staff would be decreased to 7 people, the cost of which would be borne by Core, unless reimbursed by Simpson. Staff must collect Debtor's AR and hold it in a segregated account to be paid to the buyer. Regardless of whether the sale to Simpson is consummated, Simpson receives all revenues from open orders. Doc. 141, p. 50. Simpson also receives all revenues from new orders, contingent only upon him paying a 6% commission if the sale does not close.   Doc. 141, p. 50.

4. Rather than comparing Debtor's modus operandi as recently explained to the court, the CRO instead suggests that the only alternative to the IOA would be Debtor ramping up again to full scale manufacturing. This alternative seems to be a false one since it would be disastrous indeed. The CRO projects losses of $800,000 if Debtor were to return to full manufacturing which it has not been doing for some time. These projections reflect a small gross margin of just $135,000 for orders of $1,350,000, with costs of goods sold of $1,215,000. This ramp up strategy would involve $200,000 temporary labor costs, $210,000 of wages, $20,000 in bonuses, $45,091 of Contr/temp labor, for a total of $475,000 in labor costs. In comparison, Debtor's monthly payroll expense in December was only $100,000.

5. The CRO's ramp up comparison may not be the only alternative to the IOA. There is the former Simpson arrangement which O'Dea describes as working well a few weeks ago. To understand the true benefit of the IOA, the CRO must compare the profitability of Debtor based on the Simpson arrangement three weeks ago. Debtor's operating report history does not list such large losses. That history only reflects cumulative losses of $406,940 on revenue of $1,904,065. This is important since Simpson receives a release from Debtor of all claims, and not only those in connection with the sale, if he is the successful bidder.

6. It is curious that Debtor's orders increased substantially last month: $1.35 million, as opposed to $1.1 average in 2017 and $700k average since the filing Doc. 139, p. 3. This occurred right before Simpson would get the benefit of the IOA. The CRO calls this sales increase "paradoxical" but a reason should be provided.

7. Although the CRO states his view is to the contrary, he provides no reasons why the IOA would not discourage bidders. It seems possible the new buyer would not receive any work in process or orders, and would be put in the disastrous ramp up scenario modeled by the CRO. The structure of the IOA is that it gives

Simpson the effect of a sale without an actual sale, diminishing Simpson's motivation to go through with the sale. Simpson gets to use Debtor's assets, retain the new accounts receivable, and while Simpson bears the burden of any loss if the sale is consummated, the IOA contains no provision providing that Simpson bears the burden of any loss in the interim. Instead, Debtor cites the continuing losses it expects to bear pending the sale as justification to waive the 14-day stay of Fed. R. Bankr. P. 6004(h).   If the sale with Simpson does not go through Simpson only needs to "return all of Core's assets in their custody" (Interim Agreement; Doc 141, pg 50; APA pg 39). Simpson also agrees to refrain from doing business with Core customers for 1 year. Presumably, this would exclude the new AR and orders generated, which are substantial.

8. The court is convinced Debtor's assets need to be sold, and would consider a sale on shortened notice without the IOA. The court would provide a hearing date of March 6 or 7, 2018. Under this short time frame, there may be no need for the IOA to be approved. Whether this time frame is feasible needs to be addressed at the hearing.

9. The court specifically requested information regarding the impact on creditors at an earlier status conference, yet the impact on creditors is too vague to be informative. The CRO contends the sale "*may* result in payment in full of Bank of America and administrative claims, and *the possibility* of a distribution to unsecured creditors." Doc. 141, p. 6.   What are the variables under consideration here – quantification of BofA's claim, presence of overbidders? This must be explained. The court notes that the CRO describes the gross liquidation value as $1,142,000, including cash on hand of $742,000. If inventory was valued at that amount at the inception of the case, there might be an impact on BofA's secured claim.

10. Finally, the court does not see how it can approve a waiver of the stay of any approved sale after the auction, until the auction actually occurs. The court does not understand why a stay of the order must be waived at this time.