Mette H. Kurth (SBN: 187100)
mkurth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Blvd., Suite 900
Los Angeles, CA 90067-1506
Telephone: 310.598.4150
Facsimile:  310.556.9828

*Proposed* Special Counsel for Core
Supplement Technology, Inc._____

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>**CORE SUPPLEMENT TECHNOLOGY, INC.**, a California Corporation<br><br>Debtor and Debtor in Possession | Case No.:  17-06078-MM11<br><br>Chapter 11<br><br>**DECLARATION OF RICHARD FEFERMAN IN SUPPORT OF (A) EMERGENCY MOTION FOR ENTRY OF ORDER: (1) SETTING FINAL SALE HEARING; (2) APPROVING SALE FREE AND CLEAR AND RELATED RELIEF; (3) APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019; AND (4) APPROVING ASSUMPTION AND ASSIGNMENT OF CUSTOMER ORDERS AND (B) DEBTOR'S RESPONSE TO ORDER TO SHOW CAUSE**<br><br>Judge:     Hon. Margaret M. Mann<br>Dept:      1, Room  218<br>Date:      TBD<br>Time:     TBD |

I, Richard Feferman, declare and state as follows:

1. I am the Chief Restructuring Officer of Core Technology, Inc., the debtor and debtor-in-possession in the above-captioned Chapter 11 case. I began working with the Debtor on December 26, 2017, reviewing business operations, financial reports, meeting with employees and analyzing business operations. The matters set forth herein are within my own personal knowledge,

1

1  except as to those matters stated upon information and belief. If called upon as a witness, I could
2  and would testify competently thereto.

3  **A.   Background**

4      **1.   Core's Business.**

5      2.   Oceanside-based Core Supplement Technology, Inc. ("Core") is a manufacturer and
6  distributor of private-label nutritional supplements. I am informed by Core's management team and
7  employees and on that basis believe that its customers range from small start-ups to nationally and
8  internationally known brands. I am further informed and believe that its clients are located across
9  the US and abroad and include nutritionists, doctors, trainers and competitors as well as supplement
10 and nutraceutical companies.

11     3.   I am informed by Core's management team and on that basis believe that Core began
12 its business as a custom blender. It is my understanding that Core excelled at taking a customer's
13 idea, formulating supplements, and blending the raw ingredients and flavors into "super sacks" of
14 powder and that it excelled at marketing its formulas and powders to its customers.

15     4.   My review of Core's business operations, its financial reports, my meetings with
16 employees, and my analysis of Core's business operations indicates that Core was engaged in the
17 following business practices: Core did not begin blending supplements until it received an order. It
18 required that customers provide a deposit, typically 30%, when they placed their orders. And upon
19 receipt of each order, and the accompanying deposit, Core would begin blending.

20     5.   My review of Core's business operations, its financial reports, my meetings with
21 employees, and my analysis of Core's business operations indicates that the next step in the process,
22 packaging, was problematic for Core. It is my understanding that Core initially outsourced all of its
23 packaging, but as the company grew, it attempted to handle packaging in house. But Core's
24 financial reports and business records indicate that outsourcing was always a common historical
25 practice. Core's management and employees have indicated, however, that the company always
26 struggled with the packaging part of its business. Because of its inability to master packaging, Core's
27 management and employees have indicated that Core became reactionary, turning to outsourcing on
28 a "catch-as-catch-can" basis to alleviate immediate operational pressures and fill orders. My review

1  of Core's business operations indicate that the company vacillated between in-house and outsourced
2  packaging, which management has described to me as a perpetual "teeter totter" as the company
3  tried to find an approach that would work.

4        6.    My understanding of the nutritional supplement manufacturing industry in which
5  Core operates is that it is highly competitive with low profit margins relative to other manufacturing
6  product fields. In my experience, in low profit margin industries operating expenses can easily
7  consume profits if not controlled. My review of Core's business operations, its financial reports, my
8  meetings with employees, and my analysis of Core's business operations indicates that, ultimately,
9  inefficiencies and operational challenges in Core's manufacturing and packaging operation
10 contributed heavily to significant operational losses.

11       7.    I am informed by Core's management team and on that basis believe that in the
12 summer of fall of 2017, Joseph O'Dea was introduced to Simpson Labs, LLC ("Simpson"), a
13 private-label nutritional supplement manufacturer located in Valencia, CA. To the best of my
14 knowledge, Simpson and Core are not affiliated entities. I am further informed by Core's
15 management team and employees and on that basis believe that, at around the time of this
16 introduction, Core was in need of an outsource manufacturer to process roughly $1.8 million in open
17 orders that Core could not fulfill and that it initiated discussions with Simpson about possible
18 outsourcing.

19       8.    I have reviewed Core's business records and financial reports and I have questioned
20 Core's management and employees regarding the details of the Simpson relationship, and I have
21 been unable to locate any evidence that a written contract governing their outsourcing relationship
22 was entered into between Core and Simpson; rather, Core's management and employees have
23 indicated that orders were placed on an as-needed basis.

24       **2.**    **Events Leadings Up to the Bankruptcy Filing.**

25       9.    Core's business records and financial reports, corroborated by interviews with Core's
26 management and employees, indicate that Core was experiencing increasing liquidity challenges in
27 the weeks and months prior to the Petition Date. Among other things, my investigation indicates
28 that Core was having difficulty servicing its debt, it lacked the liquidity to purchase raw materials

3

DECLARATION OF RICHARD FEFERMAN IN SUPPORT OF SALE    17-006078-11 MM11
ACTIVE\54281283.v4-3/16/18
ACTIVE\54309452.v1-3/16/18

needed to blend its powders, its suppliers were refusing to ship on credit, and some creditors had initiated collection actions against Core.

10. Core sought bankruptcy protection on October 3, 2017.

### 3. Core's Postpetition Outsourcing to Simpson Labs

11. As of the Petition Date, Core's *Schedules of Assets and Liabilities* (as amended, the "Bankruptcy Schedules") reflected total personal property with an estimated "current value" of roughly $2.9 million, comprised primarily of approximately $132,160.35 in cash; inventory with an estimated current value of $536,000; $1.3 million in accounts receivable, at net book value; and equipment with a current value of $650,000. Based upon my review of the Bankruptcy Schedules as well as Core's financial records, and interviews with Mr. O'Dea, and based upon my experience with such records, I believe that the only reasonable interpretation of "current value" in this context is that the Bankruptcy Schedules set forth an good faith estimate of the market value of these assets as of the Petition Date, as prepared by the Debtor's representative, Mr. O'Dea. In my business judgement, Mr. O'Dea's estimate of the market value of these assets appears to be reasonable.

12. Based upon interviews with Core's management and employees, it is my understanding that Core concluded and was operating on the premise that maximizing the value of work in process, raw materials, and accounts receivable–which represented the majority of the company's assets–would depend heavily on the company's ability to continue to fulfill customer orders. In my experience and business judgment, that would be a correct assumption.

13. Based upon interviews with Core's management and employees, it is my understanding and belief—corroborated by my review of Core's business records—that Core turned to Simpson to fulfill existing and new customer orders and that the following understanding and course of business evolved between the parties:

    a.    Simpson Labs did not require a deposit in order to commence production;

    b.    Simpson agreed, when possible, to purchase from Core the raw materials needed to fulfill Core orders;

    c.    Where Core did not have inventory on hand, Simpson obtained raw materials needed to fulfill Core orders without requiring payments or deposits in advance;

d.  Although Simpson's customary trade terms required payment upon presentation of an invoice (*e.g.*, when product is shipped), Simpson allowed Core to pay Simpson after the Debtor received payments from its customers;

e.  Simpson agreed to accept as payment from the Debtor roughly 94% of the amounts paid by the Debtor's customers for each order, with the Debtor retaining 6% as a "commission;"

f.  Simpson provided Core with preferred production status, *e.g.,* Core customer orders were produced first; and

g.  Simpson, at no cost to the estate, has allowed the Debtor to use its quality, regulatory, and purchasing departments to assist in servicing customer orders.

14.  The Debtor's CFO is critically ill. Accordingly, I have worked with the Debtor's management team and employees to generate reports utilizing what I believe to be the underlying source documents with respect to the transactions between Core and Simpson. Based upon my compilation and review of these source documents, I have concluded that the outsourcing agreement between Core and Simon resulted in a net profit to the estate of $76,944.72, calculated as follows:

| | |
|---|---|
| Raw Material Sales | $268,400.52 |
| Completed Orders Completely Outsourced to Simpson | $495,173.53 |
| Partially Outsourced Sales | $335,764.54 |
| **REVENUE** | **$1,099,338.59** |
| | |
| Raw Materials Cost | ($263,657.35) |
| Cost of Completed Orders Completely Outsourced to Simpson | ($461,220.94) |
| Cost of Partially Outsourced Sales | ($297,515.43) |
| **COST OF GOODS SOLD** | **($1,022,393.72)** |
| | |
| **GROSS PROFIT** | **$76,944.87** |

15.  This equates to a profit margin of roughly 7%, which is slightly higher but consistent with Core's estimate that it was generating roughly 6% in "commissions" on the Simpson outsourcing agreements. Thus, based upon my review of Core's business records and financial

5

1  reports, my due diligence and review of the underlying source documents, and as corroborated by interviews with Core's management and employees, I believe that the above information fairly represents the economics of the Simpson/Core relationship and that this relationship provided a net economic benefit to the estate.[1]

16. Based upon my due diligence, review, and investigation, as well as generally accepted accounting principles, it is therefore my conclusion that, although Core was operating at an overall loss during this time period, the transactions with Simpson did not contribute to, but rather reduced, Core's overall operating losses.

17. In my business judgment and based on my experience with other distressed and liquidating companies, it is my opinion that the benefits of the Simpson agreement far exceeded the 6-7% profit margin on each outsourcing contract. Specifically:

   a. Perishable inventory such as Core's raw materials is likely to have little or no resale or liquidation value. The Simpson outsourcing arrangement allowed Core to sell $263,657 in what where likely otherwise worthless raw materials to Simpson for $268,400 in cash.

   b. Continuing to support customer orders and relationships likely significantly enhanced the collectability of Core's accounts receivable, aiding in the collection of more than $700,000 in accounts receivable since the Petition Date.

   c. The Simpson relationship would have provided Core with essential liquidity, allowing it to continue skeleton operations while preserve its customer base and goodwill.

**B.    The Marketing Efforts and Tiger's Liquidation Proposal**

---

[1] In preparing this Declaration, I have also compared my findings to the Debtor's Monthly Operating Reports. In doing so, I have identified a discrepancy of approximately $379,000 between the Debtor's source documents and its Monthly Operating Reports. Based on my due diligence and review of the source documents, and taking into account the CFO's critical illness and the challenges that has presented for the Debtor, I believe it is possible that there is an error in the Debtor's Monthly Operating Reports. I am continuing my diligence and investigation, and when I can identify the source of the discrepancy, I will ensure that any errors are promptly corrected. I will be prepared to provide the Court with an update on this issue at the OSC hearing.

### 1. The Debtor's Initial Marketing Efforts

18. Since my appointment on December 26, 2017, insiders of the Debtor introduced me to four prospective buyers ("Initial Prospects") who were potentially interested in acquiring Core's assets. One was Simpson Labs. The other three were Messers Hyten and Bailly (insiders); Primarch Manufacturing; and an individual named Daniel Najor. During January 2018, I contacted representatives for three of the Interested Prospects to solicit offers for any or all of Core's assets. I was not introduced to Mr. Najor until February and he has indicated that he is not interested. The other three Initial Prospects, including Simpson Labs, responded and entered into non-disclosure agreements with Core. After conducting initial due diligence, the other two parties (Bailly/Hyten and Primarch Manufacturing) indicated they were not interested in presenting an offer. Primarch did ultimately make an informal offer in an email to take over management, without a commitment to provide any cash until after a 90 day "test drive." However, I have continued to contact with them periodically and I invited both to bid pursuant to the sale procedures approved by this Court. On information and belief, I understand that Simpson and the Hyten / Bailly group provided offers to the Debtor prior to my involvement.

19. On February 18, 2018, at my direction, Core also placed advertisements for the sale of its assets on two online services that specialize in listing businesses for sale: Businesses For Sale and BizBen. Established in 1996, BusinessesForSale.com indicates that it is the world's most popular website for buying or selling a business and has an international reach. BizBen.com was founded by Peter Siegel, MBA in 1994. BizBen is a niche online network of dedicated site users consisting of buyers, owner/sellers, intermediaries, landlords, brokers, agents, advisors and others looking to buy or sell: established businesses and other business opportunities in California. A true and correct copy of the listings is attached hereto as **Exhibit 1**. The listings ran on each website from roughly February 19, 2018 to March 19, 2018. Four parties (the "Internet Prospects") responded to these listings.

20. On February 22, 2018, as part of its marketing program and at my direction, the Debtor prepared a one-page summary "teaser" that it mailed to 54 strategic prospects (the "Strategic Prospects") identified through industry publications. This teaser set forth an overview of the

7

DECLARATION OF RICHARD FEFERMAN IN SUPPORT OF SALE    17-006078-11 MM11
ACTIVE\54281283.v4-3/16/18
ACTIVE\54309452.v1-3/16/18

Debtor's assets offered for sale. A true and correct copy of the teaser is attached hereto as **Exhibit 2**.

21. Through March 15, 2018, in response to these marketing efforts, a total of seven parties executed non-disclosure agreements and were provided detailed financial and operational due diligence information. Five parties requested and were given a copy of the sales procedures. All prospects who signed non-disclosure agreements were invited to tour the Debtor's facilities. Only one party, Simpson Labs, has made a formal cash offer to purchase any of the Debtor's assets.

### 2. The Debtor's Supplemental Marketing Efforts

22. On March 12, 2018, I sent a notice to all of the Initial Prospects, the Internet Prospects, and the Strategic Prospects advising them the Debtor is continuing to solicit bids for either all of the Debtor's assets or for any individual assets or lots of assets. To date, two of these parties have responded. All were advised that bids for individual assets can be presented prior to or at the hearing on the sale motion.

### 3. The Liquidation Value of the Included Assets

23. On March 12, 2018, I contacted Tiger Capital Group, LLC ("Tiger") and requested that it provide a proposal for liquidating Core's assets together with an estimate of likely valuation ranges for those assets on the secondary market.

24. Upon information and belief, Tiger's Remarketing Services Division provides assets appraisals and liquidation/disposition services across a wide range of industries. It is my understanding that, among other transactions, Tiger and Reich Brothers recently conducted the liquidation and sale—either as a going concern or in lots—of substantially all the assets of Creation's Garden, a multi-million dollar supplement company located in Valencia, CA. Tiger employs multiple sales methodologies, including direct negotiations, sealed bid offerings, and live and online auctions, to extract top dollar for excess assets, and it will work on a fee basis or make an outright purchase of assets.

25. Several members of Tigers' Remarketing Services Division spoke with me and a representative toured Core's facilities and conducted a preliminary inspection of its assets on March 13, 2018. I provided Tiger with the lists of Core's assets and requested a valuation and sale or

purchase proposals for all assets, including those that are subject to the Simpson Labs APA and those that are excluded. On March 14, 2018, Tiger provided the following preliminary estimates:

    a.    Tiger estimates that the equipment component of the Included Assets to be sold under the APA could be worth between $375,000 to $750,000 on the secondary market. Tiger could work on a fee basis to dispose of those assets over a period of roughly 90 days, or it purchase them at a discount for resale and remove them from the Debtor's premises to Tiger's own facilities within roughly 30 days.[2]

    b.    Tiger estimates that Core's accounts receivable could be worth approximately $200,000 on the secondary market. I believe that Tiger may consider purchasing them at a discount of roughly 50%.

    c.    The portion of inventory consisting of items used for bulk packaging has limited liquidation value. Tiger estimates that the bulk packaging assets could be sold for around $15,000 to $20,000 on secondary markets. Tiger could undertake this work for a fee or purchase these assets outright at a discount for resale.

    d.    Tiger indicated that Core's perishable inventory has no liquidation value as it consists of powders, quarantined and expired inventory that is not marketable on the secondary market. Tiger cannot dispose of or purchase these assets.

26. In summary, it is my understanding that Tiger has estimated that the secondary market for the Included Assets could range from $590,000 on the low end to $1.165 million on the high end. The liquidation value of these assets to the estate is lower than these resale values, as the estate would have to deduct the fees and expenses of Tiger or another liquidator and also account for the administrative costs associated with maintaining these assets for an additional 90 days. Alternatively, any purchase offer by Tiger would be net of transactional and carrying costs.

27. It is my understanding that Tiger intends to provide a written proposal to the company by March 19, 2018, and I will file that proposal with the Court once it is available.

**C.    The Debtor's Negotiations With Simpson Labs**

28. Based on my meetings and interviews with Core's management and employees, I understand that shortly after the Petition Date, Mr. O'Dea approached Simpson Labs about possibly purchasing some of Core's assets. Simpson Labs executed a Letter of Intent to Purchase Assets

---

[2] Tiger estimates that the equipment portion of the Excluded Assets could be worth between $140,000 to $200,000.

dated as of October 16, 2017, concerning its preliminary negotiations to purchase assets from Core. The letter stated that it was non-binding and was designed merely to set forth the parties expectations and understanding. It further stated that Simpson had "interest in offering $911,032.00 for assets of Core" including certain purchase orders, equipment, raw materials, goodwill, and intellectual property. It is my understanding that the proposal was limited only to certain asset and that it was communicated to Bank of America, which rejected it, indicating that the bank would only support a going-concern sale of all or substantially all of the Debtor's assets.

29. When I first became involved with the Debtor in roughly December of 2017, the Debtor and Simpson Labs people were discussing a possible sale transaction that would encompass all of the Debtor's assets. Simpson's business team had been taken on a tour of the Debtor's facility, and a purchase price of $2 million for the sale of *all* or substantially *all* of the Debtor's assets, as a going concern, had been proposed.

30. Upon information and belief, as discussions between the Debtor and Simpson became more serious, the Debtor and Simpson included their legal advisors and professionals in the discussion. I understand that the professional teams soon pointed out that the Debtor's assets included both leased and owed equipment, a distinction that the business people had not considered during their initial walk through and discussions. Simpson revised its offer to exclude the leased assets from its offer and it presented a revised offer of $1.6 million offer for only the owned assets. I have reviewed the information pertaining to these two offers, and in my opinion, the valuation of the Debtor's assets did not materially change; rather, the modified offer represented an offer for fewer assets. When fewer assets of the same value are being sold, in my experience and based on my knowledge of financial principles, the total value for the smaller basket of assets will necessarily be lower.

31. However, on February 19, 2018, Core disclosed to Simpson Labs that it had learned that its intellectual property may have been compromised. To my knowledge, the property compromised may have included, without limitation, batch records (e.g., "recipes" for products) and customer lists. Simpson Labs indicated that Core's intellectual property was a material asset and component of its calculation of its sale price, and it informed Core that it was reducing its offer to

10

$800,000.00. After heated negotiations, a sales price of $1.1 million was agreed upon. (The Debtor intends to preserve and pursue all litigation claims and causes of action against the parties who it believes may have compromised is intellectual property, thereby causing this loss in value.)

**D.     The Terms of the Proposed Sale to Simpson**

32.     Under the proposed APA, Simpson has offered to purchase the following assets (the "Included Assets"): (a) the Debtor's *owned* equipment, except for that encumbered by Berlin Packaging's lien(s); (b) its inventory, including both supplies and raw materials and finished goods; (c) two trucks; (d) the Debtor's goodwill and intellectual property as well as the membership interests in its wholly owned subsidiary, Life Brand, LLC, which has no operations but owns certain trade names, trademarks, and service marks related to the Debtor's business; (e) the Debtor's open customer orders; and (f) all of the Debtor's accounts receivable. The Included Assets are identified more fully in the APA and in Exhibits A-H thereto.

33.     The Included Assets being sold to Simpson do **not** include the following assets (the "Excluded Assets"): (a) the Debtor's *leased* equipment; (b) the Debtors' unexpired leases of real property; (c) executory contracts, other than open customer orders; (d) cash, bank deposits, and customer deposits; and (e) litigation claims, including the estate's avoidance actions, potential D&O claims, and any claims or causes of action with respect to the misuse, appropriation, or compromise of the intellectual property of the Debtor or its subsidiary. And Simpson is **not** assuming any of the Debtor's liabilities other than its customer deposit liabilities.

34.     The Purchase Price under the APA is $1.454 million, which is comprised of: (a) $1.0 million in cash; (b) the forgiveness of a $74,000 ordinary course administrative claim held by Simpson; and (c) the assumption of $380,000 in customer deposit liabilities.

35.     While many of the APA's terms are straightforward, the following explanation provides some additional context.

**1.     The Accounts Receivable, Open Orders and Customer Deposits**

36.     As discussed above, when a customer would place an order with Core, the company would typically require that the customer also provide a deposit equal to 30% of the order before Core would commence work or outsource the order for fulfillment. When Core received that

11

DECLARATION OF RICHARD FEFERMAN IN SUPPORT OF SALE                                17-006078-11 MM11
ACTIVE\54281283.v4-3/16/18
ACTIVE\54309452.v1-3/16/18

1   deposit, it would reflect this in its books and records by increasing its "cash account", an asset, and by increasing its "customer deposits," a liability account. Concurrently, it would make an entry in an off-balance sheet account, "open orders," to reflect the entire amount of the order and the deposit received. All orders placed with Core prepetition have been fulfilled. Therefore, at this time, all of Core's open orders represent orders placed and deposits received postpetition.

37.     When Core fulfilled an order (whether internally or through an outsourcing partner), it would record the sale, apply the customer deposit to the balance owed and zero out the customer deposit liability, and invoice the customer for the net balance and book an account receivable equal to the net balance due from the customer. Thus, the accounts receivable on Core's books and records should in all circumstances be net of customer deposits.

38.     Since Core is unable to fulfill any open orders itself, if the sale to Simon is not approved then Core will have no alternative except to cancel all remaining open orders. And since all open orders were placed and deposits received postpetition, all of the affected customers will have a postpetition, administrative claim for the return of their deposits. At this time, Core is holding $380,000 in cash deposits that would need to be returned.

39.     Under the APA, Simpson is acquiring all of Core's outstanding accounts receivable. It is also acquiring all of Core's open orders. Under the Initial APA, Simpson would have also received the $380,000 in cash deposits associated with those open orders and have assumed the corresponding $380,000 in customer deposit liabilities. That transaction would have had no economic impact on the estate, as both an asset (cash deposit) and the corresponding deposit liability would have transferred.  Under the current APA, Simpson has agreed to assume the $380,000 in customer deposit liabilities associated with the open orders but to allow the cash deposits, an asset, to remain with Core. This will improve the estate's position by $380,000 in cash.

**2.      The Settlement of Claims Under 9019**

41.     Both the Debtor and Simpson agree that Simpson owes Debtor $129,818.80 with respect to "commissions" owed to Debtor on account of outsourcing work sent to Simpson after the Petition Date. In addition, both the Debtor and Simpson agree that Debtor owes Simpson

12

$203,818.80 in post-petition accounts payable in connection with manufacturing orders placed by Debtor with Simpson after the Petition Date. The Debtor and Simpson agree to offset the post-petition claims identified above, and Simpson agrees to waive any and all claims against the Debtor with respect to the $74,000 net balance due after such offset (the "Offset Settlement").

42. Included in the Sale Motion is a request for approval of the Offset Settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. The terms of the agreement for which the Debtor seeks approval are as follows: Except as specified above, effective as of the Closing, the Debtor and Simpson agree to fully and forever release, acquit and discharge each other, myself as the CRO, their attorneys, accountants, and other retained professionals from any and all claims, damages, costs, attorneys' fees, demands, rights, causes of action, or liabilities which any of them ever had, or now have, against each other.

43. I understand that the Offset Settlement and this Court's approval thereof are in the best interests of the Debtor as such settlement avoids the time and financial cost of litigation and likely results in a better outcome for the Debtor than had the matter been litigated.

3. **The Sublease**

40. In connection with its liquidation effort, Core is in the process of vacating one of its two locations and consolidating its assets, books and records into the remaining location. The Included Assets under the APA are at both locations. In order to allow for an orderly transition for both parties, and to help defray administrative costs of the estate, the APA provides that Simpson may store the Included Assets at the remaining location post-closing in exchange for which it will sublease half of that space and share in half of the rent for this location. Either Core or Simpson may terminate the sublease on 2 weeks' notice. Thus, if Core is prepared to exit the facility and terminate the lease, it can terminate the associated sublease with Simpson. If Simpson exit the facility and terminates the sublease before Core has vacated, it may terminate the sublease and Core will be solely responsible for the rent going forward.

### E. The Purchase Price Represents Fair Market Value for the Assets

41. An asset's book value is its original purchase cost, typically adjusted for depreciation. Market value, in contrast, is the price that can be obtained by selling an asset on a competitive, open market. It is my understanding that there is nearly always a disparity between book value and market value, since the first is merely a recorded historical cost and the second is based on the supply and demand for an asset under current conditions.

42. Based upon my due diligence, including my review of the Debtor's business records and is filings with this Court as well as interviews with the individuals who prepared these documents, I have established that Core has disclosed to the Court both the book value, and an estimated current value, for its various assets. Its *Schedules of Assets and Liabilities* used current value, or market value, in large part, as indicated therein. Its *Monthly Operating Reports*, on the other hand, included a monthly balance statement and income statement, which present the book value of its assets and liabilities.

43. In some cases, such as cash, there is no difference between the two. In other cases, such as inventory, there can be a significant difference. For example, Core's Monthly Operating Reports reflected inventory with a book value of $2,078,130.47 as of October 31, 2017. But its Bankruptcy Schedules indicated that Core estimated the current value of its inventory as of October 3, 2017 was $536,252.00. I have reviewed Core's books and records and interviewed Core's management team, and it is my opinion that the inventory levels were substantially similar at these two points in time, and the difference in these two valuations is that the former is a market value based on the assumption that the company would continue as a going concern, while the later a book value.

44. In my experience, it is not unusual for the market value of perishable inventory held by a distressed business to be significantly lower than its book value. For one thing, once boxes and containers of perishable product are opened, they lose substantially all of their resale value and their only viable use is as raw material supporting a going concern operation. For another thing, old, expired, or defective perishable inventory is not saleable and has no market value. My interviews with Core's staff after my appointment in December 2017 revealed that the company's inventory

was insufficient to support continued production and that the remaining inventory items were "odds and ends" and "remnants" of little use or value. It was estimated that the remaining inventory had a market value of perhaps $100,000 to $200,000.

45. Although the Debtor's Monthly Operating Reports for October, November, and December of 2017 and January of 2018 reflect assets with a total book value of $6.2 million, $5.9 million, $5.7 million, and $4.7 million, respectively, it is my opinion that these figures do not represent the fair market value of Core's assets and, in my opinion and experience, they have no relevance to assessing the reasonableness of the Simpson offer, or any other purchase offer, for the assets.

46. Moreover, I have reviewed the Debtor's marketing efforts and I have supplemented them with additional marketing efforts prior to the March 8th sale hearing. Simpson Labs was the only party who presented a purchase offer for the Debtor's assets. Following the March 8th hearing, I also obtained a verbal liquidation bid from Tiger, which is informed by its experience liquidating similar assets for an industry competitor and by its review of assets lists and a preliminary physical inspection of the Debtor's assets. As noted above, Tiger estimated that it could resell the Included Assets on the secondary market or between $590,000 and $1.165 million—numbers that do not take into account liquidation fees and expenses or the costs of maintaining these assets for an additional 90 days. Thus, based on Core's marketing efforts and Tiger's assessment, it is my opinion that the Simpson offer represents fair market value for the Included Assets.

F.    **The Sale Satisfies the Requirements of Section 363(f)**

47. Upon information and belief, the only secured creditor with a lien covering Core's inventory, cash, and deposit accounts is Bank of America. The APA provides for Simpson Labs to acquire the Purchased Assets free and clear of any interest in such property of an entity. I have kept BofA appraised of the terms of the APA following the March 8th hearing, and I under that that it is generally supportive of the sale and likely to file a joinder to the sale motion.

_____
Richard Feferman