Edward Jason Dennis
jdennis@lynnllp.com
(*Pro hac vice application pending*)
Eliyahu Ness (State Bar No. 311054)
eness@lynnllp.com

LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Fax: (214)-981-3839

Attorneys for Corporate Recovery
Associates, LLC and Richard Feferman

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

In Re:

CORE SUPPLEMENT
TECHNOLOGY, INC.,

Debtor.

**CASE NO: 17-06078-MM7**

**OPPOSITION BY FORMER CHAPTER 11 CHIEF RESTRUCTURING OFFICER RICHARD FEFERMAN TO CHAPTER 7 TRUSTEE RICHARD M KIPPERMAN'S MOTION TO DISGORGE COMPENSATION**

**DATE:   May 7, 2020**
**TIME:   10:00 a.m.**
**DEPT:   1, Room 218**

**Honorable Margaret M. Mann**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iv

I.    PRELIMINARY STATEMENT ............................................................. 1

II.   STATEMENT OF FACTS .................................................................... 2

    A.    The Former CRO is Presented with Substantial Challenges Outside of his Control ......................................................... 2

    B.    The Former CRO Perseveres to Negotiate a Sale of Debtor's Assets to the Benefit of the Creditors. ......................... 7

    C.    The Former CRO Diligently Markets the Debtor's Assets. ..................... 11

    D.    The Former CRO Effectively Oversees the Debtor's Business Operations to Mitigate Losses and Preserve Value. ................................ 12

    E.    The Former CRO's Reports Regarding Tasks Performed and Time Entries Demonstrate that He Diligently Discharged His Duties. ............................................... 14

    F.    The Former CRO is Compensated out of Bank of America's Portion of Cash Collateral. ............................................................... 15

    G.    The Present Procedural Posture. .................................................. 17

III.  ARGUMENT ..................................................................................... 17

    A.    Legal Standard for Disgorgement—a Harsh Remedy that Must be Mandated by the Equities. ....................................... 17

    B.    The Equities do not Support Disgorgement Here. ................................. 20

        1.    The Former CRO's Fees were Commensurate with the Engagement Agreement, were Reasonably Earned and Resulted in a Large Return to Creditors. ...................... 20

        2.    The Former CRO had and has a Reasonable Expectation of Final Payment. ..................................... 22

        3.    No Party would Suffer from Nondisgorgement and None has Objected to the Former CRO's Fees. ........................ 23

        4.    Disgorgement would Not Benefit Administrative Claimants or Chapter 7 Creditors. ............................... 23

    C.    The Former CRO Requests a Trial on All Disputed Issues of Fact. ................................................................................. 23

FORMER CRO'S OPPOSITION TO TRUSTEE'S MOTION TO DISGORGE COMPENSATION

1

IV.  CONCLUSION................................................................................................24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FORMER CRO'S OPPOSITION TO TRUSTEE'S MOTION TO DISGORGE COMPENSATION

# TABLE OF AUTHORITIES

**<u>CASES</u>**

*In re Anolik*, 207 B.R. 34 (Bankr. D. Mass. 1997) ............................................................ 19

*In re Dick Cepek, Inc.*, 339 B.R. 730, n. 8 (B.A.P. 9th Cir. 2006) ................................... 19

*In re Home Loan Serv. Corp.*, 533 B.R. 302 (Bankr. N.D. Cal. 2015) ................. 1, 18, 19

*In re Khachikyan*, 335 B.R. 121 (B.A.P. 9th Cir. 2005) .................................................. 24

*In re Lochmiller Indus., Inc.*, 178 B.R. 241 (Bankr. S.D. Cal. 1995) ....................... 18, 19

**<u>STATUTES</u>**

11 U.S. Code § 726(b) ................................................................................................. 18, 19

**<u>RULES</u>**

Fed. R. Bankr. P. 9014(d) .............................................................................................. 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FORMER CRO'S OPPOSITION TO TRUSTEE'S MOTION TO DISGORGE COMPENSATION

Debtor's former Chapter 11 Chief Restructuring Officer Richard Feferman (the "Former CRO") respectfully submits this Opposition to the Motion by Chapter 7 Trustee, Richard M Kipperman, to Disgorge Compensation Paid to Chapter 11 Chief Restructuring Officer, Richard Feferman, filed on March 3, 2020 (Dkt. 371) (the "Motion"). This Opposition is based on the below memorandum of points and authorities, the supporting Request for Judicial Notice, and the concurrently filed Declarations of Richard Feferman and Richard Bass, all of which, including exhibits thereto, are incorporated herein by reference.

## I.    PRELIMINARY STATEMENT

The Motion seeks disgorgement of the Former CRO's compensation earned in this matter. Despite bearing the burden of justifying the "harsh remedy" of disgorgement (*see In re Home Loan Serv. Corp.*, 533 B.R. 302, 309 (Bankr. N.D. Cal. 2015)), however, the Motion is unsupported by evidence that that equitable factors customarily applied by courts to support disgorgement are met here, and relies on scant and inapposite authority. Put bluntly, the Motion is baseless.

Disgorgement is not warranted. The contention that "the CRO was negligent in the dispatch of his duties," *see* Paragraph 4 of the Declaration of Richard M Kipperman in Support of Motion (the "Kipperman Declaration"), is unsupported and incorrect. As set forth below and in the supporting declarations, the Former CRO earned his reasonable compensation by diligently discharging the duties he was engaged to perform. He did this despite a Debtor badly handicapped by a non-functioning accounting department and further handicapped by the Debtor's retention of inexperienced and inadequate bankruptcy counsel. Despite the significant challenges he faced, the Former CRO consistently exercised sound business judgment in the best interests of creditors and the Court. And the Former CRO's services resulted in measurable and substantial value to creditors. As a result of the Former

CRO's efforts to negotiate a sale of the Debtor's assets, the Chapter 7 estate netted $410,600.00 for the benefit of creditors and the administration of the bankruptcy case. Without the Former CRO's work, it is likely that all the Debtor's cash would have been consumed by the secured creditors. The assets of the Chapter 7 estate would have consisted of only avoidance actions but no cash to finance any avoidance litigation.

Setting aside the inequity of the disgorgement remedy under the circumstances, disgorgement would also not be beneficial to the estate. That is because Bank of America—the Debtor's biggest secured creditor—expressly carved out the Former CRO's compensation from its own cash collateral. Bank of America would therefore have rightful claim to any funds disgorged by the Former CRO. Thus, the very premise of the Motion—*i.e.*, that the estate would benefit from disgorgement—is false.

## II.    STATEMENT OF FACTS

### A. <u>The Former CRO is Presented with Substantial Challenges Outside of his Control.</u>

The Debtor Core Supplement Technology, Inc. (the "Debtor") filed its petition in this case on October 3, 2017. The Debtor was in the business of formulating and manufacturing nutritional supplements.

The Debtor approached the Former CRO in December 2017 to "assist in the administration of the bankruptcy estate and expeditious sale of the business or all or substantially all of the business's assets, whichever would result in the greatest recovery for the estate's creditors." *See* Dkt. 88, Decl. of Joseph O'Dea in Support of Mot. to Retain CRO, ¶ 9; *see also* Decl. of Richard Feferman in Support of Opp. ("4/6/20 Feferman Decl."), ¶ 2. The Former CRO agreed to the engagement and to accept significantly lower rates than those he ordinarily charges for comparable engagements. 4/6/20 Feferman Decl., ¶ 2.

As Debtor informed the Court in its Memorandum of Points and Authorities in Support of its Motion to Retain the Former CRO, his retention was motivated in large part by "substantial disagreement among the members of the Board of Directors and also between the shareholders as to the direction the case should take and who should lead the Debtor through the Case" and, absent the appointment of a CRO, "progress on this case [was] likely to be impeded again by more dispute amongst the Board Members and Shareholders." Request for Judicial Notice in Support of Opp. ("RJN"), Ex. 1 at 7. The Former CRO, by virtue of his appointment, would "remove[] the sole source of dispute among the various factions on the Board of Directors and Shareholders." *Id.*

The terms of the Former CRO's engagement, outlined in the final Agreement for the Engagement of a Chief Restructuring Officer, as fully vetted and approved by the Court and the U.S. Trustee, ("Engagement Agreement") and as modified and supplemented by the CRO's supplemental declaration filed on January 23, 2018 (the "1/23/18 Feferman Declaration") set forth the scope and expectations regarding the Former CRO's duties. The Engagement Agreement and 1/23/18 Feferman Declaration are attached to the February 23, 2018 Court Modified Order on Debtor's 11 USC 363 and 105(a) Motion for Appointment of a Chief Restructuring Officer (the "CRO Engagement Order") as Exhibits 1 and 2, respectively.[1] The Engagement Agreement, as supplemented by the 1/23/18 Feferman Declaration and as approved by the Court, was a product of extensive negotiation and input by the Former CRO, the Debtor, the U.S. Trustee, the Debtor's secured creditors, and the Court. 4/6/20 Feferman Decl., ¶ 4.

Under the Engagement Agreement the Former CRO had the duty and power to handle the sale of Debtor's assets in a manner that would maximize value to creditors, to manage the business and financial affairs of Debtor, and to supervise administration of the Chapter 11 case. *See* Engagement Agreement § 1(b).

---

[1] The CRO Engagement Order, including its Exhibits, are attached to the 4/6/20 Feferman Declaration as Exhibit A.

Prior to the time the Former CRO was approached by the Debtor in December 2017, the Debtor had staffed its accounting department with a single clerk serving the role of Chief Financial Officer, after the Debtor's actual Chief Financial Officer had left the company before the Chapter 11 filing.  As set forth in the supporting declaration of the Debtor's former IT manager, Richard Bass, filed concurrently herewith (the "Bass Declaration") after the former Chief Financial Officer left, the accounting department was being run by Kathy Haycook who had originally been hired as an accounting clerk.  Bass Decl., ¶ 2.  The accounting department was in a substantial amount of disarray.  *Id.*, ¶ 3; 4/6/20 Feferman Decl., ¶ 5.  In the weeks following the Chapter 11 filing, Ms. Haycook got further and further behind in her work and her health suffered.  Bass Decl., ¶ 4.  She became overwhelmed with her work and was absent a great deal of the time.  *Id.*; 4/6/20 Feferman Decl., ¶ 5.  As Ms. Haycook fell further behind in her work, the Debtor's IT manager and Head of Human Resources assumed accounting functions.  Bass Decl., ¶ 5.  This presented a huge challenge in keeping the Debtor's accounting system in sync with the transactions that were happening on a day-to-day basis, including keeping track of outsourcing transactions with Simpson Labs, Inc. ("Simpson").  *Id.*, ¶¶ 6-9.  Among other things, physical inventory counts always showed large shortages compared to what was in the accounting system.  *Id.*, ¶ 6.

Because of the Former CRO's recognition of the Debtor's severe accounting defects, it was critical for the Former CRO that the Engagement Agreement reflect the understanding of all constituents that in discharging his duties the Former CRO would rely heavily (for better or worse) on information provided to him by employees of Debtor.  In particular, the Former CRO: was "entitled to rely on the accuracy and validity of the data disclosed to [him] or supplied to [him] by employees and representatives of the Corporation" (*id.* § 4), was not expected to "perform an audit," was "under no obligation to update data submitted to [him] or review any other areas" (*id.*); and would be expected to "rely[] on information provided by other members of

FORMER CRO'S OPPOSITION TO TRUSTEE'S MOTION TO DISGORGE COMPENSATION

the Corporation's management in the preparation of … projections and other forward-looking statements." (*id.* § 1(e)).  These terms were critical to the Former CRO's acceptance of the engagement and he would not have accepted the engagement without such terms.  4/6/20 Feferman Decl., ¶ 6.

The Former CRO nonetheless diligently worked to find solutions to the Debtor's severe accounting defects.  As set forth in the 1/23/18 Feferman Declaration (Exhibit 1 to the CRO Engagement Order), the Former CRO negotiated to employ accountant Alan Myers because he was "needed to assist the CRO with assessing the problems in the Debtor's accounting department, as well as become familiar with the Debtor's accounting system in order to mitigate disruptions that may occur as a result of the bookkeeper's ill health."  1/23/18 Feferman Decl., ¶ 5.  Per the Engagement Agreement, Mr. Myers was only permitted to bill 20 hours a month.  Engagement Agreement § 2.  Unfortunately, that amount of time was drastically insufficient to gain control of the unwieldy accounting system.  4/6/20 Feferman Decl., ¶ 7.  The state of disarray that the Debtor's accounting department was in at the time Mr. Myers began his work is captured in a descriptive email from Mr. Myers to the Former CRO on February 16, 2018:

> Kathy's office is a bit of a mess, with stacks of paper and boxes here and there with no clearly defined order. As of today, January's bank accounts have not been reconciled. Kathy receives a tremendous amount of information (payments received, payments owed, invoices, etc.) thru her email. She must go thru hundreds of emails to discover what information they contain that is needed to update the accounting system.

*Id.*, Ex. B.

In an effort to get more help organizing the accounting system, the Former CRO conveyed the issues regarding the Debtor's accounting system to the Debtor's secured creditor, Bank of America, the Debtor's Counsel, the Office of the United States Trustee ("UST") and the Court.  *Id.*, ¶ 8.  The UST suggested that the Former CRO bring in an additional temporary employee (which would have been ineffective under

the circumstances) and Bank of America opposed the Former CRO spending any money whatsoever for any qualified accounting employees.  *Id.*

As a result of the Debtor having a non-functioning accounting department, it was difficult for the Former CRO to get timely and accurate accounting information which, in turn, impeded his ability to ensure that the all of the information the Court received in Court filings was accurate and consistent across various kinds of accounting documents.  *Id.*, ¶ 9.  The Former CRO informed the Court of these issues on multiple occasions, including in his March 1, 2018 Declaration in Support of Estimated Distribution Forecast, attached as Exhibit C to the 4/6/20 Feferman Declaration ("2/1/18 Feferman Declaration").    In that testimony, the Former CRO informed the Court regarding the situation, including Ms. Haycook's health issues and absenteeism, stating that "the debtor remains reliant on its sole accounting employee [*i.e.*, Ms. Haycook] for information maintained in her unique and proprietary filing and data storage systems" and that "without [Ms. Haycook] the Debtor will lose her historical knowledge."  2/1/18 Feferman Decl., ¶ 7; *see also* 4/6/20 Feferman Decl., ¶ 9.  Unfortunately, Ms. Haycook became even less able to assist the Former CRO after that March 1, 2018 declaration was filed because she was rarely present and almost never in a position to be helpful.  4/6/20 Feferman Decl., ¶ 10.

Making the situation more difficult was the fact that the Debtor was represented by inexperienced counsel, on whom the Former CRO was forced to rely.  As the Court observed many times in these proceedings, including in its December 4, 2018 Tentative Ruling (Dkt. 288), attached as Exhibit A to the Trustee's Request for Judicial Notice in Support of the Motion ("Trustee's RJN"), the Debtor had retained bankruptcy counsel completely unfit to handle a Chapter 11 bankruptcy proceeding. Trustee's RJN, Ex. A at 3.  Despite the Former CRO's requests, Bank of America would not agree to allow the Former CRO to use cash collateral to get a lawyer qualified to advise him.  4/6/20 Feferman Decl., ¶ 11.  The Former CRO suggested hiring the firm Gordon Rees, which is known for doing good work and having

6

reasonable fees, but these efforts were rejected.  *Id.*

Ultimately, the foregoing problems compounded to make it difficult at times to obtain information from the Debtor and clearly communicate that information to the Court.   But notwithstanding the Court's understandable frustration with the information and reports it had received throughout the proceedings, and in the midst of the challenges faced throughout his appointment, the Former CRO at all times exercised sound business judgment and diligently discharged his duties for the benefit of the creditors and the Court.    As set forth more fully below, and among other achievements, the Former CRO kept Simpson at the negotiating table despite numerous obstacles and ultimately negotiated a deal with Simpson that allowed the Former CRO to turn over $1,818,343.54 in cash to the Chapter 7 Trustee.  The Former CRO also ensured that the Debtor's operations were kept to the bare minimum level required to preserve the resale value of its customer base and goodwill while minimizing the rate of cash depletion.

**B.** **The Former CRO Perseveres to Negotiate a Sale of Debtor's Assets to the Benefit of the Creditors.**

The most significant "duty and power" the CRO was tasked with was the handling of a sale of Debtor's assets in a manner that would maximize value to creditors.  *See* Engagement Agreement § 1(b)(ii).  Above all else, the value the Former CRO was expected to deliver was through his work in managing the sale of Debtor's assets.  *See e.g*., RJN, Ex. 1 (Mem. ISO Mot. to Retain CRO) at 7-8 ("The Debtor requires the services of an experienced CRO to supervise the administration of the Debtor's Chapter 11 case and, in particular, to manage the asset sale proceedings in this case."); *id*. at 8 ("Mr. Feferman's services will facilitate greatly the Debtor's efforts to achieve a successful sale process in this case, for the benefit of the Debtor's creditors."); *id*. at 18 ("Mr. Feferman has substantial experience and expertise in the sale of financially-distressed businesses. Mr. Feferman's leading the Debtor's efforts to sell substantially all of the Debtor's assets will facilitate efficient and effective sale

proceedings and will enhance the prospects for a successful resolution of this case for the benefit of creditors of the Debtor.").

Mr. Feferman brought his talent, experience and expertise in the sale of financially distressed businesses to bear in this case for the benefit of all involved. It was not an easy task and was made more difficult because of actions the Debtor took, or failed to take, prior to the Former CRO's involvement. As described in the Former CRO's March 16, 2018 declaration filed in connection with the sale of the Debtor's assets to Simpson Labs, Inc. ("Simpson") ("3/16/18 Feferman Decl.")[2], in roughly December of 2017, the Debtor's and Simpson Labs, Inc.'s ("Simpson") representatives were discussing a possible sale transaction that would encompass all of the Debtor's assets. Simpson's business team had been taken on a tour of the Debtor's facility, and a purchase price of $2 million for the sale of all or substantially all of the Debtor's assets, as a going concern, had been proposed. 3/16/18 Feferman Decl., ¶ 29. Later professional teams got involved and pointed out that the Debtor's assets included both leased and owed equipment, a distinction that the business people had not considered during their initial walk through and discussions. Simpson then revised its offer to exclude the leased assets from its offer and it presented a revised offer of $1.6 million offer for only the owned assets. *Id.* ¶ 30.

The Debtor had also failed to disclose to Simpson the fact that it had learned that its intellectual property may have been compromised. *Id.* ¶ 31. The intellectual property compromised may have included, without limitation, batch records (*e.g.*, "recipes" for products) and customer lists. *Id.* These were material assets and were a significant component of the proposed purchase price. *Id.*

The intellectual property had been compromised prior to the Former CRO's involvement. As soon as the Former CRO learned that the IP had been compromised in the latter part of February 2018, he directed the Debtor to inform Simpson of that fact, after first conferring with counsel. 4/6/20 Feferman Decl., ¶ 13. The Debtor did

---

[2] The March 16, 2018 declaration is attached to the 4/6/20 Feferman Declaration as Exhibit D.

so on February 19, 2018.  3/18/2018 Feferman Decl., ¶ 31.

Upon learning of the IP breach, Simpson called off the deal entirely.  4/6/20 Feferman Decl., ¶ 14.  The Former CRO then personally engaged Simpson's representatives in extensive negotiations that ultimately brought Simpson back to the table, though initially at a drastically reduced offer price of $800,000.00 (it had been at $1.6 million).  *Id.*  The Former CRO then continued to negotiate with Simpson's representatives, ultimately bringing the price up to $1.1 million, which was the price incorporated in to the first draft Asset Purchase Agreement ("APA") submitted to the Court for approval.  *Id.*

The Court declined to approve the sale pursuant to the first APA, expressing a number of concerns reflected in the transcript of the hearing on that motion.  *See* Dkt. 184.  Some of the Court's concerns were the result of miscommunication, rather than actual substantive flaws with the transaction.  For instance, a significant concern expressed during the Court's March 8, 2018 hearing was regarding the nature of the Debtor's relationship with Simpson, the company with whom the Debtor had an outsourcing arrangement in place and which had always been the most likely prospect to purchase the Debtor's assets.  The Court was concerned as to whether the outsourcing relationship with Simpson was in fact profitable to the Debtor.  However, as the Former CRO later explained in the 3/16/18 Feferman Declaration, and as further set forth below, the relationship with Simpson was beneficial and profitable and the Debtor had been selling inventory in the course of the relationship that otherwise would have been difficult, if not impossible, to resell on the secondary market.

After the Court declined to approve the first APA, and Simpson had essentially given up on the deal, the Former CRO met with Simpson's representatives on a weekend to coax them back to the negotiating table.  4/6/20 Feferman Decl., ¶ 15.  Through intense negotiations the Former CRO ultimately convinced Simpson's representatives to agree to terms of a deal that were highly favorable to the Debtor and that addressed the Court's concerns with the respect to the initial APA.  *Id.*

FORMER CRO'S OPPOSITION TO TRUSTEE'S MOTION TO DISGORGE COMPENSATION

In particular, in negotiating the APA, the Former CRO negotiated a purchase price of $1.454 million, an increase of over $300,000.00 from the prior purchase price. *See* 4/6/20 Feferman Decl., ¶ 16, Ex. E-1 (APA).   One of the most financially significant aspects of the renegotiated APA was how customer deposits would be handled.  *See* 3/16/18 Feferman Decl., ¶¶ 36-39.  By way of background, the Debtor would take orders from customers and require a 30% cash deposit. *Id.*, ¶ 36.  At the time of the negotiation with Simpson, the Debtor held $380,000 in cash deposits for orders that it was at that point unable to fulfill.  *See id.*, ¶ 38.  Without Simpson assuming the fulfillment of the open orders, affected customers would have had a post-petition administrative claim.  *Id.*  In negotiating the Second APA, the Former CRO convinced Simpson to agree to fulfill the open customer orders while allowing the Debtor to keep the $380,000 in customer deposits. 4/6/20 Feferman Decl., ¶ 17.  This was extremely favorable to the Debtor and took significant persuasion by the Former CRO to get Simpson to accept what was effectively a 30% reduction in the sales price on those open orders.  *Id.*

Separately, at the time the parties were renegotiating the APA, Simpson owed Debtor $129,818.80 with respect to "commissions" owed to Debtor on account of outsourcing work sent to Simpson after the Petition Date, and the Debtor owed Simpson $203,818.80 in post-petition accounts payable in connection with manufacturing orders that it placed with Simpson.  3/16/18 Feferman Decl., ¶¶ 41-43. This resulted in a $74,000 net balance due from the Debtor to Simpson.  *Id.*  As part of the deal, the Former CRO convinced Simpson to waive any and all claims against the Debtor with respect to the $74,000.  *Id.*

There were many other aspects to the negotiation APA for which the Former CRO brought his expertise to bear, including the intensive work entailed in valuation of the assets sold.   To get a sense of the value of the Former CRO's efforts, and by way of illustration, the following three components of the deal directly attributable to the Former CRO are highlighted as follows: (1) the increase from $800,000.00 to $1.1

million after the IP breach was disclosed, (2) the agreement by Simpson to take on open customer orders while allowing the Debtor to keep customer deposits in the amount of $380,000.00, and (3) the forgiveness of $74,000.00 in debt.  4/6/20 Feferman Decl., ¶ 18.  The total value added of these items alone is $754,000. Realistically, this number drastically understates the value the Former CRO delivered, not least because without the Former CRO's involvement Simpson would likely have walked away from the deal altogether.  *Id.*

In connection with getting the sale to Simpson negotiated and approved by the Court, the Former CRO brought additional value to the estate by using his personal friendship with Mette Kurth at the law firm Fox Rothschild to convince her to represent the Debtor in the sale to Simpson at the significant risk that her fees would ultimately not be paid.  4/6/20 Feferman Decl., ¶ 19.  Ms. Kurth was instrumental in ensuring that the transaction was competently handled and ensuring that the Court was put in a position to make the necessary findings to approve the transaction.  *Id.*  The presence of Ms. Kurth also helped convince Simpson to come back to the negotiating table after the court declined to approve the first APA.  Additionally, with Ms. Kurth's assistance, the Former CRO was able to prepare a declaration filed on March 16, 2018 that clarified some of the issues that had previously concerned the Court.  *See id.*, Ex. D.  These were things that the Former CRO could not accomplish with Mr. Hinze. *Id.*, ¶ 19.

In total, the deal with Simpson, of which the Former CRO was the chief negotiator, allowed the Former CRO to turn over $1,818,343.54 in cash for the benefit of creditors.  *Id.*, ¶ 20.

## C. The Former CRO Diligently Markets the Debtor's Assets.

Although ultimately Simpson was the only entity to make an offer to purchase the Debtor, it was the Former CRO's duty to market the Debtor broadly in his efforts to maximize value to creditors.  To that end, the Former CRO discharged this duty by making substantial efforts to market the Debtor, as previously described in the 3/16/18

11

Feferman Declaration, Paragraphs 18 through 27.  In summary, the Former CRO did the following: (1) met with four prospective prospects and continued to solicit offers from each during the course of his involvement  (3/16/18 Feferman Decl., ¶ 18), (2) placed advertisements on leading online forum's for the sale of businesses and communicated with prospects who responded to those solicitations (*id.* ¶ 19, Ex. 1), and (3) mailed a one-page summary "teaser" to 54 strategic prospects that the Former CRO identified through industry publications (*id.*, ¶ 20, Ex. 2).

In response to these marketing efforts, a total of seven parties executed non-disclosure agreements and were provided detailed financial and operational due diligence information.  *Id.*, ¶ 21.  Five parties requested and were given a copy of the sales procedures.  *Id.*  All prospects who signed non-disclosure agreements were invited to tour the Debtor's facilities.  *Id.*  Only one party, Simpson Labs, ultimately made a formal cash offer to purchase any of the Debtor's assets.  *Id.*

### D. **The Former CRO Effectively Oversees the Debtor's Business Operations to Mitigate Losses and Preserve Value.**

The Former CRO was charged with the duty and power to "manage the business and financial affairs of the Debtor." Engagement Agreement § 1(b)(i).  This, however, was not a directive for the Former CRO to turn the Debtor's business around and make it profitable as a going concern.  Quite the opposite is true.  From the outset of the CRO's appointment, the CRO informed the Court that the Debtor would lose money over the course of the bankruptcy administration, with the only variable being the speed of the expected losses.  At the February 8, 2018 hearing on the appointment of the Former CRO, the Former CRO testified regarding the Debtor's prospects as a going concern:

> I STARTED WORKING ON THIS MATTER THE 26TH OF DECEMBER. THERE IS NO SCENARIO THAT I'VE LOOKED AT THAT THIS DEBTOR DOES NOT RUN OUT OF MONEY VERY SHORTLY. THERE'S A RANGE THERE DEPENDING ON WHAT WE DO WITH OPERATIONS,….

RJN, Ex. 2 (2/8/2018 Hrg. Tr.) at 17:8-12.

The Former CRO also explained to the Court that to preserve the value of the business in the prospective sale to Simpson, a balance had to be struck between shutting down operations to conserve cash and maintaining the value of the customer base and goodwill which were valuable assets in the prospective acquisition. *See id.* at 24.

To that end, the Former CRO exercised sound business judgment to direct that operations be reduced to a minimum, while maintaining the skeletal operations necessary to allow Debtor to collect on its accounts receivable and to preserve Debtor's customer base and goodwill which were integral to its value to prospective purchasers. 4/6/20 Feferman Decl., ¶ 21. To do so effectively, the Former CRO worked daily with the Debtor's line managers and manager of Human Resources in a constant dialogue on how to minimize the number of employees and on what could be effectively outsourced to Simpson. *Id.*

As described in the Former CRO's March 16, 2018 declaration in support of Debtor's second motion concerning sale of assets to Simpson, the Debtor's outsourcing arrangement with Simpson had resulted in a net profit to the estate on the outsourcing contracts of approximately 6-7%. *See* 3/16/18 Feferman Decl., ¶¶ 13-14. And the arrangement entailed benefits to the estate far in excess of the profit margin, as described in the same declaration:

> a. Perishable inventory such as Core's raw materials is likely to have little or no resale or liquidation value. The Simpson outsourcing arrangement allowed Core to sell $263,657 in what where likely otherwise worthless raw materials to Simpson for $268,400 in cash.
>
> b. Continuing to support customer orders and relationships likely significantly enhanced the collectability of Core's accounts receivable, aiding in the collection of more than $700,000 in accounts receivable since the Petition Date.

FORMER CRO'S OPPOSITION TO TRUSTEE'S MOTION TO DISGORGE COMPENSATION

      c.    The Simpson relationship provided Core with essential liquidity, allowing it to continue skeleton operations while preserve its customer base and goodwill.

*Id.* ¶ 7.  Keeping this arrangement in place during the course of the proceedings was beneficial to the estate.  *See id.*

## E. The Former CRO's Reports Regarding Tasks Performed and Time Entries Demonstrate that He Diligently Discharged His Duties.

Pursuant to the Court's CRO Engagement Order (4/6/20 Feferman Decl., Ex. A), the Debtor was authorized to, and did, pay the Former CRO $23,870.97 for services rendered from December 26, 2017, through February 1, 2018, reasonable costs not to exceed $1,000.00, and the $20,000 deposit called for in the Fee Agreement, which was security to be applied toward the final bill.  *Id.*  at 2.  After receipt of those amounts, the CRO was directed to file and serve a Report of Tasks Performed supported by detailed time sheets and expense reports.  *Id.*  The Former CRO submitted his Report of Tasks Performed, along with detailed time sheets and expense reports on April 2, 2018, covering the period between December 26, 2017 and January 31, 2018.  *See* Dkt. 230-1, attached as Exhibit F to the 4/6/20 Feferman Decl.

As to fees incurred by the Former CRO after February 1, 2018, concurrently with this Opposition, the Former CRO has filed and served a Second Report of Tasks Performed by Chief Restructuring Officer with Supporting Back-up covering work done in February and March of 2018 (the "Second Report of Tasks").  The Second Report of Tasks is also attached as Exhibit G to the 4/6/20 Feferman Declaration and is incorporated by reference herein.

As reflected therein the Former CRO's fees for the period covering February 1, 2018 to March 31, 2018, including fees for his staff member Alan Meyer, totaled $49,600.00, subject to amendment and verification with an additional $775.60 of expenses.  Since the Former CRO received the $20,000.00 deposit covering his final

month of work, only $30,375.60 remain to be paid.

All the tasks performed from December 26, 2017 through March 31, 2018 were integral to generating the value that the Former CRO ultimately was able to cultivate for the benefit of the creditors.  Every action the Former CRO took as CRO, both before and after his formal appointment, was done using the best of his business judgment exercised for the sole purpose of maximizing the value of the estate for the creditors' benefit.  4/6/20 Feferman Decl., ¶ 24.   This includes, among many other things, examining and identifying and valuating assets that had the potential to be sold to prospective buyers, engaging in marketing and valuation efforts, attending to operational issues, meeting and corresponding with prospective buyers and responding to due diligence requests, attending to the various court filings at the advice and direction of the Debtor's counsel, meeting and negotiating with the Debtor's creditors, negotiating the sale to Simpson and reasonable and necessary travel. *See id.*, Exs. F-G.

## F. The Former CRO is Compensated out of Bank of America's Portion of Cash Collateral.

The Debtor's biggest creditors were Bank of America, N.A. and Banc of America Leasing & Capital, LLC (collectively, "Bank of America") who held secured claims on the Debtor's estate totaling $1,805,825.02.

From the outset, Bank of America was supportive of the Debtor's efforts to retain the Former CRO.  *See, e.g.*, RJN, Ex. 2 (2/8/2018 Hrg. Tr.) at 14-15.  So much so, in fact, that Bank of America not only consented to the use of cash collateral to compensate the Former CRO, but further agreed that his compensation could be carved out from Bank of America's portion of collateral so that the Former CRO could be paid his fees:

    MS. RHIM: YOUR HONOR, OUR AGREEMENT WITH THE
    CRO, AND WE'VE BEEN APPRECIATIVE OF HIS EFFORTS, IS THAT
    THE BANK WILL CONSENT TO THE USE OF CASH COLLATERAL TO

COMPENSATE MR. FEFERMAN, OR HIS FIRM, I SHOULD SAY, PURSUANT TO THE AMOUNT AS REQUESTED IN HIS APPLICATION AND PURSUANT TO THE PROCEDURES. THERE'S SORT OF A NOTICE AND OPPORTUNITY TO OBJECT PROCEDURE. SO PURSUANT TO THOSE PROCEDURES THAT WILL BE SET OUT IN AN ORDER AUTHORIZING HIS EMPLOYMENT, WE WOULD CONSENT TO THAT. WE HAD A LOT OF DISCUSSION BECAUSE OF A CONCERN OF WHAT HAPPENS REGARDING HIS ABILITY TO GET PAID IF USE OF CASH COLLATERAL IS NO LONGER AUTHORIZED. AND **BANK OF AMERICA HAS AGREED THAT EVEN POST-TERMINATION OF REGARDING AUTHORITY TO USE CASH COLLATERAL THAT B OF A WOULD BE WILLING TO EXTEND A CARVE-OUT FROM ITS COLLATERAL SO THAT MR. FEFERMAN COULD BE PAID ANY OUTSTANDING UNPAID FEES ASSUMING THAT THE WORK IS THROUGH THE END OF APRIL OF 2018**.

*Id.* (emphasis added)

On September 27, 2018, after this case had been converted to Chapter 7, the Court issued an Order on Uncontested Notice of Intended Action Regarding Approval of Trustee's Settlement Agreement with Bank of America, N.A. and Banc of America Leasing & Capital, LLC Debtor: Core Supplement Technology, Inc., Docket No. 269 (the "BofA Settlement"), attached to the concurrently filed RJN as Exhibit 3. In the BofA Settlement, Bank of America agreed to receive $1,407,743.54 in exchange for a full release of claims. RJN, Ex. 3. In Recital F to the BofA Settlement, Bank of America asserted a security interest in substantially all of the assets sold, and those assets excluded from the sale, to Simpson. *Id.* In Recital G, Bank of America agrees to compensate the Former CRO and Mr. Myers for all services rendered prior to the effective date of the BofA Settlement by permitting the Trustee to pay those expenses using the assets over which Bank of America held secured claims:

The Trustee has requested that Creditor be required to pay various expenses relating to or for the Debtor and/or Creditor in connection with Debtor's financial affairs and the case, including without limitation fees, costs and expenses respecting services provided by Richard Feferman, CIRA, Alan Myers, CPA, and their related firms prior to the Effective Date of this Agreement (any and all such expenses, the "*Reorganization Expenses*") … As such, Creditor has agreed to permit Reorganization Expenses to be satisfied from the Excluded Assets [i.e., those assets

excluded from the sale to Simpson], namely the Customer Deposits." *Id.*

### G. The Present Procedural Posture.

On December 6, 2018, in response to the filing of certain fee applications, this Court issued a Tentative Ruling (Dkt. 288)[3] in which the Court stated that "the court is concerned why there is no disgorgement from the CRO on his own fees particularly because the court does not see any significant benefit to the fees provided by him." The Court observed that it had "modified its own order [regarding the Former CRO's compensation] to ensure that his fees would be subject to disgorgement." The Court continued that "[w]hile Trustee claims this disparity is due to these fees being paid from cash collateral, the court certainly did not expressly approve a disparate payment to the CRO." *Id.*

Over approximately a year, the Trustee and counsel for the Former CRO were in communication in an attempt to resolve these issues. No resolution could be reached. On March 3, 2020, the Trustee filed its Motion.

### III.    ARGUMENT

### A. Legal Standard for Disgorgement—a Harsh Remedy that Must be Mandated by the Equities.

Absent from the Motion is a statement of the legal standard for disgorgement. Although the Court made clear in its Order Appointing the CRO that his fees would be "subject to disgorgement," this reservation (which applies by default in connection with applications for compensation in the Southern District)[4] does not set forth a legal standard for when disgorgement is justified. The Trustee has made no showing that it would be.

Under the heading "DISGORGEMENT IS AUTHORIZED UNDER THE

---

[3] The Tentative Ruling is attached as Exhibit A to the Trustee's RJN.
[4] *See* Form CSD 1144, available at https://www.casb.uscourts.gov/sites/casb/files/documents/forms/CSD1144_1.pdf.

BANKRUPCY CODE AND APPLICABLE CASE LAW" the Trustee cites Bankruptcy Code Section §726(b) and *In re Lochmiller Indus., Inc.*, 178 B.R. 241 (Bankr. S.D. Cal. 1995) in support.  However, *Lochmiller* and Section 726(b) do not support the Motion for the reasons set forth in *In re Home Loan Serv. Corp.*, 533 B.R. 302, 306 (Bankr. N.D. Cal. 2015).  That case is helpful here.

In *Home Loan*, a chapter 7 trustee brought a motion for disgorgement of interim attorney's fees paid to the Debtor's chapter 11 counsel.  In denying the motion, the Court first noted that "Section 726(b) does not provide for a disgorgement remedy." *Id.*

Second, the court observed that "[t]he practice of bankruptcy law in the Ninth Circuit supports the view that § 726(b) does not authorize disgorgement of earned and paid chapter 11 administrative expenses solely in order to pay chapter 7 administrative expenses." *Id.* at 307.

The court observed further that it was "aware of only a single case within the Ninth Circuit where any court actually ordered disgorgement of earned and paid chapter 11 administrative expense fees solely in order to pay chapter 7 administrative expenses," citing *Lochmiller.*  The court explained that *Lochmiller* was "very unusual in several important respects," which are relevant here.  First, the bankruptcy court in *Lochmillier* acknowledged that "[n]either the parties to this action nor this Court have discovered a case in which Chapter 11 processionals were actually ordered to disgorge fees and costs paid." *Id.* (quoting *Lochmiller*, 178 B.R. at 251).   Second, the order appointing the professionals in *Lochmiller* specifically conditioned payment of the administrative professionals on there being sufficient funds in the Chapter 7 proceedings, and expressly stated in that order that the professional would be subject to "disgorgement in the event that the Chapter 7 Estate's assets are insufficient to satisfy Chapter 11 administrator (sic) expenses in full." *Id.* (quoting *Lochmiller*, 178 B.R. at 244).

Finally, the court in *Home Loan* observed that in *Lockmiller* there was no

challenge to the court's authority to order disgorgement of chapter 11 administrative fees. *See id.*

The court in *Home Loan* summarized its findings concerning the applicability of *Lockmiller* as follows:

> In sum, the *Lochmiller* court, in this twenty-year-old case, appointed the chapter 11 professionals expressly conditional on the possibility of disgorgement upon chapter 7 administrative insolvency, so that the chapter 11 professionals could not reasonably argue that they had relied on being able to keep their earned and paid fees during the chapter 11.

*Id.* For the same reasons, the Trustee's reliance on *Lockmiller* is misplaced.

As explained in *Home* Loan, where a court exercises its discretion to apply the "harsh remedy" of disgorgement, it should do so only "when mandated by the equities of the case." *Id.* at 309 (quoting *In re Anolik*, 207 B.R. 34, 39–40 (Bankr. D. Mass. 1997)). The court cited factors that another district court had used to assess the equities, including: "whether the party facing disgorgement had a reasonable expectation that the payment received was final, and whether any party who would suffer from nondisgorgement has objected to the trustee's proposed final distribution." *Id.* at 309-10 (quoting *In re Anolik*, 207 B.R. 34, 39–40 (Bankr. D. Mass. 1997)).

More generally, the law in the Ninth Circuit is that—although "disgorgement solely on the basis of section 726(b) is impermissible"—a court "may, in the exercise of its discretion, order disgorgement or turnover for other reasons, including (but not limited to) instances when a professional has not provided services commensurate with the retainer or has not properly disclosed the secured interest in the retainer." *In re Dick Cepek, Inc.*, 339 B.R. 730, 737, n. 8 (B.A.P. 9th Cir. 2006) (citation omitted); *see also Home Loan*, 533 B.R. at 310 ("[T]he bankruptcy court has the ability to review fees on the basis of whether they were ***reasonably earned*** when the work was done, without resort to § 726(b) or to disgorgement based on chapter 7 administrative insolvency.") (emphasis added). As set forth above, the Former CRO provided services commensurate with his Engagement Agreement and reasonably earned his

compensation.

### B. **The Equities do not Support Disgorgement Here.**

None of the factors that courts have applied to support disgorgement apply here. In particular: (a) the Former CRO's services were commensurate with the Engagement Agreement, were reasonably earned when incurred and his services significantly benefited the estate, (b) the Former CRO had a reasonable expectation that the payment he received, and the payment that has been earmarked for him to receive in the BofA Settlement, were final and (c) no party who would suffer from nondisgorgement has objected to the distribution of the Former CRO's fees.

### 1. **The Former CRO's Fees were Commensurate with the Engagement Agreement, were Reasonably Earned and Resulted in a Large Return to Creditors.**

The Trustee makes no attempt to demonstrate that the Former CRO did provide services commensurate with the Engagement Agreement, did not reasonably earn his compensation, that he was negligent in the discharge of his duties, that his fees were excessive, or that he did not deliver significant value to the creditors. Instead, the Trustee merely quotes the Court's December 6, 2018 Tentative Order and states that "[t]he implication of the Court's directive was that the CRO was negligent in the dispatch of his duties." Kipperman Decl., ¶ 4. But bare reference to a concern expressed by the Court without any further reference, elaboration or evidence fails to satisfy the Trustee's burden to support its Motion.

Moreover, as set forth above and in the supporting declarations, the Former CRO delivered significant benefit to the Debtor and its creditors in earning his fees. Every action the Former CRO took in his role as CRO, both before and after his formal appointment, was done using the best of his business judgment for the sole purpose of maximizing the value of the estate for the creditors' benefit. Feferman Decl., ¶ 24. The record demonstrates that the Former CRO discharged his duties in a timely and skillful manner, and that all time spent on this matter was reasonably necessary to the

performance of his duties.

As set forth on pages 2 through 7 above, the Former CRO faced many challenges in discharging his duties, most of which no individual could possibly control. Critically, the Former CRO did not have a duty to repair the Debtor's broken accounting system or restore its profitability as a going concern. The Court approved the Former CRO's engagement on the express understanding that he would be "entitled to rely on the accuracy and validity of the data disclosed to [him] or supplied to [him] by employees and representatives of the Corporation" (id. § 4), that he was not expected to "perform an audit" (*id.*), that he was "under no obligation to update data submitted to [him] or review any other areas" (*id.*), and that he would be expected to "rely[] on information provided by other members of the Corporation's management in the preparation of ... projections and other forward-looking statements" (*id.* § 1(e)). The Engagement Agreement and CRO Engagement Order should be honored and the Former CRO should not now be held culpable for the Debtor's accounting defects.

Moreover, the Former CRO made every reasonable effort to correct the Debtor's accounting problems and those attempts were thwarted by other constituents. 4/6/20 Feferman Decl., ¶¶ 7-8. His attempts to bring on competent bankruptcy counsel were also thwarted. *Id.*, ¶ 11.

Nonetheless, the Former CRO worked diligently to bring value to the creditors and ultimately delivered that value in the form of $1.818.343.54 for the Trustee to distribute. In so doing, the Former CRO discharged those duties he was brought on to perform. His greatest value was his "substantial experience and expertise in the sale of financially-distressed businesses" and the Debtor's expectation was that his efforts to sell the Debtor's assets would benefit the Debtor's creditors. RJN, Ex. 1 (Motion to Retain CRO) at 18. As set forth on pages 10 through 11 above, merely selecting for illustration three negotiable terms of the APA that were negotiated by and directly attributable to the Former CRO's efforts demonstrates that his efforts

added $754,000 in value. This alone is a substantial (over tenfold) return on the investment of the $74,246.57 in reasonable compensation for his (and Alan Myers's) services over the entire duration of the engagement.

And even where the value-added cannot be so neatly traceable to the Former CRO's efforts, every task performed by the Former CRO during the course of his appointment was performed diligently and professionally, in a timely and skillful manner, was within the scope of his engagement, and utilized sound business judgment to advance the interests of the creditors. Those tasks—which are reflected in the two Reports of Tasks Performed incorporated by reference into this Opposition—include, among many other things, his substantial efforts to find buyers other than Simpson (*see* pages 11 through 12 above), the work he did to keep the Debtor's operations running at optimal levels (pages 12 through 14 above), and his day-to-day efforts to engage creditors, better understand the Debtor's financial and operational situation and reign-in what was a haphazard, disorganized and incoherent accounting system (pages 14 through 15 above). That some initiatives did not materialize does not mean the Former CRO's did not reasonably earn his compensation for the time he spent on those tasks.

Quite simply, disgorgement here would be harsh, inequitable and unjustified and totally unsupported by the Motion.

### 2. The Former CRO had and has a Reasonable Expectation of Final Payment.

As set forth above (pages 15 through 16), the Former CRO accepted his engagement with the express agreement from Bank of America that it would "extend a carve-out from its collateral so that Mr. Feferman could be paid any outstanding unpaid fees assuming that the work is through the end of April of 2018." RJN, Ex. 2 (2/8/2018 Hrg. Tr.) at 5-10. Since Bank of America would carve out a portion of its claim to pay the Former CRO, the Former CRO reasonably expected that any payment

he received from the Debtor would be final.  Moreover, Bank of America expressly agreed in the BofA Settlement to authorize the payment of the Former CRO's compensation from its cash collateral.  Accordingly, the Former CRO had, and has, a reasonable expectation that he would receive payment from the portion of the assets that were otherwise earmarked for Bank of America.

### 3. No Party would Suffer from Nondisgorgement and None has Objected to the Former CRO's Fees.

Other than the Trustee—who does not actually claim he will suffer from nondisgorgement—no other party claims that it would suffer from nondisgorgement or has objected to the Former CRO's compensation paid to date.  To the extent any party objects to the fees still due to the Former CRO, it is not the case that those parties "would suffer from nondisgorgement."  Because Bank of America assigned to the Former CRO funds to which Bank of America was entitled, Bank of America would have priority to those funds if they were disgorged.  Thus, any administrative claimant who objects to payment of the Former CRO's fees would not suffer from nondisgorgement.  In other words, the only party who will benefit from disgorgement is Bank of America.

### 4. Disgorgement would Not Benefit Administrative Claimants or Chapter 7 Creditors.

The Trustee himself concedes that "it is unclear from the Modified Order [i.e., the order appointing the Former CRO] whether recovery would benefit the Chapter 7 Estate or Bank of America."  In fact, however, it is clear: since Bank of America assigned to the Former CRO funds to which Bank of America would have otherwise been entitled, Bank of America would have priority to those funds if they were disgorged.  Thus, even if it were equitable to order disgorgement here—and it is not— it would only benefit a single party: Bank of America.

### C. The Former CRO Requests a Trial on All Disputed Issues of Fact.

Based on the foregoing, the Former CRO contends that the following material

facts are not in dispute: his fees were reasonably earned at the time they were incurred, he brought extraordinary value to creditors, he had and has a reasonable expectation of receiving and retaining his earnings, and no party would suffer from nondisgorgement. The Trustee presented no evidence to put these facts in dispute. Accordingly, the Motion should be denied without further proceedings.

To the extent the Court finds that any of these facts are disputed, however, the Former CRO requests trial of this contested matter. In a contested matter where there are genuine factual disputes, the trial court must allow for trial testimony in open court. *See In re Khachikyan*, 335 B.R. 121, 126 (B.A.P. 9th Cir. 2005) (citing Fed. R. Bankr. P. 9014(d)). The advisory committee note to Subdivision (d) of Rule 9014 provides that subdivision (d) was added to the Rule "to clarify that if the motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held at which testimony of witnesses is taken in the same manner as testimony is taken in an adversary proceeding or at a trial in a district court civil case." Fed. R. Bankr. P. 9014(d), advisory comm. note to 2002 amendment.

This also entitles the Former CRO to conduct discovery as to these disputed facts. *See Khachikyan*, 335 B.R. at 126. Among other things, the Former CRO would seek discovery from the Trustee, former employees of the Debtor, Bank of America, and other individuals and entities with relevant information regarding the issues in dispute.

Accordingly, if the Court does not deny the Motion at this stage (it should), the Former CRO respectfully requests that the Court set this contested matter for trial at a date further enough in the future to give the Former CRO an opportunity to obtain relevant discovery.

## IV.    CONCLUSION

For the foregoing reasons, the Motion should be denied.

DATED: April 6, 2020                     LYNN PINKER COX & HURST, LLP

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  */s/ Eliyahu Ness*

EDWARD JASON DENNIS
(*Pro hac vice application pending*)
ELIYAHU NESS
Attorneys for Corporate Recovery Associates,
LLC and Richard Feferman

FORMER CRO'S OPPOSITION TO TRUSTEE'S MOTION TO DISGORGE COMPENSATION