Jason Dennis
(*Pro hac vice application pending*)
jdennis@lynnllp.com
Eliyahu Ness (State Bar No. 311054)
eness@lynnllp.com

LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Fax: (214)-981-3839

Attorneys for Corporate Recovery
Associates, LLC and Richard Feferman

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br><br><br>CORE SUPPLEMENT<br>TECHNOLOGY, INC.,<br><br>    Debtor. | **CASE NO: 17-06078-MM7**<br><br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION BY FORMER CHAPTER 11 CHIEF RESTRUCTURING OFFICER RICHARD FEFERMAN TO CHAPTER 7 TRUSTEE RICHARD M KIPPERMAN'S MOTION TO DISGORGE COMPENSATION**<br><br>**DATE:   May 7, 2020**<br>**TIME:   10:00 a.m.**<br>**DEPT:   1, Room 218**<br><br>**Honorable Margaret M. Mann** |

**Error! Unknown document property name.**

Former Chief Restructuring Officer Richard Feferman (the "Former CRO") respectfully submits the following Request for Judicial Notice in Support of his concurrently filed Opposition to Motion to Disgorge Compensation Paid to Chapter 11 Chief Restructuring Officer, Richard Feferman, as follows:

## I.

## GROUNDS FOR JUDICIAL NOTICE

Federal Rules of Evidence, Rule 201, provides, in relevant part, as follows:

Rule 201. Judicial Notice of Adjudicative Facts
(a) Scope of rule. This rule governs only judicial notice of adjudicative facts.
(b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in
that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questions.
(c) When discretionary.  A court may take judicial notice, whether requested or not.
(d) When mandatory.  A court shall take judicial notice if requested by a party and supplied with the necessary information.

## I.

## GROUNDS FOR JUDICIAL NOTICE

The Former CRO requests this Court take judicial notice of the pleadings, orders and other documents on file in the official Court files for the above-captioned bankruptcy case, including:

1.      Memorandum of Points and Authorities in Support of Motion of Debtor and Debtor-in-Possession for Entry of an Order, Pursuant to Sections 363 and 105(a) of the Bankruptcy Code Authorizing and Approving the Debtor's Retention of Richard Feferman as Chief Restructuring Officer of the Debtor, Docket No. 86, attached hereto as **<u>Exhibit 1</u>**.

REQUEST FOR JUDICIAL NOTICE ISO OPPOSITION TO MOTION TO DISGORGE
**Error! Unknown document property name.**

1    2.    February 8, 2018 Hearing Transcript, Docket No. 184, attached hereto as

2  **Exhibit 2.**

3    3.    September 27, 2018 Order on Uncontested Notice of Intended Action

4  Regarding Approval of Trustee's Settlement Agreement with Bank of America, N.A.

5  and Banc of America Leasing & Capital, LLC Debtor: Core Supplement Technology,

6  Inc., Docket No. 269, attached hereto as **Exhibit 3.**

7

8

9  DATED: April 6, 2020                    LYNN PINKER COX & HURST, LLP

10

11                                By:    */s/ Eliyahu Ness*

12                                       ELIYAHU NESS
                                         Attorneys for Corporate Recovery Associates,
13                                       LLC and Richard Feferman

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT 1

Stephen C. Hinze (State Bar No. 131787)          Electronically Filed: 1/11/2018
STEPHEN C. HINZE, ATTORNEY AT LAW
217 Civic Center Drive, Suite 10
Vista, CA 92084
Tel:  760-945-9353
Fax: 760-454-2427

Bankruptcy Counsel
for Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: | Case No.: 17-06078-MM11 |
| | Chapter 11 |
| CORE SUPPLEMENT TECHNOLOGY, INC. a California Corporation | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 363 AND 105(a) OF THE BANKRUPTCY CODE, AUTHORIZING AND APPROVING THE DEBTOR'S RETENTION OF RICHARD FEFERMAN AS CHIEF RESTRUCTURING OFFICER OF THE DEBTOR |
| Debtor and Debtor in Possession | **OST PENDING** |
| | Judge:        Hon. Margaret M. Mann |
| | Dept. :        1 |
| | Hearing Date: |
| | Time: |

Page **1** of **22**

# **TABLE OF CONTENTS**

**Page**

I.      STATEMENT OF FACTS.............................................................................6

II.     RELIEF REQUESTED ...............................................................................7

III     QUALIFICATIONS OF MR. FEFERMAN...................................................8

IV.     SERVICES TO BE PROVIDED BY THE CRO..........................................10

V.      COMPENSATION OF THE CRO AND CRA ............................................12

VI.     DISINTERESTEDNESS  OF CRA AND MR. FEFERMAN......................14

VII.    THE ENGAGEMENT AGREEMENT SHOULD BE APPROVED...........15

        A.      The Court Has Authority to Approve the Debtor's Engagement
                Agreement with CRA. ........................................................15

        B.      Authorizing the Debtor to Retain Mr. Feferman as CRO is in the Best
                Interests of the Estate. .......................................................18

        C.      Retention of Mr. Feferman Is Critical to a Successful Resolution of
                this Case. ..........................................................................18

IX.     NOTICE OF THE MOTION IS APPROPRIATE, AND NO FURTHER
        HEARING IN RESPECT OF THE MOTION IS REQUIRED, UNLESS
        SUCH HEARING IS ORDERED BY THIS COURT OR SPECIFICALLY
        REQUESTED BY A PARTY-IN-INTEREST ...........................................21

X.      CONCLUSION .........................................................................22

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

# TABLE OF AUTHORITIES

**Page**

## Cases

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
  2005 WL 435207, *14 (D.N.J. Feb. 25, 2005) ..............................................17

*Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel)*,
  722 F.2d 1063 (2d Cir. 1983) ........................................................................15

*Fulton State Bank v. Schipper (In re Schipper)*,
  933 F.3d 513 (7th Cir. 1991) .........................................................................15

*In re Adva-Lite, Inc.*,
  Case No. 07-10264 (KJC) (Bankr. D. Del. Mar. 16, 2007) ..........................17

*In re Calpine Corp.*,
  Case No. 05-60200 (Bankr. S.D.N.Y. Jan 17, 2007) .....................................16

*In re Continental Airlines*,
  203 F.3d 203 (3d Cir. 2000) ...........................................................................17

*In re Fairfield Residential LLC*,
  Case No. 09-14378 (Bankr. D. Del Jan 13, 2010) ....................................16, 17

*In re Fatburger Restaurants of California, Inc., et al.*, Case No. 09-13965 (Bankr.
  C.D. Cal. Feb. 16, 2011) ............................................................................16, 17

*In re Hoop Holdings, LLC*,
  Case No. 08-10544 (BLS) (Bankr. D. Del Apr. 22, 2008) ...........................16

*In re Integrated Resources, Inc.*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992) ...........................................................16

*In re Leiner Health Products, Inc.*,
  Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 8, 2008)..............................16

*In re Linens Holding Co.*,
  Case No. 08-10832 (CSS) (Bankr. D. Del May 28, 2008) ............................16

MPA iso Motion to Retain Chief Restructuring Officer                17-006078-11 MM11

*In re Montgomery Ward Holding Corp.*,

    242 B.R. 147 (Bankr. D. Del. 1999) ...............................................15

*In re Motor Coach Industries International, Inc*.,

    Case No. 08-12136 (Bankr. D. Del Oct. 15, 2008).......................16

*In re Pappas Telecasting, Inc.*,

    Case No. 08-10916 (Bankr. D. Del June 26, 2008) ......................16

*In re Sea Containers Ltd.*,

    Case No. 06-11156 (KJC) (Bankr. D. Del. May 8, 2007) .........................17

*In re The Holliston Mill, Inc.*,

    Case No. 07-10687 (MFW) (Bankr. D. Del. June 6, 2007).........................17

*In re Tokheim Corp.*,

    Case No. 02-13437 (RJN) (Bankr. D. Del. Feb. 25, 2003)..........................17

*In re TOUSA, Inc.*,

    Case No. 08-10928 (Bankr. S.D. Fla. Mar. 26, 2008) .................................16

*In re Westcliff Medical Laboratories, Inc*., Case No. 10-16743 (Bankr. C.D. Cal.

  June 25, 2010) ...............................................................................16

*Myers v. Martin (In re Martin)*,

    91 F.3d 389 (3d Cir. 1996)............................................................15

*Smith v. Van Gorkom*,

    488 A.2d 858 (Del. 1985)...............................................................16

*Stephens Indus., Inc. v. McClung*,

    789 F.2d 386 (6th Cir. 1986).........................................................15

*United States v. Energy Resources Co.*,

    495 U.S.545 (1990) ..........................................................................17

**Statutes**

11 U.S.C. Section 101(14)................................................................15

11 U.S.C. Section 105(a) .............................................................7, 17

11 U.S.C. Section 327.......................................................................14

MPA iso Motion to Retain Chief Restructuring Officer        17-006078-11 MM11

11 U.S.C. Section 363.......................................................................................passim

11 U.S.C. Section 363(b)...............................................................................15, 16

11 U.S.C. Section 1107 .........................................................................................7

11 U.S.C. Section 1108 .........................................................................................7

**Rules**

Federal Rules of Bankruptcy Procedure, Rule 2002 .............................................21

Federal Rules of Bankruptcy Procedure, Rule 6004(h) ..................................20, 21

Local Bankruptcy Rules for United States Bankruptcy Court for the Southern

District of California 9013-4(a)(b).......................................................................21

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

The Debtor was formed as a California corporation on May 25, 2012. Since then, the Debtor has been a corporation duly organized and existing under the laws of the State of California.

The Debtor maintains headquarters in Oceanside, California.

The Debtor formulates and manufactures nutritional supplements for its own account and to the special order of its customers.

The Debtor raised $300,000 from investors and approximately $2.1 million, in secured debt for the purchase of equipment and machinery and an operating line of credit. This secured debt was incurred to develop sufficient manufacturing capacity to efficiently compete in the nutritional supplement market. The Debtor has been unable to achieve profitability.

The Debtor's cash flow problems required cut backs its business operations, including terminating many of its employees, further impacting its ability to manufacture efficiently and exacerbating cash flow problems. To meet customer orders and collect outstanding accounts receivable the Debtor has been selling raw material and outsourcing manufacturing to Simpson Labs. Through these efforts Debtor as converted raw material into customer product, satisfied customer orders, and collected substantial outstanding accounts receivable. At the time of this motion the Debtor maintains slightly more than $500,000 on deposit in its DIP operating account. However, the inefficiencies in its manufacturing process remain and the debtor is not a viable manufacturing business.

One final and important fact: As the Court is aware, the Debtor's Chapter 11 case has been hampered by substantial disagreement among the members of the

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

Board of Directors and also between the shareholders as to the direction the case should take and who should lead the Debtor through the case. The Courts approval of Mr. Feferman as Chief Restructuring Officer should resolve this critical issue. The Debtor's Board of Directors and Shareholders have all unanimously approved his retention. Absent Mr. Feferman's approval progress on this case is likely to be impeded again by more dispute amongst the Board Members and Shareholders, as the primary dispute has involved the leadership of the Debtor's current management. Mr. Feferman removes the sole source of dispute among the various factions on the Board of Directors and shareholders.

On October 3, 2017 ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is operating and managing its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On December 26, 2017 the Debtor's board of directors met and unanimously voted to engage Mr. Feferman of CRA as Chief Restructuring Officer to assist in the administration of the bankruptcy estate and expeditious sale of the business or all or substantially all of the business's assets, whichever would result in the greatest recovery for the estate's creditors.

## II.

## <u>RELIEF REQUESTED</u>

The Debtor requests the entry of an order, pursuant to Sections 363 and 105(a) of the Bankruptcy Code, authorizing the Debtor to retain Mr. Feferman as CRO in accordance with the provisions of the Engagement Agreement (Exhibit "1" to the Feferman Declaration).

The relief requested is necessary to a successful resolution of the Debtor's bankruptcy case. The Debtor requires the services of an experienced CRO to

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

supervise the administration of the Debtor's Chapter 11 case and, in particular, to manage the asset sale proceedings in this case.

As the proposed CRO, Mr. Feferman will act as the most senior officer of the Debtor, and effectively will serve as the Debtor's chief executive officer.  Mr. Feferman will act at the pleasure and under the direction, control and guidance of the Debtor's Board of Directors.  As the proposed CRO, Mr. Feferman will manage the Debtor's business, will be responsible for supervising the administration of the Debtor's Chapter 11 case and will be responsible for all aspects of the sale proceedings in the Debtor's case.  Mr. Feferman's services will facilitate greatly the Debtor's efforts to achieve a successful sale process in this case, for the benefit of the Debtor's creditors.

**III**

**<u>QUALIFICATIONS OF MR. FEFERMAN</u>**

CRA is a financial advisory services firm.  CRA has extensive experience and expertise in Chapter 11 proceedings.  CRA is regularly employed as a business and financial advisor, liquidating trustee, Liquidating agent, plan administrator or other fiduciary.  CRA is based in San Diego California from where it provides professional services nationwide.

Mr. Feferman holds a BBA from Southern Methodist University, is a Certified Insolvency and Restructuring Advisor (CIRA) and a Master Analyst in Financial Forensics (MAFF). He has more than 37 years' experience consulting on complex financial matters, including debt and financial restructuring, financial forensics, acquisition due diligence, litigation support, and the disposition of assets.  Mr. Feferman has been the lead professional on numerous complex engagements, including engagements providing financial restructuring and reorganization services to companies in Chapter 11 cases, creditor committees,

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

companies in out-of-court restructurings, and to creditors of companies in Chapter 11 cases.  Mr. Feferman has assisted in the sale of assets pursuant to Section 363 of the Bankruptcy Code on numerous occasions.  A copy of Mr. Feferman's resume is attached as Exhibit 2 listing a representative sampling of Chapter 11 cases in which he has recently been employed.

Mr. Feferman has served as chief executive officer, chairman of the board of directors, court-appointed liquidating trustee, financial advisor, and various other fiduciary roles in Chapter 11 cases, both before and after plan confirmation.  Mr. Feferman has extensive experience providing crisis management and financial restructuring services for operating companies and real estate clients.  Mr. Feferman has substantial experience and knowledge regarding restructuring of complex loan transactions and disposition of operating companies and real estate projects.  A true and correct copy of Mr. Feferman's resume is attached as Exhibit "2" to the Feferman Declaration.

Since being retained by the Debtor, Mr. Feferman has acquired substantial knowledge of the Debtor's financial affairs and business.  Mr. Feferman is in the process of assisting the Debtor to accomplish a sale of substantially all of the Debtor's assets. In his capacity as proposed CRO, Mr. Feferman has provided and will continue to provide independent oversight over the Debtor and the Debtor's operations and the Debtor's efforts to sell its assets.  Mr. Feferman's services are necessary to the administration of the Debtor's case and to the maximizing of the value of the Debtor's assets for the benefit of the creditors of the Debtor's estate. Accordingly, the Debtor believes that the retention of Mr. Feferman as CRO is in the best interests of the Debtor's estate.

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

# IV.

## SERVICES TO BE PROVIDED BY THE CRO

By this Motion, the Debtor seeks an order authorizing the Debtor to retain Mr. Feferman as CRO in accordance with the terms of the Engagement Agreement. As set forth in the Engagement Agreement, Mr. Feferman will provide, among others, the following services to the Debtor:

(1)    Manage the business and financial affairs of the Debtor;

(2)    Direct all aspects of the sale proceedings of the assets of the Debtor and such other plans that as may maximize the enterprise value of the Debtor. With respect to any sale of the assets of the Debtor, the CRO will handle all aspects of the sale proceedings in the Debtor's case, including the following: marketing of the Debtor's assets; facilitating bidders' due diligence; negotiations with any potential bidder; evaluating any bid; conducting an auction; and selecting, subject to the approval of the Court, the successful bid(s);

(3)    Supervise the administration of the Debtor's Chapter 11 case, including monthly operating reports and other financial reporting required by the Office of the United States Trustee ("U.S. Trustee");

(4)    Review claims asserted against the Debtor;

(5)    Review and evaluate pleadings, financial reports and other documents filed by creditors or parties-in-interest in the Debtor's Chapter 11 case;

(6)    Appear in any proceedings or hearings in this Court, as appropriate;

(7)    If needed, the CRO shall assist the Debtor in the negotiation, formulation, confirmation and implementation of a Chapter 11 plan;

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

(8)     Coordinate with the Debtor's counsel, and assist the Debtor's counsel, with respect to preparation of pleadings;

(9)     Communicate with creditors, any Official Committee of Unsecured Creditors appointed in the Debtor's case ("Committee") and with other parties-in-interest in the Debtor's case;

(10)    Perform the services typical of a CRO in a Chapter 11 case, and such other services as may be mutually agreed upon by the Debtor and CRA.

The Debtor and CRA have agreed that CRA will provide to the Debtor the services of Mr. Feferman as CRO.  Alan Myers of CRA will provide limited services (no more than 20 hours per month).

The Agreement may only be terminated as follows:

(a)     By Feferman providing 30 days' written notice in accordance with the notice provisions of the Agreement; or

(b)     By the Debtor upon the Court's entry of an order finding good cause for termination.

In the event that the Debtor's board of directors deadlocks on an issue, Feferman may seek Court approval to break the deadlock.

In the event of a dispute between the Debtor and CRA arising from or related to the Agreement, then the Court shall reserve exclusive jurisdiction to determine such dispute.

The services listed above are vital to the efficient administration of the Debtor's Chapter 11 case, to the success of sale proceedings which the Debtor is pursuing in this Chapter 11 case, and, ultimately, to a successful resolution of this case for the Debtor's creditors.  For the reasons described herein, the Debtor believes that Mr. Feferman is well qualified to perform these services, and,

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

accordingly, that this Court should authorize the Debtor to retain Mr. Feferman, as CRO, to perform these services for the Debtor.

**V.**

**COMPENSATION OF THE CRO AND CRA**

Pursuant to the Engagement Agreement, the Debtor and CRA have agreed to the following compensation for Mr. Feferman to act as CRO in this Chapter 11 case.

(1)    <u>Flat Rate and Hourly Rate</u>.  The Debtor has agreed to pay to CRA a nonrefundable monthly fee of $20,000.00 (a "Flat Rate") for the CRO's services. The Flat Rate fee will be prorated for any partial months based on the number of days in the prorated month. In addition, the Debtor has agreed to pay CRA an advance deposit of $20,000 to be applied to CRA's final bill for services, against which CRA (at CRA's sole discretion) may charge for any balance left unpaid for 15 days or more.  The Debtor is obligated to restore the balance of this deposit to $20,000 at any time CRA utilizes these funds on behalf of the Debtor or its expenses. CRA is granted a security interest in the advance deposit.  Additional limited services, (of no more than 20 hours per month) will be provided by financial analyst / CPA Alan Myers of CRA at his hourly rate of $240 per hour. Total billings of CRA personnel that are charged by the hour ("Hourly Rate") are subject to a $275 per hour blended rate cap on the aggregated billings at the end of the case ("Blended Hourly Rate Cap"). The Blended Rate Cap is not applicable to employees of CRA that are provided on a Flat Rate, such as the arrangement for services rendered by Mr. Feferman. Without further Court order, Mr. Myers and Mr. Feferman are the only CRA personnel that will be rendering services on this matter.

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

(2)    CRA and the Corporation agree that, on the date that is sixty (60) days from the date of entry of the order appointing the CRO, they may revisit the compensation paid to CRA and if it appears to be advantageous to the Bankruptcy Estate, and approval by the Court if required, the CRO's compensation will move from the Flat Rate to his normal Hourly Rate effective ninety (90) days from the date of entry of the order appointing the CRO. To confirm, the aggregated compensation during the duration of the case billed by CRA on an Hourly Rate basis is subject to a $275 Blended Hourly Rate Cap.  Flat Rate Fees (the fees for the services of the CRO) are not subject to the Blended Hourly Rate Cap and are not considered in calculating the Blended Hourly Rate Cap.

(3)    <u>Reimbursement of Expenses</u>.  CRA will be reimbursed by the Debtor for any reasonable out-of-pocket expenses incurred in connection with the services provided, such as reasonable travel expenses, computer research, messenger, and telephone charges.

Mr. Feferman and CRA are being employed in the ordinary course of the Debtor's business pursuant to Section 363 of the Bankruptcy Code.  Mr. Feferman is <u>not</u> being employed as a "professional" under Section 327 of the Bankruptcy Code.  Accordingly, CRA will not be submitting fee applications pursuant to Sections 330 or 331 of the Bankruptcy Code.  Mr. Feferman and CRA will file with the Court and serve copies on the United States Trustee and any official committees a monthly report of tasks performed on the engagement.

The Debtor believes that the proposed compensation structure is fair and very reasonable in light of industry practice, market rates both in and out of Chapter 11 proceedings, the amount of time that Mr. Feferman has spent and will

spend rendering services as CRO to the Debtor, and Mr. Feferman's experience and expertise in Chapter 11 cases.

## VI.

## DISINTERESTEDNESS OF CRA AND MR. FEFERMAN

Although the Debtor does not propose to retain CRA and Mr. Feferman under Section 327 of the Bankruptcy Code, CRA has nonetheless performed a computerized check with respect to conflicts in this case. To the best of CRA's knowledge, CRA has no material conflicts in this case, and holds no interest adverse to the estate. Neither Mr. Feferman, CRA, nor any of CRA's principals, members, employees or affiliates have any connection with the Debtor, its creditors, the United States Trustee or any other party with an actual or potential interest in the Debtor's case or their respective attorneys or accountants, except as set forth in the Feferman Declaration. By the Feferman Declaration, Mr. Feferman provides full and complete disclosure in order to demonstrate that CRA and he satisfy all requirements that would be imposed by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure if Mr. Feferman were to be employed in this case.

Since the Debtor is a fairly sizeable enterprise with numerous creditors and other business relationships, CRA is unable to state with certainty that every client relationship or other material connection with the Debtor's case has been disclosed in the Feferman Declaration. In this regard, if CRA discovers additional information that requires disclosure, CRA will file a supplemental disclosure with the Court.

CRA has not been retained to assist any person or entity other than the Debtor on matters relating to, or in connection with, the Debtor's case. If this Court approves the Debtor's proposed retention of Mr. Feferman as CRO in this case,

MPA iso Motion to Retain Chief Restructuring Officer                                    17-006078-11 MM11

CRA will not accept any engagement or perform any services for any person or entity other than the Debtor with respect to the Debtor's case.  CRA will, however, continue to provide professional services to, and engage in commercial or professional relationships with, any persons or entities that may be creditors of the Debtor or parties-in-interest in the Debtor's case, provided that such services do not relate to, or have any connection with, the Debtor's case.

As of the Petition Date, the Debtor was not indebted to CRA.  CRA believes that it is a "disinterested person" as defined in Section 101(14) of the Bankruptcy Code.

## VII.

## THE ENGAGEMENT AGREEMENT SHOULD BE APPROVED

### A.    The Court Has Authority to Approve the Debtor's Engagement Agreement with CRA.

Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Under applicable case law in this and other circuits, if a debtor's proposed use of its assets pursuant to Section 363(b) of the Bankruptcy Code represents a reasonable business judgment on part of the debtor, such use should be approved. *See e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.3d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel)*, 722 F.2d 1063, 1070 (2d Cir. 1983);  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

brought pursuant to Section 363(b)); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)) ("[T]he business judgment rule is a 'presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the actions were in the best interests of the company.'").

Bankruptcy courts have analyzed the propriety of a debtor's employment of corporate restructuring officers, advisors and professionals under Section 363 on numerous occasions and have determined it is an appropriate exercise of the debtor's business judgment to employ a restructuring professional in this manner. *See In re Westcliff Medical Laboratories, Inc*., Case No. 10-16743 (Bankr. C.D. Cal. June 25, 2010); *In re Fatburger Restaurants of California, Inc., et al*., Case No. 09-13965 (Bankr. C.D. Cal. Feb. 16, 2011); *In re Fairfield Residential LLC*, Case No. 09-14378 (Bankr. D. Del Jan 13, 2010); *In re Motor Coach Industries International, Inc*., Case No. 08-12136 (Bankr. D. Del Oct. 15, 2008) (approving retention of chief restructuring officer and crisis managers); *In re Pappas Telecasting, Inc.*, Case No. 08-10916 (Bankr. D. Del June 26, 2008); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del May 28, 2008); *In re Hoop Holdings, LLC*, Case No. 08-10544 (BLS) (Bankr. D. Del Apr. 22, 2008); *In re Leiner Health Products, Inc.*, Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 8, 2008); *In re TOUSA, Inc.*, Case No. 08-10928 (Bankr. S.D. Fla. Mar. 26, 2008); *In re American Home Mortgage Holdings, Inc.*, Case No. 07-11047 (Bankr. D. Del. Sept. 5, 2007); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Jan 17, 2007).

Pursuant to Section 363(b), a debtor may employ a professional to act as its chief restructuring officer, interim corporate officer or crisis manager.  *See In re*

*Tokheim Corp.*, Case No. 02-13437 (RJN) (Bankr. D. Del. Feb. 25, 2003). The retention of interim corporate officers and other temporary employees is proper under Section 363 of the Bankruptcy Code. Numerous courts have authorized retention of officers utilizing Section 363 of the Bankruptcy Code. *See In re Westcliff Medical Laboratories, Inc.*, Case No. 10-16743 (Bankr. C.D. Cal. June 25, 2010); *In re Fatburger Restaurants of California, Inc., et al.*, Case No. 09-13965 (Bankr. C.D. Cal. Feb. 16, 2011); *In re Fairfield Residential LLC*, Case No. 09-14378 (Bankr. D. Del Jan. 13, 2010); *In re The Holliston Mill, Inc.*, Case No. 07-10687 (MFW) (Bankr. D. Del. June 6, 2007); *In re Sea Containers Ltd.*, Case No. 06-11156 (KJC) (Bankr. D. Del. May 8, 2007); *In re Adva-Lite, Inc.*, Case No. 07-10264 (KJC) (Bankr. D. Del. Mar. 16, 2007); *In re Global Home Products, LLC*, Case No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006); *In re World Health Alternatives, Inc.*, Case No. 06-10166 (PJW) (Bankr. D. Del. Mar. 15, 2006).

Additionally, the Court's general equitable powers, codified in Section 105(a) of the Bankruptcy Code, provide authority for the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of [the Bankruptcy Code.]" *See* 11 U.S.C. § 105(a). *See also United States v. Energy Resources Co.*, 495 U.S.545, 549 (1990); *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code."); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 2005 WL 435207, *14 (D.N.J. Feb. 25, 2005) (reciting the power of the bankruptcy court to "… issue any order … that is necessary or appropriate to carry out the provisions of … [title 11]").

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

**B.**   **Authorizing the Debtor to Retain Mr. Feferman as CRO is in the Best Interests of the Estate.**

The terms and conditions of the Engagement Agreement were negotiated by the Debtor and CRA at arm's length and in good faith.  The Debtor submits that the Debtor's retention of Mr. Feferman as CRO is a sound exercise of its business judgment and satisfies Section 363 of the Bankruptcy Code.  Mr. Feferman has extensive experience and expertise as a chief restructuring officer and as an advisor for troubled companies.  Moreover, the Debtor believes that Mr. Feferman's services are necessary and essential to the administration of the Debtor's case and to the Debtor's ability to maximize the value of the Debtor's assets pursuant to sale proceedings in this case, for the benefit of the Debtor's creditors.  In light of the foregoing, the Debtor believes that the Debtor's retention of Mr. Feferman as CRO is appropriate and in the best interests of the Debtor and its creditors.

**C.**   **Retention of Mr. Feferman Is Critical to a Successful Resolution of this Case.**

Denying the relief requested herein would deprive the Debtor of the assistance of a highly qualified CRO and would impair the interests of the Debtor's creditors.  Mr. Feferman has substantial experience and expertise in the sale of financially-distressed businesses.  Mr. Feferman's leading the Debtor's efforts to sell substantially all of the Debtor's assets will facilitate efficient and effective sale proceedings and will enhance the prospects for a successful resolution of this case for the benefit of creditors of the Debtor.

The Debtor's retention of Mr. Feferman pursuant to the terms of the Engagement Agreement will benefit greatly the Debtor and the Debtor's creditors. The Debtor has only one management employee, the Debtor's general manager, Joseph O'Dea.  Mr. O'Dea has no experience in Chapter 11 proceedings or in the

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

sale of a financially-distressed business, and he is presently working extremely long hours to keep the Debtor's business afloat long enough to sell it. The Debtor needs the experience and expertise of Mr. Feferman to supervise the administration of the Debtor's Chapter 11 case and to lead the efforts that will be made in this case to effectuate a successful sale of substantially all of the Debtor's assets.

Mr. Feferman already has acquired substantial knowledge of the Debtor's business, and has commenced preparation for the marketing of the Debtor's assets. If the Court declines to authorize the Debtor to retain Mr. Feferman, there will be significant delay in the sale proceedings in this case, to the substantial detriment of the Debtor's creditors. The Debtor likely would be required to engage a new chief restructuring officer or other officer to administer the Debtor's case and to be responsible for the sale proceedings in the Debtor's case. The Debtor's need to engage a new chief restructuring officer or other officer in this case would take substantial time, both in terms of finding and engaging a suitable individual and in bringing such individual "up to speed." Given the Debtor's lack of profitability or continued expected cash flow for its operations, time is of the essence in this case and the Debtor has only a brief time frame within which the Debtor can effectuate sale proceedings in this case. Moreover, the Debtor may lack resources adequate to engage a suitable replacement in this case.

As described above, the Debtor's Chapter 11 case had been hampered by significant disputes among shareholders and directors as to the direction the case should take, and who should lead it on behalf of the Debtor. The Court's approval of Mr. Feferman as CRO should solve those issues as the Debtors shareholders and all members of the board of directors have unanimously approved his retention. Absent approval of Mr. Feferman, the progress on this Chapter 11 is likely to

MPA iso Motion to Retain Chief Restructuring Officer                              17-006078-11 MM11

become impeded again by disagreements between the shareholders and within the board.

As described above, the Debtor's Chapter 11 case had been hampered by significant disputes among shareholders and directors as to the direction the case should take, and who should lead it on behalf of the Debtor. The Court's approval of Mr. Feferman as CRO should solve that problem, as the Debtor's shareholders and all members of the board of directors have unanimously approved his retention. Absent approval of Mr. Feferman, the progress on this Chapter 11 is likely to become impeded again by disagreements between the shareholders and within the board.

Mr. Feferman is qualified to serve as CRO in this case. Furthermore, the terms of the Engagement Agreement are fair. Mr. Feferman's proposed compensation in this case–a $20,000 Monthly Flat Fee is relatively modest, particularly for an individual with Mr. Feferman's extensive experience and expertise. Accordingly, the Debtor's decision to enter into the Engagement Agreement reflects an exercise of the Debtor's sound business judgment.

Based upon the foregoing, the Court should authorize the Debtor to retain Mr. Feferman as CRO in accordance with the terms of the Engagement Agreement, nunc pro tunc to December 26, 2017.

**VIII.**

## CAUSE EXISTS TO WAIVE THE STAY IMPOSED UNDER RULE 6004(h) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtor respectfully submits that, to the extent that

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

Rule 6004(h) applies to the Debtor's proposed retention of Mr. Feferman as CRO in this case, cause exists to waive the 14-day stay imposed by Rule 6004(h). Given the Debtor's cash flow difficulties, the Debtor needs to effectuate expeditiously the sale proceedings in this case. A 14-day stay of an order authorizing the Debtor's retention of Mr. Feferman as CRO will serve only to delay, unnecessarily, the sale proceedings in this case, and thereby impair the Debtor's efforts to effectuate a successful sale for the benefit of the Debtor's creditors.

### IX.

### NOTICE OF THE MOTION IS APPROPRIATE, AND NO FURTHER HEARING IN RESPECT OF THE MOTION IS REQUIRED, UNLESS SUCH HEARING IS ORDERED BY THIS COURT OR SPECIFICALLY REQUESTED BY A PARTY-IN-INTEREST

Notice of the relief requested by this Motion has been provided to all creditors and parties-in-interest in this case pursuant to Bankruptcy Rule 2002. Creditors and other parties-in-interest have been afforded an opportunity to object to this Motion and to request a hearing on this Motion, should they object to the relief requested herein. In accordance with the provisions of Rule 9013-4(a)(b) of the Local Bankruptcy Rules, absent an objection to this Motion, this Court can and should approve this Motion without any hearing thereon.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

# X.

## CONCLUSION

Based upon the foregoing, the Debtor respectfully submits that good cause exists for this Court to enter an order granting to the Debtor the relief requested herein and such other and further relief as the Court may deem just and proper.

Date: January 11, 2018

/s/ *Stephen C. Hinze*
Stephen C. Hinze, Attorney for Debtor and Debtor in Possession

MPA iso Motion to Retain Chief Restructuring Officer                    17-006078-11 MM11

# EXHIBIT 2

1           UNITED STATES BANKRUPTCY COURT

2                  SOUTHERN DISTRICT

3         JUDGE MARGARET M. MANN, PRESIDING

4

5    IN RE:

6    CORE SUPPLEMENT TECHNOLOGY,  )
     INC.,                        )   CHAPTER 11
7                                 )
                  DEBTOR.         )   CASE NO. 17-06078-MM
8    _____  )

9

10

     1) STATUS CONFERENCE ON CHAPTER 11 VOLUNTARY PETITION;
11    2) MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH
         COLLATERAL AND INVENTORY FILED BY DEBTOR; 3)
12    APPLICATION TO EMPLOY MELISSA BUSTARDE OF MAYFIELD
        BUSTARDE, LLP AS CORPORATE COUNSEL FOR DEBTOR; 4)
13   MOTION AUTHORIZING AND APPROVING DEBTOR'S RETENTION OF
       RICHARD FEFERMAN AS CHIEF REORGANIZATION OFFICER OF
14      THE DEBTOR; 5) HEARING ON SUBMISSION OF ORDER ON
       APPLICATION FOR INTERIM COMPENSATION PAID TO INSIDER
15

16          REPORTER'S TRANSCRIPT OF PROCEEDING

17                SAN DIEGO, CALIFORNIA

18              THURSDAY, FEBRUARY 8, 2018

19

20

21

22

23
     SUE ROSS, CSR NO. 5786          U.S. BANKRUPTCY COURT
24   SAN DIEGO BANKRUPTCY REPORTERS  DEPARTMENT 1
     P.O. BOX 496                    325 WEST "F" STREET
25   SOLANA BEACH, CALIFORNIA 92075  SAN DIEGO, CA 92101
     (858) 481-1707

                  UNITED STATES BANKRUPTCY COURT

```
 1    APPEARANCES OF COUNSEL:

 2         FOR THE DEBTOR:

 3              STEPHEN C. HINZE
                217 CIVIC CENTER DRIVE
 4              SUITE 10
                VISTA, CALIFORNIA 92084
 5              (760) 689-0705

 6

            FOR THE CREDITOR BANK OF AMERICA, N.A.:
 7
                HEMAR, ROUSSO & HEALD, LLP
 8              BY:  ALEXANDRA RHIM (TELEPHONIC APPEARANCE)
                15910 VENTURA BOULEVARD
 9              12TH FLOOR
                ENCINO, CALIFORNIA 91436
10              (818) 501-3800

11

12         FOR THE UNITED STATES TRUSTEE:

13              OFFICE OF THE UNITED STATES TRUSTEE
                BY:  DAVID A. ORTIZ
14              880 FRONT STREET
                SUITE 3230
15              SAN DIEGO, CALIFORNIA 92101
                (619) 557-5013
16

17         FOR THE INTERESTED PARTY JOSEPH O'DEA:

18              SULLIVAN, HILL, LEWIN, REZ & ENGEL
                BY:  CHRISTOPHER V. HAWKINS
19              550 WEST "C" STREET
                SUITE 1500
20              SAN DIEGO, CALIFORNIA 92101
                (619) 233-4100

21

22

23

24

25
```

UNITED STATES BANKRUPTCY COURT

```
1   APPEARANCES OF COUNSEL (CONTINUED):

2       FOR THE PROSPECTIVE PURCHASER SIMPSON LABS, LLC:

3           DONAHOE & YOUNG
            BY:  MARK YOUNG (TELEPHONIC APPEARANCE)
4           25152 SPRINGFIELD COURT
            SUITE 345
5           VALENCIA, CALIFORNIA 91355
            (661) 259-9000
6

7       ALSO PRESENT:

8           RICHARD FEFERMAN, CHIEF REORGANIZATION OFFICER
            DAN GRACE, REPRESENTATIVE OF SIMPSON LABS
9           (TELEPHONIC APPEARANCE)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        SAN DIEGO, CALIFORNIA, THURSDAY, FEBRUARY 8, 2018

 2                        2:35 P.M.

 3

 4            THE CLERK:  IN THE MATTER OF CORE SUPPLEMENT

 5   TECHNOLOGY, STATUS CONFERENCE ON CHAPTER 11 VOLUNTARY

 6   PETITION; MOTION FOR AN INTERIM ORDER AUTHORIZING USE OF

 7   CASH COLLATERAL; APPLICATION TO EMPLOY MELISSA BUSTARDE

 8   OF MAYFIELD BUSTARDE, LLP; MOTION AUTHORIZING AND

 9   APPROVING DEBTOR'S RETENTION OF RICHARD FEFERMAN AS

10   CHIEF REORGANIZATION OFFICER; HEARING ON SUBMISSION OF

11   ORDER ON APPLICATION FOR INTERIM COMPENSATION PAID TO

12   INSIDER.

13            MAY WE HAVE THE TWO TELEPHONIC APPEARANCES,

14   PLEASE.

15            MR. YOUNG:  GOOD AFTERNOON, YOUR HONOR.

16   MARK YOUNG OF DONAHOE & YOUNG, LLP FOR PROSPECTIVE

17   PURCHASER SIMPSON LABS, LLC.  AND A BUSINESS PERSON FROM

18   SIMPSON LABS, DON GRACE, IS HERE AS WELL.

19            MS. RHIM:  AND GOOD AFTERNOON, YOUR HONOR.

20   THIS IS ALEXANDRA RHIM OF HEMAR, ROUSSO & HEALD ON

21   BEHALF OF BANK OF AMERICA.

22            THE COURT:  ALL RIGHT.  WELL, I'M GOING TO

23   START OUT WITH THE TELEPHONIC.  THE COURT HAD AN

24   UNFORTUNATE INCIDENT THIS MORNING WITH TELEPHONIC

25   APPEARANCES WHERE ONE PARTY WAS ON THE SPEAKERPHONE.
```

UNITED STATES BANKRUPTCY COURT

```
 1            AND, MR. YOUNG, I THINK YOU ARE ON THE

 2   SPEAKERPHONE.

 3            MR. YOUNG:  YES, I AM ON A SPEAKERPHONE,

 4   YOUR HONOR, AND SO MY CLIENT CAN HEAR AS WELL.  IS THAT

 5   A --

 6            THE COURT:  WELL, WHY DOESN'T YOUR CLIENT CALL

 7   IN HIM OR HERSELF SO THAT WE DON'T HAVE THIS PROBLEM.

 8            IS THERE A NUMBER, OR IS THAT POSSIBLE,

 9   MR. ROBINSON?

10            THE CLERK:  MR. YOUNG HAS THE DIAL-IN

11   INFORMATION, YOUR HONOR.

12            MR. YOUNG:  OKAY, YES.

13            THE COURT:  ALL RIGHT.  SO WHAT I'M GOING TO

14   ASK, I'M GOING TO ASSUME THAT YOUR CLIENT, MR. YOUNG,

15   HAS A CELL PHONE AND CAN JUST DO IT THAT WAY?

16            MR. YOUNG:  YES.  AND WHAT WE WILL DO IS IF I

17   COULD BE EXCUSED FOR ABOUT 90 SECONDS, I COULD -- I'M

18   SURE WE COULD ACCOMPLISH BOTH, BECAUSE I CAN CALL IN

19   FROM A PHONE WITH A HANDSET, AND HE CAN CALL IN FROM

20   ANOTHER PHONE.

21            THE COURT:  THE MIRACLES OF MODERN TECHNOLOGY.

22   AND IT WILL TAKE ABOUT THAT LONG TO GO THROUGH THE REST

23   OF THE APPEARANCES, SO NO PROBLEM.

24            MR. YOUNG:  OKAY.  SO I WILL HANG UP AT THIS

25   POINT AND REJOIN MOMENTARILY.  THANK YOU, YOUR HONOR.
```

```
1              THE COURT:  ALL RIGHT.  THANK YOU.
2              THE CLERK:  IN THE COURTROOM.
3              MR. ORTIZ:  GOOD AFTERNOON, YOUR HONOR.
4   DAVID ORTIZ APPEARING ON BEHALF OF THE UNITED STATES
5   TRUSTEE.
6              MR. HAWKINS:  GOOD AFTERNOON, YOUR HONOR.
7   CHRIS HAWKINS OF SULLIVAN, HILL ON BEHALF OF JOE O'DEA,
8   GENERAL MANAGER AND SHAREHOLDER OF THE DEBTOR.
9              MR. HINZE:  GOOD AFTERNOON, YOUR HONOR.  I'M
10  STEVE HINZE.  I'M HERE ON BEHALF OF THE DEBTOR.
11  MR. FEFERMAN, THE PROSPECTIVE CHIEF RESTRUCTURING
12  OFFICER, IS ALSO PRESENT IN COURT.
13             THE COURT:  ALL RIGHT.  WELL, WE'LL JUST PAUSE
14  IN SILENCE WHILE WE GET THE -- MR. YOUNG AND HIS CLIENT
15  BACK ON THE LINE.
16             THE CLERK:  WE'LL HEAR A LITTLE BEEP BEEP BEEP
17  WHEN THEY COME ON THE LINE.
18             THE COURT:  I'LL WAIT FOR THE BEEP BEEP BEEP.
19             THE CLERK:  OKAY.
20             MR. YOUNG:  GOOD AFTERNOON, YOUR HONOR.  THIS
21  IS MARK YOUNG, AND I'M ON A HANDSET NOW.  MY CLIENT WILL
22  SHORTLY BE ON AS WELL ON A DIFFERENT HANDSET.
23             THE COURT:  THERE'S THE BEEP BEEP BEEP, RIGHT.
24             OKAY.  WELL, WE'RE ALL PRESENT HERE.  THE
25  COURT HAS REVIEWED -- EVEN THOUGH I DIDN'T DO
```

```
 1    PARTICULARLY ELABORATE TENTATIVE RULINGS HERE, I HAVE

 2    REVIEWED EVERYTHING.  AND THE REASON I DIDN'T IS BECAUSE

 3    IF WE'RE GOING TO HAVE A CRO, SOME OF THESE MATTERS ARE,

 4    IN FACT, PREMATURE UNTIL WE HAVE THE CRO'S EVALUATION OF

 5    THESE, ALTHOUGH I HAVE SOME QUESTIONS THAT I WILL --

 6    THAT I PLAN TO ASK THE CRO IF, IN FACT, THAT IS

 7    APPROVED.

 8           AND SO I'M GOING TO START WITH MR. ORTIZ HAD

 9    VERY HELPFULLY -- CAREFULLY REVIEWED THE INDEMNITY

10    PROVISIONS, AND I THOUGHT THAT THE U.S. TRUSTEE'S

11    CONCERNS WERE WELL FOUNDED.  AND SO I'M GOING TO ASK THE

12    U.S. TRUSTEE WHETHER, IN FACT, THOSE HAVE BEEN RESOLVED.

13           MR. ORTIZ:  THANK YOU, YOUR HONOR.  YES, WE

14    DID HAVE EXTENSIVE BACK AND FORTH BETWEEN THE PARTIES TO

15    WORK THROUGH THESE ISSUES, AND I'M PLEASED THAT

16    EVERYTHING WENT SMOOTHLY.  AND SO THE SUPPLEMENTAL

17    DECLARATION OF MR. FEFERMAN THAT MODIFIES THE FEE

18    AGREEMENT DOES ADDRESS ALL OF THE CONCERNS THAT WE HAD

19    RELATIVE TO JUDICIAL REVIEW OF FEES, THE INDEMNITY, AND

20    THE BOARD INDEPENDENCE, WHICH WERE THE THREE REALLY

21    PRIMARY ISSUES, YOUR HONOR.  AND SO THE AGREEMENT AS

22    MODIFIED BY THE SUPPLEMENTAL DECLARATION IS SATISFACTORY

23    TO THE U.S. TRUSTEE.

24           THE COURT:  ALL RIGHT.  WELL, THEN, THAT THEN

25    WILL BE APPROVED UNLESS THERE'S ANYTHING FURTHER BY --
```

```
 1    THAT ANYBODY WISHES TO ADDRESS IN THAT REGARD.

 2              THE -- THEN, FRANKLY, THE COURT THEN HAS SOME

 3    QUESTIONS, AS I SAID, FOR THE -- FOR MR. FEFERMAN, IF

 4    YOU'D LIKE TO COME ON UP.  AND IT IS A PERFECTLY

 5    ACCEPTABLE ANSWER TO SAY I WAS JUST APPOINTED WITHIN THE

 6    LAST 20 SECONDS, AND THEREFORE I NEED TO THINK ABOUT IT.

 7    BUT WE'RE GOING TO START WITH I'M GOING ASSUME THAT YOU

 8    HAVE SPENT SOME TIME LOOKING AT THIS CASE, OR YOU

 9    WOULDN'T HAVE ACCEPTED THE ENGAGEMENT.

10              MR. FEFERMAN:  WOULD YOU LIKE ME TO ANNOUNCE

11    MY APPEARANCE?

12              THE COURT:  I THINK THAT WOULD BE AN EXCELLENT

13    IDEA.

14              MR. FEFERMAN:  GOOD AFTERNOON, YOUR HONOR.

15    RICHARD FEFERMAN, THE PROPOSED CRO.

16              THE COURT:  WELL, I THINK YOU'RE NOT PROPOSED

17    ANYMORE.  YOU'RE IN.

18              MR. FEFERMAN:  THE CRO.

19              THE COURT:  YOU'RE IN.

20              MR. FEFERMAN:  THANK YOU.

21              THE COURT:  ALL RIGHT.  SO WITH THAT, LET ME

22    TELL YOU, I'M GOING TO PICK OFF THE EASY ONES --

23              MR. FEFERMAN:  SURE.

24              THE COURT:  -- FIRST, PERHAPS.  THE HEARING ON

25    COMPENSATION, APPROVAL OF COMPENSATION TO MR. O'DEA,
```

1    WHAT IS YOUR VIEW ON THAT?  I UNDERSTAND THAT -- AND THE

2    FEES RECEIVED BEFOREHAND WERE WITHOUT COURT APPROVAL WAS

3    DISGORGED, AND THERE IS NOW A MOTION FOR APPROVAL.  AND

4    WHAT IS YOUR VIEW, INCLUDING I NEED TIME TO THINK ABOUT

5    IT --

6              MR. FEFERMAN:  SURE.

7              THE COURT:  -- BUT THEN WE COULD CONTINUE THIS

8    HEARING.

9              MR. FEFERMAN:  NO.  MR. O'DEA SERVES AS THE

10   GENERAL MANAGER OF THE BUSINESS.  THIS IS A -- NOT A

11   SIMPLE BUSINESS.  IT'S A COMPLICATED BUSINESS.  HE

12   POSSESSES A NECESSARY -- OR AN ESSENTIAL SKILL SET THAT

13   IS REQUIRED IN ORDER TO MAINTAIN THE VALUE OF THE

14   BUSINESS.  I'LL TELL YOU WHAT HE DOES.

15             THE COURT:  WELL, HE COMPOUNDS THE DIFFERENT

16   DRUGS THAT NEED TO BE MANUFACTURED, IF I HAVE THAT

17   CORRECTLY.

18             MR. FEFERMAN:  THIS IS MY OBSERVATION.  HE

19   MANUFACTURES SAMPLES, SENDS THEM TO CUSTOMERS.  LOTS OF

20   CUSTOMERS LIKE THE SAMPLES, APPARENTLY.  THEY CALL AND

21   PLACE ORDERS.  MR. O'DEA SAYS I'M HAPPY TO HAVE THAT

22   MANUFACTURED FOR YOU.  WE'LL SEND IT OUT.  I NEED YOU TO

23   PAY YOUR PAST DUE BILL.  HE CONVERTS POWDER INTO MONEY.

24             THE COURT:  ALL RIGHT.  SO WITH THAT, I TAKE

25   IT, THEN, YOU THEN SUPPORT MY GRANTING THE MOTION?

```
1              MR. FEFERMAN:  WITHOUT EQUIVOCATION.

2              THE COURT:  ALL RIGHT.  AND THERE ARE NO

3    FURTHER OPPOSITION?  MR. ORTIZ, I DON'T BELIEVE YOU HAD

4    ANY, SO --

5              MR. ORTIZ:  WE DID NOT, YOUR HONOR.  WE

6    THOUGHT THE COMPENSATION REQUESTED WAS FAIRLY

7    REASONABLE.

8              THE COURT:  ALL RIGHT.  THEN THAT WILL BE

9    APPROVED.  THE COURT WILL APPROVE THE COMPENSATION.  ALL

10   RIGHT?

11             MR. FEFERMAN:  YES, MA'AM.

12             THE COURT:  OKAY.  SO THAT TAKES CARE OF THAT

13   ONE.  THE COURT HAD CONCERN ABOUT -- I UNDERSTAND THAT

14   MS. BUSTARDE HAS NOW ALSO PAID BACK THE FEES THAT WERE

15   RECEIVED POST-PETITION BASED ON THE RECORD.  AM I

16   CORRECT ON THAT?

17             MR. HINZE:  CORRECT, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  THEN I'LL SAY MY

19   REMAINING ISSUE ABOUT THE EMPLOYMENT OF MELISSA BUSTARDE

20   IS THAT I DON'T KNOW WHY THAT'S -- I STILL DON'T KNOW

21   WHY THAT'S REALLY NECESSARY.  WE'RE TALKING ABOUT A

22   DEBTOR AND HOW THE DEBTOR'S INSIDERS INTERACT WITH EACH

23   OTHER ON A CORPORATE LEVEL SEEMS TO ME TO BE AN INSIDER

24   ISSUE AND NOT A DEBTOR ISSUE.  BUT I CAN BE CONVINCED

25   OTHERWISE IF THAT'S THE CASE.
```

```
1        DO YOU FEEL A NEED, MR. FEFERMAN, FOR

2   CORPORATE COUNSEL HERE?

3        MR. FEFERMAN:  ON A VERY LIMITED BASIS,

4   YOUR HONOR.  AND THE REASON FOR THAT IS THE EMPLOYMENT

5   OF THE CRO IS CONDITIONED ON A FUNCTIONING BOARD OF

6   DIRECTORS.  AND THERE IS OCCASION THAT I MAY HAVE A

7   QUESTION OF HER.  THERE'S NO ONE ELSE TO GO TO.

8        THE COURT:  IN LIGHT OF THAT, DOES ANYONE -- I

9   MEAN, SO YOU NEED TO SHARE WITH MS. BUSTARDE THAT IT

10  ISN'T -- IT'S NOTHING PERSONAL HERE.  IT'S JUST I NEED

11  TO MAKE SURE THAT THE FEES SHE'S GOING TO CHARGE WERE

12  NECESSARY AND BENEFICIAL TO THE ESTATE.  AND I WOULD

13  THINK IF YOU REQUEST HER SERVICES, THEN THAT WILL BE A

14  VERY EASY TEST TO MEET.

15       IF IT TURNS OUT TO BE AN INSIDER TYPE OF

16  THING, I DON'T KNOW THAT THE COURT WOULD BE SO

17  PERSUADED.  BUT IN LIGHT OF THAT, I WILL ALLOW THOSE

18  ISSUES TO BE RESOLVED AT THE TIME OF THE FEE APPLICATION

19  AND INSTEAD OF HAVING THEM SERVE AS A BAR TO EMPLOYMENT

20  AT THIS POINT.

21       MR. FEFERMAN:  YES, MA'AM.  I AGREE WITH YOU

22  COMPLETELY.

23       THE COURT:  ANYTHING FURTHER ON THAT ONE?

24       ALL RIGHT.  THEN SHE -- HER EMPLOYMENT WILL BE

25  APPROVED.
```

```
 1              WHICH TAKES US TO THE ORDER WITH REGARD TO USE
 2   OF CASH COLLATERAL.  AND MS. RHIM, YOU'RE ON THE PHONE,
 3   AS I RECALL.
 4              MS. RHIM:  YES, I AM, YOUR HONOR.
 5              THE COURT:  ALL RIGHT.  SO HOW ARE WE DOING ON
 6   THAT?
 7              MR. FEFERMAN:  MS. --
 8              MS. RHIM:  YOUR HONOR -- I'M SORRY.  I WILL
 9   LET MR. FEFERMAN DO HIS PRESENTATION FIRST, AND I'D LIKE
10   TO COMMENT THEREAFTER.
11              THE COURT:  ALL RIGHT.  WELL, IF THERE'S A
12   PRESENTATION, LET'S HEAR IT.
13              MR. FEFERMAN:  I WAS GOING TO DEFER TO
14   MS. RHIM.
15              THE COURT:  WELL, YOU ALL HAVE TO PICK WHO
16   GOES FIRST.
17              MR. FEFERMAN:  MS. RHIM, YOU WIN.
18              MS. RHIM:  YOUR HONOR, BANK OF AMERICA HAS
19   BEEN VERY INTERESTED TO SEE WHAT KIND OF PROGRESS THE
20   DEBTOR WOULD MAKE WITH RESPECT TO A POTENTIAL SALE OF
21   ITS ASSETS.  MY UNDERSTANDING FROM THE CRO IS THAT THERE
22   HAS BEEN A GREAT DEAL OF NEGOTIATIONS BACK AND FORTH
23   WITH SIMPSON LABS.
24              THERE WAS A DRAFT ASSET PURCHASE AGREEMENT
25   THAT I RECEIVED AROUND 11:00 TODAY THAT IS CURRENTLY
```

1  BEING DIGESTED BY BANK OF AMERICA.  I CAN'T COMMENT ON

2  OUR FEELINGS ABOUT IT AT THIS TIME.  HOWEVER, AT A

3  MINIMUM, WE ARE -- WE ARE AT LEAST PLEASED TO SEE THAT

4  THERE'S SOME SORT OF DOCUMENTATION, SO THERE'S SOMETHING

5  TO BUILD OFF OF.

6        WITH THAT SAID, WE HAD CONTINUED THE CASH

7  COLLATERAL HEARINGS FROM WEEK TO WEEK BASICALLY, AND

8  WE'RE THANKFUL FOR THE COURT'S ACCOMMODATION.

9        YOUR HONOR, AT THIS POINT, WE WOULD SIMILARLY

10  REQUEST A TWO-WEEK CONTINUANCE OF THE CASH COLLATERAL

11  HEARING, BECAUSE WE NEED THE TIME TO DIGEST THE APA AND

12  TRY TO NEGOTIATE A CONSENSUAL CASH COLLATERAL

13  STIPULATION GOING FORWARD.  SO MY REQUEST AGAIN IS FOR A

14  TWO-WEEK CONTINUANCE.

15        IN THE MEANTIME, THE DEBTOR WOULD BE ABLE TO

16  USE CASH COLLATERAL LIMITED TO ONLY CRITICAL EXPENSES.

17  AND BANK OF AMERICA WOULD HAVE ITS REPLACEMENT LIEN, AND

18  THIS WOULD ALL BE WITHIN THE SCOPE AS PREVIOUSLY ORDERED

19  BY THE COURT.

20        THE COURT:  ALL RIGHT.  WELL, MS. RHIM, THE

21  PARTIES -- I DON'T KNOW WHETHER I SHOULD CHARACTERIZE IT

22  AS STUMBLING ALONG OR FUNCTIONING WELL UNDER THE LIMITS

23  OF THE INTERIM CASH COLLATERAL USAGE.  SO IT SOUNDS, AT

24  LEAST, THAT MIGHT BE APPROPRIATE TO HAVE THAT CONTINUE

25  WHILE THE PARTIES PUT IN PLACE A MORE COMPLETE AND

 1   FINITE DEAL.

 2              BUT WHAT'S YOUR VIEW, MR. FEFERMAN?

 3              MR. FEFERMAN:  I AGREE WITH MS. RHIM.

 4              LET ME SAY SOMETHING IN MY OWN SELF INTEREST.

 5   WE HAVE ALSO HAD EXTENSIVE CONVERSATIONS REGARDING THE

 6   COMPENSATION OF THE CRO AND THE APPROVED STAFF MEMBER

 7   FROM MY FIRM.  WE -- THERE'S BEEN BACK AND FORTH.  THE

 8   FINAL CONVERSATIONS WERE AS I WAS GOING THROUGH SECURITY

 9   DOWNSTAIRS, AND SO I WASN'T PAYING ATTENTION AS

10   CAREFULLY AS I WOULD HAVE LIKED TO.  BUT I WOULD ASK IF

11   MS. RHIM TO TAKE THIS OPPORTUNITY TO PUT ON THE RECORD

12   WHAT WAS AGREED TO BETWEEN US.

13              THE COURT:  MS. RHIM, DO YOU HAVE AN AGREEMENT

14   REGARDING COMPENSATION OF THE CRO AT THIS POINT?  ARE

15   YOU GOING TO -- AND IF YOU DON'T HAVE A FINAL AGREEMENT,

16   DO YOU HAVE AN AGREEMENT ABOUT THE NEXT TWO WEEKS UNTIL

17   WE WORK OUT THE CASH COLLATERAL STIPULATION?

18              MS. RHIM:  YOUR HONOR, OUR AGREEMENT WITH THE

19   CRO, AND WE'VE BEEN APPRECIATIVE OF HIS EFFORTS, IS THAT

20   THE BANK WILL CONSENT TO THE USE OF CASH COLLATERAL TO

21   COMPENSATE MR. FEFERMAN, OR HIS FIRM, I SHOULD SAY,

22   PURSUANT TO THE AMOUNT AS REQUESTED IN HIS APPLICATION

23   AND PURSUANT TO THE PROCEDURES.  THERE'S SORT OF A

24   NOTICE AND OPPORTUNITY TO OBJECT PROCEDURE.  SO PURSUANT

25   TO THOSE PROCEDURES THAT WILL BE SET OUT IN AN ORDER

```
 1    AUTHORIZING HIS EMPLOYMENT, WE WOULD CONSENT TO THAT.
 2              WE HAD A LOT OF DISCUSSION BECAUSE OF A
 3    CONCERN OF WHAT HAPPENS REGARDING HIS ABILITY TO GET
 4    PAID IF USE OF CASH COLLATERAL IS NO LONGER AUTHORIZED.
 5    AND BANK OF AMERICA HAS AGREED THAT EVEN
 6    POST-TERMINATION OF REGARDING AUTHORITY TO USE CASH
 7    COLLATERAL THAT B OF A WOULD BE WILLING TO EXTEND A
 8    CARVE-OUT FROM ITS COLLATERAL SO THAT MR. FEFERMAN COULD
 9    BE PAID ANY OUTSTANDING UNPAID FEES ASSUMING THAT THE
10    WORK IS THROUGH THE END OF APRIL OF 2018.
11              YOU KNOW, WE'RE HAPPY TO REVISIT IF THERE IS A
12    NEED FOR HIS EMPLOYMENT OR ACTIVE DUTIES AFTER APRIL,
13    BUT WE ARE WILLING TO GIVE MR. FEFERMAN THAT ASSURANCE.
14              MR. FEFERMAN:  THANK YOU.
15              THE COURT:  ALL RIGHT.  THAT WILL NEED TO GO
16    IN AN ORDER WHICH MR. ORTIZ WOULD HAVE TO TAKE A LOOK
17    AT.
18              MR. ORTIZ.
19              MR. ORTIZ:  YOUR HONOR, IF I MIGHT BE HEARD
20    JUST AS A POINT OF INQUIRY ON THE CASH COLLATERAL.  I
21    KNOW THIS COURT HAD ISSUED ITS ORDER ALLOWING THE
22    INTERIM USE TO AVOID IRREPARABLE AND IMMEDIATE HARM.  I
23    WANT TO JUST REMIND THE PARTIES THAT THE DEBTOR HAS NOT
24    PAID THE U.S. TRUSTEE QUARTERLY FEES THAT ARE DUE FOR
25    THE FOURTH QUARTER, AND THE FAILURE TO DO SO IS THE
```

```
 1    BASIS FOR CONVERSION, WHICH WOULD CREATE IRREPARABLE AND

 2    IMMEDIATE HARM TO THIS DEBTOR.  SO I JUST WANT TO FIND

 3    OUT IF THE BANK IS GOING TO CONSENT TO THAT USE OR

 4    WHETHER THE COURT WOULD INCLUDE THAT IN ITS ORDER.

 5           MS. RHIM?

 6           MS. RHIM:  YOUR HONOR, THE BANK WOULD CONSENT

 7    TO THE USE OF CASH COLLATERAL FOR THAT PURPOSE.

 8           THE COURT:  ALL RIGHT.

 9           MR. ORTIZ:  THANK YOU.

10           THE COURT:  THEN I THINK --

11           MR. FEFERMAN:  I'LL SEE THAT YOU PROMPTLY HAVE

12    A CHECK.

13           THE COURT:  THEN, MS. RHIM, YOU SHOULD

14    PROBABLY UPLOAD AN ORDER IN THAT REGARD, WHICH I THINK

15    TAKES US BACK UP TO THE FIRST ITEM ON CALENDAR.

16           AND I HAVE A FEW THOUGHTS THAT, BECAUSE WE

17    HAVEN'T BEEN HERE BEFORE, MR. FEFERMAN, WHEN WE COME

18    BACK ON THE 22ND FOR THE CASH COLLATERAL ISSUES,

19    HOPEFULLY TO BE RESOLVED, THE COURT HAS BEEN STRUGGLING

20    JUST TO GET MY ARMS AROUND WHAT THIS CASE IS.  AND I

21    DON'T -- I'D RATHER YOU -- YOU DON'T NEED TO GIVE ME

22    YOUR OFF-THE-TOP-OF-YOUR-HEAD RESPONSE.  BUT THE TWO

23    ISSUES THE COURT HAS BEEN STRUGGLING WITH ARE REALLY

24    QUITE INTERRELATED.

25           SO BASED ON WHAT THIS DEBTOR DOES, DOES -- YOU
```

```
1    KNOW, IS IT -- IT'S THE USUAL, IS IT DO WE KEEP

2    OPERATING, OR DO WE TRY TO SELL THE BUSINESS?  THAT'S --

3    THOSE ARE THE TWO BASICS.  AND I DON'T KNOW IF YOU EVEN

4    WOULD HAVE --

5         MR. FEFERMAN:  MAY I RESPOND?

6         THE COURT:  SURE, IF YOU'VE HAD SUFFICIENT

7    TIME TO EVALUATE THAT.

8         MR. FEFERMAN:  I STARTED WORKING ON THIS

9    MATTER THE 26TH OF DECEMBER.  THERE IS NO SCENARIO THAT

10   I'VE LOOKED AT THAT THIS DEBTOR DOES NOT RUN OUT OF

11   MONEY VERY SHORTLY.  THERE'S A RANGE THERE DEPENDING ON

12   WHAT WE DO WITH OPERATIONS, AND YOU'LL RECEIVE EVIDENCE

13   OF THAT NEXT WEEK, I BELIEVE.

14        MR. HINZE:  YES.  WE PLAN ON FILING A

15   MOTION --

16        MR. FEFERMAN:  IT'S -- THERE'S SOME

17   COMPLEXITIES --

18        THE COURT REPORTER:  I'M SORRY, I CAN'T HEAR

19   YOU.

20        THE COURT:  MR. HINZE, YOU HAVE TO GET CLOSE

21   TO THE PODIUM OR SPEAK A LOT MORE LOUDLY.

22        MR. HINZE:  WE HOPE TO HAVE A MOTION TO

23   APPROVE SALES PROTOCOLS ON FILE BY FRIDAY.

24        THE COURT:  ALL RIGHT.

25        MR. HINZE:  BY NEXT FRIDAY.
```

```
1              THE COURT:  WELL, THERE WE GO.

2              MR. FEFERMAN:  IT'S UNDERCAPITALIZED AS FAR AS

3    BEING A VIABLE, GOING CONCERN.  THAT'S IT.

4              THE COURT:  OKAY.

5              MR. FEFERMAN:  NOT AN OPTION.

6              THE COURT:  ALL RIGHT.  AND THEN THE -- THIS

7    DEBTOR, BECAUSE LIKE ALL OPERATING DEBTORS WHO

8    MANUFACTURE, IS -- HAS A COMPLEX CAPITAL STRUCTURE

9    THROUGH HERE WITH, YOU KNOW, BANK OF AMERICA.  THEY HAVE

10   THE ALL-ASSET LINE, BUT THEN THEY ALSO HAVE SOME

11   EQUIPMENT LINES, AND WHAT'S CASH COLLATERAL, AND HOW

12   DOES IT ALL COME TOGETHER, PARTICULARLY WHERE YOU'VE GOT

13   ONGOING USE WHICH IS IN PART FUNDED BY RECEIPTS FROM

14   MAYBE PRE-PETITION INVENTORY.  IT MAY BE SOMETHING ELSE

15   BUT ALSO NEW SERVICES.

16             SO TRYING TO EXACTLY FIGURE OUT THE WHOLE CASH

17   COLLATERAL ISSUE IS OFTEN CHALLENGING OR NIGH IMPOSSIBLE

18   WITHOUT COMPLETELY UNECONOMICAL EFFORT AND ANALYSIS.  SO

19   I'M NOT SURE WE GO THERE, BECAUSE I'LL NEED TO SEE WHAT

20   THE RESOLUTIONS THAT HAVE BEEN REACHED.

21             BUT IF I UNDERSTAND YOUR COMMENT, THE DEBTOR

22   DOESN'T HAVE A BUYER NOW.  WHAT THE DEBTOR IS TRYING TO

23   DO IS BRING BUYERS IN THE DOOR.  IS THAT REALLY WHERE WE

24   ARE?  OR, NO, IS THERE A BUYER?  OH, IS IT

25   SIMPSON LAB?
```

1          MR. HINZE:  SIMPSON LABS.

2          MR. YOUNG:  YES.  YES, YOUR HONOR.  YEAH, THIS

3    IS -- IF I MAY, THIS IS MARK YOUNG, ATTORNEY FOR A

4    SIMPSON LABS.  AND SIMPSON HAS BEEN NEGOTIATING

5    EXTENSIVELY WITH REPRESENTATIVES OF THE DEBTOR FOR

6    SEVERAL WEEKS NOW, AND I'VE COME INTO THE PICTURE WITHIN

7    THE LAST WEEK OR SO TO FORMALIZE.  SO SIMPSON IS A VERY

8    INTERESTED AND VERY SERIOUS BUYER.

9          THE COURT:  ALL RIGHT, AND I UNDERSTAND.  AND

10   ONE OF THE THINGS, I'M JUST GOING TO GIVE YOU A HEADS-UP

11   THAT THE COURT, MR. YOUNG, IS -- I UNDERSTAND THAT THE

12   SIMPSON HAS BEEN MANUFACTURING THIS.  THE DEBTOR HAS RUN

13   INTO FINANCIAL DIFFICULTIES.  YOU KNOW, DEBTORS OFTEN DO

14   THINGS THAT ARE NOT QUITE, I'M JUST GOING TO SAY,

15   STANDARD.  THAT DOESN'T MEAN THEY'RE INAPPROPRIATE.  IT

16   JUST MEANS THEY'RE NOT STANDARD.  AND THOSE, I JUST WANT

17   TO ENSURE THAT THOSE HAVE BEEN HANDLED FAIRLY FROM THE

18   STANDPOINT OF THE CREDITORS OF THE CASE.

19         BUT IF SIMPSON IS A PROPOSED BUYER, AND

20   PERHAPS THE MOST ATTRACTIVE BUYER, THEN THAT'S A

21   WONDERFUL DEVELOPMENT HERE.  SO I KNOW THAT THERE WAS A

22   DECLARATION RECENTLY FILED, I BELIEVE BY MR. O'DEA,

23   ABOUT THE RELATIONSHIP WITH SIMPSON.  AND I WOULD STILL

24   HAVE QUESTIONS WITH THAT, BUT I'M NOT SURE THAT THOSE

25   NEED TO BE ANSWERED OR ADDRESSED HERE TODAY.  BUT THOSE

1   WERE THE ISSUES IN MY OWN MIND ABOUT HOW THOSE AFFECTED

2   THE STATUS OF THIS CASE AND ITS ADMINISTRATION.

3            SO SOUNDS LIKE THE -- WHAT WE SHOULD DO -- SO

4   WITH THE SALES PROCEDURE MOTION TO BE FILED HOPEFULLY BY

5   THE END OF THE WEEK --

6            MR. HINZE:  NEXT OR BEFORE NEXT FRIDAY.

7            THE COURT:  -- ARE WE GOING TO SET A -- DO

8   THOSE ANTICIPATE A SALE HEARING BEING SET?  SO ARE THESE

9   BEING DONE ON AN EX PARTE BASIS OR A REDUCED NOTICE AND

10  THEN --

11           MR. HINZE:  THAT'S WHAT WE WANTED TO TALK TO

12  YOU ABOUT, WAS HOW WOULD YOU -- WOULD YOU PREFER HAVING

13  THIS BROUGHT UP ON AN EMERGENCY BASIS, HAVING THE MOTION

14  FILED, AND HAVING NOTICE ON -- PURSUANT TO AN ORDER

15  SHORTENING TIME?  WE DO HAVE A CASH -- WE NEED TO

16  PRESERVE CASH AS MUCH AS POSSIBLE, SO THE FASTEST -- THE

17  FASTER WE CAN GET THIS ACCOMPLISHED, THE BETTER FOR

18  EVERYBODY CONCERNED.

19           THE COURT:  RIGHT.  WELL, LET ME -- THEN

20  HERE'S WHAT I'M GOING TO SUGGEST.  THE SHORT ANSWER TO

21  YOUR QUESTION IS:  I DON'T REALLY KNOW HOW I WANT TO DO

22  IT UNTIL I SEE IT.  SO I HAVE TO REVIEW THAT.  BUT I

23  HAVE IN THE PAST APPROVED -- I MEAN, NO HEARING MOTIONS

24  TO APPROVE SALE PROCEDURES WHERE THE KEY PARTIES IN THE

25  CASE AGREE.  HERE, YOU KNOW, U.S. TRUSTEE, THE CRO, YOU

1    KNOW, THE DEBTOR.

2            AND THEN I WILL LOOK AT THAT MOTION TO SEE

3    WHETHER IT REALLY IMPACTS, YOU KNOW, ISSUES WITH

4    CREDITORS.  AND PERHAPS IT MIGHT EVEN BE IF B OF A

5    AGREES TO IT, THAT'S GREAT.  AND THEN I'LL HAVE TO

6    FIGURE OUT HOW I ADDRESS THE DUE PROCESS CONCERNS ONCE

7    WE GET THERE.

8            SO I CAN'T GIVE YOU MY ANSWER TODAY UNTIL I

9    SEE IT.  BUT IF ALL THE PARTIES AGREE TO A CERTAIN SET

10   OF SALE PROCEDURES, THEN I DON'T SEE WHY I'D HAVE TO

11   HAVE A HEARING ON IT.

12           I WOULD PROBABLY NEED TO RESERVE OBJECTIONS ON

13   DUE PROCESS UNTIL THE TIME OF THE HEARING, BECAUSE,

14   FRANKLY, THEY'RE PRESERVED FOREVER IF THEY'RE VALID.

15   THAT'S JUST HOW IT WORKS.  IT'S A CONSTITUTIONAL ISSUE.

16           SO, YOU KNOW, WITH THAT, I COULD EVEN GIVE

17   YOU, IF YOU THOUGHT THIS WOULD BE IMPORTANT, GIVE YOU

18   HEARING DATES RIGHT NOW TO WORK TOWARDS SO THAT THEY'RE

19   RESERVED ON THE CALENDAR.

20           MR. HINZE:  THAT WOULD BE VERY HELPFUL.

21           THE COURT:  ALL RIGHT.  SO I'LL TELL YOU WHAT

22   SOME OPTIONS ARE, ALTHOUGH I CAN EVEN WORK WITHIN THAT.

23   THE COURT IS NOT -- THE COURT IS GOING TO BE DARK THE

24   WEEK OF MARCH 12TH.  I HAVE A HEARING ON THURSDAY OF

25   BOTH -- WE KNOW ABOUT FEBRUARY 22ND.  I DON'T KNOW IF

```
 1    MARCH 8TH IS TOO SOON.  I DON'T KNOW IF MARCH 22ND IS

 2    TOO LATE.  WHAT WOULD WORK?

 3              MR. HINZE:  IF WE COULD GET SOMETHING PRIOR TO

 4    MARCH 22ND, I THINK --

 5              THE COURT:  WELL, THAT WOULD EITHER BE

 6    MARCH 8TH, OR I COULD GIVE YOU MARCH --

 7              MR. HINZE:  EXCUSE ME, BEFORE FEBRUARY 22ND.

 8              THE COURT:  YOU WANT A SALE HEARING BEFORE

 9    FEBRUARY -- IN TWO WEEKS?  I MEAN, IF YOU DO, I -- I'LL

10    NEED TO -- I'M NOT SURE I'M GOING TO GIVE IT TO YOU.

11              MR. HINZE:  OKAY.

12              THE COURT:  BUT IF YOU WANT A SALE HEARING, I

13    WILL -- I CAN GIVE YOU -- I CAN TENTATIVELY SET IT FOR

14    FEBRUARY 22.  AND THEN I'LL JUST HAVE TO FIGURE OUT,

15    ONCE I SEE EVERYTHING, WHETHER THAT'S OKAY OR NOT.

16              MR. FEFERMAN:  TAKE IT.

17              MR. HINZE:  WE'LL TAKE THE 22ND.

18              THE COURT:  ALL RIGHT.

19              MR. HINZE:  OKAY.

20              THE COURT:  NOW, DON'T ASSUME THAT THIS MEANS

21    IT'S GOING TO BE -- IF I FIND OUT THAT THERE -- THERE'S

22    OBVIOUSLY NOTICE TO CREDITORS, AND I'LL HAVE TO DECIDE

23    WHERE WE MIGHT END UP.  BUT MR. ORTIZ SEEMS TO HAVE

24    SOME --

25              MR. ORTIZ:  YOUR HONOR, I -- THAT'S REALLY
```

1    QUICK ON A SALE MOTION AS OPPOSED TO A SALES PROCEDURES

2    MOTION.

3            THE COURT:  OH, I'M ASSUMING THE SALE

4    PROCEDURES IS GOING DOWN IN AN EX PARTE BASIS.  AND

5    THEN, ONCE I APPROVE IT, IT'S GOING TO GO FORWARD.  ARE

6    WE NOT --

7            MR. ORTIZ:  BECAUSE --

8            THE COURT:  BECAUSE I WILL -- JUST TO FILL IN

9    THE GAPS HERE, IF I REVIEW THE SALE PROCEDURES MOTION,

10   WHICH IS FILED BY, SAY, FEBRUARY 12TH, AND I LOOK AT IT,

11   AND I SAY, HMM, THIS NEEDS A HEARING, I'LL SET IT FOR AN

12   EX PARTE HEARING LATER THAT WEEK, OKAY?  SO WHAT I'M

13   TALKING ABOUT IS THE ACTUAL SALE DATE FOR SALE OF THE

14   ASSETS, ASSUMING AN ORDER IS ENTERED APPROVING THE SALES

15   PROCEDURES.  DOES THAT HELP?

16           MR. ORTIZ:  I GOT -- I UNDERSTAND, YOUR HONOR,

17   MY ONLY CONCERN IS, IN HAVING SPOKEN WITH MR. FEFERMAN,

18   IS THE DESIRE TO TRY TO MARKET THIS A LITTLE BIT MORE.

19   AND SO WE -- THE U.S. TRUSTEE WOULD HAVE CONCERNS ABOUT

20   HAVING A HEARING ON THE ACTUAL SALE SO QUICKLY.

21           THE COURT:  OKAY.  HOW ABOUT MARCH 8?

22           MR. ORTIZ:  PERHAPS MR. FEFERMAN MIGHT BE

23   BETTER SUITED TO ANSWER THAT QUESTION, YOUR HONOR.

24           THE COURT:  OR MARCH -- I COULD GIVE YOU

25   MARCH 6TH.

```
1            MR. FEFERMAN:  YOUR HONOR, I'M HAPPY TO DRAG

2     YOU A LITTLE BIT INTO THE WEEDS RIGHT NOW.  WE HAVE A

3     COUPLE OF POINTS THAT WE'RE NEGOTIATING -- SEVERAL

4     POINTS THAT ARE STILL OPEN IN OUR NEGOTIATIONS WITH

5     SIMPSON.  ONE POINT DEALS WITH WHAT HAPPENS WITH ONGOING

6     LOSSES, AND IT CROSSES OVER WITH A -- WITH TRUEING UP

7     THE LEVEL OF ACCOUNTS RECEIVABLES THAT ARE BEING

8     PURCHASED.

9            IF WE'RE GOING TO TRUE UP THE ACCOUNTS

10    RECEIVABLES, WE HAVE NO INCOME, AND -- OR EFFECTIVELY,

11    WE HAVE NO INCOME.  AND, HOWEVER, TO -- MOST BUYERS WANT

12    TO MAINTAIN THE GOING CONCERN.  SO WE HAVE ALL THE

13    EXPENSES AND NO INCOME.

14            THERE'S A COUPLE OF SOLUTIONS TO THAT.

15    SIMPSON CAN BEAR THE LOSSES, OR THEY CAN ALLOW US TO

16    REDUCE OPERATIONS TO A MINIMUM.  IF WE CONTINUE AT THE

17    SAME LEVEL, WE RUN OUT OF MONEY BEFORE THE END OF

18    FEBRUARY, RUN OUT OF CASH.  THAT'S RIGHT NOW

19    APPROXIMATELY $700,000, WHICH IS A -- WOULD BE A

20    SIGNIFICANT RECOVERY FOR THE CREDITOR BODY.  IT COULD

21    MAKE THE DIFFERENCE BETWEEN THERE ACTUALLY BEING MONEY

22    FOR UNSECURED CREDITORS OR NO MONEY FOR UNSECURED

23    CREDITORS, AND, IN FACT, THE SECURED CREDITORS TAKING A

24    HAIRCUT.

25            THE COURT:  WELL, HERE'S WHAT I'M GOING TO DO,
```

UNITED STATES BANKRUPTCY COURT

```
 1    THEN.
 2              MR. FEFERMAN:  OKAY.
 3              THE COURT:  I AM GOING TO SET A HEARING ON THE
 4    SALE PROCEDURES MOTION FOR THE 14TH OF FEBRUARY AT 2:00
 5    P.M.
 6              MR. FEFERMAN:  OKAY.
 7              THE COURT:  AND WE CAN -- THEREFORE, PEOPLE
 8    CAN THINK ABOUT HOW WE CAN -- NEGOTIATIONS AND RESOLVING
 9    THESE ISSUES SO THAT WE CAN THEN DECIDE WHAT WE NEED TO
10    DO TO BALANCE ALL OF THIS.  SO DOES THAT WORK FOR
11    EVERYONE?
12              MR. FEFERMAN:  WORKS FOR ME, YOUR HONOR.
13              MR. ORTIZ:  THANK YOU, YOUR HONOR.
14              MR. HINZE:  THANK YOU.
15              MR. FEFERMAN:  THANK YOU VERY MUCH.
16              MR. YOUNG:  YES, YOUR HONOR.
17              THE COURT:  ALL RIGHT.  SO THAT'S WHAT WE WILL
18    DO.  THE SALE PROCEDURES MOTION FEBRUARY 14TH AT 2:00
19    P.M.  AND I WILL REQUIRE STATUS REPORTS TO BE FILED BY
20    9:00 A.M. ON FEBRUARY 14TH SO THAT I HAVE SOME IDEA
21    WHAT'S HAPPENING, BUT TO GIVE YOU ENOUGH TIME TO TRY TO
22    RESOLVE WHATEVER CAN BE RESOLVED.  ALL RIGHT.
23              MR. FEFERMAN:  THANK YOU VERY MUCH.
24              THE COURT:  AND I'M GOING TO TRAIL THE STATUS
25    CONFERENCE OF THE CASE TO THAT DATE AS WELL.  AND IF --
```

```
 1    I CAN ALSO, MS. RHIM, MOVE THE CASH COLLATERAL HEARING
 2    TO THE 14TH IF YOU THINK YOU'LL BE DONE BY THEN AND NOT
 3    MOVE IT TO THE 22ND.  WHAT DO YOU THINK?
 4              MS. RHIM:  YOUR HONOR, I WOULD BE FINE WITH
 5    FEBRUARY 14.  CERTAINLY, YOU KNOW, IF WE NEED MORE TIME,
 6    WE'LL ADVISE YOU.  BUT I'D BE HAPPY TO HAVE THAT AT
 7    LEAST AS A HOLDING DATE.
 8              THE COURT:  ALL RIGHT.
 9              MR. HINZE:  WHEN WOULD YOU LIKE THE MOTION
10    FILING DATE?
11              THE COURT:  WELL, DID YOU JUST TELL ME YOU
12    COULD FILE IT BY TOMORROW SO I WOULD --
13              MR. HINZE:  NO.
14              THE COURT:  NO, MONDAY AT 9:00?
15              MR. HINZE:  THAT'S GOING TO BE A STRETCH.
16              THE COURT:  WELL, WE HAVE THE HEARING ON
17    WEDNESDAY AT 2:00.
18              MR. FEFERMAN:  I THINK HE SAID THE 15TH.
19              MR. HINZE:  WE'LL HAVE TO DO IT MONDAY AT
20    9:00.
21              THE COURT:  I'LL GIVE YOU TO NOON.  HOW ABOUT
22    THAT?
23              MR. HINZE:  OKAY.
24              THE COURT:  BECAUSE IT IS GOING TO HAVE TO BE
25    NOTICED TO PEOPLE, AND ANY OPPOSITION WILL BE DUE AT THE
```

1   HEARING.  YOU KNOW, I DON'T KNOW WHAT IMPACT AND WHAT

2   CREDITOR MIGHT BE OUT HERE THAT MIGHT WANT TO BE HEARD.

3   BUT GIVING THAT DUE PROCESS WILL HELP TRY TO GET THIS

4   DONE IN AS QUICKLY A MANNER AS POSSIBLE CONSISTENT WITH

5   DUE PROCESS.

6               MR. HINZE:  DO YOU WANT ALL CREDITORS NOTICED?

7               THE COURT:  I THINK WE NEED TO DO THAT.

8               MR. HINZE:  ALL 200?

9               THE COURT:  YEAH.  BECAUSE THIS IS -- THIS IS

10  GOING TO BE THE CASE.  THIS IS GOING TO DETERMINE THE

11  CASE --

12              MR. HINZE:  OKAY.

13              THE COURT:  -- PRETTY QUICK.

14              ALL RIGHT.  ANYTHING ELSE WE CAN ACCOMPLISH

15  HERE TODAY?  APPARENTLY NOT.  I WILL SEE YOU BACK HERE

16  NEXT WEEK.  THANK YOU.

17              MR. FEFERMAN:  THANK YOU, YOUR HONOR.

18              MS. RHIM:  THANK YOU, YOUR HONOR.

19              MR. YOUNG:  THANK YOU.

20              (WHEREUPON, THE PROCEEDINGS ADJOURNED AT 3:07

21              P.M.)

22

23

24

25

1    STATE OF CALIFORNIA  )
                          :
2    COUNTY OF SAN DIEGO  )

3

4         I, SUE ROSS, A CERTIFIED SHORTHAND REPORTER, DO

5    HEREBY CERTIFY:

6         THAT I REPORTED IN SHORTHAND THE PROCEEDINGS

7    HELD IN THE FOREGOING CAUSE ON THE 8TH DAY OF FEBRUARY,

8    2018; THAT MY NOTES WERE LATER TRANSCRIBED INTO

9    TYPEWRITING UNDER MY DIRECTION AND THAT THE FOREGOING

10   TRANSCRIPT CONTAINS A CORRECT STATEMENT OF THE

11   PROCEEDINGS.

12

13        DATED THIS 13TH DAY OF FEBRUARY, 2018.

14

15        /S/

16        SUE ROSS
          CSR NO. 5786
17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT

# EXHIBIT 3

**CSD 1001A** [07/01/18]
Name, Address, Telephone No. & I.D. No.

Gary E. Slater (SBN 99141) / Timothy J. Truxaw (SBN 106428)
SLATER & TRUXAW, LLP
15373 Innovation Drive, Suite 210
San Diego, CA 92128
Tel: (858) 675-0755/ Fax: (858) 675-0733

Attorneys for Richard M Kipperman, Chapter 7 Trustee

**Order Entered on**
September 27, 2018
**by Clerk U.S. Bankruptcy Court**
**Southern District of California**

## UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West F Street, San Diego, California 92101-6991

In Re

CORE SUPPLEMENT TECHNOLOGY, INC.

Debtor.

BANKRUPTCY NO. 17-06078-MM7

Date of Hearing: N/A
Time of Hearing: N/A
Name of Judge: Hon. Margaret M. Mann

## ORDER ON

**UNCONTESTED NOTICE OF INTENDED ACTION REGARDING APPROVAL OF TRUSTEE'S SETTLEMENT AGREEMENT WITH BANK OF AMERICA, N.A. AND BANC OF AMERICA LEASING & CAPITAL, LLC**

The court orders as set forth on the continuation pages attached and numbered  2  through  2  with exhibits, if

any, for a total of  13  pages.  Motion/Application Docket Entry No.  269 .

jrm

//

//

//

//

//

//

//

DATED:
September 27, 2018

Judge, United States Bankruptcy Court

CSD 1001A [07/01/18]                                                                                    Page **2** of **2**

ORDER ON UNCONTESTED NOTICE OF INTENDED ACTION REGARDING APPROVAL OF TRUSTEE'S
SETTLEMENT AGREEMENT WITH BANK OF AMERICA, N.A. AND BANC OF AMERICA LEASING & CAPITAL, LLC
DEBTOR: CORE SUPPLEMENT TECHNOLOGY, INC                              CASE NO: 17-06078-MM7              jrm

The Court having read and considered the Notice of Intended Action and Opportunity for Hearing, supporting declaration
and certificates of service filed therewith (ECF Doc. Nos. 269, 269-1, 269-2 and 269-3, collectively, the "Notice")
regarding the request by Richard M Kipperman, Chapter 7 Trustee (the "Trustee") for authority to enter into and
consummate,and for the Court's approval of the Trustee's proposed Settlement Agreement with Bank of America, N.A.
and Banc of America Leasing & Capital, LLC (together "Creditor"), a true copy of which is attached hereto, marked
Exhibit "A" (the "Agreement"); due and sufficient notice of the relief requested in the Notice having been given to all
creditors and interested parties as provided in said certificates of service; the notice period provided in the Notice having
expired and no opposition or request for hearing having been timely filed with respect thereto; it appearing that the
Agreement is fair, reasonable and equitable in light of the factors cited in the Notice, and that it is in the best interests of
the creditors and this bankruptcy estate that the compromise and settlement provided in the Agreement be authorized,
approved and compromised as requested in the Notice; and good cause otherwise appearing therefor;

IT IS HEREBY ORDERED AND ADJUDGED that:

1.  The relief prayed in the Notice shall be and hereby is granted;

2.  The terms, conditions, and transactions contemplated by the Agreement are hereby approved in all respects, and the
Trustee is hereby authorized under 11 U.S.C. § 105(a) and Fed. R. Bank. P. 9019 to enter into and carry out the
Agreement;  and

    3.  The Trustee is hereby authorized and empowered to:

        (a) perform under, consummate, and implement the Agreement,

        (b) execute any instruments and documents that may be reasonably necessary or desirable to implement the
Agreement and to consummate the transactions contemplated thereby, and

        (c) take such other and further steps as are contemplated by the Agreement or reasonably required to fulfill the
Trustee's obligations under the Agreement, all without further order of the Court, subject to the protections afforded
bankruptcy trustees under applicable law.

/./././

/./././

CSD 1001A

Signed by Judge Christopher B. Latham September 27, 2018

## SETTLEMENT AGREEMENT

Richard M Kipperman, as Chapter 7 Trustee (the *"Trustee"*) of the bankruptcy estate (the *"Estate"*) of Core Supplement Technology, Inc., a California corporation (*"Debtor"*), in Bankruptcy Case No. 17-06078-MM7 (the "*Case*") now pending in the United States Bankruptcy Court for the Southern District of California (the "*Court*"), on the one hand; and

Bank of America, N.A. (*"Bank"*) and Banc of America Leasing & Capital, LLC ("*BofA Leasing*", together with Bank hereinafter sometimes called "*Creditor*"), on the other hand;

hereby make and enter into this compromise, settlement and release agreement ("*Agreement*"). The Trustee and Creditor are sometimes herein collectively called the "*Parties*", or separately a "*Party*". This Agreement is made and executed in connection with the following recitation of material facts:

## RECITALS

A.    Commencement and Conversion of Case; Appointment of Trustee. On October 3, 2017 (the "*Petition Date*"), Debtor commenced the Case by the filing of its voluntary petition under chapter 11 of Title 11, United States Code (the "*Bankruptcy Code*"). On April 2, 2018 (the "*Conversion Date*"), the Court's order (Doc. 237, the "*Conversion Order*") was entered, thereby converting the Case to a case under chapter 7 of the Bankruptcy Code. The Trustee was thereupon appointed as chapter 7 trustee of Debtor's Estate, and has been and is now serving in that capacity.

B.    Creditor's Claims Against the Estate.

(1)    On October 23, 2017, Creditor filed in the Case its proof of claim ("*Claim 7-1*") on behalf of BofA Leasing in the amount of $326,065.98, claiming therein that such claim was fully secured by an "equipment plus blanket lien" perfected under a UCC-1 financing statement. On December 7, 2017, Creditor filed its amended proof of claim ("*Claim 7-2*") on behalf of BofA Leasing in the amount of $326,065.98, claiming therein that such claim was fully secured by an "equipment plus blanket lien" perfected under a UCC-1 financing statement. Creditor's Claim 7-2 replaced and superseded its previous Claim 7-1.

(2)    On October 25, 2017, Creditor filed its proof of claim ("*Claim 10-1*") on behalf of Bank in the amount of $1,479,759.04, claiming therein that such claim was fully secured by a "Personalty - Blanket Lien" perfected under a UCC-1 financing statement.

C.    Debtor's Pre-Petition Secured Indebtedness to Creditor. On or about October 19, 2017, Debtor and Creditor, by their respective counsel of record herein, entered into and thereafter caused the filing of that Stipulation Regarding Interim Use of Cash Collateral and Adequate Protection (Doc. 33), wherein Debtor admitted and agreed that, as of the Petition Date: (a) Debtor was indebted to Bank in an amount not less than $1,475,089, which indebtedness was

*Settlement Agreement - Page 1*

Signed by Judge Christopher B. Latham September 27, 2018

secured by a first priority lien on substantially all assets of Debtor, including all of Debtor's cash, proceeds and product generated by Debtor's other prepetition collateral (collectively, the "*Cash Collateral*"); and (b) Debtor was also indebted to BofA Leasing in an amount not less than $326,065.98, which indebtedness was secured by a first priority lien on certain equipment and related items more particularly described in the loan documents respecting such financing (collectively, the "*Equipment Collateral*"). Copies of said loan documents, security agreements and filed UCC-1 financing statements are attached to Claim 7-2 and 10-1 on file in the Case.

     D.     <u>Emergency Interim Cash Collateral Orders; Limited Replacement Lien</u>. On January 29, 2018, the Court entered its modified order (Doc. 110) authorizing the Debtor to use cash collateral through the continued hearing date (1-1-2018) only in amounts necessary to prevent irreparable harm to the Estate and subject to the limits stated therein, and the Bank was provisionally granted a replacement lien (the "*Replacement Lien*") to the extent of any diminution in the value of the prepetition collateral resulting from the use of Cash Collateral (pending determination by a final order governing Cash Collateral) which lien shall have the same validity, extent and priority as the Bank's prepetition liens; provided, however, that neither such replacement lien nor any other lien asserted by or in favor of Creditor shall extend to any avoidance action claims or recoveries by Debtor's Estate under Chapter 5 of the Bankruptcy Code, D&O claims, or other claims asserted by the Trustee on behalf of the Estate. Such interim use was further approved by the Court multiple times on an emergency basis (*e.g.*, Doc. 123) but, as indicated in the Conversion Order (pg. 2, ¶6), Debtor and Creditor were unsuccessful in obtaining a final order of the Court respecting such use. Presently, the estate is in possession of approximately $438,000 which Creditor asserts (and the Trustee disputes) comprises Cash Collateral in which the Bank asserts a first priority security interest (the "*Remaining Cash Collateral*").

     E.     <u>Sale of Certain Property of Debtor's Estate</u>. On March 30, 2018 the Court entered its "Amended Order Granting Debtor Core Supplement Technology, Inc.'s Emergency Motion To Approve Sale Free and Clear of Relief, Approve Settlement Pursuant to Bankruptcy Rule 9019, and Approve Assumption and Assignment of Customer Orders (Docket 190)" (Doc. 226, the "*Sale Order*") wherein, *inter alia*, the Court approved the Asset Purchase Agreement modified and dated as of March 15, 2018 (the "*APA*", as that term is further defined at ¶3 on pg. 2 of the Sale Order) providing for Debtor's sale of certain of Debtor's assets to Simpson Labs LLC ("*Simpson*"). The Parties acknowledge and agree that the APA expressly excluded: various assets (the "*Excluded Assets*"), including without limitation leased equipment, unexpired real property leases, cash and bank deposits, customer deposits [including $380,000 of customer deposits (the "*Customer Deposits*", *see* Doc. 199, ¶2.4, pp. 6-7)] and litigation claims [including the Estate's avoidance actions and potential D&O claims existing as of the APA Closing Date, including assets derived from the APA Included Assets (*see* Doc. 199, Recital F, pg. 4)]. The purchase price for the assets sold under the APA was $1,454,000,000, including (1) $1,000,000 in cash (the "*Cash Sale Proceeds*"); (2) the forgiveness of a $74,000 net administrative claim held by Simpson; and (3) Simpson's assumption of the obligation to complete work associated with the Customer Deposits. Closing of said asset sale to Simpson occurred pursuant to the APA prior to entry of the Court's Conversion Order and appointment of the Trustee. Pursuant to the Sale Order, liens and interests attached to the Cash Sale Proceeds to the same extent and with the same priority as they attached to the assets sold at the time of the sale closing date.

*Settlement Agreement - Page 2*

F.  Creditor's Asserted Claim to the Cash Sale Proceeds and 11 U.S.C. § 507(b) Claim. Creditor asserts that on the Petition Date its claims against the Estate, totaling not less than $1,805,825.02, were substantially oversecured. The Debtor's amended Schedule A/B shows that the Debtor had $132,160.35 in its checking account with Creditor on the Petition Date. The Debtor's Monthly Operating Reports ("MORs") (Docs. 53, 58, 107, 169, and 202) show that from the Petition Date through February 28, 2018, the Debtor collected $1,697,978.74 on pre-petition accounts receivable. The Debtor's October 2017 MOR (Doc. 53) also shows inventory valued at $2,078,130.47 as of October 31, 2017. Creditor asserts that all of these assets, plus (among other things) the Debtor's equipment and general intangibles, was subject to Creditor's pre-petition liens. Fewer than six months later, the Debtor sold its assets (except the Excluded Assets) for only $1,000,000 in cash consideration. Thus, Creditor asserts that at the time of the sale, Creditor held an unavoidable, perfected, and senior security interest in substantially all the assets sold (and thus on the Cash Sale Proceeds, by virtue of the Sale Order), either (1) as original collateral (in the case of certain equipment and general intangibles); (2) as proceeds of original collateral by virtue of Creditor's security agreement and 11 U.S.C. § 552(b) (to the extent that Creditor has or claims to have rights included inventory or other assets directly purchased with money in the Debtor's pre-petition checking account with Creditor); or (3) by virtue of the Replacement Lien, given the substantial post-petition decline in the value of Creditor's collateral. For the same reasons, Creditor asserts that at the time of the sale, Creditor held an unavoidable, perfected, and senior security interest in the Customer Deposits. Creditor also asserts its entitlement to a substantial super-priority administrative claim under 11 U.S.C. § 507(b), which claim is being compromised and released in its entirety pursuant to this Agreement. The Trustee disputes certain of Creditor's assertions as set forth in this paragraph, including without limitation Creditor's assertion that it holds a 507(b) claim.

G.  Potential Reimbursement and Guarantor Claims. The Trustee has requested that Creditor be required to pay various expenses relating to or for the Debtor and/or Creditor in connection with Debtor's financial affairs and the Case, including without limitation fees, costs and expenses respecting services provided by Richard Feferman, CIRA, Alan Myers, CPA, and their related firms prior to the Effective Date of this Agreement (any and all such expenses, the *"Reorganization Expenses"*). In addition, to the extent that Creditor has or claims to have rights to enforce guarantees given by persons or entities other than the Debtor respecting any of Creditor's claims against the Debtor or the Estate (collectively, the *"Guarantee Claims"*), the Trustee has requested that Creditor indemnify, defend and hold the Trustee and the Estate harmless from any claims, causes of action or liabilities for any Guarantee Claims. Creditor disputes the Trustee's assertions as set forth in this paragraph. As such, Creditor has agreed to permit Reorganization Expenses to be satisfied from the Excluded Assets, namely the Customer Deposits. Creditor contends (and, subject to approval of this Agreement pursuant to the Final Order, the Trustee will not dispute) that the Guarantee Claims are also subject to disallowance as they cannot be asserted against the estate as a matter of law, and that Creditor will not be liable for any Guarantee Claims as there is no basis in law or fact to hold Creditor liable for such claims.

H.  Compromise and Settlement of Disputed Claims. Various disputes, claims and controversies have arisen and continue to exist by and between the Parties regarding their

*Settlement Agreement - Page 3*

Exhibit "A"                    [Page 3 of 11]

Signed by Judge Christopher B. Latham September 27, 2018

respective rights, obligations, duties, and liabilities respecting the matters referred to above. The Parties each acknowledge, understand and agree that this Agreement is not intended to be, and shall not be deemed or construed to constitute, an admission of any liability by either of the Parties, nor shall it be deemed an agreement to or waiver or release of any of the contentions, claims, defenses, or allegations by either of the Parties, except as explicitly provided herein to the contrary. By entering into and performing their respective obligations required under this Agreement, it is the joint desire and intention of the Parties to "buy peace" between them and to effect a final, mutual resolution of their existing differences respecting the claims, debts, liabilities, obligations, costs, controversies and disputes referred to hereinabove, except as otherwise provided herein.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, and in consideration of the covenants, releases, representations and conditions set forth below, and subject to the Bankruptcy Court's Approval Order authorizing and approving this Agreement becoming a Final Order,[1] the Parties hereby make and enter into this Agreement.

1. <u>Recitals</u>. By reference hereto, the Parties incorporate the recitals set forth in Recitals A through H hereinabove as if set forth herein.

2. <u>Court Approval</u>. This Agreement is subject to approval by the Court in the Case. Within five (5) business days after the date on which the Trustee's counsel of record receives a fully-executed counterpart copy of this Agreement, the Trustee will cause the filing with the Court of a notice of motion and any supporting papers (together, the "*Motion*") deemed by the Parties to be reasonably necessary to obtain Court approval of this Agreement by entry of an Approval Order. The Parties will each, at their own expense, promptly provide such support as is reasonably necessary to assist the Trustee in connection with filing the Motion and obtaining entry of the Approval Order. The obligations of and releases by the Parties as set forth in any other provision in this Agreement, are subject to and made expressly contingent upon the Court's Approval Order becoming a Final Order; provided, however, that this Agreement, including but not limited to the releases granted herein, shall be null and void if the Approval Order does not become a Final Order, and the Parties shall then return to the *status quo ante* as of the day that is the day before the last Party signed this Agreement.

---

[1] The following additional definitions apply to this Agreement. "***Approval Order***" means an order of the Bankruptcy Court that authorizes and approves this Agreement and the compromise and settlement memorialized herein in form and substance reasonably acceptable to the Trustee and Creditor. "***Final Order***" means an Approval Order as to which the time to appeal, petition for *certiorari*, or move for reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the parties, and their counsel, or in the event that an appeal, writ of *certiorari*, or reargument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or *certiorari* has been denied or from which reargument or rehearing was sought, and the time to take any further appeal, petition for *certiorari* or move for reargument or rehearing shall have expired. (The term "***Effective Date***" used herein shall refer to the date the Approval Order becomes a Final Order.)

*Settlement Agreement - Page 4*

Exhibit "A"          [Page 4 of 11]

3.  Release of Certain Asset Sale Proceeds and Cash Collateral as Settlement Payment; Satisfaction of Creditor Claims and Releases of Creditor Security Interests. The Trustee shall cause the payment (by wire transfer, cashier's check, or other "good funds" form of payment) to the Creditor, made payable to Bank of America, N.A., of a lump sum settlement payment in the amount of ONE MILLION FOUR HUNDRED SEVEN THOUSAND SEVEN HUNDRED FORTY-THREE and 54/100 ($1,407,743.54) Dollars (the *"Settlement Payment"*), payable not later than five (5) days after the Court's Approval Order becomes a Final Order of the Court. The Settlement Payment consists of the Cash Sale Proceeds and an agreed portion of the Remaining Cash Collateral.  In consideration of Creditor's receipt of such Settlement Payment, Creditor will execute and deliver to the Trustee such documents as the Trustee's counsel shall prepare and provide for reasonable approval by the Trustee and his counsel which shall confirm the release or the assignment to the Trustee (at the Trustee's sole election) of any remaining sums under Claims 7-2 and 10-1 after credit of the Settlement Payment, and all lien(s) and security interest(s) then securing such sums (such as those alleged to be encumbering the Customer Deposits) due under to Creditor and subject to the releases provided herein.

4.  Releases; Waiver of Unknown Claims.

4.1.  Subject to the provisions of this Agreement, Creditor and its/their respective predecessors, successors, affiliates, subsidiaries, parent corporations, guarantors, sureties, insurers, members, managers, principals, agents, employers, representatives, attorneys, employees, assigns, officers and directors, as applicable (collectively, the "*Creditor Affiliates*"), hereby release and forever discharge the Trustee, the Debtor, the Estate, and his/its/their respective predecessors, successors, affiliates, employees, officers, managers, insurers, principals, agents, attorneys, accountants and representatives (collectively, the "*Trustee Affiliates*") from any and all claims, debts, damages, liabilities, demands, objections, costs, expenses, disputes, actions and causes of action of every nature, whether known or unknown, suspected or unsuspected, which Creditor and/or any of the Creditor Affiliates holds against the Trustee and/or the Trustee Affiliates by reason of any acts, circumstances, facts, events or transactions occurring before the Effective Date of this Agreement with respect to the Case or otherwise with respect to the subject matter of the Recitals hereinabove, except only as otherwise specifically retained or created under this Agreement. Without limitation, Creditor and the Creditor Affiliates forever waive, withdraw and release each proof of claim and amendment thereto which has been filed in the Case as of the Effective Date of this Agreement, and they agree that they are hereafter barred from filing or otherwise asserting any claim against the Estate, the Debtor or the Trustee; provided, however, that this release shall not apply to any claims against the Debtor which first arose after the Effective Date of this Agreement. Neither the Trustee nor the Estate shall hereafter have or be subject to, and the Trustee and the Estate are hereby released from, any claims, liability or obligation for any claims by or liabilities under or arising out of any assertion by or on behalf of Creditor or Creditor Affiliates of any Guarantee Claims. For avoidance of doubt, nothing in this Agreement shall affect or impair the right of Creditor to seek or obtain a recovery from third parties in connection with the Guarantee Claims or otherwise.

4.2.  Without modifying or limiting any other provision of this Agreement, subject

*Settlement Agreement - Page 5*

Signed by Judge Christopher B. Latham September 27, 2018

to and upon Creditor's receipt of the Settlement Payment, the Parties agree that any and all rights, title, interests, claims, liens (including any Replacement Lien) and security interests held or claimed by or through Creditor against the Trustee, Debtor and/or Estate's interests in the Excluded Assets (including without limitation the Customer Deposits and other present and former property of the Estate) are hereby fully released by Creditor and Creditor Affiliates (provided that, at Trustee's sole election, the Trustee may request in writing and Creditor will thereupon cause such liens and security interests to be assigned to the Trustee for the benefit of the Estate). Should the Trustee or his counsel thereafter deliver written request to Creditor or its undersigned counsel therefor, Creditor will cause the prompt execution and delivery to the Trustee of any further documents or instruments as may be reasonably necessary to confirm the release or assignment of Creditor's rights, security interests or other interests in, or liens required pursuant to this Agreement.

    4.3.    Subject to the provisions of this Agreement, the Trustee and the Trustee Affiliates each release and forever discharge the Creditor and the Creditor Affiliates from any and all claims, debts, damages, liabilities, demands, objections, costs, expenses, disputes, actions and causes of action of every nature, whether known or unknown, suspected or unsuspected, which the Trustee or any of the Trustee Affiliates holds against Creditor and/or the Creditor Affiliates by reason of any acts, circumstances, facts, events or transactions occurring before the Effective Date of this Agreement with respect to the Case or otherwise with respect to the subject matter of the Recitals hereinabove, except only as otherwise specifically retained or created under this Agreement. Without limitation, the Trustee forever waives, withdraws and releases Creditor and the Creditor Affiliates from any claims by or liability to the Trustee or the Estate for Reorganization Expenses or Guarantee Claims, whether arising before, on, or after the Effective Date of this Agreement, including without limitation any claim under 11 U.S.C. § 506(c) or similar law.  For avoidance of doubt, the Reorganization Expenses may be exclusively satisfied from the Excluded Assets and any other unrestricted cash without further recourse against Creditor as is consistent with the releases herein.

    4.4.    The Parties waive any and all rights which each may have under the provisions of California Civil Code § 1542, which provides:

    A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
    CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
    FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN
    BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER
    SETTLEMENT WITH THE DEBTOR.

It is understood by the Parties that facts with respect to which the releases are hereby given may turn out to be other than, or different from, the facts now believed by the Parties to be true. Each Party expressly assumes the risk of the facts turning out to be different than that Party believes them to be, and agrees that this Agreement shall in all respects be effective and not subject to termination or rescission because of any such mistaken belief. Notwithstanding the foregoing, the releases provided for herein shall not apply to any breach of any provision of this Agreement.

    5.  General Provisions.
                            *Settlement Agreement - Page 6*

Signed by Judge Christopher B. Latham September 27, 2018

5.1.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute but one and the same Agreement; and that facsimile or "pdf" copies of the signed Agreement shall have the same force and effect as originals thereof.

5.2.  Subject to the remaining provisions of this Agreement, this Agreement shall be binding upon and shall inure to the benefit of the Parties.

5.3.  This Agreement contains the entire agreement and understanding of the Parties with respect to its subject matter, and any and all prior discussions, negotiations, commitments or understandings related hereto, if any, are hereby merged herein. No representations, oral or otherwise, express or implied, have been made by any Party other than those set forth in this Agreement. No other agreements not specifically contained herein, oral or otherwise, shall be deemed to exist or to bind any of the Parties.

5.4.  No provision hereof may be modified, amended or waived unless in writing and signed by the Party seeking to enforce such modification, amendment or waiver. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein. This Agreement may be modified or amended only by a written agreement executed by all of the Parties.

5.5.  This Agreement shall be construed in accordance with the laws of the State of California and under any applicable federal laws. In the event this Agreement must be enforced or interpreted by a court of law, the parties hereby agree that the Court shall have exclusive jurisdiction to resolve any disputes among or relating to this Agreement. No action to enforce this Agreement shall be commenced until the Party seeking to do so has first provided written notice and not less than two (2) business days to cure.

5.6.  Except as expressly made herein, neither Party has made, nor shall he/it be deemed to have made, any admission of any kind. The Parties are entering into this Agreement for the purpose of resolving disputed issues between them and to avoid the costs and risks of litigation.

5.7.  The Parties agree that this Agreement reflects the joint drafting efforts of each of the Parties and that any ambiguities that may be found in this Agreement shall not be construed against any Party on account of that Party's contribution to the drafting of this Agreement.

5.8.  Each person signing this Agreement warrants and represents that he or she has full authority to execute this Agreement on behalf of the settling Party on whose behalf he or she signs. The Trustee's execution of this Agreement is made solely in his capacity as the Court-appointed chapter 7 trustee in the Case, subject to Court approval of this Agreement and the immunity provisions of applicable laws.

5.9.  Each Party agrees to take such steps and to execute such documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to

*Settlement Agreement - Page 7*

Exhibit "A"                                [Page 7 of 11]

Signed by Judge Christopher B. Latham September 27, 2018

preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any person not a Party hereto to invalidate, interpret, or prevent the validation, enforcement or carrying out of all or any of the provisions of this Agreement, the Parties will cooperate fully in opposing such action or proceeding.

     IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date last written below, and their attorneys have indicated their approval as to form by their respective signatures in the appropriate spaces below. Except as otherwise provided herein, this Agreement is intended by the Parties to be effective when all Parties have executed the Agreement.

Dated: August _24_, 2018

**Bank of America, N.A.**

By: _____
Its: _Senior Vice President_____

**Banc of America Leasing & Capital, LLC**

By: _____
Its: _____

Dated: August _____, 2018

**Richard M Kipperman, Chapter 7 Trustee**
*[In re Core Supplement Technology, Inc.,*
*a California corporation, Debtor.*
*Bankruptcy Case No. 17-06078-MM7]*

By: _____
    Richard M Kipperman, Chapter 7 Trustee

*Settlement Agreement - Page 8*

Exhibit "A"                    [Page 8 of 11]

preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any person not a Party hereto to invalidate, interpret, or prevent the validation, enforcement or carrying out of all or any of the provisions of this Agreement, the Parties will cooperate fully in opposing such action or proceeding.

      IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date last written below, and their attorneys have indicated their approval as to form by their respective signatures in the appropriate spaces below. Except as otherwise provided herein, this Agreement is intended by the Parties to be effective when all Parties have executed the Agreement.

Dated: August _____, 2018

Bank of America, N.A.

By: _____

Its: _____

Banc of America Leasing & Capital, LLC

By: _____

Its: _Senior Vice President_

Dated: August 27, 2018

**Richard M Kipperman, Chapter 7 Trustee**
[*In re Core Supplement Technology, Inc.,*
*a California corporation, Debtor.*
*Bankruptcy Case No. 17-06078*-MM7]

By _____

Richard M Kipperman, Chapter 7 Trustee

*Settlement Agreement - Page 8*

Exhibit "A"                    [Page 9 of 11]

APPROVED AS TO FORM:

HEMAR, ROUSSO & HEALD, LLP

By: _____

    J. Alexandra Rhim
Attorneys for Bank of America, N.A. and
Banc of America Leasing & Capital, LLC

SLATER & TRUXAW, LLP

By:_____

    Gary E. Slater / Timothy J. Truxaw
Attorneys for Richard M Kipperman,
Chapter 7 Trustee

*Settlement Agreement - Page 9*

Exhibit "A"                              [Page 10 of 11]

APPROVED AS TO FORM:

HEMAR, ROUSSO & HEALD, LLP

By:_____
    J. Alexandra Rhim
Attorneys for Bank of America, N.A. and
Banc of America Leasing & Capital, LLC

SLATER & TRUXAW, LLP

By:_____
    Gary E. Slater / Timothy J. Truxaw
Attorneys for Richard M Kipperman,
Chapter 7 Trustee

*Settlement Agreement - Page 9*

Exhibit "A"                    [Page 11 of 11]