Edward Jason Dennis
(*Pro hac vice application pending*)
jdennis@lynnllp.com
Eliyahu Ness (State Bar No. 311054)
eness@lynnllp.com

LYNN PINKER COX & HURST, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Fax: (214)-981-3839

Attorneys for Corporate Recovery
Associates, LLC and Richard Feferman

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br><br><br>CORE SUPPLEMENT TECHNOLOGY, INC.,<br><br>        Debtor. | **CASE NO: 17-06078-MM7**<br><br>**DECLARATION OF RICHARD FEFERMAN IN SUPPORT OF OPPOSITION BY FORMER CHAPTER 11 CHIEF RESTRUCTURING OFFICER RICHARD FEFERMAN TO CHAPTER 7 TRUSTEE RICHARD M KIPPERMAN'S MOTION TO DISGORGE COMPENSATION**<br><br>**DATE:   May 7, 2020**<br>**TIME:   10:00 a.m.**<br>**DEPT:   1, Room 218**<br><br>**Honorable Margaret M. Mann** |

1

2

3

4

I, Richard Feferman, declare and state as follows:

5

6       1.      I am the founder and managing member of Corporate Recovery

Associates, LLC ("CRA"), a financial advisory services firm with extensive experience

7       and expertise in Chapter 11 proceedings.  I began working with the Debtor, Core

8       Supplement Technology, Inc. (the "Debtor") in connection with its Chapter 11 case on

9       December 26, 2017, reviewing business operations, financial reports, meeting with

10      employees and analyzing business operations.  On February 23, 2018, the Court issued

11      its Order on Debtor's 11 USC 363 and 105(a) Motion for Appointment of a Chief

12      Reconstruction Officer the Court, approving the Debtor's retention of me as its Chief

13      Restructuring Officer ("CRO") *nunc pro tunc* to December 26, 2017.  The matters set

14      forth herein are within my own personal knowledge, except as to those matters stated

15      upon information and belief.  If called upon as a witness, I could and would testify

16      competently thereto.

17      2.      The Debtor approached me in December 2017 to assist in the

18      administration of its Chapter 11 bankruptcy.  I am informed and believe that the Debtor

19      approached other individuals and entities to serve a similar role prior to my

20      appointment.  The rates I proposed to charge the Debtor, which were ultimately

21      incorporated into the final engagement agreement, were significantly lower than the

22      rates I ordinarily charge for comparable engagements.

23      3.      I agreed to take on the role of Chief Restructuring Officer subject to

24      approval by the Court.  The final Agreement for the Engagement of a Chief

25      Restructuring Officer ("Engagement Agreement") was approved by the Court via the

26      February 23, 2018 Court Modified Order on Debtor's 11 USC 363 and 105(a) Motion

27      for Appointment of a Chief Restructuring Officer ("CRO Engagement Order").  The

28      Engagement Agreement was modified by my January 23, 2018 supplemental

declaration.  The Engagement Agreement and supplemental declaration are attached to

DECLARARTION OF RICHARD FEFERMAN ISO OPPOSITION TO MOTION TO DISGORGE
**Error! Unknown document property name.**

the CRO Engagement Order as Exhibits 1 and 2, respectively. A true and correct copy of the CRO Order is attached hereto as **Exhibit A**.

4.      The final Engagement Agreement, as supplemented and approved by the Court, was product of extensive negotiation between me, the Debtor, the U.S. Trustee, the Debtor's secured creditors, and the Court.

5.      At the time I began consulting the Debtor in December 2017, the accounting department was being run by Kathy Haycook, who I understood to have been a former bookkeeper and had been placed in the role of Chief Financial Officer after the company's Chief Financial Officer departed the company. During my time assisting the Debtor, Ms. Haycook's health grew worse and she was absent from the office a great deal of the time. Employees from the Debtor's other departments tried to pick up the slack but could not do so consistently or effectively. In short, the accounting department was in a state of disarray.

6.      Important terms of the Engagement Agreement were the express rights I was given to rely on the accuracy and validity of data I received from employees of the Debtor and the understanding that I would be under no obligation to audit or update that data. Because of the state of disarray the accounting department was in at the time, I would not have accepted the engagement without these terms.

7.      During my time as CRO I worked diligently to find solutions to the Debtor's severe accounting defects. To that end, I sought to bring on Alan Myers, a qualified accountant familiar with accounting systems. However, because of the state of disarray in which he found the accounting system, it soon became clear that his limit of 20 hours a month of work would be drastically insufficient. On February 16, 2018, Mr. Myers sent me an email in which he described what he was finding. A true and correct copy of that email is attached hereto as **Exhibit B**.

8.      In an effort to get more help organizing the accounting system, I conveyed the issues regarding the Debtor's accounting system to the Debtor's secured creditor, Bank of America, the Debtor's Counsel, the Office of the United States Trustee

("UST") and the Court. The UST suggested that the Former CRO bring in an additional temporary employee (which would have been ineffective under the circumstances) and Bank of America opposed the Former CRO spending any money whatsoever for any qualified accounting employees

9.     As a result of the Debtor having a non-functioning accounting department, it was difficult for me to get timely and accurate accounting information and, in turn, impeded my ability to ensure that the all of the information the Court received in Court filings was accurate and consistent across various kinds of accounting documents. The Former CRO informed the Court of these issues on multiple occasions, including in my March 1, 2018 Declaration in Support of Estimated Distribution Forecast, attached to this declaration as **Exhibit C**.

10.     After I filed the March 1, 2018 declaration describing some of the issues with Ms. Haycook, her situation degraded even further to the point that she was rarely present and almost never helpful.

11.     Making the situation more difficult was the fact that the Debtor was represented by inexperienced counsel, on whom I was forced to rely. Despite my requests, Bank of America would not agree to allow me to use cash collateral to get a lawyer qualified to advise me and the debtor. I suggested hiring the firm Gordon Rees, which is known for doing good work and having reasonable fees, but my efforts were rejected.

12.     Attached as **Exhibit D** hereto is a true and correct copy of my March 16, 2018 declaration filed in these proceedings, setting forth some of the events relating to the sale of the Debtor's assets to Simpson, among other things.

13.     In the latter part of February 2018, I learned from the Debtor that its intellectual property ("IP") had been compromised. After conferring with counsel, I directed the Debtor to disclose that fact to representatives of Simpson.

14.     Upon learning of the IP breach, Simpson called off the deal entirely. I personally engaged Simpson's representatives in extensive negotiations, which

Error! Unknown document property name.

ultimately brought Simpson back to the table, but at a drastically reduced offer price of $800,000.00 (it had been at $1.6 million).  I then continued to negotiate with Simpson's representatives, ultimately bringing the price up to $1.1 million.

15.    After the Court declined to approve the first Asset Purchase Agreement, and Simpson had essentially given up on the deal, I met with Simpson's representatives on a weekend to coax them back to the negotiating table.  After intense negotiations, the I ultimately convinced Simpson's representatives to agree to terms of an amended APA that were highly favorable to the Debtor and that addressed the Court's concerns with the respect to the initial APA.

16.    Attached hereto as **Exhibit E** is a true and correct copy of the March 16, 2018 motion to approve the amended Asset Purchase Agreement with Simpson (the "Amended APA"), which was filed with the Court as Docket No. 193 and contains a copy of the Amended APA as Exhibit 1.

17.    In negotiating the Amended APA, I persuaded Simpson to agree to fulfill the Debtor's open customer orders while allowing the Debtor to keep the $380,000 in customer deposits.  This was extremely favorable to the Debtor and took significant persuasion to get Simpson to accept what was effectively a 30% reduction in the sales price on those open orders.

18.    The following components of the negotiation, among others, can be fairly attributed to my negotiation efforts: (1) the increase in Simpson's offer from $800,000.00 to $1.1 million after the IP breach was disclosed, (2) the agreement by Simpson to take on open customer orders while allowing the Debtor to keep customer deposits in the amount of $380,000.00, and (3) the forgiveness of $74,000.00 in debt that the Debtor owed Simpson at the time of the dale.  More significantly, without my involvement in the deal, Simpson would likely have walked away from the deal altogether.

19.    In connection with getting the sale to Simpson negotiated and approved by the Court, I contacted Mette Kurth, a personal friend at the law firm of Fox

DECLARARTION OF RICHARD FEFERMAN ISO OPPOSITION TO MOTION TO DISGORGE
**Error! Unknown document property name.**

Rothschild, and convinced her to represent the Debtor in the transaction.  I explained to Ms. Kurth that she would not get a carve out from cash collateral from Bank of America and thus there would be significant risk concerning her fees.  She nonetheless agreed to the representation, and ultimately was instrumental in ensuring that the transaction was done in a lawful manner and ensuring that the Court was put in a position to make the necessary findings to approve the transaction.  The presence of Ms. Kurth also helped convince Simpson to come back to the negotiating table after the court declined to approve the first APA.  Additionally, with Ms. Kurth's assistance, I was able to prepare my March 16, 2018 declaration that clarified some of the issues that had previously concerned the Court.  These were things that I could not accomplish with Mr. Hinze.

20.    In total, the deal with Simpson, of which the Former CRO was the chief negotiator, allowed the Former CRO to turn over $1,818,343.54 in cash for the benefit of creditors.

21.    During the pendency of the Chapter 11 proceedings and while I was working to sell the Debtor's assets, I was also cognizant of my responsibility to preserve the value of the business in the prospective sale, which required that a balance be struck between shutting down operations to conserve cash and maintaining the value of the customer base and goodwill which were valuable assets in the prospective acquisition.  To that end, I directed that operations be reduced to a minimum, while maintaining the skeletal operations necessary to allow Debtor to collect on its accounts receivable and to preserve Debtor's customer base and goodwill which were integral to its value to prospective purchasers.  To do so effectively, I worked daily with the Debtor's line managers and manager of Human Resources in a constant dialogue on how to minimize the number of employees and on what could be effectively outsourced to Simpson.

**Error! Unknown document property name.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

22.    Attached hereto as **Exhibit F** is a true and correct copy of my Report of Tasks Performed for the period of December 26, 2017 through January 31, 2018, which was filed with the Court as Docket No. 230-1.

23.    Attached hereto as **Exhibit G** is a true and correct copy of my Report of Tasks Performed for February and March of 2018.

24.    Every action I took in my role as CRO, both before and after my formal appointment, was done using the best of my business judgment exercised for the sole purpose of maximizing the value of the estate for the creditors' benefit.

I declare under penalty of perjury that the forgoing is true and correct.

Executed in the County of San Diego, State of California, on the 6th day of April, 2020.

RICHARD FEFERMAN

DECLARARTION OF RICHARD FEFERMAN ISO OPPOSITION TO MOTION TO DISGORGE
**Error! Unknown document property name.**