# EXHIBIT E

1   Mette H. Kurth (SBN: 187100)
2   mkurth@foxrothschild.com
    **FOX ROTHSCHILD LLP**
3   1800 Century Park East, Suite 300
    Los Angeles, CA 90067-1506
4   Telephone: 310.598.4150
    Facsimile:  310.556.9828
5
6   Attorneys for

7              UNITED STATES BANKRUPTCY COURT

8             SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: | ) Case No.:  17-06078-MM11 |
| | ) |
| | ) Chapter 11 |
| CORE SUPPLEMENT TECHNOLOGY, INC., | ) |
| a California Corporation | ) DEBTOR'S MOTION FOR ENTRY OF AN |
| | ) ORDER (1) APPROVING STALKING |
| | ) HORSE, MARKETING AND OVERBID |
| Debtor and Debtor in Possession | ) PROCEDURES, AND SETTING FINAL |
| | ) HEARING DATE; (2) APPROVING SALE |
| | ) FREE AND CLEAR AND RELATED |
| | ) RELIEF; (3) APPROVING SETTLEMENT |
| | ) PURSUANT TO BANKRUPTCY RULE |
| | ) 9019; AND (4) APPROVING ASSUMPTION |
| | ) AND ASSIGNMENT OF CUSTOMER |
| | ) ORDERS |
| | ) |
| | ) IMAGED FILE |
| | ) |
| | ) Judge:      Hon. Margaret M. Mann |
| | ) Dept:       1, Room  218 |
| | ) Date:       March 6th, 2018 |
| | ) Time:       2:00 p.m. |
| | ) |

**EMERGENCY MOTION FOR ENTRY OF ORDER (1) SETTING FINAL SALE HEARING;
(2) APPROVING SALE FREE AND CLEAR AND RELATED RELIEF; (3) APPROVING
SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019 AND
(4) APPROVING ASSUMPTION AND ASSIGNMENT OF CUSTOMER ORDERS**

        CORE SUPPLEMENT TECHNOLOGY, INC., a California Corporation, the debtor and

debtor-in-possession in the above captioned case (the "Debtor"), hereby files this Emergency Motion

for an Order (1) Approving Stalking Horse, Marketing and Overbid Procedures and Setting Final

Hearing; (2) Approving Sale Free and Clear and Related Relief; (3) Approving Settlement Pursuant

to Bankruptcy Rule 9019; and (4) Approving Assumption and Assignment of Customer Orders (the "Sale Motion").

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of California (the "Court") has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue of this proceeding and this Sale Motion is proper in this district pursuant to 28 U.S.C §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are Sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6004 and 6004-1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELIEF REQUESTED

4.      On February 22, 2018, this Court entered an order establishing bidding procedures and approving a stalking horse bidder. (See D.I. # 148).  On March 9, 2018, this Court entered an order denying Debtor's sale motion filed on February 19, 2018 without prejudice to Debtor's right to file a renewed sale motion with additional evidentiary support.

5.      By this Sale Motion, the Debtor seeks the authority to sell and transfer all rights, title, and interest in certain of the Debtor's assets (the "Included Assets") in a public auction and seeks entry of an order (a) setting an auction and final hearing date for sale of the assets; (b) approving the sale of certain of the Debtor's assets outside the ordinary course of business free and clear of all liens and encumbrances, subject to higher and better offers; (c) approving settlement pursuant to Fedr. R. Bankr. Pro. 9019; (d) approving the assumption and assignment of the Debtor's open orders to the buyer; and (e) related relief.

## STATEMENT OF FACTS

**A.      Background**

6.      On October 3, 2017 (the Petition Date"), the above captioned Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

7.     No trustee or examiner has been appointed in this Case, nor has an official committee of unsecured creditors ("Committee") been formed.   Richard Feferman of Corporate Recovery Associates, LLC ("CRA") is the Debtor's Chief Restructuring Officer (the "CRO").

**I.     The Sale Process**

8.     On February 19, 2018, the Debtor filed and noticed a motion seeking, *inter alia,* approval of a sale of substantially all of the Debtor's assets (the "First Sale Motion"). (See D.I. No's. 138 and 139). In support of the First Sale Motion the Debtor filed the Declaration of Joseph O'Dea in Support of Motion to Approve Sale Procedures and Set hearing for Sale (See D.I. No. 140); the Declaration of Richard Feferman in Support of Motion to Approve Sale Procedures and Set Hearing for Sale and various Errata filings thereto (See D.I. No. 141, 142, 145, 147).   On February 22, 2018, this Court entered its Order Partially Granting Debtor's Motion for Entry of an Order Approving Stalking Horse, Marketing and Overbid Procedures, and Setting Final Sale Hearing (See D.I. No. 148).

9.     Ultimately, this Court denied the First Sale Motion without prejudice to the Debtor to file a renewed sale motion providing evidentiary support. (See D.I. No. 178).   In the order denying the First Sale Motion, the Court held that: (a) the Debtor did not meet its burden to prove that secured lenders would be adequately protected 11 U.S.C. § 363(f); (b) the Debtor did not meet its burden to prove that the estate was receiving optimal value; (c) the Debtor did not persuade the Court that the continuing decline in sale price was reasonable and that the purchase price reflected fair value; (d) the Debtor failed to provide enough detail regarding marketing efforts; the Debtor did not convince the Court that the sale as proposed would generate any value for the unsecured creditors; (e) the evidence presented showed a greater benefit to Simpson than it did to the Debtor's estate and creditors; (f) the Debtor failed to meet its burden under 11 U.S.C. §363(m) that Simpson was a good faith purchaser; and (g) the Debtor failed to meet its burden establishing the Simpson

was entitled to a general release of all claims.

**B.      The Debtor's Additional Marketing and Valuation Efforts**

10.      In anticipation of the filing of this renewed Sale Motion, the Debtor, through its CRO, contacted Tiger Capital Group, LLC ("Tiger") and requested that it provide a proposal for liquidating the Debtor's assets together with an estimate of likely valuation ranges for those assets on the secondary market.  As further explained in the Feferman Declaration, Tiger's Remarketing Services Division has a wealth of experience providing assets appraisals and liquidation/disposition services across a wide range of industries. Among other transactions, Tiger, in partnership with Reich Brothers, recently conducted the liquidation and sale—either as a going concern or in lots—of substantially all the assets of Creation's Garden, a multi-million dollar supplement company located in Valencia, CA.  Tiger is therefore familiar with the Debtor's industry, the nature of its inventory and equipment, and the secondary market for these assets and it is able to rapidly evaluate the Debtor's assets and provide valuation estimates and a liquidation proposal.

11.      On March 14, 2018, Tiger provided the following preliminary estimates:

a.      Tiger estimates that the equipment component of the Included Assets to be sold under the APA could be worth between $375,000 to $750,000 on the secondary market. Tiger could work on a fee basis to dispose of those assets over a period of roughly 90 days, or it purchase them at a discount for resale and remove them from the Debtor's premises to Tiger's own facilities within roughly 30 days.[1]

b.      Tiger estimates that Core's accounts receivable could be worth approximately $200,000 on the secondary market.  Tiger would consider purchasing them at a discount for resale.

c.      The portion of inventory consisting of items used for bulk packaging has limited liquidation value.  By way of analogy, it is the commercial equivalent of mismatched Tupperware containers and lids, and sorting and selling these items will require disproportionate handling costs.  Tiger estimates that the bulk packaging assets could be sold for around $15,000 to

---

[1]      Tiger estimates that the equipment portion of the Excluded Assets could be worth between $140,000 to $200,000.

$20,000 on secondary markets. Tiger could undertake this work for a fee or purchase these assets outright at a discount for resale.

    d. Tiger indicated that Core's perishable inventory has no liquidation value as it consists of powders, quarantined and expired inventory that is not marketable on the secondary market. Tiger cannot dispose of or purchase these assets.

  12. In summary, Tiger has estimated that purchase offers for the Included Assets on the secondary market could range from $590,000 on the low end to $1.165 million on the high end. The liquidation value of these assets to the estate is lower than these resale values, as the estate would have to deduct the fees and expenses of Tiger or another liquidator and also account for the administrative costs associated with maintaining these assets for an additional 90 days. Alternatively, any purchase offer by Tiger would be net of transactional and carrying costs. Tiger intends to provide a written proposal to the company by March 19, 2018, that will be filed that with the Court once it is available.

  13. In addition, following the March 8 2018 sale hearing, the Debtor's CRO reached out to all parties previously contacted regarding the sale and invited them to submit bids for individual assets or lots of assets. To date. None of these parties have responded to express interest in making an offer.

  14. Based on the supplemental efforts, in particular, the valuation estimates provided by Tiger, the Debtor believes that the Simpson sale provides significantly greater recoveries to the estate than it could hope to achieve even under a best-case liquidation of the Included Assets subject to the APA.

**C.** **The Amended APA and Improved Sales Terms**

  15. In addition, following the hearing, in order to further address this Court's concerns, the Debtor's CRO engaged in negotiations and improved the offer by $354,000.

  16. As evidenced by the APA, attached hereto as Exhibit 2, Simpson is willing to purchase the Included Assets for a purchase price of $1,454,000.00 (the "Purchase Price", as further described below), free and clear of all liens, claims and encumbrances of any kind. The Included

Assets consist of: (a) Debtor's *owned* equipment; (b) its inventory, including supplies and raw materials and finished goods;  (c) two trucks; (d) the Debtor's goodwill and intellectual property as well as the membership interests in its wholly owned subsidiary, Life Brand, LLC, which has no operations but owns certain trade names, trademarks, and service markd related to the Debtor's business; (e) the Debtor's open customer orders; and (f) all of the Debtor's accounts receivable. The Included Assets are identified more fully in the APA and Exhibits A-H thereto.

17.    The  Included Assets being sold to Simpson do **not** include the following assets (the "Excluded Assets"): (a) the Debtor's *leased* equipment; (b) the Debtor's unexpired real property leases; (c) executory contracts, other than open customer orders; (d) cash, bank deposits and customer deposits; and (e) litigation claims including the estate's avoidance actions, potential D&O claims, and any claim or causes of action with respect to the misuse, appropriation, or compromise of the intellectual property of the Debtor or its subsidiary.  In addition, Simpson is **not** assuming any of the Debtor's liabilities other than its customer deposit liabilities.

18.    The Purchase Price under the APA is $1.454 million, which is comprised of (a) $1.0 million in cash; (b) the forgiveness of a $74,000 ordinary course administrative claim held by Simpson; and (c) the assumption of $380,000 in customer deposit liabilities.

19.     While many of the APA's terms are straightforward, the accompanying Declaration of Richard F. Fefferman provides additional background and explanation of the sale's terms and mechanics.

**D.    The Debtor's Business Judgment**

20.    The modified APA is superior to the original APA for the following reasons, among others: (a) it resulted in a higher purchase price by $354,000, thereby resulting in a higher return to the Debtor's estate; (b) it resulted in more cash available to the Debtor in the form of the Customer Deposits which, pursuant to the original APA, were part of the Included Assets; (c) it provides for a

cap on any potential purchase price reductions related to the equipment; and (d) it provides for a waiver by Simpson of a post-petition claim in the approximate amount of $74,000.  All of these elements provide for an improvement in the position and are in the best interest of the Debtor's estate and creditors.

21.    The Debtor proposes to sell the Included Assets free and clear of all liens, claims and encumbrances, and subject to higher and better offers at the auction (the "<u>Auction</u>") scheduled by this Court in accordance with the terms and conditions previously approved pursuant to the prior order.

**E.    Evidentiary Record**

22.    As previously indicated, the Court requested additional evidence and support on several issues presented by the Debtor at its first sale hearing. (See ¶ 9, above).  The Debtor submits that the Declarations of Richard Feferman and Joseph O'Dea provide the evidence and support sought by this Court.

**<u>LEGAL BASIS FOR SALE AND BIDDING PROCEDURES</u>**

23.    Section 363(b)(1) of the Bankruptcy Code provides that:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—
>
> (A) such sale or such lease is consistent with such policy; or
>
> (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—
>
> (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
>
> (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

24.     Although section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, court have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if the transaction is supported by the reasonable business judgment of the debtor.  *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *see also In re Fountain Imaging of N. Miami Beach, LLC*, No. 06-12686, Docket Nos. 215-217 (Bankr. S.D. Fla. Dec. 14, 2006); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); *In re Abbotts Dairies Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *Stephens Indus. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986).

25.     In the instant case, the Debtor submits that the most important consideration in assessing the Debtor's business judgment is the consequences to the Debtor, its estate, creditors and other parties in interest if the Debtor is not authorized to consummate an expeditious Sale of the Included Assets for the highest possible value.  Under the circumstances facing the Debtor, there is no better alternative to maximize value for the benefit of the estate and its creditors.

26.     The Debtor submits that the factors described herein, which require a prompt Sale of the Included Assets to preserve value for the estate, are entirely consistent with the longstanding rationale for authorizing a sale outside a chapter 11 plan.  *See Lionel Corp.; Financial Assocs. V. Loeffler (In re Equity Funding Corp. of America)*, 492 F.2d 793, 794 (9th Cir.), *cert. denied*, 419 U.S. 964 (1974) ("Other circuits have recognized the power of the bankruptcy court under chapter 11 to authorize a sale of the debtor's property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets.") (citations omitted).  Indeed, in view of the sales efforts engaged in by the Debtor and its professionals, in particular the CRO, the Debtor believes that maximum value for the Included Assets will be obtained through the Auction process.

### ***Sale Free and Clear of Liens***

27.     This Court has the statutory authority to authorize the Sale of the Included Assets free and clear of all liens, claims, interests or encumbrances. Pursuant to Section 363(f) of the

Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, encumbrances or interests if (i) such sale is permitted under applicable non-bankruptcy law, (ii) the party asserting such a lien, claim or interest consents to such sale, (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. *See*, 11 U.S.C. §363 (f); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988)(section 363 (f) is written in the disjunctive; the court may approve a sale "free and clear" provided at least one of the subsections is met").

28.   A debtor's assets may be sold outside the ordinary course of business. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). Courts interpreting section 363(b)(1) of the Bankruptcy Code have held that transactions should be approved under section 363(b)(1) when (a) they are supported by the sound business judgment of the debtor's management; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith. *See, In re Fountain Imaging of N. Miami Beach, LLC*, No. 06-12686, Docket Nos. 215-217 (Bankr. S.D. Fla. Dec. 14, 2006); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987).

29.   Case law generally provides that a sale of a debtor's assets free and clear of all liens, claims, encumbrances and interests is permissible under section 363(f) as long as the liens, claims, encumbrances and interests attach to the net proceeds of the sale.  *See In re Wells*, 296 B.R. 728, 734 (Bankr. E.D. Va. 2003) (holding that a trustee could sell property free and clear of equitable interest in property with interest to attach to proceeds); *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000) ("The holdings of the courts suggest that any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f) and, therefore, attaches to the proceeds of the sale."); *In re WPRV-TV, Inc*., 143 B.R. 315, 321 (D.P.R. 1991).

30.     The Debtor submits that the consideration which will be provided in the Sale will allow the satisfaction of any liens pursuant to section 363(f) of the Bankruptcy Code, with such liens to transfer and attach to the net sale proceeds with the same validity, priority, force and effect that such liens had on the Included Assets immediately prior to the closing.

31.     Accordingly, the Debtor will request that the Included Assets be transferred to the successful purchaser at the Auction (the "Successful Purchaser"), free and clear of all liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests attaching to the proceeds of the Sale in the same order of priority as such interests existed as of the Petition Date, as modified by any Court order entered in these proceedings.

### ***Good Faith Purchaser***

32.     While the Bankruptcy Code does not define "good faith," "[t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *Abbotts Dairies*, 788 F.2d at 147 (citations omitted).  The Debtor submits, and if necessary, will present evidence at the Sale Hearing, that any executed Successful Bidder Purchase Agreement is the result of, and due to, the open and competitive nature of the marketing and Sale process described herein, and is the result of open, arm's-length negotiations in good faith.  Additionally, the Debtor will disclose any and all, if applicable, relationships to the Successful Purchaser, and accordingly have satisfied its fiduciary duty of full and complete disclosure of any and all insider involvement in the Sale.

33.     The Debtor will make the necessary presentations in order to seek a finding by this Court that the Successful Purchaser is a "good faith purchaser" under section 363(m) of the Bankruptcy Code and that the Successful Purchaser is entitled to all the benefits and  protection of a good faith purchaser under section 363 (m) of the Bankruptcy Code.

### ***Waiver of Ten-Day Stay Imposed by Bankruptcy Rules 6004(g) and 6006(d)***

34.     It is important that the Debtor have the ability to close the Sale as soon as practicable after the entry of an order approving the Sale and in any event no later than March 26, 2018.

Accordingly, the Debtor hereby requests that this Court, in the discretion provided to it under Rules 6004(g) and 6006(d) of the Bankruptcy Rules, waive the ten-day stay of an order approving the Sale to the Successful Purchaser arising under those same Bankruptcy Rules.

**Best Interest/Business Justification**

35.    In order to facilitate the Sale of the Included Assets, the Debtor requests authority to sell the Included Assets to the highest bidder at the Auction to be conducted, as described in the Bidding Procedures, free and clear of any and all liens, with any and all valid liens to attach to the Sale proceeds.  Here, the best interests of the Debtor's estate and creditors and ample business justification support both a Sale and Auction.  The relief requested in this Sale Motion is reasonable and appropriate and is commonly approved by courts.  *See In re Fountain Imaging of N. Miami Beach, LLC*, No. 06-12686, Docket No. 133, 189 (Bankr. S.D. Fla. Oct. 13, 2006, Dec. 5, 2006).

**THE SETTLEMENT AGREEMENT WITH RESPECT TO POST-PETITION CLAIMS BETWEEN THE DEBTOR AND THE BUYER**

36.    The APA includes a reconciliation and setoff of postpetition claims by and between the Debtors and Simpson, as set forth in detain in the accompanying Fefferman Declaration. The key terms of the Agreement are as follows:

(a) Both the Debtor and Simpson agree that Simpson owes Debtor $129,818.80 with respect to "commissions" owed to Debtor on account of outsourcing work sent to Simpson after the Petition Date.

(b) In addition, both the Debtor and Simpson agree that Debtor owes Simpson $203,818.80 in post-petition accounts payable in connection with manufacturing orders placed by Debtor with Simpson after the Petition Date.

(c) The Debtor and Simpson agree to offset the post-petition claims identified above, and Simpson agrees to waive any and all claims against the Debtor with respect to the $74,000 net balance due after such offset (the "Offset Settlement").

(d) Except as specified above, effective as of the Closing, the Debtor and Simpson agree to fully and forever release, acquit and discharge each other, the CRO, their attorneys, accountants, and other retained professionals from any and all claims, damages, costs,

11

attorneys' fees, demands, rights, causes of action, or liabilities which any of them ever had, or now have, against each other. Futhermore, except as specified in §9.2 of the APA, the Parties agree to waive any and all rights which each may have under the provisions of California Civil Code §1542, which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(e) The release provided for herein shall not apply to any breach of any provision of the APA, including without limitation the warranties stated in §§5-6 thereto and the post-closing covenants stated in §7 thereto.

37.     Federal Rule of Bankruptcy Procedure provides, in relevant part:

Rule 9019. Compromise and Arbitration

(a) COMPROMISE. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed.R.Bankr. Pro. 9019.

38.     "Compromises are a normal part of the process of reorganization." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (citations and internal quotation marks omitted). The Court is afforded "great latitude in approving compromise agreements." Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 620 (9th Cir. 1988). "The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." Martin v. Kane (In re A&C Props.), 784 F.2d 1377, 1380-81 (9th Cir. 1986). Moreover, "[t]he law favors compromise and not litigation for its own sake . . . ." Id. at 1381. Accordingly, to approve a settlement agreement, a bankruptcy court need not conduct a mini-trial on the merits of the claims or an exhaustive investigation into the underlying dispute between the parties. United States v. Alaska

Nat'l Bank (In re Walsh Constr., Inc.), 669 F.2d 1325, 1328 (9th Cir. 1982). It is sufficient that the court find that the settlement was negotiated in good faith and that it is fair and equitable. A&C Props., 784 F.2d at 1381.

39.    The Ninth Circuit has identified four factors that a bankruptcy court must consider in determining whether a proposed settlement agreement is reasonable, fair and equitable:

    e.    the probability of success in the litigation;

    f.    the difficulties, if any, to be encountered in the matter of collection;

    g.    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

    h.    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

A & C Props., 784 F.2d at 1381 (citations omitted).

40.    In considering these factors, bankruptcy courts need only canvass the issues, not decide disputed facts and questions of law. See Burton v. Ulrich (In re Schmitt), 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997). "If the court were required to do more than canvass the issue[s], 'there would be no point in compromising; the parties might as well go ahead and try the case.'" Suter v. Goedert (In re Suter), 396 B.R. 535, 548 (D. Nev. 2008) (quoting 10 Collier on Bankruptcy, ¶ 9019.02). Additionally, "while creditors' objections to a compromise must be afforded due deference, such objections are not controlling." A & C Props., 784 F.2d at 1382. Indeed, the settlement need not be the best that could have been achieved, but only must not fall "below the lowest point in the range of reasonableness." In re Pac. Gas & Elec. Co., 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004) (quoting In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (citations and internal quotation marks omitted)); accord Redwood Trust v. Am. Bldg. Storage, LLC (In re Am. Bldg. Storage, LLC), No. CC-06-1259-MOPAD, 2007 WL 7532281, at *5 (B.A.P. 9th Cir. Apr. 2, 2007) (not for publication).

### *The A&C Properties Application*

41.    The Offset Settlement should be approved because the *A&C Properties* factors favor the approval. The Debtor and Simpson believe that the Offset Settlement is in the best interests of

the Debtor's estate and its creditors and therefore should be approved. Each of the <u>A&C Properties</u> factors is analyzed below:

- Success of litigation: Were the setoff amount issues to be litigated, there is a more than reasonable chance that the Debtor would have to remit the post-confirmation obligation to Simpson, and would not only not benefit from the $74,000 credit amount, but would also incur litigation fees, further reducing the assets of the estate and, therefore, result in less return to creditors.

- Collection difficulties: As Debtor would likely not prevail in litigation, this factor does not apply to the Offset Settlement. If this factor does apply, it does so in favor of this Court approving the Offset Settlement;

- Complexity, expense and delay of litigation: While not a complex legal issue, the financial drain and time expense that litigation over the Offset Settlement would cost would be detrimental to the Debtor's Sale process.

- Interest to the creditors: There is no doubt that approval of the Offset Settlement is in the best interest of the Debtor's creditors, as it results in $74,000 more in the coffers of the Debtor to be distributed to its creditors.

42.     Therefore, it is in Debtor's best interest to proceed with the Offset Settlement on the terms set forth above and the Debtor respectfully requests that this Court approve the Offset Settlement.

## ASSUMPTION/ASSIGNMENT OF CUSTOMER AGREEMENTS

43.     As further explained above and in the Fefferman Declaration, when the Debtor receives an order for goods, it opens a customer agreement (the "Customer Agreements") and requires from said customer a cash deposit on the order equal to 30% of the total amount of the order. The Customer Orders represent obligations of the Debtor to the customer whose order is in process, and also represent an obligation of the customer to remit the balance of the total price for delivery of the order. As explained in this Sale Motion and the APA, the Customer Orders, all of

which were entered into post-petition, are part of the "Included Assets" being purchased by Simpson. Wherefore, to the extent necessary, the Debtor hereby requests that it be authorized to assume and assign the Customer Agreements to Simpson pursuant to 11 U.S.C. §365.

## NOTICE

44.     The Debtor will provide notice of this Sale Motion to all parties listed on the Certification of Service which includes all secured and unsecured parties, all creditors and, to the best of Debtor's knowledge, all parties who have expressed an interest in the Included Assets.

45.     Additionally, the Sale Motion will be sent to other parties that, in the Debtor's business judgment, may have an interest in the proceedings or in placing a higher or better offer for the Debtor's Assets, but who as of yet have not expressed an interest in purchasing the Debtor's Assets.

WHEREFORE, the Trustee respectfully requests that the Court enter the proposed Sale Order granting the relief requested herein and other such relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

/S/ Stephen C. Hinze
Stephen C. Hinze, Attorney for
Debtor and Debtor in Possession

and

**FOX ROTHSCHILD LLP**
*Proposed Attorneys for the Debtor and Debtor-in-Possession*

Mette H. Kurth (Admitted in CA #187100)
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
Telephone: (302) 622-4209
Facsimile: (302) 656-8920
E-Mail: *mkurth@foxrothschild.com*

Dated: March 15, 2018

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# SALE MOTION
# <u>EXHIBIT 1</u>
# (APA)

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made and entered into as of March 15, 2018, by and between SIMPSON LABS LLC, a California limited liability company (or nominee) as buyer ("Simpson"), and CORE SUPPLEMENT TECHNOLOGY INC., a California corporation, as seller and debtor-in-possession in the Bankruptcy Case (as defined below) (the "Debtor"). Each of Simpson and Debtor are referred to herein individually as a "Party," and both Simpson and Debtor are referred to collectively as the "Parties."

## RECITALS

A.    Debtor is in the business of formulating and manufacturing nutritional supplements.

B.    Debtor is a debtor and debtor-in-possession in a Chapter 11 case pending in the United States Bankruptcy Court, Southern District of California ("Bankruptcy Court"), Case Number 17-06078-MM11 (the "Bankruptcy Case"). The transaction described in this Agreement is subject to approval by the Bankruptcy Court.

C.    On February 22, 2018, the Bankruptcy Court entered its *Court Modified Order Partially Granting Debtor's Motion for Entry of Order Approving Stalking Horse, Marketing and Overbid Procedures, and Setting a Final Sale Hearing* [D.I. No. 148] (the "Procedures Order") approving certain relief requested by the Debtor as further described in the Procedures Order, including the sale of substantially all of the Debtor's assets, and designating Simpson as the Stalking Horse Bidder for those assets. In addition, a proposed Asset Purchase Agreement (the "Original APA") between Debtor and Simpson was approved as the base bid for the sale.

D.    Following a hearing on March 8, 2018, the Court denied approval of the Original APA but indicated that it would consider a new sale motion if filed and properly noticed to creditors. This Asset Purchase Agreement is entered into as of March 15, 2018 and contains certain modifications responsive to the Court's concerns.

E.    Debtor is the owner of the following assets, which are referred to collectively as "the Included Assets":

1.    All equipment, tools, machinery, and office furniture that is owned by Debtor, whether or not subject to a security interest (the "Owned Equipment"), including without limitation the specific items detailed in Exhibit "A" hereto. To be clear, none of the equipment that is subject to a secured interest held by Berlin Packaging, LLC is considered an Included Asset. For a full description of such equipment, refer to Docket Item # 157;

2.    All supplies and raw materials used in the formulation and manufacture of nutritional supplements (the "Supplies"), as detailed in Exhibit "B" hereto, subject to reduction in the Supplies during the period between execution of this Agreement and the Closing Date (as defined below);

3.      All finished goods (the "Inventory") as detailed in Exhibit "C" hereto, subject to reduction in the Inventory during the period between execution of this Agreement and the Closing Date;

4.      Two (2) trucks and trailers (the "Vehicles"), as detailed in Exhibit "D" hereto;

5.      One hundred percent (100%) of the membership interests in Life Brand, LLC, a California limited liability company (the "Subsidiary") that owns intellectual property including trade names, trademarks, and service marks related to the nutritional supplement business and other property (the "Subsidiary Property"), as detailed in Exhibit "E" hereto;

6.      Debtor's tradename, website, domain names, formulas, trade secrets, customer and supplier lists, and goodwill (the "Intellectual Property"), as detailed in Exhibit "F" hereto (and as further identified to Simpson with respect to Intellectual Property that is not specified in such exhibit);

7.      Debtor's open customer orders, work-in-process ("WIP"), accounts receivable associated with such orders or WIP (each of the foregoing shall be referred to collectively, as the "Orders"), as detailed in Exhibit "G" hereto, to the extent the Orders exist as of the Closing Date; and

8.      All accounts receivable of Debtor (the "Receivables"), including without limitation the accounts receivable detailed in Exhibit "H" hereto, to the extent the Receivables exist as of the Closing Date.

F.      This Agreement does not effectuate a sale, transfer or disposition of assets of Debtor that are not listed in § E (1-8) above including, but not limited to: leased equipment; unexpired real property leases, except as otherwise indicated herein; cash and bank deposits; customer deposits; and litigation claims including the estate's avoidance actions and potential D&O claims. The assets that are not the subject of and being purchased or transferred pursuant to this Agreement are referred to as the "Excluded Assets." For avoidance of doubt, the Excluded Assets include cash and bank deposits, cash equivalents, executory leases (other than customer contracts) and customer deposits existing as of the Closing Date including assets derived from the Included Assets above.

G.      Debtor wishes to sell to Simpson the Included Assets at the price and on the other terms and conditions specified in detail below and Simpson wishes to so purchase and acquire the Included Assets.

H.      Following execution of this Agreement, Debtor will file a motion with the Bankruptcy Court to obtain Bankruptcy Court Approval of the sale described herein (as defined in §4.1 below). The sale will be subject to overbid, and the sale will close promptly to the highest and best bidder following such Bankruptcy Court Approval.

# AGREEMENT

In consideration of the foregoing Recitals and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration as set forth herein, the Parties agree as follows:

1.0    Transfer of Included Assets.

  1.1    Purchase and Sale of Included Assets.  On the Closing Date, as hereinafter defined, in consideration of the covenants, representations and obligations of Simpson hereunder, and subject to the conditions hereinafter set forth, Debtor shall sell, assign, transfer, convey and deliver to Simpson, and Simpson shall purchase all of Debtor's right, title and interest as of the Closing Date in and to the Included Assets, consisting of all of Debtor's right title and interest in and to those assets listed in the attached Exhibits "A" through "H", inclusive, pursuant to 11 U.S.C. §363, free and clear of all liens, claims and encumbrances, as provided by Bankruptcy Court order.

  1.2    Instruments of Transfer. The sale, assignment, transfer, conveyance and delivery of the Included Assets to Simpson shall be made by bill of sale and assignment duly executed buy Debtor, and such other instruments as may reasonably be requested by Simpson.

  1.3    No Assumed Liabilities. Simpson is not assuming any liability of Debtor or agreeing to assume and perform any contractual obligation of Debtor, and Simpson shall not be liable for any other liabilities or obligations of Debtor by virtue of this transaction, except for liabilities for payments due after the Closing Date on subleases that are entered into between Simpson and the Debtor as specifically identified in Exhibit "I" hereto.

2.0    Consideration.

  2.1    Purchase Price. The consideration to be paid by Simpson to Debtor for the Included Assets is One Million Four Hundred Fifty Four Thousand Dollars ($1,454,000.00) (the "Purchase Price"), made up of the following components:

  2.2    Cash. One Million Dollars in cash to be paid as follows: Five Hundred Thousand Dollars ($500,000.00) (the "Deposit") as described in §2.2 hereof; and Five Hundred Thousand Dollars ($500,000.00) (the "Completion Payment") payable at the Closing Date as defined and described in §3.2 hereof;

  2.3    Waiver of Claims. Simpson will waive and release any and all post-petition claims, including a certain claim delineated in the sum of $74,000.00, against Debtor, as set forth in Exhibit L hereto.

  2.4    Retention of Customer Deposits. The Debtor will retain $380,000.00 of customer deposits, which represents approximately 30% of all open customer orders. The

open customer orders pertaining to such deposits, however, are part of the Included Assets being transferred to Simpson as part of the sale and therefore the deposits represent an asset of the Debtor's estate.

2.5     Deposit.     Concurrently with the mutual execution and delivery of this Agreement, Simpson will deposit with the Trust Account of Debtor's Chapter 11 counsel the sum of Five Hundred Thousand Dollars ($500,000.00) in Good Funds (the "Deposit"). For purposes of this Agreement, "Good Funds" shall mean immediately available funds delivered via wire transfer or cashier's check drawn on a California bank. Debtor's Chapter 11 main counsel shall return to Simpson the Deposit only as provided in §4.6 hereof.

2.6     Equipment Condition:     Simpson conducted a final documented inspection of all purchased equipment on March 3, 2018. Simpson agrees to a $50,000.00 cap on any purchase price reduction for equipment damaged, lost or stolen after the original inspection. Debtor agrees to assign to Simpson, and to the extent possible, all insurance rights and coverage over the owned equipment that Simpson has agreed to purchase.

3.0     Closing Transaction.

3.1     Closing.     The Closing of the transactions provided for herein (the "Closing") shall take place on the Closing Date at the offices of Sullivan Hill Lewin Rez & Engel, 550 West C Street, Suite 1500, San Diego, CA 92101 or other such place as mutually agreed upon by Debtor and Simpson.

3.2     Closing Date.     Following execution of this Agreement, Debtor will file a motion with the Bankruptcy Court to obtain Bankruptcy Court Approval and the sale will close within three (3) business days following the entry of an order of the Bankruptcy Court authorizing such sale, as provided in §4.1 hereof, so long as the effectiveness of such order has not been stayed by a court of competent jurisdiction ("Closing Date"). Alternatively, the parties may mutually agree to an extended Closing Date. Until this Agreement is either terminated or the parties have agreed upon an extended Closing Date, the parties shall diligently continue to work to satisfy all conditions to Closing.

3.3     Debtor 's Deliveries to Simpson at Closing.     At the Closing, Debtor shall cause to be delivered to Simpson the following:

(a)     An Assignment and Bill of Sale in the form attached hereto as Exhibit "J" hereto, duly executed by Debtor, pursuant to which Debtor sells and assigns the Included Assets to Simpson (the "Assignment"); and

(b)     Such other instruments of transfer, including without limitation such assignments and consents to assignments as are reasonably requested by Simpson and necessary to transfer to Simpson good, marketable and legal title to all of the Included Assets, all in forms which are consistent with the terms of this Agreement and are usual and customary for transferring the type of assets involved under the laws of the jurisdictions applicable to such transfers.

3.4    Simpson's Deliveries to Debtor at Closing. At the Closing, Simpson shall cause to be delivered to Debtor the Completion Payment. The Completion Payment shall be paid at the Closing by cash, certified check or wire transfer.

3.5    Allocation. The Parties have agreed to the allocation of the consideration referred to in §2.0 hereof among the Included Assets as set forth in Exhibit "K" hereto. The allocation set forth in Exhibit K shall be conclusive and binding upon the Parties for all purposes, and no Party (or any affiliate of) shall file any tax return or other document with, or make any statement or declaration to, any taxing agency that is inconsistent with such allocation.

3.6    Sales, Use and Other Taxes. Debtor shall bear and pay any sales or use taxes imposed by the State of California on the sale of the Included Assets based upon and to the extent of the consideration allocated to the property as set forth in Exhibit "K" hereto.

4.0    Conditions Precedent to Closing.

4.1    Bankruptcy Court Approval; Hearing; Overbid Procedure. Debtor's obligation to sell and Simpson's right to buy are each conditioned on (collectively "Bankruptcy Court Approval"):

(a)    Entry of an Order of the Bankruptcy Court approving the bid and related procedures for the sale as described in the "Sale Procedures Memorandum" approved by Simpson on February 22, 2018 except as to such revisions thereto that are specifically agreed to by Simpson and Debtor in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court;

(b)    The subsequent conduct of the in-court auction sale described therein in conformance with such procedures, except as to variances and changes to such procedures that are specifically agreed to by Simpson and Debtor in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court; and

(c)    Entry of an Order of the Bankruptcy Court authorizing the sale to Simpson on the terms described herein, except as to such revisions thereto that are specifically agreed to by Simpson and Debtor in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court.

4.2    Conditions to Debtor's Obligations. Debtor's obligation to make the deliveries required of Debtor at the Closing Date shall be subject to the satisfaction or waiver by Debtor of each of the following conditions:

(a)    Debtor shall enter into a sublease with respect to that certain parcel of land further described in Exhibit "I" (the "Leased Property") subject the following terms: Debtor shall remain the lessee on the month to month lease of the Leased Property currently in place and Simpson will be sublessee. The Debtor and Simpson will have joint use of the Leased Property, each party paying 50% of the monthly rent obligations. If either party decides to leave the Leased Property, it will provide the other party 15 days

notice of such departure. The $30,000 security deposit being held by the Landlord is and will remain property of the Debtor.

      (b)    Debtor has received the Deposit;

      (c)    All of the representations and warranties of Simpson contained herein shall continue to be true and correct at the Closing in all material respects.

      (d)    Simpson shall have executed and delivered to Debtor all of those documents, instruments and agreements required to be executed by Simpson to Debtor under §3.4 hereof.

      (e)    No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

      (f)    Debtor shall have obtained Bankruptcy Court Approval, as provided in §4.1 hereof above.

    4.3    <u>Conditions to Simpson's Obligations</u>. Simpson's obligation to make the deliveries required of Simpson at the Closing shall be subject to the satisfaction or waiver by Simpson of each of the following conditions:

      (a)    All representations and warranties of Debtor contained herein shall continue to be true and correct at the Closing in all material respects.

      (b)    Debtor shall have executed and delivered to Simpson all of those documents, instruments and agreements required to be executed by Debtor to Simpson under §3.3 hereof.

      (c)    Debtor shall have obtained Bankruptcy Court Approval, as provided in §4.1 hereof above.

5.0    <u>Notice</u>. Notice of Debtor's motion for approval of the sale of the Included Assets shall be given by Debtor to all creditors of Debtor listed on the master mailing matrix maintained by the Bankruptcy Court as updated through the date such notice is served.

6.0    <u>Termination</u>. This Agreement shall be terminated only as provided below:

      (a)    By written mutual consent of Debtor and Simpson executed at any time prior to the Closing;

      (b)    Upon the closing of a transaction with a third-party overbidder, as provided in §4.1(b) hereof above; or

(c)     Pursuant to order of the Bankruptcy Court obtained upon notice to Debtor and Simpson.

6.1.    Consequences of Termination

(a)     In the event this Agreement is terminated pursuant to §4.5(a) hereof, all rights and obligations of the Parties hereunder shall terminate, and Debtor shall immediately deliver the Deposit to Simpson to the extent that Debtor and Simpson agree.

(b)     In the event this Agreement is terminated pursuant to §4.5(b) hereof, all rights and obligations of the Parties hereunder shall terminate, Debtor shall immediately deliver the Deposit to Simpson, and Debtor shall immediately pay Simpson a break-up fee of Eighty Thousand Dollars ($80,000.00) in addition thereto (if such break-up fee has been approved by the Bankruptcy Court as part of the approval of sale procedures described in §4.1(a) hereof).

(c)     In the event this Agreement is terminated pursuant to §4.5(c) hereof, all rights and obligations of the Parties hereunder shall terminate, and the Bankruptcy Court shall determine whether the break-up fee described in §4.6(b) above or the liquidated damages described in §4.7 below are payable.

7.0     Liquidated Damages. **SIMPSON AND DEBTOR ACKNOWLEDGE THE IMPRACTICALITY AND EXTREME DIFFICULTY OF FIXING THE ACTUAL DAMAGES DEBTOR WOULD SUSTAIN AS A RESULT OF THE BREACH OF SIMPSON'S OBLIGATION TO COMPLETE THE PURCHASE OF THE INCLUDED ASSETS FOLLOWING OBTAINING BANKRUPTCY COURT APPROVAL, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR HEREIN REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES THAT DEBTOR WILL INCUR AS A RESULT OF SIMPSON'S FAILURE TO COMPLETE THE PURCHASE. IF SIMPSON BREACHES THE OBLIGATION TO COMPLETE THE PURCHASE OF ASSETS, THEN DEBTOR, BY NOTICE TO SIMPSON, MAY TERMINATE SIMPSON'S RIGHTS TO PURCHASE THE ASSETS AND, AS DEBTOR'S SOLE REMEDY FOR THE DEFAULT BY SIMPSON, DEBTOR SHALL RECEIVE AND RETAIN ONE HUNDRED THOUSAND DOLLARS ($100,000.00) OF THE DEPOSIT UNDER THIS AGREEMENT AS LIQUIDATED AND AGREED UPON DAMAGES. BY INITIALING THE SPACES WHICH FOLLOW, SIMPSON AND DEBTOR SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS PARAGRAPH CONCERNING LIQUIDATED DAMAGES.**

CORE's INITIALS                          SIMPSON's INITIALS

8.0     Debtor's Representations and Warranties. Debtor hereby makes the following representations and warranties to Simpson:

8.1    <u>Validity of Agreement</u>. Upon obtaining Bankruptcy Court approval, this Agreement shall constitute the valid and binding obligation of Debtor, enforceable in accordance with its terms.

8.2    <u>Title</u>. At the Closing, Simpson will acquire all of Debtor's right, title and interest in and to all the Included Assets, free and clear of any liens, claims or encumbrances, as provided in the Bankruptcy Court Order approving the sale.

8.3    <u>Insurance.</u> Debtor will take all reasonable steps to designate Simpson as a beneficiary or additional insured on all insurance of Debtor that is presently in force, including without limitation insurance against defalcation or other improper acts by directors, officers, or employees of Debtor.

8.4    <u>Equipment in Good Working Order</u>. All of the Owned Equipment will be maintained by Debtor in substantially the same condition as it was when Simpson inspected the Equipment, pending the Closing.  In the event that any item of Owned Equipment is damaged, destroyed, breaks, wears out, or is lost or stolen, after the execution of this Agreement and prior to the Closing, and Debtor is aware of such fact, Debtor shall notify Simpson immediately upon learning such fact, and Simpson may reduce the Purchase Price by an amount reasonably equivalent to the lesser of the value of the equipment or the cost to repair such equipment.

8.5    <u>Equipment Condition:</u> Simpson conducted a final documented inspection of all purchased equipment on March 3, 2018.  Simpson agrees to a $50,000 cap on any purchase price reduction for equipment damaged, lost, or stolen after the final inspection. Core agrees to assign to Simpson, to the extent possible, all insurance rights and coverage over the owned equipment Simpson has agreed to purchase.

9.0    <u>Simpson's Representations and Warranties</u>. Simpson hereby makes the following representations and warranties to Debtor:

9.1    <u>Validity of Agreement</u>.  This Agreement, when executed and delivered by Simpson, shall constitute the valid and binding obligation of Simpson enforceable in accordance with its terms.

9.2    <u>No Conflicts or Violations</u>.   The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Simpson do not and will not: (i) conflict with or result in a breach of the articles of organization of Simpson; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Simpson is a party or by which Simpson or its assets or properties may be bound.

9.3    Other than as provided in § 9.4 hereof, Simpson shall have ten (10) business days to "true-up" the assets actually purchased (the "Purchase Assets") from

those Included Assets listed on the Exhibits hereto. Should Simpson determine that there is a discrepancy between the Purchased Assets and the Included Assets, it shall immediately notify Debtor with details regarding such discrepancy. The Debtor and Simpson agree to work toward resolving any true-up issues but, in the event they cannot do so, Simpson may seek relief from the Bankruptcy Court no earlier than three (3) business days after notice to the Debtor.

9.4    "AS IS" Transaction.    Debtor specifically disclaims (and Simpson expressly agrees that Debtor is not making or giving) any covenant, undertaking, representation or warranty, express or implied, in connection with the nature, quantity, quality and description of the Included Assets, or the condition, quality, suitability, value, or merchantability of Debtor's interest in or rights to the Included Assets, except as specifically provided in §5 hereof. SIMPSON ACKNOWLEDGES AND AGREES THAT EXCEPT AS SPECIFICALLY PROVIDED IN §5 HEREOF: (A) THE SALE OF THE INCLUDED ASSETS TO SIMPSON IS: ON AN "AS IS, WHERE IS" BASIS; WITHOUT ANY REPRESENTATION OR WARRANTY AS TO THE NATURE, QUANTITY, QUALITY OR DESCRIPTION OF THE INCLUDED ASSETS; (B) DEBTOR MAKES NO REPRESENTATIONS AS TO THE VALUE OF THE INCLUDED ASSETS; (C) THE SOLE REPRESENTATIONS AND WARRANTIES OF DEBTOR REGARDING THE INCLUDED ASSETS ARE THOSE SPECIFICALLY PROVIDED IN WRITING IN THIS AGREEMENT AND NO OTHER REPRESENTATIONS OR WARRANTIES ARE TO BE IMPLIED OR INFERRED. SIMPSON FURTHER ACKNOWLEDGES THAT PRIOR TO THE CLOSING DATE, SIMPSON HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF ALL RELEVANT MATTERS RELATING TO OR AFFECTING THE INCLUDED ASSETS AS SIMPSON DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE INCLUDED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN §5 HEREOF, SIMPSON IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INVESTIGATIONS.

CORE'S INITIALS    SIMPSON'S INITIALS

10.0    Post-Closing Covenants.

10.1    Post-Closing Maintenance of and Access to Information.    The Parties acknowledge that after closing, Debtor or its successors will need access to Debtor's information technology system and all information residing thereon (including installed software and data in memory) for the purposes of preparing or filing tax returns, responding to audits, prosecuting or defending third party claims, completing the administration of the bankruptcy case, satisfying other legal requirements, and otherwise fulfilling its duties as a debtor under the Bankruptcy Code. Accordingly,

(a)    Immediately upon closing, the Parties will instruct a third party vendor to be agreed upon to prepare a separate identical duplicate copy of Debtor's information technology system and all information residing thereon (including installed

software and data in memory), so that each Party will have its own copy (with different usernames and passwords for each to use in accessing the system), with the Parties to split the costs charged by such vendor, to a maximum of $15,000.00 per Party, based on the actual needs of each Party. Until such time as the duplicate copy is complete, Debtor shall maintain custody of the information technology system and all information residing thereon, and shall allow Simpson access to such information technology system as reasonably necessary to fulfill the purposes and intents of this Agreement.

(b)     Immediately upon closing, the Parties will instruct a third party vendor to be agreed upon to prepare a separate identical duplicate copy of Debtor's non-electronic books and records (including into OCR searchable PDF files, at Debtor's discretion), so that each Party will have its own copy, with the Parties to split the costs charged by such vendor to a maximum of $2,500.00 per Party. Until such time as the duplicate copy is complete, Debtor shall maintain custody of the non-electronic books and records, and shall allow Simpson access to such records as reasonably necessary to fulfill the purposes and intents of this Agreement.

(c)     Simpson agrees to use the information described in this Section 7 in compliance with all laws and regulations applicable thereto.

(d)     Debtor agrees to use the information described in this section 7 solely for the purpose described in this Section 7, and not to operate a business or otherwise compete with Simpson. Debtor's right to access the system shall terminate upon the closing of Debtor's bankruptcy case.

11.0   <u>Indemnification</u>.  Simpson agrees to defend at its own cost and to indemnify and hold harmless Debtor, and its employees, affiliates and agents, from and against any and all loss, costs, expenses (including attorney fees), damages, and liabilities, however caused, resulting directly or indirectly from or pertaining to the ownership or operation of the Included Assets after Closing.

12.0   <u>Broker's Commission</u>.  Simpson and Debtor each represent to the other that it knows of no claim for broker's or finder's fees or other commissions in connection with this transaction other than as provided herein.

13.0   <u>Miscellaneous</u>.

13.1   <u>Attorneys' Fees</u>.  In the event that either Party brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

13.2   <u>Notices</u>.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either Party to the other ("Notice") shall be in writing and shall be deemed given:  (1) when personally delivered, or (2) upon receipt or refused delivery if deposited in the United States mail, certified or registered mail, postage prepaid, return

receipt required, or (3) the next business day after being deposited with a recognized overnight mail or courier delivery service, or (4) the next business day after being transmitted by email or facsimile, with receipt acknowledgment upon transmission, and with a copy sent on the same day by one of the other permitted methods of delivery addressed as follows:

|  |  |
|---|---|
| To (Debtor) Core: | Core Supplement Technology, Inc.<br>Attn: Richard Feferman, CRO<br>3830 Valley Centre Drive; Suite 705-152<br>San Diego, CA 92130<br>Fax: (858) 430-2454<br>E-Mail: richard@crarecovery.com |
| With a copy to: | Core Supplement Technology, Inc.<br>Attn: Joseph O'Dea, President<br>4645 North Avenue<br>Oceanside, California 92056<br>Fax: 760-639-6041<br>Email: joe@coresupplementtech.com |
| With a copy to: | Stephen C. Hinze, Attorney at Law<br>217 Civic Center Drive, Suite 10<br>Vista, California 92084<br>Fax: (760) 454-2427<br>Email: sch@schinzelaw.com |
| With a copy to: | Mette H. Kurth, Attorney at Law<br>Meg Manning, Attorney at Law<br>919 N. Market Street<br>Suite 300<br>Wilmington, DE 19801<br>Fax: (302) 656-8920<br>Email: mkurth@foxrothschild.com<br>          mmanning@foxrothschild.com |
| With a copy to: | Sullivan Hill Lewin Rez & Engel<br>550 West C Street, 15th Floor<br>San Diego, California 92101<br>Attn: Christopher V. Hawkins<br>Fax: (619) 231-4372<br>Email: hawkins@sullivanhill.com |
| To Simpson: | Simpson Labs LLC<br>27540 Avenue Mentry<br>Valencia, California 913554<br>Attn: Donald Grace<br>Fax: (661) 347-4331 |

Email: dgrace@simpsonlabs.net

With a copy to:    Donahoe & Young LLP
25152 Springfield Court, Suite 345
Valencia, California 91355
Attn: Mark T. Young
Fax: (661) 554-7088
Email: myoung@donahoeyoung.com

13.3    Entire Agreement.    This instrument and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Included Assets.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

13.4    Modification.    This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all Parties.

13.5    Closing Date.    All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously at 12:01 AM on the Closing Date, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

13.6    Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

13.7    Captions.    All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

13.8    Further Assurances.    Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto.

13.9    Waiver.    No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

13.10    Payment of Fees and Expenses.    Each Party shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

13.11    Survival.    Except for the covenants and agreements to be performed after

the Closing Date, none of the respective representations, warranties, covenants and agreements of Core and Simpson herein, or in any certificates or other documents delivered prior to or at the Closing, shall survive the Closing.

13.12   <u>Assignments</u>.   Except as specifically provided otherwise in this Agreement, neither this Agreement nor any interest herein shall be assignable (voluntarily, involuntarily, by judicial process, operation of law or otherwise), in whole or in part, by Simpson without first obtaining the prior written consent of Core. Any attempt at such an assignment without such consent shall be void and, at the option of Core, shall be an incurable breach of this Agreement resulting in the termination of this Agreement.

13.13   <u>Binding Effect</u>.   This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties.

13.14   <u>Applicable Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of California, the United States Bankruptcy Code, the Federal Bankruptcy Rules and the Federal Rules of Evidence.

13.15   <u>Good Faith</u>.   The Parties agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

13.16   <u>Construction</u>.   In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party.

13.17   <u>Counterparts</u>.   This Agreement may be signed in counterparts, and may be executed by the exchange of facsimile signature pages.

13.18   <u>Time is of the Essence</u>.   Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

13.19   <u>Tax Effect</u>.   None of the Parties (nor such Parties' counsel or accountants) has made or is making in this Agreement any representation to any other Party (or such Party's counsel or accountants) concerning any of the tax effects or consequences on the other Party of the transactions provided for in this Agreement. Each Party represents that it has obtained, or may obtain, independent tax advice with respect thereto and upon which it, if so obtained, has solely relied.

**(The remainder of this page intentionally left blank.)**

14.0    <u>Bankruptcy Court Jurisdiction</u>.  **THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (I) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (II) THE INCLUDED ASSETS.  THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.**

IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the day and year first above written.

**SIMPSON:**

SIMPSON LABS LLC
a California limited liability company,
as Buyer

By:
_____
Donald Grace, its Executive Vice
President

**CORE:**

CORE SUPPLEMENT TECHNOLOGY INC.
a California corporation,
as Seller

By:
_____
Joseph O'Dea, its General Manager

and

By:
_____
Richard Feferman, Chief Restructuring
Officer

## EXHIBIT "A"

### OWNED EQUIPMENT

Group 1 (Bank of America security interest):
1. 165 cu. ft. Paul Abbe Double Cone Blender  304/S/S 48460
2. NRS51-HES Chuck Capper Machine w/3 sets of tooling NRS51-HES
3. Cremer Counter Tablet Press Machine 1308
4. AF3 screw Conveyor & In-feed Turn table (39" diameter)

Group 2 (Bank of America security interest):
5. Bosch Capsylon 705 complete with all standard, parts, attachments and accessories 8-111-999-201
6. GRFLOWRATEX: Flodex
7. 2008 Hyster E50Z - 5,000 LB, Electric Forklift, complete with all standard parts, attachments and accessories. G108N09950
8. 2009 Skyjack Scissorlift SJIII 3219, complete with all standard parts, attachments and accessories 22019403
9. 2003 Yale Reach Truck, NR035AENM24TE095/EASIR40TT, complete with all standard parts, attachments and accessories. C815N03043A/DZ-A-98-11405
10. Global Auto Floor Scrubber 20", complete with all standard parts, attachments and accessories. 261165GN

Group 3 (Core List 8/9/17):

Portable AC unit - 10000 BTU
Dehumidifier IDEAL Air CG2
16 Station Tablet Press & set of
Acer G236HL Bbd 23 In LED
48" ROTARY TABLE STAINLESS STEEL
A/C Unit 1400 Portable 14000BTU
A/C Unit 1400 Portable 14000BTU
AC DAIKIN 5 TON 3 PHASE 208/230
Air Conditioning for MFG
AC Unit Diakin 5 ton Heat Pump
AFS SCREW CONVEYOR/W
150 PSI Oilless Air Compressor 8
Air Dryer – Refrigerated
Euro-Dry Energy DE106 Air Chille
AAV-90D DESICCANT AIR DRYER
AIR IMPACT WRENCH
All Fill Autp Powder Filler
Fiber Optic Amp for Feeder
Sartorius LE225D Analytical Bala

Auto Auger Series Filler
Auger BSL-S3 130001
A&D FX-700CT Balance
Sartorius ENTRIS64-1S Analytical
Precision Balance
ENTRIS323-1S
Marburg Delibander Model 1250
Battery Reconditioned Deka 18-12
Bi directional label process 18-
Bin Blender Motor  5HP 1725 6 0H
Blender 10 Cu. Ft.
Bin Blender
Bin Blender
Big Blender
480 Volt 60 Amp Breaker Steam Cl
Fiberoptic BRKT Guide
2 Door Flammable Cabinet
Cabinet Stainless Steel on Wheel
Black Metal Storage Cabinets
Cabinets in WH
King  Capsule Counter
ZANASI 40F
Capsule Filler Semi-Automatic
Spring torque tester - 0-100in.L
Spring torque tester - 0-100in.L
Cremer CF1230 Channel Counter
Sure Kap (Capper Machine)
CAP SHOE
Bosch 705 Encapsulation Machine
Carts Stainless Steel
Carts
Carts and Tools
3M T&B Model 200A SN 15054
Casters for Bin Blender
Desk Chairs
Mid-Back Swivel Chair
Hercules Swivel Task chair with
5 Tier Chrome Wire Shelving
Small Clean Room
Cleanroom
Clean Room Strip Doors
6 2 x4 Logi-Clean Room Light
Front Lobby Clock
Compressor
Computers

Computer
Computer Dell 745 Optiplex
Computer Sales (label printer ro
Windows 7 Dell 745 Desktop, Ramo
HP Compaq 8200 Elite Win 7 DVD
HP Compaq 8200 Elite Win 7 DVD
HP Compaq 8200 Elite Win 7 DVD
Computer Dell 745 Optiplex B. As
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC – Intte
Dell Computer 840 EVO MZ-7TE250B
HP Elite 8300 Desktop PC
Dell Optiplex 745 3.4GHZ 8GB
Lenovo Think Centre M71e SFF Des
Hp Elite 8300 Desktop PC
Dell 745 Optiplex Desktop Comput
Dell Optiplex 780 SFF E800 Dual
CONTROL PANEL FOR SCREW CONVEYOR
Conveyor Belt
Conveyor SS 6x4
12.5 FT. CONVEYOR 304 SS SHELLS
GlobalTek 6' X 4" SS Conveyor W/
Conveyor Bottomless
Conveyor Table Top 8x4.5
Conveyor Label Aire 6x3.5
Conveyor 6" Wide
Conveyor 4.5"
Bottomless Conveyor
CONVEYOR 59" LENGTH
8' Stainless Steel Conveyor
Globaltek 10' X 4" SS Conveyor
CONVEYOR 12' x 4" SS W/ SPEED CO
10ft Conveyor (7.5"W) W/Indexing
Transfer Conveyor 60 in x 30 in
Bottomless Conveyor G100TR
Cottner (Lasko)
Clean Room Soft Walls
Cubical with desk and drawers
Cubical with desk and drawers
Cubical with desk and drawers
Double Cone Blender
15.6 E6520 laptop PC - Intel cor
Dell Optiplex 790 SFF Desktop In
Dell Latitude E5520 15" Notebook
Dell Optiplex 780 SFF E8400 3ghz

Desk - Extra in AK Office
Double Pedestal Desk Maple
Desk L. Rocha Mfg
Desk for R. Arreola
5'6"x6'6" Right Return Desk
24"x 48" Mahogany Single pedesta
C/M Amber 30X60 single pedestal
Desk L Shape Right Return Mahoga
DESK L SHAPED 6' X 6' CHERRY
6'x6' L SHAPE DESK W/LEFT RETURN
dosing discs for Capsylon Encaps
57850-1/16-1/2 X Chicago-Latrobe
Dust Collection
Data View Temperature Data Logge
Nissan CUM01L15S 36V Electric Fo
Electric Sub Panel
Lakso 73 Electric Lift
Encapsulating Digital Balance
Encapsulation Machine
Encapsulator Orientator 70F
F40 Encapsulator Tooling
Vibrator for Encapsulation Machi
Encapsulation Room Electricity
Beach Pebble Front Entry
INDUCTION SEALER
24' FG Extension Ladder
Patterson Fan 2052533
4 Hands Free Faucets
File Cabinet 4 Drawer Vertical
4 Drawer Vertical File w/Lock
4 Drawer Vertical File w/Lock
4 Drawer Vertical File w/lock Le
1 4 drawer 1 2 drawer Black w/lo
Lateral File Cabinets
Fork Lift Aerial Platfor, 48x40
FLOWABILITY INDEX MEASUREMENT
Weigh Tronix DWS3030-01 Floor Sc
Weigh Tronix DWS3030-01 Floor Sc
Tennant Floor Scrubber
Global Auto Floor Scrubber 20"
Floor Scrubber for W/H
Flooring Temple Heights
CHARGER 24VDC 11 A 50/60HZ
Blender
food scale 6 X0.001 lbs NTEP

Fork Lift
Fork Lift CAT Reach lb
Freight Forklift
Freight Euro Dry Air chiller
Freight for Conveyor
Freight Encapsulator
Freight Flowability Tester
Freight for heritage global purc
FRT Pallet Rack
freight for ss conveyor for feed
Freight Turn Tables, SS tables
ATR STD SET Polystyrene ATR Stan
2007 GMC TRUCK MODEL C7500
Hand Capsule Counter
Wireless Headset W/handset lifte
Heat Guns
Heat Lamps
Heat Tunnel
Heat Tunnel - Oven-3Levell/6" Tal
Digimatic Height Gage w/ switcha
Bulk Hopper/Elevator Assembly
Hot Stamp Coder for Labeler
HP ELITE 8300 DESKTOP PC
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC
Humidity Data Loggers with displ
hydraulic driver for stud driven
Electric 3 stage side shift 2008
Sotax FT-300 Flowability Testerm
Nilfisk CFM - 3151 Industrial Va
PN# STC05-57 / 5" dia x 7.5 Inde
Induction Sealer
Inductiion Tunnel Pkg Line
Lepel CSplus200 Induction Sealer
MARKEM-IMAJE SERIAL#FR16210026
Markem - imaje serial number FR1
Inspection Table Kangola Machine
server, monitor wiring whs 3 for
Cisco 7940 G IP Phones
IT Equipment
IT Equipment
Kirby Lester TT Count Verificati
Lab/QC Equipment
Easy Labeler Label Machine

Label Machine
Zebra Label Machine
Label Printer
Zebra ZM400 Thermal Label Printe
Zebra ZT410 Direct Thermal Trans
Label Sensor Model #1120
Labelette Labeler
ST1100 Wrap around Labeler 8'X10
Label Machine with Encoder
CLEAR LABEL SENSOR
High Shelf Ladders
Low Step Ladder
Dell Latitude E6510 15.6 in Lt C
Laser Jet Printer  Pro 400
Laser Printer AK
LASER SENSOR 1 250 MM RANGE 4 PI
Lateral File Cabinet
4 DR LATERAL FILE GREY
Lot of locks and tags
LOCKOUT TAGS
Sink and Faucet for Lunch Room
Ungesa Clean-Trace NG Luminomete
MAGNET 4N-201505301 GR1
MAKITA XT218 18V LXT LITHIUM-ION
Manual for Auto Label Appicator
Material Guide 66MM (butterfly)
Material Guide 77MM (Butterfly)
Material Guide 90 MM (butterfly)
80 pc pan set
Loma Auto Metal Detector for Bot
TOUCH SCREEN  & 60" CONVEYOR/PLO
Mezzanine for Big Blender
Mezzanine for Big Blender
Mezzanine
Extension of Manufacturing Rooms
Extension of Manufacturing Rooms
Milling Machine
Mobile Box/File Pedestal Black
Moisture Analysis pans & Glass f
Arizona Instruments Moisture Ana
Ohaus MB200 Moisture Analyzers
Moisture Meter HE53/03
Monitor 21.5"
Acer G236HL Bbd 23 inch LED Moni
Acer G236HL Bbd 23 inch LED Moni

Monitor LED 23" A. Kumjian
Monitor ASUS VH238H 23 " B. Asli
Monitor R. Arreola
Monitor LED 24 inch, R. Rocha
Acer 23" Monitor for Sales
VA2446M-LED 24" N. McEvers
Acer G236HL Bbd 23 Inch Led-lit
ACER G236HL BbD 23-INCH MONITOR
Monitor ACER 23"
Monitor C. Robison Sales
ViewSonic VA2446M-LED 24 inch LE
Monitor Joe  VA2246M 22 inch led
Viewsonic 27 inch lit lcd 1080
ViewSonic VA2446M-LED 24 inch LE
24in LCD Monitor
Acer G236HL 23 inch
ViewSonic VA2446M-LED 24 inch LE
Acer G237HK bi 23 inch LED Back
MONITOR ASUS VS207T-P 20 IN
Acer G246HL 24 inch  LED Monitor
Toledo ID 1 Multirange Scale
Neck Bander for Packaging
NECK BANDER
HP Probook 6560B Notebook PC
Office Equipment
Office Furniture/Fixture
Office Furniture/Fixture
Office Furniture/Fixture
Office Furniture
Mounting Brackets qty 2
Skidding
Pallet Jack
Pallet Jack
Mitsu Pallet Jack
2.5 Ton Pallet Jack
2.5 Ton Pallet Jack
2.5 Ton Pallet Jack
Heavy Duty Pallet Rack
Heavy Dute Pallet Rack
Heavy Duty Pallet Rack
Pallet Racks in W/H
Pallet Racking for Warehouse
TEAR DROP STYLE PALLET RACKS
Heavy Duty Pallet Racks
Heavy Duty Pallet Racks

Packaging Pallet Wrapper
Panic Bar for Door
Picnic table and banches 6 ft
Picnic Table Round 44" Top Almon
Picnic Tables
Packaging Line
Packaging Line
Packaging Line
Packaging Line
Lab Work Station Portable 2 Shel
PDC Shrink Heat Tunnel
Sartorius Digital Balance Scale
Ishida Check Weigher Model:RE-W-
LD19SB Custom 1-6 HR 1 Phase 60h
Ramsond CUT 50DY
Ohaus EP 12001 Explorer Pro Plat
LITTLE GIANT NCB-2448-8PYBK
Polishing Macine CVC
Capsule Polisher
Logistical S-7 Weigh & Fill 1503
Power Washer
Precision Balance Sartorius
Mi-T-M JP-1502-3ME1 - 1500 PSI
Print Plates for Labeling
Brother DCPL2540DW WCL Printer
Office Jet Printer All in one
Brother HL-L2340DW Compact
Brother all in one CL  MFCL2700D
Brother Wireless Compact Laser P
Brother DCPL2540DW Wireless CL p
Monochrome Desktop Thermal Trans
InFocus IN116A DLP Projector
LEYBOLD SV-100 PUMP
BUSCH RC-0100 PUMP
PUNCH AND DIE SET FOR STAINLESS
QC Luminameter
Racks
Storage Racks
Yale Reach Truck
High Back Exec Chair Black
U-Shape, Left return 6'X8'6" Esp
Hot Point Refrigerator/Freezer
Full Face Respirator
Roller for PKG Labeler
12 step rolling ladder

SS ROTARY TABLE W/ SPEED CONTROL
48" Global Tech Rotary Table W/S
Rotary Table 58 in. Stainless St
Rotary Table 48" SS-48
Rotary Table 48"
Sanitation Equipment
SCALE WEIGHING EJ6100 COMPACT
SCALE – PRODUCTION
Scales
Scales
Scale
Sartorius ENTRIS323-1S Milligram
Digital Scale Ohaus Model Valor
Scale Platform FG-30KAM
Scale Sartorius AY-5101 Small
SARTORIUS SCALE
Screening Machine Model #MTS 600
AF3 Screw Conveyor
INDUCTION FOIL SEALER
SECURITY CAMERA WHS 3
Security System
Security Equipment
Security Equipment
Security Camera System TH
8 ch DVr w/4 IR Camera Kit, IR c
Sensor kit, Triton, Gen IR Detec
Sensor kit, Triton, Gen IR Detec
Server Net Gear
Shipping for Equipment from SJ A
Shrink Tunnel
Document Shredder
Stainless Steal Sink
SKIDDING FOR ASSET SHIPMENT
Scissorlift 19 ft platform 25 ft
SS Slot Sampler (4) Slots 1000 m
SLOT SAMPLER STAINLESS STEEL
Custom cleanroom soft walls
Software
Spindle Capper w/ 6 spindles
SS Shelves Wall Mt 2 12 x 48, 1
Toledo SS table w/casters
SS Tables w/casters
SS WORK TABLE 30 X 24 X 33
Stack Pack Machine Former 80MM
40KW X Treme Steam Generator 480

Former 65 mm Cooling Part for St
Steel Wheel Risers
Metal Storage Cabinet
Strip Doors Clean Room
STRIP DOORS FOR CLEAN ROOMS
STRIP DOORS CLEAN ROOMS
Strip Doors 4
Custom Clean room Strip Doors
Table for Filler
Bi Directional Accumultion Table
SS Table 24" X 24"
Rolling Stainless Steel Table 30
Stainless Steel Table w/Bcksplsh
Tap Density tester SERIAL # 504.
DUAL TABLET/CAPSULE COUNTER
Testing Equipment
Testing Equipment
Testing Equipment
Testing Equipment
Lenovo Thinkserver TS140
16' Isuzu Box Truck
Turntable 48"
Turntable
2854-3 CAPPLUS TWIN SHELL BLENDE
T&B T3 UNIV FER CRIMP TOOL
Alto Vacuum
Air Power Vibrator
VINYL WALL PANELS FOR ENCAPSULAT
Motorola Talkabout MD200, Ramon
Motorola Talkabout MD200, Alex.
Motorola Talkabout MD200, Luis.
Motorola Talkabout MD200, Beau
Motorola Talkabout MD200, Fabian
Motorola Talkabout MD200, Japhet
20 gallon/2000W electric Water
Brother DCPL2540DW Wireless Comp
Ubiquiti UAP-LR-3 Unifi AP Enter
WIRE SHELVING WH
Stainless Steel Work Table
CVC 300C Wrap Labeler
CVC 310 WRAP LABELER

**EXHIBIT "B"**

**SUPPLIES**

**EXHIBIT "C"**

**INVENTORY**

## EXHIBIT "D"

## VEHICLES

2007 GMC C7500 Truck (24') Vin #1GDJ7C1357F900650

2007 Isuzu Box Truck (16') Vin #JALC4B16377001739

## EXHIBIT "E"

## SUBSIDIARY PROPERTY

1. **Rights to trade name and logo for "Strongman" products, including:**

| |
|---|
| Strongman Pre-Workout Airplane Punch Bulk Powder |
| Strongman Pre-Workout Lemonade Lift Bulk Powder |
| Strongman Pre-Workout Lift Juice Watermelon Bulk Powder |
| Strongman Pre-Workout Airplane Punch |
| Strongman Pre-Workout Lemonade Lift |
| Strongman Post-Workout Airplane Punch |
| Strongman Post-Workout Lemonade Lift |
| Strongman Pre-Workout Lift Juice Watermelon |
| Strongman Glutamine |
| Strongman Creatine |
| Strongman Whey Protein Isolate Chocolate 30 serving |
| Strongman Whey Protein Isolate Chocolate 15 serving |
| Strongman Pre-Workout Lift Juice Strawberry Lemonade |
| Strongman Whey Protein Isolate Chocolate 5 serving |

2. **All inventory of such products on hand;**
3. **All materials for manufacture of such products on hand; and**
4. **All receivables for products of Subsidiary.**

## EXHIBIT "F"

## INTELLECTUAL PROPERTY

**Website:**      **www.coresupplementtech.com**
**Tradename:   Core Supplement Technology**
**Formulas and Trade Secrets:      Not identified in a public document**
**Customer List:      Not identified in a public document**
**Supplier List:      Not identified in a public document**

**Core owned formulations**
**Master batching records**
**Blending procedures**
**Label proof approvals**
**Raw material specifications**
**FTIR and third party testing records**
**Customer list**

### IP Statement
### Core Supplement Technology IP

Core Supplement Technology, Inc. is the creator of its in house formulations and master batching records.  Core holds all rights and IP to these formulations.  Select customers have copies of formulations created in house per individual agreements.  These customers represent less than 5% of total sales.

**EXHIBIT "G"**

**ORDERS (INCLUDING WIP)**

**EXHIBIT "H"**

**RECEIVABLES**

**EXHIBIT "I"**
**REAL PROPERTY LEASE**

Building 1, 4645 North Ave, Oceanside, CA 92056, month to month tenancy.  Landlord Wade W. Prescott, et al.  Monthly rent $16,367 per month.  Lease payments (and all other obligations of Core) are current through February 28, 2018.

EXHIBIT "J"

# ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE is being delivered as of the date indicated below by CORE SUPPLEMENT TECHNOLOGY INC. ("Seller"), pursuant to the terms of that certain Asset Purchase Agreement dated March _____, 2018 (the "APA"), by and between Seller and SIMPSON LABS LLC ("Purchaser"). Capitalized terms used herein without definition shall have the same respective meanings as the capitalized terms that are defined in the APA.

    1. **Transfer of Assets**: In consideration of payment of One Million Four Hundred Fifty Four Thousand Dollars ($1,454,000.00), the receipt of which is hereby acknowledged, Seller hereby sells, grants, assigns, transfers, conveys and delivers to Purchaser the Included Assets described in § E of the APA, including the specific assets listed in §§1.1 -1.9 below, and all right, title and interest therein and thereto (collectively the "Transferred Assets"):  [LANGUAGE BELOW SHOULD TRACK REVISIONS TO RECITALS IN APA ABOVE]

    1.1   All equipment, tools, machinery, and office furniture that is owned by Core, whether or not subject to a security interest (the "Owned Equipment"), including without limitation the specific items detailed in Exhibit "A" hereto;

    1.2   All supplies and raw materials used in the formulation and manufacture of nutritional supplements (the "Supplies"), as detailed in Exhibit "B" hereto;

    1.3   All finished goods (the "Inventory") as detailed in Exhibit "C" hereto;

    1.4   Two (2) trucks and trailers (the "Vehicles"), as detailed in Exhibit "D" hereto;

    1.5   One hundred percent (100%) of the membership interests in Life Brand, LLC, a California limited liability company (the "Subsidiary") that owns intellectual property including trade names, trademarks, and service marks related to the nutritional supplement business and other property (the "Subsidiary Property"), as detailed in Exhibit "E" hereto;

    1.7   Core's tradename, website, domain names, formulas, trade secrets, customer and supplier lists, and goodwill (the "Intellectual Property"), as detailed in Exhibit "F" hereto;

    1.8   Core's open customer orders, work-in-process ("WIP"), deposits by customers for such orders or WIP, and accounts receivable associated with such orders or WIP (the "Orders"), as detailed in Exhibit "G" hereto

1.9 All accounts receivable of Core (the "Receivables"), including without limitation the accounts receivable detailed in Exhibit "H" hereto,

2. **Further Acts and Documents:** Seller hereby covenants that it will, at any time and from time to time, upon the request of Purchaser, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further acts, deeds and documents as Purchaser may reasonably request in order to vest in Purchaser the Included Assets and all right, title and interest therein and thereto.

3. **Subject to APA:** This Assignment and Bill of Sale is subject to all of the terms and conditions of the APA.

4. **Binding Effect:** This Assignment and Bill of Sale shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns.

5. **California Law Applies:** This Assignment and Bill of Sale shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws principles.

6. **No Amendment Without Consent:** This Assignment and Bill of Sale may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of Seller and Purchaser.

IN WITNESS WHEREOF, Seller has caused this Assignment and Bill of Sale to be executed and delivered on the date stated below.

Dated: ___3/15/___, 2018

CORE SUPPLEMENT TECHNOLGY INC.
a California corporation, as Seller

By: _____
Joseph O'Dea, its General Manager

and

By: _____
Richard Feferman, Chief Restructuring Officer

# EXHIBIT "K"

## ALLOCATION

| | |
|---|---|
| **Owned Equipment:** | **$50,000.00** |
| **Premises Lease:** | **-0-** |
| **Supplies:** | **1,000.00** |
| **Inventory:** | **100,000.00** |
| **Vehicles:** | **10,000.00** |
| **Subsidiary/Subsidiary Property:** | **34,000.00** |
| **Intellectual Property (incl. goodwill):** | **454,000.00** |
| **Orders/WIP:** | **530,000.00** |
| **Receivables:** | **275,000.00** |
| **Total:** | **$1,454,000.00** |

**EXHIBIT L**

**SETTLEMENT AGREEMENT, WAIVER OF POST-PETITION CLAIMS, AND MUTUAL GENERAL RELEASE**

1.      <u>Post-Petition Core A/R</u>:  Simpson owes Core $129,818.80 with respect to "commissions" owed to Core on account of outsourcing work sent to Simpson after the Petition Date.

2.      <u>Post-Petition Simpson A/R</u>:  Debtor owes Simpson $203,818.80 in post-petition accounts payable in connection with manufacturing orders placed by Core with Simpson after the Petition Date.

3.      <u>Offset, Settlement and Release</u>:  Effective as of the Closing Date and as part of the Purchase Price Consideration, subject to entry of a Court Order approving this settlement agreement pursuant to Bankruptcy Code Section 9019, Simpson and Core will offset the post-petition claims identified in Paragraph 1 and 2, above, and Simpson will waive any and all claims against Debtor with respect to the $74,000[1] net balance due after such offset.

4.      <u>Mutual General Release.</u>  Except as specified in Paragraph 3 and any other executory obligations under the APA, effective as of the Closing, the Parties fully and forever release, acquit and discharge each other, Core's Chief Restructuring Officer, their attorneys, accountants, and other retained professionals from any and all claims, damages, costs, attorney's fees, demands, rights, causes of action, or liabilities which any of them ever had, or now have,  against each other.

5.      <u>Waiver of California Civil Code §1542.</u>  Except as specified in §13.9 of the APA, the Parties waive any and all rights which each may have under the provisions of California Civil Code §1542, which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

It is understood by the Parties that facts with respect to which the releases are hereby given may turn out to be other than, or different from, the facts now believed by the Parties to be true. Each Party expressly assumes the risk of the facts turning out to be different than that Party believes them to be, and agrees that this Agreement shall in all

---

[1] Shortly before filing this APA, Simpson informed the Debtor that the waived amount may be slightly higher than the $74,000 originally reported but was not able to provide an exact amount. As such, this amount is subject to change.

respects be effective and not subject to termination or rescission because of any such mistaken belief.

6.      The release provided for herein shall not apply to any breach of any provision of this Agreement, including without limitation the warranties stated in ¶¶8-9 of the APA and the post-closing covenants stated in ¶ 10 of the APA.

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made and entered into as of March 15, 2018, by and between SIMPSON LABS LLC, a California limited liability company (or nominee) as buyer ("Simpson"), and CORE SUPPLEMENT TECHNOLOGY INC., a California corporation, as seller and debtor-in-possession in the Bankruptcy Case (as defined below) (the "Debtor"). Each of Simpson and Debtor are referred to herein individually as a "Party," and both Simpson and Debtor are referred to collectively as the "Parties."

## RECITALS

A.     Debtor is in the business of formulating and manufacturing nutritional supplements.

B.     Debtor is a debtor and debtor-in-possession in a Chapter 11 case pending in the United States Bankruptcy Court, Southern District of California ("Bankruptcy Court"), Case Number 17-06078-MM11 (the "Bankruptcy Case"). The transaction described in this Agreement is subject to approval by the Bankruptcy Court.

C.     On February 22, 2018, the Bankruptcy Court entered its *Court Modified Order Partially Granting Debtor's Motion for Entry of Order Approving Stalking Horse, Marketing and Overbid Procedures, and Setting a Final Sale Hearing* [D.I. No. 148] (the "Procedures Order") approving certain relief requested by the Debtor as further described in the Procedures Order, including the sale of substantially all of the Debtor's assets, and designating Simpson as the Stalking Horse Bidder for those assets. In addition, a proposed Asset Purchase Agreement (the "Original APA") between Debtor and Simpson was approved as the base bid for the sale.

D.     Following a hearing on March 8, 2018, the Court denied approval of the Original APA but indicated that it would consider a new sale motion if filed and properly noticed to creditors. This Asset Purchase Agreement is entered into as of March 15, 2018 and contains certain modifications responsive to the Court's concerns.

E.     Debtor is the owner of the following assets, which are referred to collectively as "the Included Assets":

1.     All equipment, tools, machinery, and office furniture that is owned by Debtor, whether or not subject to a security interest (the "Owned Equipment"), including without limitation the specific items detailed in Exhibit "A" hereto. To be clear, none of the equipment that is subject to a secured interest held by Berlin Packaging, LLC is considered an Included Asset. For a full description of such equipment, refer to Docket Item # 157;

2.     All supplies and raw materials used in the formulation and manufacture of nutritional supplements (the "Supplies"), as detailed in Exhibit "B" hereto, subject to reduction in the Supplies during the period between execution of this Agreement and the Closing Date (as defined below);

3.     All finished goods (the "Inventory") as detailed in Exhibit "C" hereto, subject to reduction in the Inventory during the period between execution of this Agreement and the Closing Date;

4.     Two (2) trucks and trailers (the "Vehicles"), as detailed in Exhibit "D" hereto;

5.     One hundred percent (100%) of the membership interests in Life Brand, LLC, a California limited liability company (the "Subsidiary") that owns intellectual property including trade names, trademarks, and service marks related to the nutritional supplement business and other property (the "Subsidiary Property"), as detailed in Exhibit "E" hereto;

6.     Debtor's tradename, website, domain names, formulas, trade secrets, customer and supplier lists, and goodwill (the "Intellectual Property"), as detailed in Exhibit "F" hereto (and as further identified to Simpson with respect to Intellectual Property that is not specified in such exhibit);

7.     Debtor's open customer orders, work-in-process ("WIP"), accounts receivable associated with such orders or WIP (each of the foregoing shall be referred to collectively, as the "Orders"), as detailed in Exhibit "G" hereto, to the extent the Orders exist as of the Closing Date; and

8.     All accounts receivable of Debtor (the "Receivables"), including without limitation the accounts receivable detailed in Exhibit "H" hereto, to the extent the Receivables exist as of the Closing Date.

F.     This Agreement does not effectuate a sale, transfer or disposition of assets of Debtor that are not listed in § E (1-8) above including, but not limited to: leased equipment; unexpired real property leases, except as otherwise indicated herein; cash and bank deposits; customer deposits; and litigation claims including the estate's avoidance actions and potential D&O claims. The assets that are not the subject of and being purchased or transferred pursuant to this Agreement are referred to as the "Excluded Assets." For avoidance of doubt, the Excluded Assets include cash and bank deposits, cash equivalents, executory leases (other than customer contracts) and customer deposits existing as of the Closing Date including assets derived from the Included Assets above.

G.     Debtor wishes to sell to Simpson the Included Assets at the price and on the other terms and conditions specified in detail below and Simpson wishes to so purchase and acquire the Included Assets.

H.     Following execution of this Agreement, Debtor will file a motion with the Bankruptcy Court to obtain Bankruptcy Court Approval of the sale described herein (as defined in §4.1 below). The sale will be subject to overbid, and the sale will close promptly to the highest and best bidder following such Bankruptcy Court Approval.

# AGREEMENT

In consideration of the foregoing Recitals and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration as set forth herein, the Parties agree as follows:

1.0     Transfer of Included Assets.

1.1     Purchase and Sale of Included Assets.  On the Closing Date, as hereinafter defined, in consideration of the covenants, representations and obligations of Simpson hereunder, and subject to the conditions hereinafter set forth, Debtor shall sell, assign, transfer, convey and deliver to Simpson, and Simpson shall purchase all of Debtor's right, title and interest as of the Closing Date in and to the Included Assets, consisting of all of Debtor's right title and interest in and to those assets listed in the attached Exhibits "A" through "H", inclusive, pursuant to 11 U.S.C. §363, free and clear of all liens, claims and encumbrances, as provided by Bankruptcy Court order.

1.2     Instruments of Transfer. The sale, assignment, transfer, conveyance and delivery of the Included Assets to Simpson shall be made by bill of sale and assignment duly executed buy Debtor, and such other instruments as may reasonably be requested by Simpson.

1.3     No Assumed Liabilities. Simpson is not assuming any liability of Debtor or agreeing to assume and perform any contractual obligation of Debtor, and Simpson shall not be liable for any other liabilities or obligations of Debtor by virtue of this transaction, except for liabilities for payments due after the Closing Date on subleases that are entered into between Simpson and the Debtor as specifically identified in Exhibit "I" hereto.

2.0     Consideration.

2.1     Purchase Price.  The consideration to be paid by Simpson to Debtor for the Included Assets is One Million Four Hundred Fifty Four Thousand Dollars ($1,454,000.00) (the "Purchase Price"), made up of the following components:

2.2     Cash. One Million Dollars in cash to be paid as follows: Five Hundred Thousand Dollars ($500,000.00) (the "Deposit") as described in §2.2 hereof; and Five Hundred Thousand Dollars ($500,000.00) (the "Completion Payment") payable at the Closing Date as defined and described in §3.2 hereof;

2.3     Waiver of Claims. Simpson will waive and release any and all post-petition claims, including a certain claim delineated in the sum of $74,000.00, against Debtor, as set forth in Exhibit L hereto.

2.4     Retention of Customer Deposits.  The Debtor will retain $380,000.00 of customer deposits, which represents approximately 30% of all open customer orders. The open customer orders pertaining to such deposits, however, are part of the Included Assets being transferred to Simpson as part of the sale and therefore the deposits represent an asset of the Debtor's estate.

2.5     Deposit.   Concurrently with the mutual execution and delivery of this Agreement, Simpson will deposit with the Trust Account of Debtor's Chapter 11 counsel the sum of Five Hundred Thousand Dollars ($500,000.00) in Good Funds (the "Deposit"). For purposes of this Agreement, "Good Funds" shall mean immediately available funds delivered via wire transfer or cashier's check drawn on a California bank. Debtor's Chapter 11 main counsel shall return to Simpson the Deposit only as provided in §4.6 hereof.

2.6     Equipment Condition: Simpson conducted a final documented inspection of all purchased equipment on March 3, 2018.  Simpson agrees to a $50,000.00 cap on any purchase price reduction for equipment damaged, lost or stolen after the original inspection.  Debtor agrees to assign to Simpson, and to the extent possible, all insurance rights and coverage over the owned equipment that Simpson has agreed to purchase.

3.0   Closing Transaction.

3.1     Closing.  The Closing of the transactions provided for herein (the "Closing") shall take place on the Closing Date at the offices of Sullivan Hill Lewin Rez & Engel, 550 West C Street, Suite 1500, San Diego, CA 92101 or other such place as mutually agreed upon by Debtor and Simpson.

3.2     Closing Date.  Following execution of this Agreement, Debtor will file a motion with the Bankruptcy Court to obtain Bankruptcy Court Approval and the sale will close within three (3) business days following the entry of an order of the Bankruptcy Court authorizing such sale, as provided in §4.1 hereof, so long as the effectiveness of such order has not been stayed by a court of competent jurisdiction ("Closing Date").    Alternatively, the parties may mutually agree to an extended Closing Date. Until this Agreement is either terminated or the parties have agreed upon an extended Closing Date, the parties shall diligently continue to work to satisfy all conditions to Closing.

3.3     Debtor 's Deliveries to Simpson at Closing.  At the Closing, Debtor shall cause to be delivered to Simpson the following:

(a)     An Assignment and Bill of Sale in the form attached hereto as Exhibit "J" hereto, duly executed by Debtor, pursuant to which Debtor sells and assigns the Included Assets to Simpson (the "Assignment"); and

(b)     Such other instruments of transfer, including without limitation such assignments and consents to assignments as are reasonably requested by Simpson and necessary to transfer to Simpson good, marketable and legal title to all of the Included Assets, all in forms which are consistent with the terms of this Agreement and are usual and customary for transferring the type of assets involved under the laws of the jurisdictions applicable to such transfers.

3.4     Simpson's Deliveries to Debtor at Closing.  At the Closing, Simpson shall cause to be delivered to Debtor the Completion Payment.  The Completion Payment shall be paid at the Closing by cash, certified check or wire transfer.

3.5     Allocation.  The Parties have agreed to the allocation of the consideration

referred to in § ____ hereof among the Included Assets, as set forth in Exhibit "K" hereto. The allocation set forth in Exhibit K shall be conclusive and binding upon the Parties for all purposes, and no Party (or any affiliate of) shall file any tax return or other document with, or make any statement or declaration to, any taxing agency that is inconsistent with such allocation.

3.6    Sales, Use and Other Taxes.    Debtor shall bear and pay any sales or use taxes imposed by the State of California on the sale of the Included Assets based upon and to the extent of the consideration allocated to the property as set forth in Exhibit "K" hereto.

4.0    Conditions Precedent to Closing.

4.1    Bankruptcy Court Approval; Hearing; Overbid Procedure.    Debtor's obligation to sell and Simpson's right to buy are each conditioned on (collectively "Bankruptcy Court Approval"):

(a)    Entry of an Order of the Bankruptcy Court approving the bid and related procedures for the sale as described in the "Sale Procedures Memorandum" approved by Simpson on February 22, 2018 except as to such revisions thereto that are specifically agreed to by Simpson and Debtor in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court;

(b)    The subsequent conduct of the in-court auction sale described therein in conformance with such procedures, except as to variances and changes to such procedures that are specifically agreed to by Simpson and Debtor in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court; and

(c)    Entry of an Order of the Bankruptcy Court authorizing the sale to Simpson on the terms described herein, except as to such revisions thereto that are specifically agreed to by Simpson and Debtor in writing or on the record in open court, and are thereafter approved by the Bankruptcy Court.

4.2    Conditions to Debtor's Obligations.    Debtor's obligation to make the deliveries required of Debtor at the Closing Date shall be subject to the satisfaction or waiver by Debtor of each of the following conditions:

(a)    Debtor shall enter into a sublease with respect to that certain parcel of land further described in Exhibit "I" (the "Leased Property") subject the following terms: Debtor shall remain the lessor on the month to month lease of the Leased Property currently in place and Simpson will be sublessor. The Debtor and Simpson will cohabitate on the Leased Property, each party paying 50% of the monthly rent obligations. If either party decides to leave the Leased Property, it will provide the other party 15 days notice of such departure. The $30,000 security deposit being held by the Landlord is and will remain property of the Debtor.

(b)    Debtor has received the Deposit;

(c)     All of the representations and warranties of Simpson contained herein shall continue to be true and correct at the Closing in all material respects.

(d)     Simpson shall have executed and delivered to Debtor all of those documents, instruments and agreements required to be executed by Simpson to Debtor under §3.4 hereof.

(e)     No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

(f)     Debtor shall have obtained Bankruptcy Court Approval, as provided in §4.1 hereof above.

4.3     Conditions to Simpson's Obligations. Simpson's obligation to make the deliveries required of Simpson at the Closing shall be subject to the satisfaction or waiver by Simpson of each of the following conditions:

(a)     All representations and warranties of Debtor contained herein shall continue to be true and correct at the Closing in all material respects.

(b)     Debtor shall have executed and delivered to Simpson all of those documents, instruments and agreements required to be executed by Debtor to Simpson under §3.3 hereof.

(c)     Debtor shall have obtained Bankruptcy Court Approval, as provided in §4.1 hereof above.

5.0     Notice. Notice of Debtor's motion for approval of the sale of the Included Assets shall be given by Debtor to all creditors of Debtor listed on the master mailing matrix maintained by the Bankruptcy Court as updated through the date such notice is served.

6.0     Termination. This Agreement shall be terminated only as provided below:

(a)     By written mutual consent of Debtor and Simpson executed at any time prior to the Closing;

(b)     Upon the closing of a transaction with a third-party overbidder, as provided in §4.1(b) hereof above; or

(c)     Pursuant to order of the Bankruptcy Court obtained upon notice to Debtor and Simpson.

6.1.    Consequences of Termination

(a)     In the event this Agreement is terminated pursuant to §4.5(a) hereof,

all rights and obligations of the Parties hereunder shall terminate, and Debtor shall immediately deliver the Deposit to Simpson to the extent that Debtor and Simpson agree.

(b)    In the event this Agreement is terminated pursuant to §4.5(b) hereof, all rights and obligations of the Parties hereunder shall terminate, Debtor shall immediately deliver the Deposit to Simpson, and Debtor shall immediately pay Simpson a break-up fee of Eighty Thousand Dollars ($80,000.00) in addition thereto (if such break-up fee has been approved by the Bankruptcy Court as part of the approval of sale procedures described in §4.1(a) hereof).

(c)    In the event this Agreement is terminated pursuant to §4.5(c) hereof, all rights and obligations of the Parties hereunder shall terminate, and the Bankruptcy Court shall determine whether the break-up fee described in §4.6(b) above or the liquidated damages described in §4.7 below are payable.

7.0    Liquidated Damages. **SIMPSON AND DEBTOR ACKNOWLEDGE THE IMPRACTICALITY AND EXTREME DIFFICULTY OF FIXING THE ACTUAL DAMAGES DEBTOR WOULD SUSTAIN AS A RESULT OF THE BREACH OF SIMPSON'S OBLIGATION TO COMPLETE THE PURCHASE OF THE INCLUDED ASSETS FOLLOWING OBTAINING BANKRUPTCY COURT APPROVAL, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR HEREIN REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES THAT DEBTOR WILL INCUR AS A RESULT OF SIMPSON'S FAILURE TO COMPLETE THE PURCHASE. IF SIMPSON BREACHES THE OBLIGATION TO COMPLETE THE PURCHASE OF ASSETS, THEN DEBTOR, BY NOTICE TO SIMPSON, MAY TERMINATE SIMPSON'S RIGHTS TO PURCHASE THE ASSETS AND, AS DEBTOR'S SOLE REMEDY FOR THE DEFAULT BY SIMPSON, DEBTOR SHALL RECEIVE AND RETAIN ONE HUNDRED THOUSAND DOLLARS ($100,000.00) OF THE DEPOSIT UNDER THIS AGREEMENT AS LIQUIDATED AND AGREED UPON DAMAGES.    BY INITIALING THE SPACES WHICH FOLLOW, SIMPSON AND DEBTOR SPECIFICALLY AND EXPRESSLY AGREE TO ABIDE BY THE TERMS AND PROVISIONS OF THIS PARAGRAPH CONCERNING LIQUIDATED DAMAGES.**

_____          _____D C_____
CORE's INITIALS                          SIMPSON's INITIALS

8.0    Debtor's Representations and Warranties. Debtor hereby makes the following representations and warranties to Simpson:

8.1    Validity of Agreement. Upon obtaining Bankruptcy Court approval, this Agreement shall constitute the valid and binding obligation of Debtor, enforceable in accordance with its terms.

8.2    Title. At the Closing, Simpson will acquire all of Debtor's right, title and interest in and to all the Included Assets, free and clear of any liens, claims or encumbrances, as provided in the Bankruptcy Court Order approving the sale.

8.3    Insurance. Debtor will take all reasonable steps to designate Simpson as a beneficiary or additional insured on all insurance of Debtor that is presently in force, including without limitation insurance against defalcation or other improper acts by directors, officers, or employees of Debtor.

8.4    Equipment in Good Working Order. All of the Owned Equipment will be maintained by Debtor in substantially the same condition as it was when Simpson inspected the Equipment, pending the Closing. In the event that any item of Owned Equipment is damaged, destroyed, breaks, wears out, or is lost or stolen, after the execution of this Agreement and prior to the Closing, and Debtor is aware of such fact, Debtor shall notify Simpson immediately upon learning such fact, and Simpson may reduce the Purchase Price by an amount reasonably equivalent to the lesser of the value of the equipment or the cost to repair such equipment.

8.5    Equipment Condition: Simpson conducted a final documented inspection of all purchased equipment on March 3, 2018. Simpson agrees to a $50,000 cap on any purchase price reduction for equipment damaged, lost, or stolen after the final inspection. Core agrees to assign to Simpson, to the extent possible, all insurance rights and coverage over the owned equipment Simpson has agreed to purchase.

9.0    Simpson's Representations and Warranties. Simpson hereby makes the following representations and warranties to Debtor:

9.1    Validity of Agreement. This Agreement, when executed and delivered by Simpson, shall constitute the valid and binding obligation of Simpson enforceable in accordance with its terms.

9.2    No Conflicts or Violations. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Simpson do not and will not: (i) conflict with or result in a breach of the articles of organization of Simpson; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Simpson is a party or by which Simpson or its assets or properties may be bound.

9.3    "AS IS" Transaction. Debtor specifically disclaims (and Simpson expressly agrees that Debtor is not making or giving) any covenant, undertaking, representation or warranty, express or implied, in connection with the nature, quantity, quality and description of the Included Assets, or the condition, quality, suitability, value, or merchantability of Debtor's interest in or rights to the Included Assets, except as specifically provided in §5 hereof. SIMPSON ACKNOWLEDGES AND AGREES THAT EXCEPT AS SPECIFICALLY PROVIDED IN §5 HEREOF: (A) THE SALE OF THE INCLUDED ASSETS TO SIMPSON IS: ON AN "AS IS, WHERE IS" BASIS; WITHOUT ANY REPRESENTATION OR WARRANTY AS TO THE NATURE, QUANTITY, QUALITY OR DESCRIPTION OF THE INCLUDED ASSETS; (B) DEBTOR MAKES

NO REPRESENTATIONS AS TO THE VALUE OF THE INCLUDED ASSETS; (C) THE SOLE REPRESENTATIONS AND WARRANTIES OF DEBTOR REGARDING THE INCLUDED ASSETS ARE THOSE SPECIFICALLY PROVIDED IN WRITING IN THIS AGREEMENT AND NO OTHER REPRESENTATIONS OR WARRANTIES ARE TO BE IMPLIED OR INFERRED. SIMPSON FURTHER ACKNOWLEDGES THAT PRIOR TO THE CLOSING DATE, SIMPSON HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF ALL RELEVANT MATTERS RELATING TO OR AFFECTING THE INCLUDED ASSETS AS SIMPSON DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE INCLUDED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN §5 HEREOF, SIMPSON IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INVESTIGATIONS.

_____        _____
CORE's Initials          SIMPSON's Initials

10.0    Post-Closing Covenants.

10.1    Post-Closing Maintenance of and Access to Information. The Parties acknowledge that after closing, Debtor or its successors will need access to Debtor's information technology system and all information residing thereon (including installed software and data in memory) for the purposes of preparing or filing tax returns, responding to audits, prosecuting or defending third party claims, completing the administration of the bankruptcy case, satisfying other legal requirements, and otherwise fulfilling its duties as a debtor under the Bankruptcy Code. Accordingly,

(a)    Immediately upon closing, the Parties will instruct a third party vendor to be agreed upon to prepare a separate identical duplicate copy of Debtor's information technology system and all information residing thereon (including installed software and data in memory), so that each Party will have its own copy (with different usernames and passwords for each to use in accessing the system), with the Parties to split the costs charged by such vendor, to a maximum of $15,000.00 per Party, based on the actual needs of each Party. Until such time as the duplicate copy is complete, Debtor shall maintain custody of the information technology system and all information residing thereon, and shall allow Simpson access to such information technology system as reasonably necessary to fulfill the purposes and intents of this Agreement.

(b)    Immediately upon closing, the Parties will instruct a third party vendor to be agreed upon to prepare a separate identical duplicate copy of Debtor's non-electronic books and records (including into OCR Debtor searchable PDF files, at Debtor's discretion), so that each Party will have its own copy, with the Parties to split the costs charged by such vendor to a maximum of $2,500.00 per Party. Until such time as the duplicate copy is complete, Debtor shall maintain custody of the non-electronic books and records, and shall allow Simpson access to such records as reasonably necessary to fulfill the purposes and intents of this Agreement.

(c)    Simpson agrees to use the information described in this Section 7

in compliance with all laws and regulations applicable thereto.

(d)     Debtor agrees to use the information described in this section 7 solely for the purpose described in this Section 7, and not to operate a business or otherwise compete with Simpson. Debtor's right to access the system shall terminate upon the closing of Debtor's bankruptcy case.

11.0     Indemnification.  Simpson agrees to defend at its own cost and to indemnify and hold harmless Debtor, and its employees, affiliates and agents, from and against any and all loss, costs, expenses (including attorney fees), damages, and liabilities, however caused, resulting directly or indirectly from or pertaining to the ownership or operation of the Included Assets after Closing.

12.0     Broker's Commission.  Simpson and Debtor each represent to the other that it knows of no claim for broker's or finder's fees or other commissions in connection with this transaction other than as provided herein.

13.0     Miscellaneous.

13.1     Attorneys' Fees.  In the event that either Party brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

13.2     Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either Party to the other ("Notice") shall be in writing and shall be deemed given:  (1) when personally delivered, or (2) upon receipt or refused delivery if deposited in the United States mail, certified or registered mail, postage prepaid, return receipt required, or (3) the next business day after being deposited with a recognized overnight mail or courier delivery service, or (4) the next business day after being transmitted by email or facsimile, with receipt acknowledgment upon transmission, and with a copy sent on the same day by one of the other permitted methods of delivery addressed as follows:

To (Debtor) Core:     Core Supplement Technology, Inc.
                      Attn:  Richard Feferman, CRO
                      3830 Valley Centre Drive; Suite 705-152
                      San Diego, CA 92130
                      Fax: (858) 430-2454
                      E-Mail: richard@crarecovery.com

With a copy to:       Core Supplement Technology, Inc.
                      Attn: Joseph O'Dea, President
                      4645 North Avenue
                      Oceanside, California 92056
                      Fax:  760-639-6041

Page **10** of **40**

Email: joe@coresupplementtech.com

| With a copy to: | Stephen C. Hinze, Attorney at Law<br>217 Civic Center Drive, Suite 10<br>Vista, California 92084<br>Fax: (760) 454-2427<br>Email: sch@schinzelaw.com |
|---|---|
| With a copy to: | Mette H. Kurth, Attorney at Law<br>Meg Manning, Attorney at Law<br>919 N. Market Street<br>Suite 300<br>Wilmington, DE 19801<br>Fax: (302) 656-8920<br>Email: mkurth@foxrothschild.com<br>          mmanning@foxrothschild.com |
| With a copy to: | Sullivan Hill Lewin Rez & Engel<br>550 West C Street, 15th Floor<br>San Diego, California 92101<br>Attn: Christopher V. Hawkins<br>Fax: (619) 231-4372<br>Email: hawkins@sullivanhill.com |
| To Simpson: | Simpson Labs LLC<br>27540 Avenue Mentry<br>Valencia, California 913554<br>Attn: Donald Grace<br>Fax: (661) 347-4331<br>Email: dgrace@simpsonlabs.net |
| With a copy to: | Donahoe & Young LLP<br>25152 Springfield Court, Suite 345<br>Valencia, California 91355<br>Attn: Mark T. Young<br>Fax: (661) 554-7088<br>Email: myoung@donahoeyoung.com |

13.3    Entire Agreement.    This instrument and the documents to be executed pursuant hereto contain the entire agreement between the parties relating to the sale of the Included Assets. Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

13.4    Modification.    This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all Parties.

13.5    Closing Date.    All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously at 12:01 AM on the Closing

Date, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

13.6    Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

13.7    Captions. All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

13.8    Further Assurances. Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto.

13.9    Waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

13.10    Payment of Fees and Expenses. Each Party shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

13.11    Survival. Except for the covenants and agreements to be performed after the Closing Date, none of the   respective representations, warranties, covenants and agreements of Core and Simpson herein, or in any certificates or other documents delivered prior to or at the Closing, shall survive the Closing.

13.12    Assignments. Except as specifically provided otherwise in this Agreement, neither this Agreement nor any interest herein shall be assignable (voluntarily, involuntarily, by judicial process, operation of law or otherwise), in whole or in part, by Simpson without first obtaining the prior written consent of Core. Any attempt at such an assignment without such consent shall be void and, at the option of Core, shall be an incurable breach of this Agreement resulting in the termination of this Agreement.

13.13    Binding Effect. This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties.

13.14    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, the United States Bankruptcy Code, the Federal Bankruptcy Rules and the Federal Rules of Evidence.

13.15    Good Faith. The Parties agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to

the terms and conditions contained herein before and after Closing.

13.16   Construction.  In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party.

13.17   Counterparts.  This Agreement may be signed in counterparts, and may be executed by the exchange of facsimile signature pages.

13.18   Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

13.19   Tax Effect.  None of the Parties (nor such Parties' counsel or accountants) has made or is making in this Agreement any representation to any other Party (or such Party's counsel or accountants) concerning any of the tax effects or consequences on the other Party of the transactions provided for in this Agreement.  Each Party represents that it has obtained, or may obtain, independent tax advice with respect thereto and upon which it, if so obtained, has solely relied.

14.0 <u>Bankruptcy Court Jurisdiction</u>. **THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (I) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (II) THE INCLUDED ASSETS. THE PARTIES EXPRESSLY CONSENT TO AND AGREE NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.**

IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the day and year first above written.

**SIMPSON:**
SIMPSON LABS LLC
a California limited liability company,
as Buyer

By:

Donald Grace, its Executive Vice
President

**CORE:**
CORE SUPPLEMENT TECHNOLOGY INC.
a California corporation,
as Seller

By: _____

Joseph O'Dea, its General Manager

and

By: _____

Richard Feferman, Chief Restructuring
Officer

## EXHIBIT "A"

## OWNED EQUIPMENT

Group 1 (Bank of America security interest):
1. 165 cu. ft. Paul Abbe Double Cone Blender  304/S/S 48460
2. NRS51-HES Chuck Capper Machine w/3 sets of tooling NRS51-HES
3. Cremer Counter Tablet Press Machine 1308
4. AF3 screw Conveyor & In-feed Turn table (39" diameter)

Group 2 (Bank of America security interest):
5. Bosch Capsylon 705 complete with all standard, parts, attachments and accessories 8-111-999-201
6. GRFLOWRATEX: Flodex
7. 2008 Hyster E50Z - 5,000 LB, Electric Forklift, complete with all standard parts, attachments and accessories. G108N09950
8. 2009 Skyjack Scissorlift SJIII 3219, complete with all standard parts, attachments and accessories 22019403
9. 2003 Yale Reach Truck, NR035AENM24TE095/EASIR40TT, complete with all standard parts, attachments and accessories. C815N03043A/DZ-A-98-11405
10. Global Auto Floor Scrubber 20", complete with all standard parts, attachments and accessories. 261165GN

Group 3 (Core List 8/9/17):

Portable AC unit - 10000 BTU
Dehumidifier IDEAL Air CG2
16 Station Tablet Press & set of
Acer G236HL Bbd 23 In LED
48" ROTARY TABLE STAINLESS STEEL
A/C Unit 1400 Portable 14000BTU
A/C Unit 1400 Portable 14000BTU
AC DAIKIN 5 TON 3 PHASE 208/230
Air Conditioning for MFG
AC Unit Diakin 5 ton Heat Pump
AFS SCREW CONVEYOR/W
150 PSI Oilless Air Compressor 8
Air Dryer – Refrigerated
Euro-Dry Energy DE106 Air Chille
AAV-90D DESICCANT AIR DRYER
AIR IMPACT WRENCH
All Fill Autp Powder Filler
Fiber Optic Amp for Feeder
Sartorius LE225D Analytical Bala

Auto Auger Series Filler
Auger BSL-S3 130001
A&D FX-700CT Balance
Sartorius ENTRIS64-1S Analytical
Precision Balance
ENTRIS323-1S
Marburg Delibander Model 1250
Battery Reconditioned Deka 18-12
Bi directional label process 18-
Bin Blender Motor  5HP 1725 6 0H
Blender 10 Cu. Ft.
Bin Blender
Bin Blender
Big Blender
480 Volt 60 Amp Breaker Steam Cl
Fiberoptic BRKT Guide
2 Door Flammable Cabinet
Cabinet Stainless Steel on Wheel
Black Metal Storage Cabinets
Cabinets in WH
King  Capsule Counter
ZANASI 40F
Capsule Filler Semi-Automatic
Spring torque tester - 0-100in.L
Spring torque tester - 0-100in.L
Cremer CF1230 Channel Counter
Sure Kap (Capper Machine)
CAP SHOE
Bosch 705 Encapsulation Machine
Carts Stainless Steel
Carts
Carts and Tools
3M T&B Model 200A SN 15054
Casters for Bin Blender
Desk Chairs
Mid-Back Swivel Chair
Hercules Swivel Task chair with
5 Tier Chrome Wire Shelving
Small Clean Room
Cleanroom
Clean Room Strip Doors
6 2 x4 Logi-Clean Room Light
Front Lobby Clock
Compressor
Computers

Computer
Computer Dell 745 Optiplex
Computer Sales (label printer ro
Windows 7 Dell 745 Desktop, Ramo
HP Compaq 8200 Elite Win 7 DVD
HP Compaq 8200 Elite Win 7 DVD
HP Compaq 8200 Elite Win 7 DVD
Computer Dell 745 Optiplex B. As
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC – Intte
Dell Computer 840 EVO MZ-7TE250B
HP Elite 8300 Desktop PC
Dell Optiplex 745 3.4GHZ 8GB
Lenovo Think Centre M71e SFF Des
Hp Elite 8300 Desktop PC
Dell 745 Optiplex Desktop Comput
Dell Optiplex 780 SFF E800 Dual
CONTROL PANEL FOR SCREW CONVEYOR
Conveyor Belt
Conveyor SS 6x4
12.5 FT. CONVEYOR 304 SS SHELLS
GlobalTek 6' X 4" SS Conveyor W/
Conveyor Bottomless
Conveyor Table Top 8x4.5
Conveyor Label Aire 6x3.5
Conveyor 6" Wide
Conveyor 4.5"
Bottomless Conveyor
CONVEYOR 59" LENGTH
8' Stainless Steel Conveyor
Globaltek 10' X 4" SS Conveyor
CONVEYOR 12' x 4" SS W/ SPEED CO
10ft Conveyor (7.5"W) W/Indexing
Transfer Conveyor 60 in x 30 in
Bottomless Conveyor G100TR
Cottner (Lasko)
Clean Room Soft Walls
Cubical with desk and drawers
Cubical with desk and drawers
Cubical with desk and drawers
Double Cone Blender
15.6 E6520 laptop PC - Intel cor
Dell Optiplex 790 SFF Desktop In
Dell Latitude E5520 15" Notebook
Dell Optiplex 780 SFF E8400 3ghz

Page **18** of **40**

Desk - Extra in AK Office
Double Pedestal Desk Maple
Desk L. Rocha Mfg
Desk for R. Arreola
5'6"x6'6" Right Return Desk
24"x 48" Mahogany Single pedesta
C/M Amber 30X60 single pedestal
Desk L Shape Right Return Mahoga
DESK L SHAPED 6' X 6' CHERRY
6'x6' L SHAPE DESK W/LEFT RETURN
dosing discs for Capsylon Encaps
57850-1/16-1/2 X Chicago-Latrobe
Dust Collection
Data View Temperature Data Logge
Nissan CUM01L15S 36V Electric Fo
Electric Sub Panel
Lakso 73 Electric Lift
Encapsulating Digital Balance
Encapsulation Machine
Encapsulator Orientator 70F
F40 Encapsulator Tooling
Vibrator for Encapsulation Machi
Encapsulation Room Electricity
Beach Pebble Front Entry
INDUCTION SEALER
24' FG Extension Ladder
Patterson Fan 2052533
4 Hands Free Faucets
File Cabinet 4 Drawer Vertical
4 Drawer Vertical File w/Lock
4 Drawer Vertical File w/Lock
4 Drawer Vertical File w/lock Le
1 4 drawer 1 2 drawer Black w/lo
Lateral File Cabinets
Fork Lift Aerial Platfor, 48x40
FLOWABILITY INDEX MEASUREMENT
Weigh Tronix DWS3030-01 Floor Sc
Weigh Tronix DWS3030-01 Floor Sc
Tennant Floor Scrubber
Global Auto Floor Scrubber 20"
Floor Scrubber for W/H
Flooring Temple Heights
CHARGER 24VDC 11 A 50/60HZ
Blender
food scale 6 X0.001 lbs NTEP

Fork Lift
Fork Lift CAT Reach lb
Freight Forklift
Freight Euro Dry Air chiller
Freight for Conveyor
Freight Encapsulator
Freight Flowability Tester
Freight for heritage global purc
FRT Pallet Rack
freight for ss conveyor for feed
Freight Turn Tables, SS tables
ATR STD SET Polystyrene ATR Stan
2007 GMC TRUCK MODEL C7500
Hand Capsule Counter
Wireless Headset W/handset lifte
Heat Guns
Heat Lamps
Heat Tunnel
Heat Tunnel - Oven-3Levell/6" Tal
Digimatic Height Gage w/ switcha
Bulk Hopper/Elevator Assembly
Hot Stamp Coder for Labeler
HP ELITE 8300 DESKTOP PC
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC
HP Elite 8300 Desktop PC
Humidity Data Loggers with displ
hydraulic driver for stud driven
Electric 3 stage side shift 2008
Sotax FT-300 Flowability Testerm
Nilfisk CFM - 3151 Industrial Va
PN# STC05-57 / 5" dia x 7.5 Inde
Induction Sealer
Inductiion Tunnel Pkg Line
Lepel CSplus200 Induction Sealer
MARKEM-IMAJE SERIAL#FR16210026
Markem - imaje serial number FR1
Inspection Table Kangola Machine
server, monitor wiring whs 3 for
Cisco 7940 G IP Phones
IT Equipment
IT Equipment
Kirby Lester TT Count Verificati
Lab/QC Equipment
Easy Labeler Label Machine

Label Machine
Zebra Label Machine
Label Printer
Zebra ZM400 Thermal Label Printe
Zebra ZT410 Direct Thermal Trans
Label Sensor Model #1120
Labelette Labeler
ST1100 Wrap around Labeler 8'X10
Label Machine with Encoder
CLEAR LABEL SENSOR
High Shelf Ladders
Low Step Ladder
Dell Latitude E6510 15.6 in Lt C
Laser Jet Printer  Pro 400
Laser Printer AK
LASER SENSOR 1 250 MM RANGE 4 PI
Lateral File Cabinet
4 DR LATERAL FILE GREY
Lot of locks and tags
LOCKOUT TAGS
Sink and Faucet for Lunch Room
Ungesa Clean-Trace NG Luminomete
MAGNET 4N-201505301 GR1
MAKITA XT218 18V LXT LITHIUM-ION
Manual for Auto Label Appicator
Material Guide 66MM (butterfly)
Material Guide 77MM (Butterfly)
Material Guide 90 MM (butterfly)
80 pc pan set
Loma Auto Metal Detector for Bot
TOUCH SCREEN  & 60" CONVEYOR/PLO
Mezzanine for Big Blender
Mezzanine for Big Blender
Mezzanine
Extension of Manufacturing Rooms
Extension of Manufacturing Rooms
Milling Machine
Mobile Box/File Pedestal Black
Moisture Analysis pans & Glass f
Arizona Instruments Moisture Ana
Ohaus MB200 Moisture Analyzers
Moisture Meter HE53/03
Monitor 21.5"
Acer G236HL Bbd 23 inch LED Moni
Acer G236HL Bbd 23 inch LED Moni

Monitor LED 23" A. Kumjian
Monitor ASUS VH238H 23 " B. Asli
Monitor R. Arreola
Monitor LED 24 inch, R. Rocha
Acer 23" Monitor for Sales
VA2446M-LED 24" N. McEvers
Acer G236HL Bbd 23 Inch Led-lit
ACER G236HL BbD 23-INCH MONITOR
Monitor ACER 23"
Monitor C. Robison Sales
ViewSonic VA2446M-LED 24 inch LE
Monitor Joe  VA2246M 22 inch led
Viewsonic 27 inch lit lcd 1080
ViewSonic VA2446M-LED 24 inch LE
24in LCD Monitor
Acer G236HL 23 inch
ViewSonic VA2446M-LED 24 inch LE
Acer G237HK bi 23 inch LED Back
MONITOR ASUS VS207T-P 20 IN
Acer G246HL 24 inch  LED Monitor
Toledo ID 1 Multirange Scale
Neck Bander for Packaging
NECK BANDER
HP Probook 6560B Notebook PC
Office Equipment
Office Furniture/Fixture
Office Furniture/Fixture
Office Furniture/Fixture
Office Furniture
Mounting Brackets qty 2
Skidding
Pallet Jack
Pallet Jack
Mitsu Pallet Jack
2.5 Ton Pallet Jack
2.5 Ton Pallet Jack
2.5 Ton Pallet Jack
Heavy Duty Pallet Rack
Heavy Dute Pallet Rack
Heavy Duty Pallet Rack
Pallet Racks in W/H
Pallet Racking for Warehouse
TEAR DROP STYLE PALLET RACKS
Heavy Duty Pallet Racks
Heavy Duty Pallet Racks

Packaging Pallet Wrapper
Panic Bar for Door
Picnic table and banches 6 ft
Picnic Table Round 44" Top Almon
Picnic Tables
Packaging Line
Packaging Line
Packaging Line
Packaging Line
Lab Work Station Portable 2 Shel
PDC Shrink Heat Tunnel
Sartorius Digital Balance Scale
Ishida Check Weigher Model:RE-W-
LD19SB Custom 1-6 HR 1 Phase 60h
Ramsond CUT 50DY
Ohaus EP 12001 Explorer Pro Plat
LITTLE GIANT NCB-2448-8PYBK
Polishing Macine CVC
Capsule Polisher
Logistical S-7 Weigh & Fill 1503
Power Washer
Precision Balance Sartorius
Mi-T-M JP-1502-3ME1 - 1500 PSI
Print Plates for Labeling
Brother DCPL2540DW WCL Printer
Office Jet Printer All in one
Brother HL-L2340DW Compact
Brother all in one CL  MFCL2700D
Brother Wireless Compact Laser P
Brother DCPL2540DW Wireless CL p
Monochrome Desktop Thermal Trans
InFocus IN116A DLP Projector
LEYBOLD SV-100 PUMP
BUSCH RC-0100 PUMP
PUNCH AND DIE SET FOR STAINLESS
QC Luminameter
Racks
Storage Racks
Yale Reach Truck
High Back Exec Chair Black
U-Shape, Left return 6'X8'6" Esp
Hot Point Refrigerator/Freezer
Full Face Respirator
Roller for PKG Labeler
12 step rolling ladder

SS ROTARY TABLE W/ SPEED CONTROL
48" Global Tech Rotary Table W/S
Rotary Table 58 in. Stainless St
Rotary Table 48" SS-48
Rotary Table 48"
Sanitation Equipment
SCALE WEIGHING EJ6100 COMPACT
SCALE – PRODUCTION
Scales
Scales
Scale
Sartorius ENTRIS323-1S Milligram
Digital Scale Ohaus Model Valor
Scale Platform FG-30KAM
Scale Sartorius AY-5101 Small
SARTORIUS SCALE
Screening Machine Model #MTS 600
AF3 Screw Conveyor
INDUCTION FOIL SEALER
SECURITY CAMERA WHS 3
Security System
Security Equipment
Security Equipment
Security Camera System TH
8 ch DVr w/4 IR Camera Kit, IR c
Sensor kit, Triton, Gen IR Detec
Sensor kit, Triton, Gen IR Detec
Server Net Gear
Shipping for Equipment from SJ A
Shrink Tunnel
Document Shredder
Stainless Steal Sink
SKIDDING FOR ASSET SHIPMENT
Scissorlift 19 ft platform 25 ft
SS Slot Sampler (4) Slots 1000 m
SLOT SAMPLER STAINLESS STEEL
Custom cleanroom soft walls
Software
Spindle Capper w/ 6 spindles
SS Shelves Wall Mt 2 12 x 48, 1
Toledo SS table w/casters
SS Tables w/casters
SS WORK TABLE 30 X 24 X 33
Stack Pack Machine Former 80MM
40KW X Treme Steam Generator 480

Former 65 mm Cooling Part for St
Steel Wheel Risers
Metal Storage Cabinet
Strip Doors Clean Room
STRIP DOORS FOR CLEAN ROOMS
STRIP DOORS CLEAN ROOMS
Strip Doors 4
Custom Clean room Strip Doors
Table for Filler
Bi Directional Accumultion Table
SS Table 24" X 24"
Rolling Stainless Steel Table 30
Stainless Steel Table w/Bcksplsh
Tap Density tester SERIAL # 504.
DUAL TABLET/CAPSULE COUNTER
Testing Equipment
Testing Equipment
Testing Equipment
Testing Equipment
Lenovo Thinkserver TS140
16' Isuzu Box Truck
Turntable 48"
Turntable
2854-3 CAPPLUS TWIN SHELL BLENDE
T&B T3 UNIV FER CRIMP TOOL
Alto Vacuum
Air Power Vibrator
VINYL WALL PANELS FOR ENCAPSULAT
Motorola Talkabout MD200, Ramon
Motorola Talkabout MD200, Alex.
Motorola Talkabout MD200, Luis.
Motorola Talkabout MD200, Beau
Motorola Talkabout MD200, Fabian
Motorola Talkabout MD200, Japhet
20 gallon/2000W  electric Water
Brother DCPL2540DW Wireless Comp
Ubiquiti UAP-LR-3 Unifi AP Enter
WIRE SHELVING WH
Stainless Steel Work Table
CVC 300C Wrap Labeler
CVC 310 WRAP LABELER

## EXHIBIT "B"

## SUPPLIES

**EXHIBIT "C"**

**INVENTORY**

**EXHIBIT "D"**

**VEHICLES**

2007 GMC C7500 Truck (24') Vin #1GDJ7C1357F900650

2007 Isuzu Box Truck (16') Vin #JALC4B16377001739

## EXHIBIT "E"

## SUBSIDIARY PROPERTY

**1. Rights to trade name and logo for "Strongman" products, including:**

| |
|---|
| Strongman Pre-Workout Airplane Punch Bulk Powder |
| Strongman Pre-Workout Lemonade Lift Bulk Powder |
| Strongman Pre-Workout Lift Juice Watermelon Bulk Powder |
| Strongman Pre-Workout Airplane Punch |
| Strongman Pre-Workout Lemonade Lift |
| Strongman Post-Workout Airplane Punch |
| Strongman Post-Workout Lemonade Lift |
| Strongman Pre-Workout Lift Juice Watermelon |
| Strongman Glutamine |
| Strongman Creatine |
| Strongman Whey Protein Isolate Chocolate 30 serving |
| Strongman Whey Protein Isolate Chocolate 15 serving |
| Strongman Pre-Workout Lift Juice Strawberry Lemonade |
| Strongman Whey Protein Isolate Chocolate 5 serving |

2. **All inventory of such products on hand;**
3. **All materials for manufacture of such products on hand; and**
4. **All receivables for products of Subsidiary.**

## EXHIBIT "F"

## INTELLECTUAL PROPERTY

**Website:**      **www.coresupplementtech.com**
**Tradename:**  **Core Supplement Technology**
**Formulas and Trade Secrets:**      **Not identified in a public document**
**Customer List:**      **Not identified in a public document**
**Supplier List:**      **Not identified in a public document**

**Core owned formulations**
**Master batching records**
**Blending procedures**
**Label proof approvals**
**Raw material specifications**
**FTIR and third party testing records**
**Customer list**

## IP Statement
## Core Supplement Technology IP

Core Supplement Technology, Inc. is the creator of its in house formulations and master batching records.  Core holds all rights and IP to these formulations.  Select customers have copies of formulations created in house per individual agreements.  These customers represent less than 5% of total sales.

# EXHIBIT "G"

## ORDERS (INCLUDING WIP)

## EXHIBIT "H"

## RECEIVABLES

## EXHIBIT "I"
## REAL PROPERTY LEASE

Building 1, 4645 North Ave, Oceanside, CA 92056, month to month tenancy. Landlord Wade W. Prescott, et al. Monthly rent $16,367 per month. Lease payments (and all other obligations of Core) are current through February 28, 2018.

EXHIBIT "J"

# ASSIGNMENT AND BILL OF SALE

This ASSIGNMENT AND BILL OF SALE is being delivered as of the date indicated below by CORE SUPPLEMENT TECHNOLOGY INC. ("Seller"), pursuant to the terms of that certain Asset Purchase Agreement dated March _____, 2018 (the "APA"), by and between Seller and SIMPSON LABS LLC ("Purchaser"). Capitalized terms used herein without definition shall have the same respective meanings as the capitalized terms that are defined in the APA.

1. **Transfer of Assets**: In consideration of payment of One Million Four Hundred Fifty Four Thousand Dollars ($1,454,000.00), the receipt of which is hereby acknowledged, Seller hereby sells, grants, assigns, transfers, conveys and delivers to Purchaser the Included Assets described in § E of the APA, including the specific assets listed in §§1.1 -1.9 below, and all right, title and interest therein and thereto (collectively the "Transferred Assets"): [LANGUAGE BELOW SHOULD TRACK REVISIONS TO RECITALS IN APA ABOVE]

1.1   All equipment, tools, machinery, and office furniture that is owned by Core, whether or not subject to a security interest (the "Owned Equipment"), including without limitation the specific items detailed in Exhibit "A" hereto;

1.2   All supplies and raw materials used in the formulation and manufacture of nutritional supplements (the "Supplies"), as detailed in Exhibit "B" hereto;

1.3   All finished goods (the "Inventory") as detailed in Exhibit "C" hereto;

1.4   Two (2) trucks and trailers (the "Vehicles"), as detailed in Exhibit "D" hereto;

1.5   One hundred percent (100%) of the membership interests in Life Brand, LLC, a California limited liability company (the "Subsidiary") that owns intellectual property including trade names, trademarks, and service marks related to the nutritional supplement business and other property (the "Subsidiary Property"), as detailed in Exhibit "E" hereto;

1.7   Core's tradename, website, domain names, formulas, trade secrets, customer and supplier lists, and goodwill (the "Intellectual Property"), as detailed in Exhibit "F" hereto;

1.8   Core's open customer orders, work-in-process ("WIP"), deposits by customers for such orders or WIP, and accounts receivable associated with such orders or WIP (the "Orders"), as detailed in Exhibit "G" hereto

1.9   All accounts receivable of Core (the "Receivables"), including without

limitation the accounts receivable detailed in Exhibit "H" hereto,

2.      **Further Acts and Documents:** Seller hereby covenants that it will, at any time and from time to time, upon the request of Purchaser, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further acts, deeds and documents as Purchaser may reasonably request in order to vest in Purchaser the Included Assets and all right, title and interest therein and thereto.

3.      **Subject to APA:** This Assignment and Bill of Sale is subject to all of the terms and conditions of the APA.

4.      **Binding Effect:** This Assignment and Bill of Sale shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns.

5.      **California Law Applies:** This Assignment and Bill of Sale shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of laws principles.

6.      **No Amendment Without Consent:** This Assignment and Bill of Sale may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of Seller and Purchaser.

IN WITNESS WHEREOF, Seller has caused this Assignment and Bill of Sale to be executed and delivered on the date stated below.

Dated: _____, 2018        CORE SUPPLEMENT TECHNOLGY INC.
                                        a California corporation, as Seller


                                        By: _____
                                            Joseph O'Dea, its General Manager

                        and
                                        By: _____
                                            Richard Feferman, Chief Restructuring
                                            Officer

# EXHIBIT "K"

## ALLOCATION

| | |
|---|---|
| **Owned Equipment:** | **$50,000.00** |
| **Premises Lease:** | **-0-** |
| **Supplies:** | **1,000.00** |
| **Inventory:** | **100,000.00** |
| **Vehicles:** | **10,000.00** |
| **Subsidiary/Subsidiary Property:** | **34,000.00** |
| **Intellectual Property (incl. goodwill):** | **454,000.00** |
| **Orders/WIP:** | **530,000.00** |
| **Receivables:** | **275,000.00** |
| **Total:** | **$1,454,000.00** |

**EXHIBIT L**

## SETTLEMENT AGREEMENT, WAIVER OF POST-PETITION CLAIMS, AND MUTUAL GENERAL RELEASE

1.    Post-Petition Core A/R:  Simpson owes Core $129,818.80 with respect to "commissions" owed to Core on account of outsourcing work sent to Simpson after the Petition Date.

2.    Post-Petition Simpson A/R:  Debtor owes Simpson $203,818.80 in post-petition accounts payable in connection with manufacturing orders placed by Core with Simpson after the Petition Date.

3.    Offset, Settlement and Release:  Effective as of the Closing Date and as part of the Purchase Price Consideration, subject to entry of a Court Order approving this settlement agreement pursuant to Bankruptcy Code Section 9019, Simpson and Core will offset the post-petition claims identified in Paragraph 1 and 2, above, and Simpson will waive and any and all claims against Debtor with respect to the $74,000 net balance due after such offset.

4.    Mutual General Release.  Except as specified in Paragraph 3 and any other executory obligations under the APA, effective as of the Closing, the Parties fully and forever release, acquit and discharge each other, Core's Chief Restructuring Officer, their attorneys, accountants, and other retained professionals from any and all claims, damages, costs, attorney's fees, demands, rights, causes of action, or liabilities which any of them ever had, or now have,  against each other.

5.    Waiver of California Civil Code §1542.  Except as specified in §9.2, the Parties waive any and all rights which each may have under the provisions of California Civil Code §1542, which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

It is understood by the Parties that facts with respect to which the releases are hereby given may turn out to be other than, or different from, the facts now believed by the Parties to be true. Each Party expressly assumes the risk of the facts turning out to be different than that Party believes them to be, and agrees that this Agreement shall in all respects be effective and not subject to termination or rescission because of any such mistaken belief.

The release provided for herein shall not apply to any breach of any provision of this Agreement, including without limitation the warranties stated in §§5-6 hereto and the post-closing covenants stated in §7 hereto.

# SALE MOTION
# <u>EXHIBIT 2</u>

# (SET OFF AGREEMENT)

## SETTLEMENT AGREEMENT, WAIVER OF POST-PETITION CLAIMS, AND MUTUAL GENERAL RELEASE

1.    <u>Post-Petition Core A/R</u>:  Simpson owes Core $129,818.80 with respect to "commissions" owed to Core on account of outsourcing work sent to Simpson after the Petition Date.

2.    <u>Post-Petition Simpson A/R</u>:  Debtor owes Simpson $203,818.80 in post-petition accounts payable in connection with manufacturing orders placed by Core with Simpson after the Petition Date.

3.    <u>Offset, Settlement and Release</u>:  Effective as of the Closing Date and as part of the Purchase Price Consideration, subject to entry of a Court Order approving this settlement agreement pursuant to Bankruptcy Code Section 9019, Simpson and Core will offset the post-petition claims identified in Paragraph 1 and 2, above, and Simpson will waive any and all claims against Debtor with respect to the $74,000[1] net balance due after such offset.

4.    <u>Mutual General Release.</u>  Except as specified in Paragraph 3 and any other executory obligations under the APA, effective as of the Closing, the Parties fully and forever release, acquit and discharge each other, Core's Chief Restructuring Officer, their attorneys, accountants, and other retained professionals from any and all claims, damages, costs, attorney's fees, demands, rights, causes of action, or liabilities which any of them ever had, or now have,  against each other.

5.    <u>Waiver of California Civil Code §1542.</u>  Except as specified in §13.9 of the APA, the Parties waive any and all rights which each may have under the provisions of California Civil Code §1542, which provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

It is understood by the Parties that facts with respect to which the releases are hereby given may turn out to be other than, or different from, the facts now believed by the Parties to be true. Each Party expressly assumes the risk of the facts turning out to be different than that Party believes them to be, and agrees that this Agreement shall in all respects be effective and not subject to termination or rescission because of any such mistaken belief.

---

[1] Shortly before filing this APA, Simpson informed the Debtor that the waived amount may be slightly higher than the $74,000 originally reported but was not able to provide an exact amount. As such, this amount is subject to change.

     6.      The release provided for herein shall not apply to any breach of any provision of this Agreement, including without limitation the warranties stated in ¶¶8-9 of the APA and the post-closing covenants stated in ¶ 10 of the APA.

# SALE MOTION
# EXHIBIT 3

### BID PROCEDURES

**A.**     **Marketed Assets.** Core Supplement Technology, Inc. ("Seller")[2] proposes to sell certain of the assets and properties of Seller, including without limitation, Seller's furniture, fixtures, equipment, inventory, accounts, intangibles, intellectual property rights and goodwill associated with the operation of the Business (collectively, the "Included Assets").

**B.**     **Seller's Retention of Financial Advisor.** Seller has retained Richard Feferman of Corporate Recovery Associates, LLC ("CRA") as its Chief Restructuring Officer. Mr. Feferman will be primarily responsible for marketing the Included Assets; interfacing with prospective bidders regarding qualification of bidders and performance of diligence investigations; conducting a Court-supervised auction ("Auction"); evaluating any bids made; and selecting the "Successful Bidder" (as defined below).

**C.**     **Stalking Horse Bidder.** Simpson Labs ("Stalking Horse Bidder") has provided to Seller an offer to acquire the Included Assets, and Seller has accepted that offer, subject to overbid and the approval of the Court. Seller and the Stalking Horse Bidder have entered into that Asset Purchase Agreement which is attached as Exhibit A hereto ("Stalking Horse Bidder's Purchase Agreement"). The proposed purchase and sale transaction ("Sale Transaction") between Seller and the Stalking Horse Bidder is subject to overbid at the Auction in accordance with the sale procedures (the "Sale Procedures") set forth herein. As set forth in the Stalking Horse Bidder's Purchase Agreement, the Stalking Horse Bidder does not propose to acquire the "Excluded Assets" described therein.

**D.**     **Sale Hearing/Auction.** On March 21, 2018, the Court will conduct a hearing ("Sale

---

[2] All references to Seller mean Core Supplement Technology, Inc. acting by and through its Court-approved Chief Restructuring Officer Richard Feferman, subject to final approval by the Court.

Hearing")[3] at which it will conduct the Auction of the Included Assets, with open bidding by prospective buyers, after which the Court will approve the winning bidder.

      **E.**      **Bidder Pre-Qualification for Auction.** Any person or entity that desires to participate in the Auction must be a qualified bidder ("Qualified Bidder"). In order to become a Qualified Bidder, a bidder must satisfy the following requirements:

      **1.**      **Required Documentation/Evidence of Bidder's Ability to Consummate the Proposed Sale Transaction.** In order for a potential bidder to be deemed a Qualified Bidder to participate in the Auction, the bidder must deliver to CRA (with a copy to Seller's Counsel (defined below)), among other things, the following documents:  (a) an executed confidentiality agreement in the form attached hereto as Exhibit B hereto (Seller reserves the right to require that such form of the confidentiality agreement be executed without any revisions thereto); (b) current financial statements of the bidder, current bank account statements of the bidder or such other form of disclosure regarding the bidder's financial condition acceptable to Seller, providing to Seller ▪ (c) a signed letter setting forth the identity of the bidder, the contact information for the bidder, and full disclosure of any pre-petition or post-petition affiliations that the bidder has or may have with (i) Seller, (ii) any of Seller's affiliates, (iii) any creditor of Seller, (iv) any holder of an equity interest in Seller, or (v) any of Seller's current or former officers, directors or other insiders, and/or their relatives or family members; (d)  signed letter acknowledging receipt of a copy of these Sale Procedures and agreeing to accept and be bound by the provisions contained herein; (e) a signed letter by the bidder that any bid made by the bidder is irrevocable and binding until the closing ("Closing") of the sale of Included Assets; and (f) any other documents reasonably requested by Seller.

---

[3] Unless otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the Sale Procedure Order.

In addition, a potential bidder will qualify to participate in the Auction only if the potential bidder demonstrates its ability to consummate the Sale Transaction contemplated by the terms of the potential bidder's bid and demonstrates its ability to provide, under Section 365 of the Bankruptcy Code, adequate assurance of its future performance under all leases and contracts that the bidder desires to assume from Seller ("Assumed Contracts"). Each bidder must cooperate with Seller with respect to the assumption and assignment of Assumed Contracts to the bidder by providing to Seller information regarding the bidder, including financial information regarding the bidder, that will be sufficient to demonstrate adequate assurance of the bidder's future performance pursuant to the Assumed Contracts. Seller may deliver such information to the non-debtor party to an Assumed Contract, and may file such information with the Court. Seller may decline to recognize a potential bidder as a Qualified Bidder if Seller determines that the potential bidder lacks the ability to consummate timely the proposed Sale Transaction.

Seller may take into account several subjective factors in determining whether a bidder will be deemed to be a Qualified Bidder, as described in paragraph __ below. Seller may approve as many or as few Qualified Bidders as it deems appropriate for an active and productive sale process. Seller may consult with, and may take into account any input provided by, any creditor and any other party-in-interest. By way of example, and not limitation, Seller will require that, in order for a bidder to be deemed a Qualified Bidder, the bidder demonstrate to Seller that the bidder can obtain timely for consummating the proposed Sale Transaction any acquisition and/or working capital financing that the bidder proposes to obtain to fund the proposed Sale Transaction, and the bidder demonstrate to Seller that the bidder will be able to close timely the Sale Transaction.

**2.     Bid Requirements.** Seller will require that all bids be in the form of an Asset Purchase Agreement, comparable to the form of the Stalking Horse Bidder's Purchase Agreement, marked to show all proposed revisions to the Stalking Horse Bidder's Purchase Agreement, including the purchase price and other financial terms proposed by the Qualified Bidder ("Overbidder's Purchase Agreement").

If a bidder submits a bid to acquire an assignment of an executory contract or unexpired lease of Seller, the bidder must either obtain the consent of a counterparty to any such executory contract or unexpired lease ("Counterparty") to such assignment, or obtain a determination by the Court at the Sale Hearing that such executory contract or unexpired lease is assignable to the bidder without the consent of the Counterparty. Seller will authorize a Qualified Bidder, after the execution of an appropriate confidentiality agreement, to engage in discussions with any Counterparty to an executory contract or unexpired lease with Seller, for the purpose of obtaining consent to the assignment of such executory contract or unexpired lease to such bidder.

Seller will require that a Qualified Bidder's bid for Included Assets be signed by the Qualified Bidder and be irrevocable and binding until the Closing of the sale of Included Assets.

Unless otherwise determined by Seller in the exercise of its sole and absolute discretion, Seller will consider a Qualified Bidder's bid <u>only</u> if the bid (a) provides, in the case of any bidder other than the Stalking Horse Bidder, for a purchase price ("Purchase Price") with a value not less than the sum of: (i) $1,554,000 in cash; (ii) the amount of sales taxes that will be assessed in connection with the Transaction; (iii) the amount of any costs required to be paid to cure arrearages under the Assumed Contracts in connection with the assumption and assignment to the Qualified Bidder of any Assumed Contracts; (iv) the value to Seller's Chapter 11 estate of the assumption by the Stalking Horse Bidder of the "Assumed Liabilities," as that term is defined in Article II of the Stalking Horse Bidder's Purchase Agreement; and (v) an initial overbid increment of $100,000; (b) is not conditioned on the Qualified Bidder's obtaining financing; (c) is not conditioned on the outcome of diligence to be performed by the Qualified Bidder after the Bid Deadline (as defined below); (d) states the legal and identifying tax identification number of the Qualified Bidder; (e) does not include any closing conditions or other terms more burdensome to Seller than those set forth in the Stalking Horse Bidder's Purchase Agreement; and (f) does not request a payment of a break-up fee or expense reimbursement ("<u>Qualified Bid</u>").

In evaluating competing bids, Seller generally will favor cash consideration over non-cash consideration, such as the Stalking Horse Bidder's proposed assumption of the Assumed Liabilities. The Assumed Liabilities constitute approximately $853,000 in general unsecured liabilities. At this early stage of Seller's case, the projected recovery by general unsecured creditors is highly uncertain. It is very difficult, if not impossible, therefore, for Seller now to evaluate with any degree of accuracy the benefit to Seller's bankruptcy estate of an assumption of the Assumed Liabilities by the Stalking Horse Bidder. Accordingly, to be conservative, Seller intends to discount substantially the benefit to Seller's estate of the Stalking Horse Bidder's assumption of the Assumed Liabilities versus the benefit of a competing cash bid. In this regard, given Seller's current evaluation of Seller's assets and liabilities, it is Seller's current intention to place only a nominal value on the Stalking Horse Bidder's proposed assumption of the Assumed Liabilities (e.g., a 10% value versus a competing cash bid). Seller reserves the right to change the value that it attributes to the Stalking Horse Bidder's assumption of the Assumed Liabilities, if and when changes in circumstances so dictate. Seller will give to any Qualified Bidders prompt notice of such change in valuation.

3.    <u>Deposit.</u> In order for a bidder to qualify as a Qualified Bidder, the bidder must provide to Seller a deposit in the amount of $100,000 ("<u>Deposit</u>"):

a.    <u>Payment of Deposits.</u> The Deposit must be wired to STEPHEN C. HINZE, ATTORNEY AT LAW, A PC ("<u>Seller's Counsel</u>"). Wire instructions are attached as d "3" hereto.

b.    <u>Refund of Deposits.</u> A Qualified Bidder will be entitled to obtain a refund of its Deposit only if the Qualified Bidder's

Qualified Bid is not selected as the Successful Bid in accordance with the provisions of paragraph N hereof.

**4.** **Notification of Qualifying.** Seller will notify promptly each potential bidder whether Seller will deem the bidder to be a Qualified Bidder or whether Seller has declined to recognize the bidder as a Qualified Bidder. The Stalking Horse Bidder is deemed to be a Qualified Bidder. Seller may provide to any bidder an opportunity to remedy any deficiencies in a bid. Seller's recognizing a bidder as a Qualified Bidder reflects only that the bidder may participate in the Auction, and does not reflect any determination by Seller, or by the Court, that the bidder is capable of consummating the proposed Sale Transaction, or is capable of demonstrating adequate assurance of the bidder's future performance under any Assumed Contracts in accordance with Section 365 of the Bankruptcy Code.  Seller reserves the right to reject any Qualified Bid as unsatisfactory, or to discount a Qualified Bid relative to other bids, based upon any matter pertaining to the business experience or financial condition of the bidder, or based upon any other matter pertaining to the bidder, that Seller believes will impair Seller's ability to obtain from the Court approval of the proposed Sale Transaction with the bidder or otherwise will impair Seller's ability to close timely the proposed Sale Transaction with the bidder.

**F.** **Due Diligence.** Parties interested in purchasing the Included Assets who have satisfied the requirements of paragraph E(1) above may obtain diligence materials, and arrange for inspection of the Included Assets, by contacting Richard Feferman of CRA, as follows:

> 3830 Valley Centre Drive, Suite 705-152,
> San Diego, CA 92130
> E-Mail:  richard@crarecovery.com
> Telephone:  858.792.7473

A bidders' due diligence must be completed no later than the Bid Deadline (defined below).

**G.** **Bid Deadline.** The deadline for all Qualified Bidders to submit a Qualified Bid is 12:00 p.m. (Pacific) on **March 20, 2018** ("Bid Deadline"), the final day of the marketing period

ordered by the Court, subject to Seller's ability to extend the Bid Deadline as it deems appropriate.

A bidder that desires to make a Qualified Bid must deliver, by mail, e-mail or by personal delivery: (1) an executed copy of the Qualified Bid (in the form of the Overbidder's Purchase Agreement), with original signatures; (2) a corresponding redlined version of the Qualified Bid (in the form of the Overbidder's Purchase Agreement), marked to show changes made to the Stalking Horse Bidder's Purchase Agreement; and (3) the materials required to become a Qualified Bidder as set forth in paragraph __ above, as follows:

|  |  |
|---|---|
| To CRA: | Richard Feferman<br>3830 Valley Centre Drive, Suite 705-152,<br>San Diego, CA 92130<br>E-Mail:  richard@crarecovery.com<br>Telephone:  858.792.7473 |
| With a Copy to<br>Seller's Counsel: | Stephen C. Hinze, Esq.<br>STEPHEN C. HINZE, ATTORNEY AT LAW, A PC<br>217 Civic Center Drive, Suite 10<br>Vista, California 92084<br>Telephone: (760) 689-0705<br>E-Mail: sch@schinzelaw.com |
|  | Mette H. Kurth, Attorney at Law<br>Meg Manning, Attorney at Law<br>919 N. Market Street<br>Suite 300<br>Wilmington, DE 19801<br>Fax: (302) 656-8920<br>Email:  mkurth@foxrothschild.com<br>          mmanning@foxrothschild.com |

**H.**     <u>**Seller's Consideration of Bids**.</u> After all Qualified Bids have been received by

Seller, Seller will determine the best Qualified Bid to recommend that the Court approve, including

the bid by the Stalking Horse Bidder. Seller will make this determination based in part upon the

financial and other terms proposed by the Qualified Bidder pursuant to its Qualified Bid, and Seller's

determination regarding the likelihood of Seller's ability to consummate timely a Transaction with

the Qualified Bidder in accordance with the terms and conditions of the Qualified Bidder's Qualified

Bid, taking into account, among other things, the evidence provided by the Qualified Bidder of its

financial ability to close timely the Transaction.

Seller will favor bids that provide, in part, for the following terms: (1) a Purchase Price payable all in cash, rather than one that requires that Seller finance a portion of the Purchase Price; (2) the assignment to the Qualified Bidder of Seller's executory contracts and unexpired leases associated with the operation of Seller's business; (3) Seller's retention of the "Excluded Assets" associated with Seller's business as provided in section __ of the Stalking Horse Bidder's Purchase Agreement; (4) Seller's making covenants, or making representations or warranties, not more burdensome to Seller than those set forth in the Stalking Horse Bidder's Purchase Agreement; (5) conditions to the closing of the Sale Transaction not more burdensome to Seller than those set forth in the Stalking Horse Bidder's Purchase Agreement; (6) an expeditious Closing of the Sale Transaction; and (7) a Sale Transaction that is reasonably certain to be consummated.

Subject to the approval of the Court at the Sale Hearing, Seller may, in the exercise of its business judgment, reject a bid that is not an all-cash bid, or discount any bid that is not an all-cash bid relative to a cash bid, based upon criteria adopted reasonably by Seller (e.g., based upon whether collateral is provided to secure the payment of the non-cash component of the bid; the terms of the non-cash bid; the bidder's ability to demonstrate that the bidder will be able to pay the non-cash portion of its bid; and Seller's need for cash in the administration of its case).

**I.**    **Auction.** The Auction will be conducted in Court on **March 21, 2018**, at:

> Jacob Weinberger United States Courthouse
> 325 West F Street
> San Diego, CA 92101 – 6998
> Department 1
> Room 218

The Auction will be held in person; provided, however, that Seller reserves the right, in the exercise of its sole and absolute discretion, to allow telephonic participation by certain bidders. Qualified Bidders, and representatives of Qualified Bidders, will be entitled to attend and/or participate at the Auction. Seller may elect, in the exercise of its sole and absolute discretion, not to hold an Auction if no overbids, or only overbids deemed unsatisfactory by Seller, are received by Seller. Seller will provide to all Qualified Bidders notice of any cancellation of the Auction.  Seller may seek to sell the Marketed Assets through a single Transaction, or through separate Transactions under separate Purchase Agreements with different purchasers in the event that the combination of such sales is determined by Seller in the exercise of its sole and absolute discretion to obtain the highest or otherwise best bid for the Marketed Assets.

**J.**    **Overbidding at Auction.** Seller will announce at the commencement of the Auction the Qualified Bid that Seller determines to be the most favorable bid for the Marketed Assets. At the Auction, Qualified Bidders, including the Stalking Horse Bidder, will have the opportunity, but not the obligation, to make in an open forum overbids in excess of their initial bids.

The Purchase Price offered by any overbidder must include an initial overbid in an amount not less than $100,000. Subsequent overbids by any bidder (including the Stalking Horse Bidder)

must be in minimum increments of not less than $20,000. Seller reserves the right to amend the bidding terms at any time.

**K.**   **Successful Bid/Court Approval/Sale Order/Good Faith Finding.** After the conclusion of bidding, Seller will select the successful bid for the Included Assets ("Successful Bid") and will request that the Court approve it by entry of an order ("Sale Order") pursuant to which the Court will authorize Seller to consummate the Sale Transaction with the Successful Bidder, in accordance with the terms and conditions of the Successful Bid. The Sale Order will be in a form acceptable to the Successful Bidder, which acceptance cannot be unreasonably withheld. Within one (1) business day after the completion of the Auction, the bidder making the Successful Bid ("Successful Bidder") must complete, execute and deliver to Seller all agreements, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

If the Successful Bidder desires a "good faith" finding under Bankruptcy Code section 363(m), then it will be required to file with the Court a declaration confirming that it has not engaged in any collusion with respect to the bidding or the sale process.

**L.**   **Non-Refundable Deposit of Successful Bidder.** In the event that the Successful Bidder fails, through no fault of Seller, to consummate timely the Sale Transaction approved by the Sale Order, the Successful Bidder will irrevocably forfeit its Deposit without further order of the Court.

**M.**   **Back-Up Bids.** Seller will request that, in connection with the Sale Order, the Court determine the priority, with reference to the favorableness to Seller's Chapter 11 estate, of any Qualified Bid made by one or more Qualified Bidders other than the Successful Bidder ("Back-Up Bidders") and establish the date by which each Back-Up Bidder must consummate a Sale Transaction with Seller (as such Back-Up Bidder's bid may be improved by the terms of any overbid made by such Back-Up Bidder pursuant to the Auction), in the event that the Successful Bidder fails to consummate its Sale Transaction with Seller by the date established by the Court therefor. If a

Successful Bidder fails to close timely a Sale Transaction after approval of the Sale Transaction by the Court, the next highest or otherwise best back-up bid ("Back-Up Bid"), as determined by the Sale Order, instead will be deemed to be the Successful Bid with respect to such Sale Transaction, without any need for further order of the Court. Seller reserves the right to seek all additional damages from, and to exercise all remedies against, a defaulting Successful Bidder or Back-Up Bidder.

**N.**      **Retention and Return of Deposits.** Except as provided expressly to the contrary herein, all Deposits provided to Seller by Qualified Bidders will be retained by Seller, and all Qualified Bids will remain open, notwithstanding the Court's approval of a Sale Transaction with the Successful Bidder, until two (2) business days after the Closing of the Sale Transaction with the Successful Bidder, but in no event later than thirty (30) days after the Sale Hearing without the consent of the Qualified Bidder; provided, however, that Seller will return, within seven (7) days after the Auction, all Deposits provided by a Qualified Bidder if Seller determines, in the exercise of its sole and absolute discretion, that the Qualified Bid of such Qualified Bidder is not viable as a Back-Up Bid.

**O.**      **Closing of the Sale Transaction.** The Closing of a Sale Transaction with the Successful Bidder or with any Back-Up Bidder will occur no later than 7 days following the Court's entry of the Sale Order.

**P.**      **Seller's Discretion with Respect to Sale Procedures.** Seller may amend the Sale Procedures set forth herein, or may adopt additional procedures or rules for the bidding process, that in the discretion of Seller will better promote the goals of the sale process and which will maximize the proceeds generated for the benefit of Seller's estate which are not inconsistent with the provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Local Bankruptcy Rules. Without limiting the generality of the foregoing, Seller may, in the exercise of its

sole and absolute discretion, do any of the following:  (1) extend the Bid Deadline; (2) deem a bidder a Qualified Bidder, notwithstanding the bidder's failure to comply with the terms of the Sale Procedures, or notwithstanding any initial determination by Seller that the bidder is not a Qualified Bidder; (3) adopt criteria that Seller deems appropriate for determining the Successful Bid; (4) amend the terms and conditions of the Stalking Horse Bidder's Purchase Agreement or an Overbidder's Purchase Agreement, including, without limitation, the Purchase Price, conditions to the Closing of the Sale Transaction contemplated thereby, and the timing of the Closing of the Sale Transaction, as Seller and the bidder may mutually agree; (5) sell any Excluded Asset (other than bankruptcy avoidance claims and causes of action); (6) reject any bid that is inadequate or insufficient, or that is not in conformity with the requirements of the Sale Procedures; and (7) allow additional bidding after the Auction, up to the conclusion of the Sale Hearing, as Seller may deem appropriate. Seller's ability to consummate any Sale Transaction, however, will be subject to the approval of the Court.

**Q.    Acceptance of Successful Bid.** Seller's obligation to consummate a sale of the Marketed Assets to the Successful Bidder will arise only when the Court approves the proposed Sale Transaction at the Sale Hearing, and the Successful Bidder tenders in full the Purchase Price for the Included Assets and otherwise complies with its obligations under its Purchase Agreement. Seller reserves the right, in the exercise of its sole and absolute discretion, to decline to sell the Included Assets in the event that (1) the Successful Bidder does not consummate timely its proposed Sale Transaction, and (2) Seller determines that the terms of any overbid are unsatisfactory or are not in the best interest of Seller's creditors.

All funds that a bidder will pay to Seller in connection with the sale process described herein, including, without limitation, all Deposits and the Purchase Price, will be paid to the attorney trust account of Seller's Counsel. Seller's Counsel will hold all such funds and will not release such funds

to Seller or to a bidder, unless either (1) Seller and the bidder provide to Seller's Counsel their mutual written instructions authorizing the release of such funds, or (2) the Court enters an order authorizing the release of such funds after notice and a hearing. All bidders hereby absolve and waive and release fully and completely Seller's Counsel from any liability of any nature whatsoever for any acts taken by Seller's Counsel in accordance with the provisions of this paragraph.

**R.** **Jurisdiction.** Any and all disputes relating to, resulting or arising from the Sale Procedures set forth herein, the Auction, the Sale Hearing, the selection of the Successful Bidder, the disposition of Deposits or the conduct of Seller, will be adjudicated solely by the Court. A bidder's submission of a bid will constitute an express consent by the bidder to the exclusive jurisdiction of the Court to hear and to rule on any action or proceeding with respect to all such matters. Notwithstanding the foregoing, in the event that the Court declines jurisdiction or is otherwise wholly unavailable, then any action or proceeding with respect to such matters may be brought only in the state or federal courts sitting in San Diego County, California.

**FOR FURTHER INFORMATION REGARDING THE MARKETED ASSETS, DUE DILIGENCE OR THE SALE PROCESS, PLEASE CONTACT:**

> Richard Feferman
> 3830 Valley Centre Drive, Suite 705-152,
> San Diego, CA 92130
> E-Mail:  richard@crarecovery.com
> Telephone:  858.792.7473

# PROCEDURES EXHIBIT "3"

# <u>WIRE INSTRUCTIONS</u>

# Exhibit 3

# Wire Instructions

| | |
|---|---|
| Account Name: | Stephen C. Hinze, Attorney At Law, APC |
| | Core Asset Purchase Agreement Trust Account |
| | |
| Account Address: | 217 Civic Center Drive, Suite 10 |
| | Vista CA 92084 |
| | |
| Bank Name: | California Bank and Trust |
| Account No.: | 5790485287 |
| Routing No: | 122232109 |
| SWIFT No. (International Transfers): | ZFNBUS55 |

**All domestic wire transfers must include an additional $14.00 to cover incoming wire service fee charged by the Bank. International wires include an additional $15.00.**

**The last incoming deposit did not include the incoming wire fee. There was a $36.00 to return the money adding up to $50.00. The bank will charge $14.00 to accept the new incoming deposit. Please ensure that the new wire exceeds the amount of the deposit by $64.00 to ensure that sufficient funds are on account to pay the deposit.**